IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:26-cv-_______

(REMOVED STATE COURT CASE NO.: 2026-013631-CA-01)

BH APIRION LLC,

Plaintiff,

v.

ISAAC TOLEDANO,
BH SD-SOUTHPLACE MANAGER LLC,
BH-SD MALL LLC,
BH SOUTHPLACE HOLDINGS LLC, and
BH WORLDWIDE REAL ESTATE HOLDINGS LLC,

Defendants.
_____________________________________________/

# NOTICE OF REMOVAL

Defendants ISAAC TOLEDANO ("**Toledano**"), BH SD-SOUTHLACE MANAGER LLC ("**BH Manager**"), BH-SD MALL LLC ("**BH Member**"), BH SOUTHPLACE HOLDINGS LLC ("**BH Member No. 2**"), and BH WORLDWIDE REAL ESTATE HOLDINGS LLC ("**BH Worldwide**" and, together with Toledano, BH Manager, BH member, and BH Member No. 2, the "**Toledano Parties**"), hereby remove the civil action titled *BH Apirion, LLC v. Toledano, et al.*, Case No. 2026-013631-CA-01, filed July 7, 2026 in the eleventh Judicial Circuit Court, in and for Miami-Dade County, Florida (the "**State Court Action**"). The Toledano Parties remove the State Court Action to this Court pursuant to 28 U.S.C. § 1441. Copies of the process and pleadings served on the Toledano Parties in the State Court Action and all other filings with the State Court, including a copy of the complaint (the "**Complaint**"), are included in **Exhibit "A"** hereto.

1. On July 7, 2026, Plaintiff commenced the State Court Action against the Toledano Parties.

2. On July 30, 2026 Plaintiff served the Toledano Parties in the State Court Action.

3. The claims set forth in the Complaint arise out of a real estate transaction involving Plaintiff and the Toledano Parties. Claims relating to this same real estate transaction are currently being litigated in the civil action titled *Toledano, et al. v. Morad, et al.* pending in the Southern District of Florida Federal Court before judge Moreno, Case No. 1-26-cv-25010-FAM (the "**Related Case**"). Accordingly, the Toledano Parties respectfully submit that this action, upon removal, should be assigned to the Honorable Judge Moreno for purposes of consistency and judicial efficiency. If necessary, the Toledano Parties will file a motion to transfer this action to Judge Moreno.

4. The Toledano Parties timely file this Notice of Removal, in accordance with 28 U.S.C. § 1441(b), as it is filed within 30 days of when Plaintiff served the Toledano parties with a copy of the Complaint.

5. The Toledano Parties have not yet responded to the allegations in Plaintiff's Complaint.

6. Removal is proper because there is complete diversity between the parties. 28 U.S.C. § 1332(a); 28 U.S.C. § 1441(b).

7. As made clear by Plaintiff BH APIRION, LLC in a the Notice of Removal filed in the Related Case, Plaintiff BH APIRION, LLC is a Delaware limited liability company and its sole member, Yaakov Morad, is a citizen and resident of Israel. The Notice of Removal filed in the Related Cased (without exhibits) is attached as **Exhibit "B."** Accordingly, Plaintiff BH APIRION, LLC is a citizen of Israel.

8. Defendant Isaac Toledano is an individual and a citizen of the United Sates and a resident of Florida.

9. Defendant BH WORLDWIDE REAL ESTATE HOLDINGS, LLC is a Delaware limited liability company. BH WORLDWIDE REAL ESTATE HOLDINGS, LLC is owned by three individuals, all of whom are United States citizens and residents of Florida. BH WORLDWIDE REAL ESTATE HOLDINGS, LLC is therefore a citizen of Florida for purposes of diversity jurisdiction.

10. Defendant BH-SD MALL, LLC is wholly owned by BH WORLDWIDE REAL ESTATE HOLDINGS, LLC and is therefore a citizen of Florida for purposes of diversity jurisdiction.

11. Defendant BH SOUTHPLACE HOLDINGS, LLC is wholly owned by BH WORLDWIDE REAL ESTATE HOLDINGS, LLC and is therefore a citizen of Florida for purposes of diversity jurisdiction.

12. Defendant BH SD-SOUTHPLACE MANAGER LLC is wholly owned by BH WORLDWIDE REAL ESTATE HOLDINGS, LLC and is therefore a citizen of Florida for purposes of diversity jurisdiction.

13. Plaintiff BH APIRION, LLC – the sole plaintiff in this lawsuit – is a foreign citizen. All of the Defendants in this lawsuit are citizens of Florida. Accordingly, there is complete diversity between the parties.

14. Based on the damages alleged in Plaintiff's Complaint – which includes more than $500,000 in allegedly wrongful capital calls – it is facially apparent that the amount in controversy exceeds $75,000.

15. Copies of all pleadings, process, orders, and other filings in the State Court Action are attached to this notice in Exhibit A, as required by 28 U.S.C. § 1446(a).

16. Removing Defendants will promptly file a copy of this Notice of Removal with the clerk of the Circuit Court, Eleventh Judicial Circuit, in and for Miami-Dade County, Forida, where the State Court Action has been pending. *See* 28 U.S.C. §§ 1446(a), (d).

17. Based on the foregoing, the Toledano Parties hereby respectfully remove the State Court Action to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1332 and 1441.

Respectfully submitted,

**KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.**
*Counsel for Defendants*
201 South Biscayne Boulevard
Suite 1800
Miami, Florida 33131
Telephone: (305) 379-9000
Facsimile: (305) 379-3428

By: s/ *Steve I. Silverman*
**Alan J. Kluger**
Fla. Bar No. 200379
akluger@KlugerKaplan.com
**Steve I. Silverman**
Fla. Bar No. 516831
ssilverman@KlugerKaplan.com
**Jonathan Korin**
Fla. Bar. No. 93914
jkorin@KlugerKaplan.com

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished to all counsel of record via the Florida E-Filing portal on this August 10, 2026.

By: */s/ Steve I. Silverman*
Steve I. Silverman, Esq.

# EXHIBIT "A"

Filing # 251856370 E-Filed 07/06/2026 06:24:23 PM
NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

---

**I. CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

BH APIRION LLC
Plaintiff

Case # ________________
Judge ________________

vs.
ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, BH WORLDWIDE REAL ESTATE HOLDINGS LLC
Defendant

---

**II. AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

**III. TYPE OF CASE** (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
  ☐ Business governance
  ☐ Business torts
  ☐ Environmental/Toxic tort
  ☐ Third party indemnification
  ☐ Construction defect
  ☐ Mass tort
  ☐ Negligent security
  ☐ Nursing home negligence
  ☐ Premises liability—commercial
  ☐ Premises liability—residential
☐ Products liability
☒ Real Property/Mortgage foreclosure
  ☐ Commercial foreclosure
  ☐ Homestead residential foreclosure
  ☐ Non-homestead residential foreclosure
  ☒ Other real property actions

☐Professional malpractice
  ☐ Malpractice—business
  ☐ Malpractice—medical
  ☐ Malpractice—other professional
☐ Other
  ☐ Antitrust/Trade regulation
  ☐ Business transactions
  ☐ Constitutional challenge—statute or ordinance
  ☐ Constitutional challenge—proposed amendment
  ☐ Corporate trusts
  ☐ Discrimination—employment or other
  ☐ Insurance claims
  ☐ Intellectual property
  ☐ Libel/Slander
  ☐ Shareholder derivative action
  ☐ Securities litigation
  ☐ Trade secrets
  ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

☐ Replevins
☐ Evictions
☐ Residential Evictions
☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order. Yes ☐ No ☒

**IV. REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V. NUMBER OF CAUSES OF ACTION:** [ ]
(Specify)

2

**VI. IS THIS CASE A CLASS ACTION LAWSUIT?**
☐ yes
☒ no

**VII. HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☐ no
☒ yes If "yes," list all related cases by name, case number, and court.
Apirion Real Estate LLC, et al. v. Isaac Toledano, et al., No. 2026-012715-CA-01, 11th Jud. Cir.; Isaac Toledano, et al. v. Yaakov Morad, et al., No. 2026-012788-CA-01, 11th Jud. Cir.

**VIII. IS JURY TRIAL DEMANDED IN COMPLAINT?**
☐ yes
☒ no

**IX. DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
☐ yes
☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Brian P. Miller — Attorney or party
Fla. Bar # 980633 — (Bar # if attorney)

Brian P. Miller
(type or print name)

07/06/2026
Date

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Filing # 251856370 E-Filed 07/06/2026 06:24:23 PM
NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. ______________

BH APIRION LLC,

Plaintiff,

v.

ISAAC TOLEDANO,
BH SD-SOUTHPLACE MANAGER LLC,
BH-SD MALL LLC,
BH SOUTHPLACE HOLDINGS LLC, and
BH WORLDWIDE REAL ESTATE
HOLDINGS LLC,

Defendants.
_____________________________________/

**COMPLAINT**

Plaintiff BH Apirion LLC ("Plaintiff" or "Apirion"), by its attorneys, brings this action seeking damages against defendants Isaac Toledano ("Toledano"), BH SD-Southplace Manager LLC ("BH Manager"), BH-SD Mall LLC ("BH Member"), BH Southplace Holdings LLC ("BH Member No. 2"), and BH Worldwide Real Estate Holdings LLC ("BH Worldwide" and, together with Toledano, BH Manager, BH Member, and BH Member No. 2, "Defendants"). Plaintiff alleges as follows:

**NATURE OF THE ACTION**

1. This case seeks redress for Defendants' material breaches of their obligations under a Funding Agreement dated as of February 7, 2024 (the "Funding Agreement"), attached hereto as Exhibit "A." In the Funding Agreement, Apirion agreed to fund 90% of the money necessary for Toledano to satisfy his capital calls on two specific joint ventures to redevelop the Southland Mall

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

site in south Miami-Dade County. Toledano utilized the Funding Agreement and Apirion's money to hide from his joint venture partners that he was not in fact funding his entire share of the investment in the project, in violation of his agreements with his joint venture partners for the mall redevelopment project. This also stands in stark contrast to Toledano's public (but false) persona that he is a successful real estate developer who invests his own money into deals. The Funding Agreement provided that Apirion could convert its loan to BH Manager into equity, but Defendants have refused to effectuate that conversion. The reason why is now apparent; Toledano has stated that he was willing to approach his joint venture partners about Apirion converting to equity, but "I have to do it in such a way that I do not risk Electra taking me out of the deal for violation of the JV agreement I have with them." It is now clear that Toledano engaged in a consistent pattern of misrepresentations, concealment, and bad-faith conduct with regard to Apirion, as outlined in detail herein. The Southland Mall project is over budget and behind schedule, Apirion has invested over $13.5 million with nothing to show for it, Toledano refuses to provide full information about the project, has demanded (and continues to demand) money for other activities unrelated to the joint venture, and refuses to act in good faith to effectuate Apirion's conversion to equity. This Court must hold Defendants responsible for their conduct.

## PARTIES AND RELEVANT ENTITIES

2. Plaintiff Apirion is a Delaware limited liability company. Apirion is a party to the Funding Agreement.

3. Defendant Toledano is a citizen of Florida and a resident of Miami-Dade County, Florida. Toledano personally guaranteed all obligations under the Funding Agreement.

4. Defendant BH Manager is a Delaware limited liability company 100% indirectly owned and controlled by Toledano. BH Manager is a party to the Funding Agreement.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

5. Defendant BH Member is a Delaware limited liability company 100% indirectly owned and controlled by Toledano. BH Member is a party to the Funding Agreement.

6. Defendant BH Member No. 2 is a Delaware limited liability company 100% indirectly owned and controlled by Toledano. BH Member No. 2 is a party to the Funding Agreement.

7. Defendant BH Worldwide is a Delaware limited liability company that is 100% owned and controlled by Toledano. BH Worldwide is a party to the Funding Agreement.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction over this action that seeks in excess of $50,000.

9. This Court has personal jurisdiction over all Defendants pursuant to Fla. Stat. § 48.193. As detailed herein, all Defendants operated, conducted, engaged in, or carried on a business or business venture in the State of Florida, caused injuries to Apirion within the State of Florida, and otherwise purposefully availed themselves of conducting activities in the State of Florida.

10. Venue is proper in this Court under Fla. Stat. § 47.011.

11. Venue also is proper in this Court pursuant to Section 14 of the Funding Agreement.

## FACTUAL ALLEGATIONS

### A. Toledano and BH Group.

12. Toledano is a 51-year-old individual based in Aventura, Florida.

13. Toledano pitches himself as a "highly accomplished real estate developer and astute businessman."

14. Toledano operates through what he brands as "BH Group." According to its website, BH Group claims to have completed over 1,100 residential units with another 10,000+

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"in-progress," 2 million square feet of commercial properties "owned and managed," and 30+ "properties in our portfolio."

15. In reality, Toledano plays a bit role in his development "projects" and typically latches himself on to other more successful real estate developers or investors such as Apirion in order to pretend to be more successful and richer than he actually is.

16. For example, when pressed for backup to support BH Group's representation that it had 10,000 residential units in development, Toledano only could scrape together evidence of only approximately 500 housing units.

17. Toledano also represented to Apirion that other projects he supposedly had completed generated internal rates of return (IRR) that were unusually high compared to comparable real estate projects. All of these representations were designed to paint an exaggerated picture of Toledano as a successful real estate investor.

18. The Southplace City Center is pitched as one of Toledano's "projects." This project is a redevelopment of the existing Southland Mall located in southern Miami-Dade County. According to the BH Group website, Southplace City Center is an "ambitious redevelopment [which] is a joint venture with Electra America, leveraging our expertise to transform this expansive property into a vibrant mixed-use community." This project is advertised on BH Group's website to include 5,000 residential units and 500,000 square feet of retail space. However, the first "phase" consists only of 350 apartments and 24,000 square feet of grocery space, to be completed in 2028.

19. In reality, the Southplace City Center project is not being developed by BH Group, but rather is a project developed by the U.S. arm of a successful Israeli real estate developer called Electra, in which Toledano plays a minor role.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**B. Joint Venture No. 1.**

20. Toledano and Electra entered into two separate joint venture agreements related to the Southplace project.

21. Toledano and Electra entered into the first joint venture as of February 23, 2022.

22. The first joint venture is memorialized through a limited liability company called Electra America SD Mall JV LLC ("Joint Venture No. 1"). Joint Venture No. 1 has two members. The Electra member is called Electra America SD Mall Management LLC, and owns 75% of the capital in Joint Venture No. 1. This Electra member also serves as the sole "Manager" under the LLC agreement. Toledano's member is BH-SD Mall LLC, referred to herein as Defendant BH Member, and owns 25% of the capital in Joint Venture No. 1.

23. Joint Venture No. 1 owns 100% of BH South Dixie SL Mall LLC, which is the fee simple title holder to the largest parcel comprising part of the current mall:




24. Joint Venture No. 1 also owns 100% of BH South Dixie Dev LLC, which is the fee simple title holder to another parcel comprising part of the current mall:

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS




25. And Joint Venture No. 1 also owns 100% of BH Retail South Dixie LLC, which is the fee simple title holder to another parcel comprising part of the current mall:




26. The following flow chart from the LLC agreement for Joint Venture No. 1 further describes the ownership structure of Joint Venture No. 1:

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS




27. As noted in the Funding Agreement, Toledano subsequently transferred 100% of his interest in BH Worldwide Real Estate Holdings LLC (shown above on the ownership chart) to Defendant BH Manager.

28. Despite the fact that BH Member owns 25% of the capital in Joint Venture No. 1, BH Member only is required to put up 60% of the capital that otherwise would be required to fund that interest. Electra agreed to lend BH Member the remaining capital. This has the ultimate effect that BH Member is required to put up only 15% of the capital called from both members of Joint Venture No. 1.

29. The LLC Agreement for Joint Venture No. 1 contains an express representation and obligation to Electra by BH Member that all of BH Member's capital contributions will be satisfied with Toledano's "personal funds":

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

> (k) At all times during the existence of the Company, Toledano shall continuously (i) maintain exclusive Control, exercisable without the consent or approval of any other Person, over the business and affairs of BH Member, and (ii) cause all of BH Member's Capital Contributions required under this Agreement to be satisfied with Toledano's personal funds.
>
> 48

30. But Toledano violated that representation. As noted in the Funding Agreement, 90% of the money used to fund BH Member actually came from Plaintiff Apirion.

31. To summarize, Defendant BH Member owns 25% of the capital of Joint Venture No. 1 and is required to fund 15% of the capital called for the business, and BH Member is turn owned 100% by BH Manager, which is 100% owned by Toledano, but Toledano has falsely represented to Electra that Toledano is the sole source of funding for the business.

**C. Joint Venture No. 2.**

32. Toledano and Electra entered into the second joint venture as of September 8, 2022.

33. The second joint venture is memorialized through a limited liability company called Electra America Southland 2 JV LLC ("Joint Venture No. 2"). Joint Venture No. 2 has two members. The Electra member is called Electra America Southland 2 Management LLC, and owns 75% of the capital interest in Joint Venture No. 2. This Electra member also serves as the sole "Manager" under the LLC agreement. Toledano's member is BH Southplace Holdings LLC, and owns 25% of the capital interest in Joint Venture No. 2.

34. Joint Venture No. 1 and Joint Venture No. 2 are referred to collectively herein as the "Joint Ventures."

35. Joint Venture No. 2 owns 100% of BH Electra Southland Part 2 LLC, which is the fee simple title holder to another parcel comprising part of the current mall:

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS




36. This parcel is also sometimes referred to as the "Sears" property.

37. The following flow chart from the LLC agreement for Joint Venture No. 2 further describes the ownership structure of Joint Venture No. 2:




38. As noted above and in the Funding Agreement, Toledano subsequently transferred 100% of his interest in BH Worldwide Real Estate Holdings LLC (shown above on the ownership chart) to Defendant BH Manager.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

39. Despite the fact that BH Member No. 2 owns 25% of the capital in Joint Venture No. 2, BH Member No. 2 only is required to put up 40% of the capital that otherwise would be required to fund that interest. Electra agreed to lend BH Member No. 2 the remaining capital. This has the ultimate effect that BH Member No. 2 is required to put up only 10% of the capital called from both members of Joint Venture No. 2.

40. The LLC Agreement for Joint Venture No. 2 also contains an express representation and obligation to Electra by BH Member No. 2 that all of BH Member No. 2's capital contributions will be satisfied with Toledano's "personal funds":

> (k) At all times during the existence of the Company, Toledano shall continuously (i) maintain exclusive Control, exercisable without the consent or approval of any other Person, over the business and affairs of BH Member, and (ii) cause all of BH Member's Capital Contributions required under this Agreement to be satisfied with Toledano's personal funds.

41. But Toledano also violated that representation. As noted in the Funding Agreement, 90% of the money used to fund BH Member No. 2 actually came from Plaintiff Apirion.

42. To summarize, Defendant BH Member No. 2 owns 25% of the capital of Joint Venture No. 2 and is required to fund 10% of the capital called for the business, and BH Member No. 2 is turn owned 100% by BH Manager, which is 100% owned by Toledano, but Toledano has falsely represented to Electra that Toledano is the sole source of funding for the business.

**D. The Funding Agreement.**

43. After Toledano entered into the joint ventures with Electra in 2022, he began to look for a source of funding to satisfy his capital calls, knowing that he lacked the resources, assets, and liquidity to be able to pay those monies himself – even with the reduced funding obligation Toledano had as a result of Electra already agreeing to lend him nearly half of the capital that he otherwise would need to put up.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

44. This led Toledano to approach Apirion to invest.

45. Apirion is owned by an Israeli citizen who owns and operates a large facilities management company in Israel. Apirion's principal came to know Toledano through Toledano's son-in-law, who also is the brother of Apirion's principal. Toledano represented himself as a mentor to the son-in-law and as a family member in seeking investments from Apirion on an informal basis. Toledano told the son-in-law things such as "I will make you very successful," "you will succeed with me," and "I will teach you real estate." Toledano told Apirion's principal that "we are family" and that Toledano was looking out for Apirion's interests. These were not arms' length discussions. Toledano's representations caused Apirion to invest with Toledano even in the absence of any formal agreement.

46. Prior to Apirion agreeing to invest in the Southplace City Center project, Toledano provided Apirion with a slide deck pitching a "premier investment opportunity: 50% stake in South Place City Center."

47. That slide deck represented that the project would have 5,000 residential units, a 150-key hotel, and 701,000 square feet of retail space "across 21 distinct blocks." The slide deck also represented that:

> Investors will receive an 8% preferred return annually from the GP position in the mall investment, along with first right of refusal on future land unit investments at cost price, without promotion. The development model is divided into 10 blocks, each with detailed financial projections, ensuring transparency and alignment between BH Group, Electra, and the investor.

48. Toledano's slide deck also made clear (contrary to Toledano's later position after he roped Apirion into making the investment) there would be "transparency and alignment between BH Group, Electra, and the investor."

49. On February 14, 2022, Toledano sent an email to Apirion soliciting an investment in the Southplace City Center project. Toledano imposed a tight 48-hour deadline for a response. In that email, Toledano offered closing within 45 days, an 8% preferred return, an additional 50%

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

of all profits earned by BH Manager from the Joint Ventures, and return of Apirion's invested capital within 12 to 24 months.

50. Apirion agreed to start funding Defendants' capital calls for Joint Venture No. 1 based on these representations and the promise of an 8% preferred return. Apirion started to do so in 2022, even in the absence of a written agreement, given the family relationship. Apirion understood that the total to be invested was approximately $7 million, to which Toledano responded in a text message in November 2022, "My word is my word, always remember."

51. However, the amount of capital calls demanded from Apirion later ballooned to over $13.5 million. This stands in contrast to Toledano's prior representations that the investment would be approximately $7 million. Toledano continued to demand more and more in capital calls, without Apirion ever having transparency into the project, a documented equity stake, or any collateral protections.

52. And Apirion has not been paid back one dime as return on the investment, over four years later. In fact, Toledano just continues to ask Apirion for more and more money. On information and belief, Toledano only has invested approximately $1 million of his own money as equity into the Joint Ventures, whereas Apirion has contributed over $13.5 million.

53. To make matters even worse, Toledano took a $489,250 "fee" from the closing of the first real estate purchase related to the Southplace City Center. Toledano did not share one penny of that payment with Apirion, despite the fact that Apirion is the true source of funding for BH Manager. Toledano also used Apirion's money to pay approximately $56,000 in expenses unrelated to the Joint Ventures, and to pay a $25,000 "bonus" to one of Toledano's employees.

54. Later in June 2022, Toledano approached Apirion regarding Joint Venture No. 2, and convinced Apirion to transfer $2 million as a further "loan" to finance Toledano's commitment

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

to the purchase price for the Sears parcel in Joint Venture No. 2. Toledano threatened Apirion that if it did not make this investment – described as the "cherry on the top" – Apirion would lose part of its investment in Joint Venture No. 1. Toledano also advised Apirion that the Sears acquisition was the "last missing piece of the puzzle!!!"

55. Toledano also misrepresented the terms of the Sears parcel investment to Apirion. Toledano calculated Apirion's investment as 90 percent of 15% of the joint venture equity investment, which was the case as to the original parcel. But BH's obligation as to the Sears parcel was only 10% of the joint venture equity investment. This misrepresentation resulted in Apirion funding approximately $140,000 more than contractually required. When Apirion pointed this out, Toledano berated Apirion's principal and only after being shown the relevant contractual language did Toledano reluctantly agree to refund the overpayment, and even then blamed it on Electra. On information and belief, Toledano knew what he was doing, and always hoped that he could get away with this mistake.

56. When Toledano later sought to memorialize Apirion's investments into a written document, he proposed the Funding Agreement, which was notably different from the terms agreed to previously and Toledano's (apparently worthless) "word." But by then it was too late because Apirion had invested well over $10 million into the project based on Toledano's prior representations about the business terms, and Toledano therefore had undue leverage as he insisted that Apirion agree to radically different terms in the Funding Agreement. Toledano attempted at every turn to take advantage of Apirion's limited English capabilities and unfamiliarity with U.S. real estate investment partnership documents. Toledano also took advantage of marital strife between his son-in-law and daughter in order to try to drive a wedge between Apirion's principal and the principal's brother.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

57. Instead, the Funding Agreement called Apirion's investment a "loan" to BH Manager, eliminated the 8% preferred return, replaced it with interest on the "loan" that would accrue (rather than be paid) – at the bare minimum permitted under IRS regulations – and provided that Toledano would be entitled to retain all (unspecified) "fees" paid by the Joint Ventures without using any of that money to repay Apirion for financing the vast majority of Toledano's financial contribution to the Joint Ventures.

58. The Funding Agreement was executed in February 2024, well after many of the investments in the Joint Ventures had already been funded by Apirion, as evidenced by Schedule C-1 to the Funding Agreement.

**E. Breaches of the Funding Agreement.**

59. Critically, the Funding Agreement provides a mechanism for Apirion to convert the "loan" into equity in BH Member and BH Member No. 2. This conversion is one of the most essential provisions of the agreement, and appears in Part 3 of the Funding Agreement, captioned "Purpose of Funding Agreement." Toledano understood the critical importance of this term, and represented that the Funding Agreement structure was temporary and tax-driven and that Apirion would be able to convert its investment into direct equity.

60. Section 3(d) of the Funding Agreement provides as follows:

NOT AN OFFICIAL COPY PUBLIC ACCESS NOT AN OFFICIAL COPY PUBLIC ACCESS

> (d) Apirion shall have the right at any time, subject to BH Member's consent, and subject to Manager first obtaining the consent of the Electra Member (as that term is defined in the Joint Venture Agreements), and, if applicable of any other parties whose consent may be required such as any lender to the Joint Ventures, to cause the Apirion Loan to convert to capital contributions to the Company (more specifically, Apirion's Funding relative to SD Mall shall be capital contributions to SD Mall, and its Funding relative to Southland shall be capital contributions to Southland) on a retrospective basis and also on a going forward basis, in which event and at which time Apirion shall be a Member in the Company. To be clear, the Apirion Loan would convert to 90% of the overall capital contributions to the Company. More specifically, Apirion shall send to Manager and BH Member a request that BH Member consent to such conversion. BH Member shall provide its response within 10 days thereafter (If BH Member does not respond within such time period then Apirion shall send a second notice to Manager and BH Member, referring to the prior notice and stating that pursuant to this Section 3(d) a response from BH Member is due within 5 days of Manager receiving such second notice, and BH Member shall have 5 days following such reminder notice to respond). It is hereby agreed and clarified that in case the BH Member does not respond within such additional 5 days then it will be considered as if the BH Member has given its written consent to the said conversion. All notices to Manager and BH Member shall be sent simultaneously, by email and also by reputable overnight delivery service (or at least two business day delivery service given the distance involved) to BH Member's counsel, Eric Everett, Esq., DarrowEverett LLP, 50 Congress Street, Suite 1041, Boston, MA 02109, email: eeverett@darroweverett.com, and also with an email to CRENotices@darroweverett.com. If BH Member consents in writing then within 7 days thereafter the Manager will seek to obtain Electra Member's consent, and, if applicable, the other consents described above, and will present to Apirion references for said request(s) and for Electra Member's response, and, if applicable, for the response of the other applicable parties whose consent may be required.
>
> Manager shall use good faith efforts to obtain the necessary consents (beginning with the consent of Electra Member) to such requested conversion to equity, but shall not be required to give economic or other concessions to Electra Member, or any other necessary consent parties, in order do so.

61. This provision applies duties on all Defendants. BH Manager is expressly obligated to work toward obtaining all consents. BH Member and BH Member No. 2 are required to consider their consent to conversion. Toledano personally guaranteed the performance of all obligations of the other Defendants under the Funding Agreement.

62. In 2023, before the Funding Agreement was executed, and when Apirion as funding 90% of Toledano's contributions based on Toledano's prior representations, Toledano claimed to make a half-hearted effort to try to obtain Electra's consent to bringing in Apirion as a full-fledged member. He sent his son-in-law a copy of a text message to Amir at Electra in Israel, which stated as follows (translated from Hebrew):

> Hi Amir, Following our telephone conversation, I hereby raise in writing the request according to which I wish to carry out a transfer of half of my rights in the

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

> company BH-SD Mall LLC to a member of my family Mr. Netanel Morad (married to my daughter) who will be a partner in the project companies. Netanel works with me and the matter is done for reasons personal – family and also due to various taxation aspects. Besides that, no change will apply in the agreements, and all that is stated there will apply also to him accordingly. Likewise, no change will apply also in the conduct in relation to the project. It is clarified for the removal of any doubt, that no change will apply in the ownership of the company BH Worldwide Real Estate Holdings LLC which was and will remain under the control of the Toledano family. In light of the above, and with the aim to advance the matter, I would thank and greatly appreciate the receipt of your consent to the above.

63. No such transfer occurred then.

64. It also is noteworthy that Toledano did not disclose to Electra in that request that Apirion actually had been funding 90% of Toledano's required contributions to the Joint Ventures, in violation of the Joint Ventures' LLC agreements.

65. In reality, it appears that Toledano's offers to "help" his family member actually were Toledano trying to look out for his own financial interests in trying to cash out his personal stake in the Southland Mall project.

66. Also, before the Funding Agreement was executed, Toledano falsely represented to Apirion that he was permitted to sell 49% of his interest without Electra's approval. Toledano made this representation in order to induce Apirion to invest in the project even before the formal Funding Agreement was executed.

67. In 2024, after the Funding Agreement had been executed, Apirion and Toledano discussed attempting to find a buyer for the Southplace City Center project, and Apirion worked on attempting to do so. This came about because Apirion complained about the delays in the timeline represented by Toledano regarding when Apirion would be repaid its investment. Toledano recognized that he had represented that Apirion already would be repaid at that point, and therefore suggested that the two parties attempt to sell 50% of the equity in the project as a result. Toledano participated in these efforts, and assisted with sale calculations and had potential

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

purchasers sign the BH non-disclosure agreement form. The sale effort was not done by Apirion acting "off the reservation."

68. However, consistent with his other misleading practices, Toledano repeatedly engaged in behavior to hide the existence of these discussions from Electra, his co-joint venturer. And Apirion began to discover that Toledano was not very familiar with the project, despite his representations that it was his project, and had mismanaged the project as a result. For example, Toledano arranged a meeting with Electra in order for Electra to provide detailed information to Apirion about the project. From Apirion's perspective, the purpose of this meeting was to obtain information in order to evaluate a potential sale, but Toledano misrepresented to Electra that the meeting was for his son-in-law to "start" working on the project. Toledano also asked Apirion to keep the sale efforts "quiet." Then, after Electra became aware of the process, Toledano shifted the blame away from himself and scolded Apirion for allegedly not keeping the efforts "quiet" enough.

69. Toledano claimed that Apirion could not meet freely with Electra because Toledano's son-in-law allegedly was too "young" and "inexperienced" in real estate investment. Yet when Apirion complains about Toledano misleading them, Toledano's tune suddenly changes and he describes Apirion as sophisticated and experienced investors.

70. The sale exploration efforts ultimately were unsuccessful.

71. In retrospect, all of this behavior is not surprising, because Toledano actually has nothing to do with the actual management of the real estate development project being done by Electra. These events also demonstrate a consistent pattern of Toledano attempting to "divide and conquer" by preventing Apirion from interacting directly with Electra. To Apirion, Toledano

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

represented that Apirion was a financial partner; to Electra, it appears that Toledano presented a much narrower and different story and failed to disclose Apirion's true role.

72. During this time period, Toledano also called capital from Apirion for other development activities at Southplace City Center unrelated to Joint Venture No. 1 and Joint Venture No. 2. Apirion had lost trust in Toledano and began to question all capital calls more extensively and demand updates on the development project which was overdue at that time. Even so, Toledano refused to provide all information about the transactions; for example, Toledano would not provide all wire confirmations to document that all Apirion payments were used for their intended purposes.

73. BH Manager called "capital" from Apirion for other "blocks" that Electra was trying to purchase at the project, which were not owned by Joint Venture No. 1 or Joint Venture No. 2. The total dollar amount of these "capital calls" for other matters was over $500,000. These capital calls also were inconsistent with Toledano's 2022 representation that the Sears purchase was the "last missing piece of the puzzle!!!," thereby confirming they are not part of the Funding Agreement for the Joint Ventures.

74. The parties' correspondence confirms that investments in other parcels was outside of Joint Venture No. 1.

75. When Apirion refused to fund other development efforts unrelated to Joint Venture No. 1 and Joint Venture No. 2 because these were not part of the deal agreed-to, Toledano's response was to threaten Apirion with default, and to take the ridiculous position that the "purpose" of the LLC is so broad that it could be used for real estate development and other business purposes anywhere in Florida.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

76. Toledano also repeatedly represented to Apirion that there were efforts to sell the Southplace City Center project and pay off Apirion. Of course, none of these ever came to fruition, and instead Toledano kept asking Apirion for more and more money.

77. Toledano also failed to provide Apirion with all information and updates on the project. Toledano steadfastly refused to ever allow Apirion to be listed as a direct recipient of material updates and other communications about the Joint Ventures. This behavior also is consistent with Toledano's "divide and conquer" approach described above.

78. After the failed sales effort and Toledano's other conduct, Apirion formally asked in 2024 to convert its "loan" to equity in BH Member and BH Member No. 2, pursuant to Section 3(d) of the Funding Agreement.

79. Toledano reluctantly agreed to approach Electra pursuant to the Funding Agreement, but consistently stonewalled, tried to talk Apirion out of it, lacked candor with Electra, and thereby breached BH Manager's obligations under the Funding Agreement to "use good faith efforts to obtain the necessary consents (beginning with the consent of Electra Member) to such requested conversion to equity."

80. For example, in December 2024, Toledano wrote to Apirion and stated that he was willing to approach Electra about Apirion converting to equity, but "I have to do it in such a way that I do not risk Electra taking me out of the deal for violation of the JV agreement I have with them."

81. This admission of wrongdoing by Toledano was telling and contradicts Defendants' express representations in the Funding Agreement that "the Company [BH Member and BH Member No. 2] is permitted to obtain financing to fund its portion of the Capital Contributions to the Joint Venture."

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

82. Finally, in August 2025, after Apirion was forced to engage counsel to protect its interests. Toledano finally made a half-hearted effort to obtain Electra's consent. Apirion has no knowledge what telephone conversations took place, but on information and belief Toledano spoke with Amir Yaniv from Electra and failed to disclose all of the details of Apirion's role during such conversations.

83. Toledano did send an email from his phone on August 7, 2025 to Electra to follow up on his telephone conversations regarding Apirion's conversion to equity:

**From:** Isaac Toledano <Isaac@bhinvestments.us>
**Sent:** Thursday, August 7, 2025 4:58 PM
**To:** Amir Yaniv <amiry@ere.co.il>
**Subject:** Southland mall project

Amir,
per our discussion the other day, my son in law Netanel morad and his brother Yaakov has a loan/funding arrangement with me. It is only a loan/funding arrangement, NOT an equity interest. just fyi Yaakov Morad is experience in sophisticated US commercial real estate investing. The name of the Delaware entity is BH Apirion LLC ("Apirion").

The purpose of this email is to ask if Electra would consent to Aprion having an *equity* interest in each of the two BH joint venture member entities (namely, BH-SD Mall, LLC as to the Mall joint venture, and BH Southplace Holdings, LLC as to the Southplace joint venture). Under the existing operating agreements for those BH entities I am the Manager, and I would remain the Manager.

My request is that Electra waive the Transfer requirements to allow this particular (indirect) Transfer. Once Electra approve this request I will also ask the lender TYKO for there approval.

If this concept as I have outlined it meets with Electra's preliminary approval, then I can send KYC information, etc.

Please let me know.

Isaac Toledano

Please excuse the short replies and typos as this email was sent from my iPhone.

84. Toledano's email to Electra did not explain the true role that Apirion has played, the fact that Apirion is the party that actually had funded the vast majority of Toledano's equity

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

contributions to the Joint Ventures, Toledano's prior promises to Apirion that they would be converted to equity, or the terms of the Funding Agreement.

85. Electra responded a short time later the same day, purporting to reject the request:

**From:** Amir Yaniv <amiry@ere.co.il>
**Date:** August 7, 2025 at 12:53:30 EDT
**To:** Isaac Toledano <Isaac@bhinvestments.us>
**Subject: RE: Southland mall project**

Dear Isaac,

While we greatly appreciate you as a partner and a friend, unfortunately, Electra Real Estate won't be able to accept your request below.
We made the Southland deal with you. We are not in a position to accept additional partners into our JV.
We hope you understand.

86. By definition, because Toledano approached Electra to obtain its consent, the conditions precedent in Section 3(d) to obtain the consent of both BH Member and BH Member No. 2 were satisfied.

87. Toledano took no further steps to obtain Electra's consent, despite Apirion's repeated pre-suit efforts during 2025 and 2026 – as well as Apirion's numerous proposed other solutions – to get Toledano to live up to the agreement or restructure the parties' relationship. Thus necessitating this lawsuit.

**<u>COUNT I – BREACH OF CONTRACT</u>**

88. Plaintiff repeats and realleges the allegations contained in paragraphs 1 – 87 above as if set forth fully herein.

89. The Funding Agreement is a valid and enforceable contract between Apirion and Defendants.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

90. Toledano personally guaranteed all obligations of BH Manager, BH Member, and BH Member No. 2 under the Funding Agreement, as a guaranty of payment and performance, which is an enforceable obligation under the Funding Agreement, and thereby is individually liable under the Funding Agreement to the same extent as the other Defendants.

91. Defendants materially breached the Funding Agreement by, among other things, causing Apirion to Fund matters unrelated to the Joint Ventures and the Funding Agreement, misrepresenting to Apirion that the Funding Agreement would not cause of a breach of the Joint Venture agreements, and by failing to use good faith efforts to secure the contractual conversion of Apirion's loan to equity in BH Member and BH Member No. 2.

92. As a direct and proximate result of Defendants' breaches of the Funding Agreement, Apirion has suffered substantial damages, including paying capital calls that were not required under the Funding Agreement, diminution in the value of its investment due to Defendants' mismanagement of the Joint Ventures, loss of use of capital, lost opportunity costs, expenses incurred due to Defendants' breaches, and losses from inability to convert its loan into equity pursuant to the terms of the Funding Agreement and thereby participate in the upside from the Joint Ventures.

93. Defendants' breaches of the Funding Agreement excuse Apirion's obligations to fund additional amounts under the Funding Agreement and excuse any defaults that Defendants contend Apirion has incurred under the Funding Agreement.

94. Apirion's investments in the Joint Ventures were part of a series of a complex transaction. Despite being requested repeatedly, Defendants have refused to provide adequate details regarding the uses of the money that Apirion has provided, which are facts known only to Defendants. Defendants also obfuscated the use of Apirion's investments and the flow of funds

in the Joint Ventures. Therefore, Apirion also is entitled to an equitable accounting of the investments, capital calls, management and other fees paid to Toledano and his affiliates, related-party transactions by Toledano and his affiliates, and the use of proceeds from Apirion's investments into the Joint Ventures or otherwise to the extent that Apirion's remedy at law is inadequate.

95. All conditions precedent to Apirion's recovery have been satisfied.

**COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

96. Plaintiff repeats and realleges the allegations contained in paragraphs 1 – 87 above as if fully set forth herein.

97. The Funding Agreement, like all contracts, includes an implied covenant of good faith and fair dealing, which required Defendants to act in good faith and to refrain from engaging in unreasonable, grossly negligent, or bad faith conduct that would prevent Apirion from receiving the benefits of its bargain.

98. The Funding Agreement also implies the obligation that Defendants act in good faith to secure the conversion of Apirion's loan to equity, which is an essential purpose of the contract.

99. Through their conduct, as described herein, Defendants breached the implied covenant of good faith and fair dealing.

100. As a direct and proximate result of these breaches of the implied covenant, Apirion has suffered substantial damages, including paying capital calls that were not required under the Funding Agreement, diminution in the value of its investment due to Defendants' mismanagement of the Joint Ventures, loss of use of capital, lost opportunity costs, expenses incurred due to



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Defendants' breaches, and losses from inability to convert its loan into equity pursuant to the terms of the Funding Agreement and thereby participate in the upside from the Joint Ventures.

101. Apirion's investments in the Joint Ventures were part of a series of a complex transaction. Despite being requested repeatedly, Defendants have refused to provide adequate details regarding the uses of the money that Apirion has provided, which are facts known only to Defendants. Defendants also obfuscated the use of Apirion's investments and the flow of funds in the Joint Ventures. Therefore, Apirion also is entitled to an equitable accounting of the investments, capital calls, management and other fees paid to Toledano and his affiliates, related-party transactions by Toledano and his affiliates, and the use of proceeds from Apirion's investments into the Joint Ventures or otherwise to the extent that Apirion's remedy at law is inadequate

102. All conditions precedent to Apirion's recovery have been satisfied.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants:

(a) Finding that each Defendant in each Count is jointly and severally liable on each Count set forth above;

(b) Awarding monetary damages in an amount to be proven at trial;

(c) Awarding pre-judgment and post-judgment interest;

(d) Awarding injunctive relief;

(e) Awarding an accounting; and

(f) Awarding such other and further relief as the Court may deem just and proper.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Dated: July 6, 2026

Respectfully submitted,

*/s/ Brian P. Miller*

**KING AND SPALDING LLP**
Brian P. Miller
Florida Bar No. 0980633
Ross E. Linzer
Florida Bar No. 0073094
Southeast Financial Center
200 S. Biscayne Boulevard, Suite 4700
Miami, FL 33131
Telephone: (305) 462-6000
Facsimile: (305) 462-6100
bmiller@kslaw.com
rlinzer@kslaw.com
miamilit@kslaw.com

*Attorneys for Plaintiff*

# Exhibit A

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

# FUNDING AGREEMENT

FOR

**BH-SD MALL, LLC,**
**a Delaware limited liability company**
**&**
**BH SOUTHPLACE HOLDINGS, LLC,**
**a Delaware limited liability company**

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# FUNDING AGREEMENT
# FOR BH-SD MALL, LLC & BH SOUTHPLACE HOLDINGS, LLC
## Delaware limited liability companies

**THIS FUNDING AGREEMENT** (the "Agreement") is entered into as of the last date on the signature page below (including the Joinder signature page) (the "Effective Date") by and among (i) **BH-SD MALL LLC**, a Delaware limited liability company (referred to in this Agreement as "SD Mall"); (ii) **BH SOUTHPLACE HOLDINGS, LLC** (referred to in this Agreement as "Southplace") (SD Mall and Southplace shall be referred hereinafter together, and also each of them apart, as the "Company"), (iii) **BH APIRION LLC,** a Delaware limited liability company ("Apirion"), and (iv) **BH SD-SOUTHPLACE MANAGER LLC**, a Delaware limited liability company, ("BH Member"), (v) BH Worldwide Real Estate Holdings LLC, a Delaware limited liability company ("BH Worldwide") *[see also footnote 1 below]* (BH Member, its parent entity BH Worldwide, the Company, and the Manager [as the term Manager is defined in Schedule A below] are sometimes referred to, together but also each of them apart, as the "BH Parties" and each singly as a "BH Party", and the BH Parties and Apirion are referred to, together but also each of them apart, as the "Parties" and each singly as a "Party"). Capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule A. References in this Agreement to the Operating Agreement of any entity are deemed followed by "as it may be amended from time to time".

## RECITALS

### Part 1. The Company

**WHEREAS**, the former sole member of SD Mall, BH Worldwide Real Estate Holdings, LLC, a Delaware limited liability company ("BH Worldwide"), formed SD Mall as a limited liability company pursuant to the Delaware Revised Limited Liability Company Act, as amended from time to time, and any successor statute (the "Act"), by filing the Certificate of Formation of the SD Mall (the "Certificate of Formation") with the office of the Secretary of State of the State of Delaware (the "Secretary of State") on February 7, 2022, and the Operating Agreement of BH-SD Mall LLC is attached hereto as Schedule D-1, and on or about the date hereof BH Worldwide transferred all of its membership interests in SD Mall to BH Member; and

**WHEREAS**, BH Worldwide, as the former sole member of Southplace, formed Southplace as a limited liability company pursuant to the Act, by filing the Certificate of Formation of Southplace (the "Certificate of Formation") with the office of the Secretary of State on August 24, 2022, and the Operating Agreement of BH Southplace Holdings LLC is attached hereto as Schedule D-2, and on or about the date hereof BH Worldwide transferred all of its membership interests in Southplace to BH Member; and

1 Prior to the execution of this Agreement, the BH Member was BH Worldwide. Thus, references to any past actions of "BH Member" actually mean that such action was taken by BH Worldwide. On or about the date hereof BH Worldwide transferred all of its membership interests in the Company to BH Member, and thus BH Member has succeeded to all of the rights and obligations of BH Worldwide as the sole member of the Company.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**WHEREAS**, the Operating Agreement of BH-SD Mall LLC and the Operating Agreement of BH Southplace Holdings LLC are referred to together, and also each of them apart, as the "Company Operating Agreement"; and

**WHEREAS**, the BH Member is the sole owner of the Company;

**WHEREAS**, the principal business office of the Company is, and shall continue to be, located at c/o BH INVESTMENTS, LLC, 2999 NE 191st Street, PH2, Aventura, Florida 33180 or such other location as may hereafter be determined by the Manager; the Company does, and shall continue to, maintain a registered office and registered agent in the State of Delaware as required by the Act, and the Term of the Company is defined in Section 8 of the Company Operating Agreement, as modified by Section 20 of this Agreement; and

**WHEREAS**, the nature and purposes of the business being conducted by the Company is to participate in the benefits received by investing in the Joint Ventures (defined below), which interests include: (i) to own a twenty-five percent (25%) limited liability company membership interest in, and be entitled to its applicable share of Joint Venture Distributions, including without limitation fifty percent (50%) of the Joint Venture Distributions under Section 7.1(a)(iii) of the Joint Venture Agreements *[see also footnote 2 below]*; (ii) to contribute capital to the Joint Ventures in response to Capital Call Notices made pursuant to the Joint Venture Agreements (defined below); and (iii) to fulfill the obligations of the Company pursuant to the terms of the Joint Venture Agreement; and

**WHEREAS**, the Company has all of the powers and rights conferred upon limited liability companies formed pursuant to the Act, and the Manager on behalf of the Company, has all powers necessary, convenient or incidental to accomplish the Company's purposes, as further discussed in Section 5 of the Company Operating Agreement; the Company and the Manager on behalf of the Company will exercise all powers necessary, convenient or incidental to accomplish the Company's purposes, including all powers statutory or otherwise; the Manager shall devote such time to the Company as it shall determine to be reasonably required for the welfare and success of the Company; provided, however, for the avoidance of doubt and notwithstanding anything to the contrary contained in this Agreement, neither the Manager nor any of its Affiliates are required to devote their full time or efforts to the business of the Company; and

**WHEREAS**, the Company was formed in order to enter into the Joint Ventures.

---

2 See Section 7.1 of the Joint Venture Agreements, which are attached as Schedules E-1 and E-2 hereto, regarding Joint Venture Distributions under Section 7.1(a)(i) (if indeed there are any Default Priority Loans made by the Company), and Section 7.1(a)(ii). For the avoidance of doubt, Apirion is entitled to its Percentage Interest in Joint Venture Distributions, as that term is defined in Schedule A and Schedule B hereof (namely, 50%) relative to *any and all* Joint Venture Distributions under Sections 7.1(a)(i), (ii) *and* (iii), but the *Company itself* is entitled to a 50% share of Joint Venture Distributions only under Section 7.1(a)(iii). If there is any Default Priority Loan made by the Company then the *Company* is entitled to 100% of that Section 7.1(a)(i) Joint Venture Distribution, and if there are Joint Venture Distributions under Section 7.1(a)(ii) then the *Company* is, as set forth in that subsection, entitled to its "Percentage Interest" (as that term is defined in the Joint Venture Agreements, namely, 25%) of those distributions.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## Part 2. The Joint Ventures

**WHEREAS**, SD Mall (along with the other members thereof) executed a Second Amended and Restated Limited Liability Company Agreement of Electra America SD Mall JV LLC on September 8th, 2022, with an effective date of February 23, 2022, as amended by Amendment to Second Amended and Restated Limited Liability Company Agreement of Electra America SD Mall JV LLC executed on October 27, 2022 with an effective date of January 20, 2022 (as amended, the "Electra SD Mall JV Operating Agreement", and said limited liability company is referred to as the "Electra SD Mall JV"), a copy of which documents is attached herewith as Schedule E-1; and

**WHEREAS**, Southplace (along with the other members thereof) executed a Limited Liability Company Agreement of Electra America Southland 2 JV LLC on September 8th, 2022, with an effective date of July 19th, 2022 as amended by Amendment to Limited Liability Company Agreement of Electra America Southland 2 JV LLC executed on October 27, 2022 with an effective date of July 19, 2022 (as amended, the "Electra Southland JV Operating Agreement", and said joint venture is referred to as the "Electra Southland JV"), a copy of which documents is attached herewith as Schedule E-2; and

**WHEREAS**, Electra SD Mall JV and Electra Southland JV are referred to, together and also each of them apart, as the "Joint Ventures"), and the Electra SD Mall JV Operating Agreement and the Electra Southland JV Operating Agreement are referred to, together and also each of them apart, as the "Joint Venture Agreements");

**WHEREAS**, pursuant to the terms of the Joint Venture Agreements, the Company is permitted to obtain financing to fund its portion of the Capital Contributions to the Joint Venture (as used in this recital, "Capital Contributions" has the meaning ascribed to it in the definitions section of the Joint Venture Agreements) (the "Joint Venture Capital Contributions"); and

**WHEREAS**, as set forth in the sixth Whereas clause of Part 1 above, the Company owns a 25% membership interest, but is entitled to its applicable share of Joint Venture Distributions, including without limitation fifty percent (50%) of the Joint Venture Distributions under Section 7.1(a)(iii) of the Joint Venture Agreements;

**WHEREAS**, regarding the Section 7.1 "waterfall" under the Joint Venture Agreements, the Parties acknowledge that under Section 3.1(c) of the Joint Venture Agreements the Electra Member agrees to make the Electra Member Loan (as those terms are defined in the Joint Venture Agreements) to SD Mall and Southplace, respectively, as members of the Joint Ventures, in order to fund forty percent (40%) of SD Mall's Joint Venture Capital Contributions and sixty percent (60%) of Southplace's Joint Venture Capital Contributions, and said Section 3.1(c) states that all applicable amounts otherwise distributable to SD Mall, or Southplace, as the case may be under the Joint Venture Agreements shall first be paid to Electra Member to be applied first to interest on such Electra Member Loan and then to the principal thereof;

**WHEREAS**, the Joint Ventures indirectly own the Property (as the term Project is defined in the Joint Venture Agreements) each such Property being located in Cutler Bay, Florida; and

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## Part 3. Purpose of Funding Agreement

**WHEREAS**, BH Member and Apirion have already been Funding (defined in Schedule A below) to the Company so that the Company can meet its obligation to satisfy Capital Call Notices (as that term is defined in the definitions section of the Joint Venture Agreements) from the Joint Ventures (the "Joint Venture Funding Requirements"), but desire to better memorialize their respective rights and obligations;

**NOW, THEREFORE,** in consideration of the premises and promises contained herein, the Parties agree as follows:

**Section 1.** **Recitals**. The recitals set forth above are true and correct and incorporated herein by this reference.

**Section 2.** **Funding Percentage and Percentage Interest in Joint Venture Distributions**. Each Party's notice address, Funding Percentage (defined in Schedule A), and Percentage Interest in Joint Venture Distributions (defined in Schedule A) are set forth on Schedule B. The amount Funded by BH Member and Apirion, respectively, as of the Effective Date, is set forth in Schedule C hereto. Upon the request of BH Member or Apirion the Manager shall update Schedule C from time to time to reflect further Funding by BH Member and Apirion respectively.

**Section 3.** **Funding Obligations of BH Member and Apirion**.

(a) BH Member has been Funding, and shall continue to Fund, its Funding Percentage (defined in Schedule A below) of the Funding Requirements.

(b) Apirion has been Funding, and shall continue to Fund, its Funding Percentage of the Funding Requirements. The Manager shall notify Apirion at least fourteen (14) days in advance of the amount that Apirion is required to Fund in response to any Funding Call (defined in Schedule A below).

(c) If either BH Member or Apirion shall fail to timely Fund its obligations as set forth above or any portion thereof required or requested to be made by such Party (a "Funding Shortfall"), then the non-defaulting Party (i.e. the Party that does timely Fund its obligation as to the particular Funding Call) may (i) elect to withdraw its own applicable Funding and (ii) whether or not it withdraws its own applicable Funding, shall have no obligation whatsoever to Fund the Funding Shortfall. The Parties acknowledge that the resulting breach of the applicable Capital Call Notice will cause severe consequences for the Company pursuant to the terms of the Joint Venture Agreements, including without limitation pursuant to Section 3.5 of such agreements, and the non-defaulting Party shall have no liability whatsoever for such consequences (including, to be clear, if the non-defaulting Party withdraws its own Funding; but, to be clear, the non-defaulting Party may withdraw its own Funding *only* in the situation described above, namely, where and as long as the defaulting Party fails to fund its obligations). Subject to and without deviating from the above, the defaulting Party shall be liable to the non-defaulting Party for any and all loss suffered by the non-defaulting Party as a result of such failure of the Company to satisfy the Capital Call Notice. If the non-defaulting Party does elect, in its sole discretion, to Fund the Funding Shortfall then the Shortfall amount owed by the defaulting Party shall bear default interest at the same default rate per annum as provided for in the loan documents secured by the first priority mortgage on the Property or the highest amount allowed by law, whichever is less, and, for tax and other relevant economic purposes such additional Funding shall be deemed a loan from the non-defaulting Party (the

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Shortfall Covering Party") to the defaulting Party ("Default Loan") which accrues interest at said default rate of interest and may be collected by the Shortfall Covering Party from the distributions otherwise owing to the defaulting Party, as set forth in Section 4 hereof. To be clear, such Default Loan does not cure the default, it is simply a default interest rate, characterized as a loan for tax and other relevant economic purposes.

(d) Apirion shall have the right at any time, subject to BH Member's consent, and subject to Manager first obtaining the consent of the Electra Member (as that term is defined in the Joint Venture Agreements), and, if applicable of any other parties whose consent may be required such as any lender to the Joint Ventures, to cause the Apirion Loan to convert to capital contributions to the Company (more specifically, Apirion's Funding relative to SD Mall shall be capital contributions to SD Mall, and its Funding relative to Southland shall be capital contributions to Southland) on a retrospective basis and also on a going forward basis, in which event and at which time Apirion shall be a Member in the Company. To be clear, the Apirion Loan would convert to 90% of the overall capital contributions to the Company. More specifically, Apirion shall send to Manager and BH Member a request that BH Member consent to such conversion. BH Member shall provide its response within 10 days thereafter (If BH Member does not respond within such time period then Apirion shall send a second notice to Manager and BH Member, referring to the prior notice and stating that pursuant to this Section 3(d) a response from BH Member is due within 5 days of Manager receiving such second notice, and BH Member shall have 5 days following such reminder notice to respond). It is hereby agreed and clarified that in case the BH Member does not respond within such additional 5 days then it will be considered as if the BH Member has given its written consent to the said conversion. All notices to Manager and BH Member shall be sent simultaneously, by email and also by reputable overnight delivery service (or at least two business day delivery service given the distance involved) to BH Member's counsel, Eric Everett, Esq., DarrowEverett LLP, 50 Congress Street, Suite 1041, Boston, MA 02109, email: eeverett@darroweverett.com, and also with an email to CRENotices@darroweverett.com. If BH Member consents in writing then within 7 days thereafter the Manager will seek to obtain Electra Member's consent, and, if applicable, the other consents described above, and will present to Apirion references for said request(s) and for Electra Member's response, and, if applicable, for the response of the other applicable parties whose consent may be required.

Manager shall use good faith efforts to obtain the necessary consents (beginning with the consent of Electra Member) to such requested conversion to equity, but shall not be required to give economic or other concessions to Electra Member, or any other necessary consent parties, in order do so.

**Section 4. Distributions.**

Distributions of Available Cash of the Company will be made by the Manager (at such times as the Manager chooses but not less than quarterly) to the BH Member and Apirion as follows:

(a) *first*, to the Shortfall Covering Party, if there be one, on account of the principal and interest owed by the defaulting party under the Default Loan (and thus, by virtue of this Section 4(a), the Shortfall Covering Party is repaid the Default Loan from the distributions otherwise owing to the defaulting Party);

(b) *second, to* Apirion on account of the principal amount due under the Apirion Loan, and to the BH Member, on account of the BH Member's Unreturned Capital, on a pari passu and

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

proportionate basis, until each of these amounts is reduced to zero (it is understood that if Apirion converts to equity then the reference above to "principal amount due under the Apirion Loan" shall instead mean "Apirion's Unreturned Capital") ;

(c) *third*, to Apirion on account of interest due on the Apirion Loan (it is understood that this Section 4(c) shall not apply if Apirion converts to equity); and

(d) *thereafter*, 50% to the BH Member and 50% to Apirion.

The Manager and/or its Affiliate shall be entitled to retain all fees paid to the BH Member or an Affiliate thereof under the provisions of the Electra SD Mall JV Operating Agreement and the Electra Southland JV Operating Agreement ("BH Member Fees"), and such amounts shall not be part of Available Cash as that term is defined in Schedule A. The Parties acknowledge that the possibility of fees being paid is anticipated in the Joint Venture Agreement, and, as set forth above, nothing in this Agreement (including nothing in Section 16 below) prohibits the provision of fees and such fees being paid to the Manager and/or its Affiliate.

Nothing in this Agreement shall be implied as meaning that any of the BH Parties guaranties (or promises or gives assurances of any kind, express or implied) that there will be Joint Venture Distributions (or any particular amount of Joint Venture Distributions), and thus that there will be Available Cash (or any particular amount of Available Cash), out of which to make any such distributions as discussed above in this Section 4 (including without limitation payments of principal and interest under the Apirion Loan). To be clear, none of the BH Parties shall be in default or otherwise liable if the Joint Venture Distributions are not sufficient to repay the principal and interest on the Apirion Loan (or, if Apirion converts to equity, then to repay Apirion's Unreturned Capital).

As collateral for fulfilling the obligations of the BH Member, BH Worldwide, the Manager, SD Mall and Southplace under this agreement, the BH Worldwide and the BH Member will deliver to **G.L.E Trust Services LTD**, the trust company of Apirion's lawyers, Goldfarb, Gross, Seligman (Tel Aviv office) (contact attorneys: Israel Aziel, and Yael Mirone Mezamer) in trust (hereinafter: the "**Trustee**") on the Effective Date certificates of all of BH Worldwide membership interests in the BH Member and all of BH Member's membership interests in the Company (i.e. in SD Mall and Southplace), deeds of transfer of membership interests in the BH Member from BH Worldwide to Apirion and of membership interests in the Companies from BH Member to Apirion, all duly signed by the BH Worldwide and BH Member (respectively), and any other required documents (hereinafter: the "**Trust Document**"). The Parties irrevocably instruct the Trustee to hand over the Trust Documents to Apirion at the end of 43 days from the date that Apirion delivered a written notice to the BH Member regarding the violation of the obligations of the BH Member and/or BH Worldwide and/or the Manager and/or SD Mall and/or Southplace under this agreement (hereinafter: the "**Default Notice**"), with a copy to the Trustee, and provided that the Trustee has not received a written notice from both the BH Member and Apirion confirming that the default has been cured within 30 day period from the delivery of the Default Notice. Notwithstanding the above, in case Apirion has not given its confirmation that the default has been cured within said 30 days, then the BH Member will send Apirion a written reminder and if Apirion has not given its confirmation that the default has been cured within 3 more days (i.e. 33 days from the delivery of the Default Notice) then the Parties irrevocably instruct the Trustee to hand over the Trust Document to Apirion at the end of 10 more days (i.e. 43 days from the delivery of the Default Notice) unless one of the following has occurred:

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(i) the Trustee has received a written notice from both the BH Member and Apirion confirming that the default has been cured within said 10 days.

(ii) The Trustee received an order from a competent court which prevents the transfer of the documents to Apirion.

It is agreed for this matter only, that the competent court to discuss the question of whether the conditions for the release of the Trust Document have been met and to issue an order as stated, will be the District Court in Tel Aviv, Israel, and the law that will apply will be the Israeli law, and this despite everything stated in sections 13-15 below.

The Trust Document is attached herewith as Schedule F-1 and the instructions to the Trustee are attached herewith as Schedule F-2. A copy of such Default Notice shall be sent simultaneously, by email and also by reputable overnight delivery service (or at least two business day delivery service given the distance involved) to BH Member's counsel, Eric Everett, Esq., DarrowEverett LLP, 50 Congress Street, Suite 1041, Boston, MA 02109, email: eeverett@darroweverett.com, and also with an email to CRENotices@darroweverett.com.

The Parties will have no claims against the Trustee regarding the trust and his actions as said trustee. The BH Member, BH Worldwide, the Manager, SD Mall and Southplace declares that they know that the Trustee is the trust company of Apirion's lawyers - Goldfarb, Gross, Seligman (Tel Aviv office), which represents Apirion and Yaakov Morad, and they do not and will not have any claim regarding this representation, and furthermore they confirm that Apirion's lawyers can continue to represent Apirion and Yaakov Morad, including against the BH Member, BH Worldwide, the Manager, SD Mall and Southplace and regarding this agreement. The trust will end in one of the following two cases: (1) with the delivery of the Trust Document to Apirion in accordance with the above; or (2) upon receipt by the Trustee of a written notice signed by both the BH Member and Apirion according to which the BH Member, BH Worldwide, the Manager, SD Mall and Southplace have fully fulfilled their obligations according to this agreement and their joint order to return the Trust Document to the BH Member and BH Worldwide (respectively).

**Section 5.** **Books and Records**. At all times during the continuance of the Company, the Manager, on behalf of the Company, shall maintain, at its registered office and principal place of business all records and materials referred to in Act, including separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company. Such books of account, together with a copy of this Agreement and of the organizational documents of the Company, shall at all times be maintained at the principal place of business of the Company and shall be open to inspection, examination and audit at any time by BH Member and Apirion and its duly authorized representatives for any purpose.

(a) Annual Financial Statements. Within ninety (90) days after the end of each Fiscal Year, the Manager, on behalf of the Company, shall cause to be delivered to each Party a financial statement of the Company for the prior Fiscal Year, prepared at the expense of the Company, which financial statement shall set forth, as of the end of and for such Fiscal Year, the following: as to the Company a profit and loss statement and a balance sheet of the Company; and as to BH Member and Apirion: (i) the balance in the BH Member's Capital Account; (ii) the principal balance on the Apirion

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Loan, and in both cases such other information as reasonably shall be necessary for the Parties to be advised of the financial status and results of operations of the Company.

(b) Reports. In addition to the financial statements specified above, the Manager, on behalf of the Company, shall, (a) promptly (but in no event later than ten days after preparation thereof), deliver to the Parties, at the expense of the Company, copies of any material monthly reports internally prepared by the Manager, and (b) upon receipt of a written request of any Party, cause to be delivered to each Party, at the expense of the Company, such other information as shall be reasonably necessary for the Parties to be advised of the financial status and results of the Company.

**Section 6. Assignments.**

(a) The BH Member, BH Worldwide and the Manager may not directly or indirectly, encumber, pledge, assign, sell, exchange or otherwise dispose of, in whole or in part (each, a "Transfer"), its Interest in the BH Member and in the Company (including any pledge of or transfer of the BH Member membership interests owned by the BH Worldwide and registered under BH Worldwide' name and/or Company's (meaning, as defined above, SD-Mall's and Southplace's) membership interests owned by the BH Member and registered under BH Members' name) or permit a Transfer of a portion of the direct or indirect ownership in BH Member; provided, however, that Isaac Toledano and Liat Toledano, as Tenants by the Entirety, may Transfer its interests in BH Worldwide for estate planning purposes.

Apirion may not directly or indirectly, encumber, pledge, assign, sell, exchange or otherwise dispose of, in whole or in part (each, a "Transfer"), its Interest in the Company or permit a Transfer of a portion of the direct or indirect ownership in Apirion, without the prior written consent of the BH Member, which consent shall not be unreasonably withheld, conditioned or delayed. For clarity, reasonable considerations for refusal will include the issue of the scope of the discussed transfer, and it shall not be unreasonable if consent is withheld because the applicable proposed transfer would result in the Key Person and/or his Family Members or the executors upon his death, no longer controlling Apirion . In case of a transfer to a Key Person, the BH consent is not required.

Any encumbrance, pledge, assignment, sale, or other transfer or disposition in contravention of any of the provisions of this Section shall be null and void and ineffectual, and shall not bind or be recognized by the Company.

(b) In all events, Apirion shall be permitted, at any time and from time to time, to Transfer a portion of the direct or indirect ownership in the applicable entity to any Person as long as after giving effect to any such Transfer the Key Person, and/or his Family Members or the executors upon his death, shall retain control of the applicable entity, through the ownership of voting interests and equity interests of no less than fifty percent (50%) in the aggregate. "Key Person" means Yaakov Morad.

**Section 7. U.S. Person.** To the extent applicable, the Parties shall cooperate, at no material cost to BH Member, in pursuing having the Apirion Loan qualify under Section 871(h) of the Internal Revenue Code as a Portfolio Loan.

**Section 8. Expenses.** The Company shall pay all legal and accounting fees, costs and expenses (including other representatives and consultants) incurred in connection with the negotiation of this Agreement, the performance of the Company's obligations hereunder and the consummation of the transactions contemplated hereby.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 9. **Waiver of Partition; Nature of Interest**. Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, the BH Parties hereby irrevocably waive any right or power that they might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company.

Section 10. **Severability of Provisions**. Each provision of this Agreement is to be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable, or illegal under any existing or future law, such invalidity, unenforceability, or illegality will not impair the operation of or affect those portions of this Agreement which are valid, enforceable, and legal.

Section 11. **Entire Agreement**. This Agreement and the exhibits and schedules hereto (including the Company Operating Agreement to the extent certain portions of it are expressly or impliedly incorporated herein) constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, among the parties hereto with respect to the subject matter hereof and thereof.

Section 12. **Binding Agreement**. Notwithstanding any other provision of this Agreement, each of BH Parties and Apirion agrees that this Agreement constitutes a legal, valid and binding agreement of each such Party, and is enforceable against such Party.

Section 13. **Governing Law**. Subject to and without derogating from the provisions of section 4 above, THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF DELAWARE (WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES), ALL RIGHTS AND REMEDIES BEING GOVERNED BY SAID LAWS.

Section 14. **Venue**. Subject to and without derogating from the provisions of section 4 above, any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, and any claim of whatever character arising under this Agreement or under any statute or common law relating in any way, directly or indirectly, to the subject matter of this Agreement or to the dealings between the Parties during the term of this Agreement, to the fullest extent permitted by applicable law, shall be exclusively brought by the plaintiff party against any of the Parties in any state or federal court located in or for Miami-Dade County, Florida, including the federal district court having jurisdiction for such county, and each of the Parties hereby agrees that such action shall be maintained in the courts in or for the county in which the action was commenced and consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such suit, action or proceeding and waives any objection to venue laid therein.

Section 15. **Waiver of Jury Trial**. Subject to and without derogating from the provisions of section 4 above, THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THAT ANY PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE DEVELOPMENT, THIS AGREEMENT OR ANY OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH, OR IN RESPECT OF ANY COURSE

NOT AN OFFICIAL COPY-PUBLIC ACCESS-NOT AN OFFICIAL COPY-PUBLIC ACCESS

OF CONDUCT, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH OF THE PARTIES TO ENTER INTO THIS AGREEMENT.

**Section 16.** **Amendments**. This Agreement may be amended (which term is deemed to include the words "including, modified, altered, or supplemented") only pursuant to a written agreement executed and delivered by each of Apirion and whoever/whichever may be the applicable BH Party or BH Parties. In addition (i) the BH Parties shall not amend the Company Operating Agreement without the written consent of Apirion, and (ii) the Company shall not consent to any amendment of the Joint Venture Agreements (where the Company's consent is required) if such amendment would reasonably be expected to have a disproportionate effect on Apirion's rights under this Agreement compared to the BH Parties (other than by virtue of the in-built "disproportionate" effect resulting from the Aprion's and BH Member's different Funding Percentage Interests). This Section 16 shall not prohibit such modifications or supplements as may be contemplated in the applicable agreement, including, certain deemed modifications (as set forth in this Agreement) to the Company Operating Agreement if Apirion converts to equity, or supplements that are solely of an "informational" nature.

**Section 17.** **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but together shall constitute the same instrument; and signatures delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, shall be given the same legal force and effect as original signatures.

**Section 18.** **Notices**. The Parties have been, and likely will continue to, deliver notices and other communications between themselves via email, at the respective email addresses set forth in Schedule B below. Such emails an are official methods of giving notice, including without limitation notice of Funding Calls. The Parties may also, if they desire, deliver a notice by hand delivery or recognized overnight courier (such as Federal Express) at the applicable mailing address set forth on Schedule B, but are not required to. Either party may change its notice address (including email address), by delivering at least ten (10) days advance notice of such change to the other party. Attorneys may give notices on behalf of their clients. All notices are effective upon delivery to the other party (or upon the other party's refusal to accept delivery), and in the event of an email, such delivery shall be deemed to occur immediately upon such notice being sent out.

**Section 19**. **No General Partnership**. In no event shall this Agreement be held or construed to imply the existence of a general membership or joint venture among the Parties, nor as establishing the Parties' relative rights and obligations with regard to matters, trades or businesses or enterprises outside the scope of the Company and this Agreement, and no Party shall have any power or authority under this Agreement to act as the member, agent or representative of the other Parties with regard to any matter except as may be specifically contemplated in this Agreement.

**Section 20.** **Term of the Company**. In Section 8(b) of the Company Operating Agreement, the reference to "all the parties to this Agreement" is deemed amended to add to the end thereof "and all parties to that certain Funding Agreement for BH-SD Mall, LLC & BH Southplace Holdings, LLC". In addition, Section 8(a) of the Company Operating Agreement is deemed amended to add to the end thereof "as long as it does not originate from any of the parties to this agreement and/or Isaac Toledano and/or anyone on his behalf".

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**Section 21. Miscellaneous.** Notwithstanding all the above in this agreement (and especially on chapter - Part 1. The Company) and in view of the fact that as of the Effective Date, Electra's approval for the transfer of all of BH-Worldwide membership interests in the Companies from BH Worldwide to the BH Member has not yet been received, so that as of the Effective Date BH Worldwide is the sole owner of the Companies, it is clarified and agreed that as long as Electra will not grant its approval for the aforementioned transfer, wherever the agreement refers to the BH Member, the reference will be to the BH Worldwide.

**Section 22.** **Schedules**. The following Schedules are attached hereto.

| | |
|---|---|
| SCHEDULE A | DEFINITIONS |
| SCHEDULE B | MEMBERS |
| SCHEDULE C | EXPENSE REPORT |
| SCHEDULE D-1 | OPERATING AGREEMENT OF BH-SD MALL LLC |
| SCHEDULE D-2 | OPERATING AGREEMENT OF BH SOUTHPLACE HOLDINGS LLC |
| SCHEDULE E -1 | ELECTRA SD MALL JV OPERATING AGREEMENT (AND AMENDMENT) |
| SCHEDULE E-2 | ELECTRA SOUTHPLACE JV OPERATING AGREEMENT (AND AMENDMENT) |
| SCHEDULE F -1 | TRUST DOCUMENT |
| SCHEDULE F-2 | INSTRUCTIONS TO THE TRUSTEE |

**[Signature page follows]**

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**IN WITNESS WHEREOF,** the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the Effective Date.

**BH SD-SOUTHPLACE MANAGER LLC,**
a Delaware limited liability company,

By:______________________
Isaac Toledano, Manager
Date: February 7, 2024

**BH WORLDWIDE REAL ESTATE HOLDINGS LLC,**
a Delaware limited liability company

By:______________________
Isaac Toledano, Manager
Date: February 7, 2024

**BH APIRION LLC,**
a Delaware limited liability company

By:______________________
Yaakov Morad, Manager
Date: February 7, 2024

**MANAGER**
(of the **Company**, as that term is defined in this Agreement):

______________________
Isaac Toledano
Date: February 7, 2024

**BH SOUTHPLACE HOLDINGS LLC,**
a Delaware limited liability company

By:______________________
Isaac Toledano, Manager
Date: February 7, 2024

**BH SD-MALL LLC,**
a Delaware limited liability company

By:______________________
Isaac Toledano, Manager
Date: February 7, 2024

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## TOLEDANO PERSONAL GUARANTY

Isaac Toledano, in his individual capacity, personally guarantees to Apirion that the BH Parties will not default on their obligations to Apirion under this Agreement (including without limitation, that the Manager (as defined in Schedule A below) will timely pay to Apirion that part of Available Cash to which Apirion is entitled as its distribution thereof pursuant to the terms of this Agreement).

Isaac Toledano
Date: February 7, 2024

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE A

## DEFINITIONS

### A. Definitions

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"Affiliate" means (i) in the case of a natural person, such Person's Family Members, and (ii), with respect to any Person, (A) any officer or director or Manager of the Company or the Member including Family Members, (B) any person that Controls, is Controlled by or is under common Control with such Member, and (C) any officer, director or Manager of any entity described in the foregoing clause (B).

"Agreement" means this Funding Agreement, together with the schedules attached hereto, as further amended, restated or supplemented or otherwise modified from time to time.

"Apirion Loan" means the loan from BH Apirion LLC, to the Company as set forth herein, which loan shall bear interest at the short term applicable federal rate (AFR). This loan shall mature upon the final distribution to the Company under the Joint Venture Agreements. However, to be clear, at the time of maturity the amount owed on the Apirion Loan shall not exceed the total distributions received by Apirion under the terms of this Agreement.

"Available Cash" means, with respect to any period for which such calculation is being made, (i) all cash received by the Company from any source (but excluding BH Member Fees) less reasonable reserves for the payment of all expenses incurred or to be incurred by the Company.

"Business Day" means any day other than a Saturday, Sunday or a day on which federally chartered financial institutions are not open for business in Miami, Florida.

"Capital Call" and "Capital Call Notice" have the meaning ascribed to such terms in the definitions section of the Joint Venture Agreements.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"Company" has the meaning set forth in the preamble of this Agreement.

"Effective Date" has the meaning set forth in the preamble of this Agreement.

"Family Member" means (i) the spouse, children (including natural and adopted children and stepchildren), brothers, sisters, grandchildren and parents of the designated natural person and (ii) trusts or corporate entities, including limited partnerships and limited liability companies, whose sole beneficiaries or beneficial owners are one or more of the persons designated in the foregoing clause (i).

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Funding" (and "to Fund", and "Funded") means, with respect to BH Member, to remit to the Company, in response to a Funding Call, its applicable Capital Contributions, and means, with respect to Apirion, to remit to the Company, in response to a Funding Call, amounts advanced under the Apirion Loan. Notwithstanding the foregoing, if Apirion converts to equity, as set forth in Section 3(d), then Funding (and to Fund, and Funded) shall mean Capital Contributions with respect to Apirion.

"Funding Call" means notice from the Manager to BH Member and Apirion respectively, of the Funding that each is to make to the Company so that the Company can meet its Funding Requirements as those requirements arise from time to time based on capital calls from the Electra SD Mall JV and/or from the Electra Southplace JV, as the case may be. A Funding Call may also be made to with respect to payment of any liabilities of the Company, but the Funding Percentage for any such Funding Call shall be 50% for the BH Member & BH Worldwide (together and separately and mutually guaranteed) and 50% for Apirion, unless the liability was caused by the Bad Conduct (defined below) of BH Parties, or of Apirion, in which event the Funding Percentage for the party that caused the liability through such Bad Conduct shall be 100%. To be clear, the reference in the sentence above to "party" means BH Member & BH Worldwide (together and separately and mutually guaranteed) if any of the BH Parties cause the liability through Bad Conduct. "Bad Conduct", as applied to BH Parties, means any willful default, willful misconduct, gross negligence, or fraud, and as to Aprir→on, means a willful default under this Agreement. To be clear, to the extent that Capital Calls are considered "liabilities" the Funding Percentage shall be 90/10 as set forth below in the definition of Funding Percentage.

"Funding Percentage" means, as to BH Member and Apirion, the respective percentage of each Funding Call (and thus, the respective percentage of overall Funding Requirements) that each is obligated to Fund. The Funding Percentage for each is set forth in Schedule B attached hereto. For purposes of example, if a Funding Call is for One Million Dollars ($1,000,000.00) then BH Member shall be responsible to Fund its Funding Percentage of ten percent (10%) thereof, or One Hundred Thousand Dollars ($100,000.00) and Apirion shall be responsible to Fund its Funding Percentage of ninety percent (90%) thereof, or Nine Hundred Thousand Dollars ($900,000.00). Also for purposes of example, if in the final analysis the total of all Funding Calls under the Joint Venture Agreements turns out to be Twenty Million Dollars ($20,000,000.00), and assuming that neither BH Member nor Apirion has breached its Funding obligations under this Agreement, then of such total amount BH Member will have Funded ten percent (10%), or Two Million Dollars ($2,000,000.00) and Apirion will have Funded ninety percent (90%) or Eighteen Million Dollars ($18,000,000.00). All numbers used in these examples are hypothetical, and solely for illustrative purposes. See also discussion, above, in the definition of Funding Call, regarding Funding Percentage as to any liabilities of the Company.

"Joint Venture Distributions" means distributions from the Joint Ventures to the Company pursuant to the terms of the Joint Venture Agreements.

"Interest" means a Person's limited liability company membership interest in the Company together with the share of the allocations of the Company and a Person's rights to receive distributions of the Company's assets in accordance with the provisions of this Agreement and the Act, whether as a Member or an assignee of a Member's Interest. Until such time, if ever, as Apirion elects to convert the Apirion Loan to equity as set forth in this Agreement, Apirion has no

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

equity interest in the Company, and any references to it being a "Member", and having an "Interest" in the Company mean, more precisely, that it is an *indirect* member, and has an *indirect* Interest in the Company, in that (i) it has the obligation to Fund 90% of the amounts that the Company is obligated to fund to the Electra SD Mall JV and the Electra Southplace JV (as opposed to the Funding Percentage as to any liabilities of the Company as set forth in the definition of Funding Call); (ii) it has the right to receive certain distributions from the Company as set forth in Section 4; and (iii) more generally, it has such other rights and obligations relative to the Company as are set forth in this Agreement. It shall be deemed upon any election to convert, and assuming that Manager obtains the necessary consents, that this Agreement is an amendment to the Company Operating Agreement, with Apirion Member having no more, and no less, than its rights and obligations hereunder, although, of course, with the key differences that (i) the Apirion Loan is converted to equity and past and future Funding by Apirion shall be deemed capital contributions to the Company; and (ii) Apirion would then be a Member of the Company, and thus Apirion would have a direct (not indirect) Interest in the Company, and more generally would have such rights and obligations of a Member in a Delaware limited liability company act as are mandatory for a Member to have under the Act.

"Manager" –Isaac Toledano.

"Member" means any member of the Company and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company.

"Percentage Interest in Joint Venture Distributions" means the percentage set forth in Schedule B under the column titled Percentage Interest in Joint Venture Distributions.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any Governmental Authority.

"Secretary of State" has the meaning set forth in the recitals of this Agreement.

"Transfer" has the meaning set forth in Section 6.

"Treasury Regulations" or "Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Unreturned Capital" means the outstanding amount of the unpaid Capital Contributions of the BH Member. To be clear, only BH Member is making Capital Contributions, Apirion's Funding is in the form of a loan. Notwithstanding the foregoing, if Apirion converts to equity, as set forth in Section 3(d), then Unreturned Capital shall also refer to Apirion's unreturned Capital Contributions.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE B

## PARTIES, FUNDING PERCENTAGE, AND PERCENTAGE INTEREST IN JOINT VENTURE DISTRIBUTIONS

| Name | Mailing Address | Funding Percentage* | Percentage Interest in Joint Venture Distributions |
|---|---|---|---|
| 1. BH SD-Southplace Manager LLC | 2999 NE 191st Street<br>Penthouse #2<br>Aventura, FL 33180<br>Email: isaac@bhinvestments.us | 10% | 50% |
| 2. BH Apirion LLC – Loan | 2999 NE 191st Street<br>Penthouse #2<br>Aventura, FL 33180<br>Email: yaakov@royal-grp.co.il | 90% | 50% |
| **TOTAL** | | **100%** | **100%** |

* (The amount currently due from BH Member, for recent capital calls, is $15,343.54 and from Apirion, for recent capital calls, is $584,618.55 – see the Schedule C Expense Report). The amounts funded by each party as of the date hereof, as well as what the total funding amounts will be once BH Member pays the $15,343.54 and Apirion pays the $584,618.55 are set forth in Schedule C-1 attached hereto. For the avoidance of doubt the sum of $584,618.55 does not and shall not bear any interest, including the Default Interest mentioned in Section 3(c) of the Funding Agreement. BH Member shall pay the $15,343.54 and Apirion shall pay the $584,618.55 that they are presently owing within two (2) business days after the execution and delivery of this Agreement).

To be clear, the Funding percentage mentioned in this schedule does not detract from the agreement regarding the Funding Percentage as to any liabilities of the Company as set forth in the definition of Funding Call in Schedule A.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE C

## EXPENSE REPORT

## MOST RECENT SEARS EXPENSE REPORT - AS OF JANUARY 2, 2024

1/2/2024

*20701 SW 112th Ave Miami (SEARS) - EXPENSE REPORT*

| DATE | EXPENSE | AMOUNT | Form of Payment |
|---|---|---|---|
| 7/1/2022 | Formation - BH South Place LLC | $ 454.00 | Amex - CC |
| 7/5/2022 | Escrow Deposit - First American Trust | $ 400,000.00 | Wire - BH worldwide |
| 8/9/2022 | Lender | $ 10,000.00 | Wire - BH worldwide |
| 8/16/2022 | Escrow Deposit - First American Trust | $ 100,000.00 | Wire - BH worldwide |
| 9/22/2022 | Legal Fees - Arnstein | $ 3,049.60 | Wire - BH worldwide |
| 10/18/2022 | Closing Proceeds $1,553,544.00 | $ 1,553,544.00 | Wire - BH worldwide |
| 2/1/2023 | Capital call | $ 31,469.25 | Wire - BH worldwide |
| 5/30/2023 | Capital call | $ 71,118.00 | Wire - BH worldwide |
| 7/26/2023 | Capital call | $ 105,451.50 | Wire - BH worldwide |
| 12/4/2023 | Capital call | $ 18,681.25 | Wire - BH worldwide |
| 1/2/2024 | Capital call | $ 130,635.00 | Wire - BH worldwide |
| | | | |
| | | | |
| | | | |
| | TOTAL: | $ 2,424,402.60 | |
| | | | |

$ 149,316.25
*90% =
$ 134,384.63
$ (400,000.00) 1/2/2024 payment
$ (265,615.37) balance of $400K applied to mall balance

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# SCHEDULE C – CONTINUED

## EXPENSE REPORT

## MOST RECENT MALL EXPENSE REPORT – AS OF FEBRUARY 8, 2024

*20405 and 20505 S Dixie HWY Cutler Bay, FL - EXPENSE REPORT* 2/8/2024

| DATE | EXPENSE | AMOUNT | Form of Payment |
|---|---|---|---|
| 2/2/2022 | Formation Corp : BH - SD LLC | $ 404.00 | AMEX - CC |
| 2/14/2022 | Landscience - Phase 1 | $ 3,500.00 | AMEX - CC |
| 2/24/2022 | Deposit to Purchase | $ 1,500,000.00 | Wire - BH Worldwide |
| 2/24/2022 | outgoing wire | $ 35.00 | |
| 3/2/2022 | Deposit to Lender for Morteage application | $ 56,250.00 | Wire - BH Worldwide |
| 3/2/2022 | outgoing wire | $ 35.00 | |
| 3/2/2022 | Landscience - Phase 2 | $ 12,785.00 | AMEX - CC |
| 3/2/2022 | Town of Cutler Bay | $ 106.89 | CK 60 |
| 3/31/2022 | 2nd Deposit to Purchase | $ 812,500.00 | Wire - BH Worldwide |
| 3/31/2022 | outgoing wire | $ 35.00 | |
| 4/6/2022 | 3rd Deposit to Purchase | $ 62,500.00 | Wire - BH Worldwide |
| 4/6/2022 | outgoing wire | $ 35.00 | |
| 4/19/2022 | Smith Aerial Photos | $ 3,660.00 | CK66 |
| 4/25/2022 | Formation Corp : BH Apirion LLC | $ 454.00 | AAdvantage - CC |
| 4/28/2022 | Southland Mall Cash to Close | $ 4,168,750.00 | Wire - BH Worldwide |
| 4/28/2022 | Southland Mall Cash to Close | $ 1,320,000.00 | Wire - BH Worldwide |
| 4/28/2022 | outgoing wire | $ 35.00 | |
| 4/28/2022 | outgoing wire | $ 35.00 | |
| 4/28/2022 | Wilson | $ 25,000.00 | CK65 |
| 4/29/2022 | Incoming Wire | $ 15.00 | |
| 5/1/2022 | Saul Ewing Arnstein & Lehr - Legal Fees | $ 12,745.25 | Amex - CC |
| 9/20/2022 | Saul Ewing Arnstein & Lehr - Legal Fees | $ 829.60 | Amex - CC |
| 9/22/2022 | Capital Call | $ 31,250.00 | Wire - BH Worldwide |
| 10/19/2022 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 11/15/2022 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 12/7/2022 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 1/3/2023 | Darrow Everett LLP- Legal Fees | $ 1,909.50 | ACH |
| 1/6/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 2/14/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 3/7/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 3/8/2023 | Capex Funding : Roof / Restroom Project | $ 488,318.00 | Wire - BH Worldwide |
| 4/11/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 5/4/2023 | Capital Call - Insurance | $ 135,471.60 | Wire - BH Worldwide |
| 5/8/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 5/12/2023 | Capital Call - Interest Rate Cap | $ 85,875.00 | Wire - BH Worldwide |
| 6/20/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 7/13/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 8/21/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 9/7/2023 | Capital Call | $ 135,000.00 | Wire - BH Worldwide |
| 9/11/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 10/5/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 11/8/2023 | Capital Call | $ 130,500.00 | Wire - BH Worldwide |
| 11/16/2023 | Capital Call | $ 100,875.00 | Wire - BH Worldwide |
| 11/29/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 12/4/2023 | Capital Call | $ 277,500.00 | Wire - BH Worldwide |
| 12/12/2023 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 1/2/2024 | Capital Call | $ 290,843.00 | Wire - BH Worldwide |
| 1/8/2024 | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| 2/1/2024 | Capital Call | $ 94,300.95 | Wire - BH Worldwide |
| Pending | Capital Call | $ 147,185.40 | Wire - BH Worldwide |
| Pending | Capital Call | $ 6,250.00 | Wire - BH Worldwide |
| | | | |
| | SUBTOTAL: | $ 10,012,018.18 | |
| | | | |
| 4/29/2022 | BH DD Reimbursement | $ (18,041.88) | |
| 5/5/2022 | Got credit back for Landscience - Phase 2 | $ (12,785.00) | |
| | | | |
| | TOTAL: | $ 9,981,191.30 | |

$ 944,704.35
*90% =
$ 850,233.92
$ (265,615.37) Partial of the $400K payment
$ 584,618.55 Balance

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE C-1

## TOTAL AMOUNTS FUNDED

**NUMBERS BEFORE $584,618.55 IS PAID BY APIRION AND $15,343.54 IS PAID BY BH MEMBER:**

| | |
|---|---|
| **Total Contributions For Mall** | **$9,381,229.21** |
| 90% Apirion | $8,398,453.62 |
| 10% Worldwide | $982,775.59 |
| **Total Contributions For Sears** | **$2,424,402.60** |
| 90% Apirion | $2,181,962.34 |
| 10% Worldwide | $242,440.26 |
| **Combined Mall and sears** | **$11,805,631.81** |
| 90% Apirion | $10,580,415.96 |
| 10% Worldwide | $1,225,215.85 |

**NUMBERS AFTER $584,618.55 IS PAID BY APIRION AND $15,343.54 IS PAID BY BH MEMBER:**

| | |
|---|---|
| **Total Contributions For Mall** | **$9,981,191.30** |
| 90% Apirion | $8,983,072.17 |
| 10% Isaac | $998,119.13 |
| **Total Contributions For Sears** | **$2,424,402.60** |
| 90% Apirion | $2,181,962.34 |
| 10% Worldwide | $242,440.26 |
| **Combined Mall and Sears** | **$12,405,593.90** |
| 90% Apirion | $11,165,034.51 |
| 10% Worldwide | $1,240,559.39 |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE D – 1

## OPERATING AGREEMENT OF BH-SD MALL LLC

(starts on next page)

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

# OPERATING AGREEMENT
# OF
# BH - SD MALL LLC

This Operating Agreement (the "**Agreement**") of BH - SD MALL LLC, a Delaware limited liability company (the "**Company**"), effective as of February 7, 2022 (the "**Effective Date**") among **BH WORLDWIDE REAL ESTATE HOLDINGS LLC**, a Delaware limited liability company (hereinafter also referred to as a "**Member**").

## WITNESSETH:

**WHEREAS**, the Company was formed under the name "BH - SD MALL LLC", through its Certificate of Formation filed with the State of Delaware Division of Corporations on February 7, 2022;

**WHEREAS**, the Member is the owner of membership interests in the Company in accordance with the schedule of Interests set forth in Schedule A attached hereto (the "**Interests**");

**WHEREAS**, the Member and the Company desire, as permitted by the Delaware Limited Liability Company Act, as amended from time to time (the "**Act**"), to enter into this Operating Agreement to set forth certain rights and obligations pertaining to the management, direction and operation of the Company's business, including the selection of the Manager and officers of the Company; and

**NOW THEREFORE**, in consideration of the premises aforesaid, all of the covenants, agreements, terms and conditions hereinafter set forth and the sum of One Dollar ($1.00) and other good and valuable consideration paid by each of the parties to the other, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

1. RECITALS. The foregoing recitals are true and correct and are incorporated herein by reference.

2. CONFLICT. This Agreement, to the extent that it is inconsistent with any other instrument governing the affairs of the Company, including, but not limited to the Company's Certificate of Formation and Regulations shall supersede such instrument to the fullest extent permitted by law. The parties hereto shall take any and all actions required to effect the foregoing supersedure. A copy of this Agreement shall also be filed at the Company's principal office, if different that the location of the Company's Minute Book.

3. PRINCIPAL BUSINESS OFFICE. The principal place of business and office of the Company shall be located at, and the Company's business shall be conducted from, 2999 N.E. 191st Street, PH 2, Aventura, Florida 33180, or such other place or places as may hereafter be determined by the Manager.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

4. REGISTERED OFFICE AND REGISTERED AGENT. The name and address of the registered agent of the Company shall be: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

5. MANAGEMENT OF THE COMPANY. The management, control and operation of the Company shall be governed in accordance with the following:

a. Manager. The Manager of the Company shall be appointed by the Member of the Company, and shall initially be YIZHAK TOLEDANO. The initial Manager shall remain the Manager until replaced by the Member.

b. Powers and Authority of the Manager. The Manager of the Company shall manage and conduct the Company's affairs and shall have the power and authority to make all decisions and take all action on behalf of the Company.

c. Duties and Obligations of the Manager. The Manager shall take all actions which may be necessary or appropriate for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Member or to enable the Company to conduct the business in which it is engaged.

6. BUSINESS OF THE COMPANY. The Company shall engage in any lawful business permitted by the Act, including, without limitation, becoming an investor in ELECTRA AMERICA SD MALL JV LLC, a Delaware limited liability company.

7. ENGAGEMENT OF THE MEMBER AND THEIR AFFILIATES.

a. The Company may employ Affiliates of the Member to perform services for the Company in accordance with fair and reasonable compensation.

b. The Company shall reimburse Affiliates of the Member for reasonable out of pocket costs and expenses incurred in connection with the performance of services for the Company subject to the prior approval of the Company or its designated representative.

8. TERMINATION. This Agreement and the obligations and restrictions placed on and the undertakings agreed to by the Member (and the Manager) hereunder shall terminate (except for the indemnifications provided for herein) immediately upon the occurrence of any of the following:

a. A final decree of bankruptcy against the Company or a dissolution of the Company pursuant to the applicable laws of the state of its organization; or

b. The execution of an instrument by all of the parties to this Agreement pursuant to which such parties agree to terminate this Agreement

6. NOTICES. All notices, demands, requests, consents and approvals which may or are required to be given or made pursuant to any provisions of this Agreement shall be given or

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

made in writing and shall be served personally or mailed by prepaid certified or registered mail, return receipt requested, by telecopier, hand delivery or overnight courier service, to the address of each of the parties hereto as set forth beneath their respective signatures on the execution page(s) of this Agreement or such other address as any of the parties may from time to time advise the other parties hereto by notice in writing. The date of receipt of any such notice, demand or request shall be deemed to be the date of giving of such notice, demand or request if delivered personally, or if mailed, as aforesaid, the fifth (5th) day of business following the date of such mailing, provided that if any such notice, request, demand or other communication shall have been mailed and if regular mail service shall be interrupted by strikes or other irregularities, such notices, requests, demands or other communications shall be deemed to have been received five (5) business days following the resumption of normal mail service.

7. MISCELLANEOUS.

a. Governing Law. The parties acknowledge that this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

b. Binding Effect; No Assignment. This Agreement shall be binding upon the parties hereto, their heirs, administrators, successors and assigns. No party may assign or transfer its interests herein, or delegate its duties hereunder, without the written consent of the other party. Any assignment or delegation of duties in violation of this provision shall be null and void.

c. Amendment. The parties hereby irrevocably agree that no attempted amendment, modification, termination, discharge or change (collectively, "**Amendment**") of this Agreement shall be valid and effective, unless the parties shall unanimously agree in writing to such Amendment.

d. No Waiver. No waiver of any provision of this Agreement shall be effective unless it is in writing and signed by the party against whom it is asserted, and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver.

e. Provisions Severable. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the parties do business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall, for any reason or to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be, affected thereby, but rather shall be enforced to the greatest extent permitted by law.

f. No Third-Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective heirs, successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person shall have any rights, interests or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third-party beneficiary or otherwise.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

g. Remedies. Each party hereto recognizes and agrees that the violation of any term, provision or condition of this Agreement may cause irreparable damage to the other parties which may be difficult to ascertain, and that the award of any sum of damages may not be adequate relief to such parties. Each party, therefore, agrees that, in addition to other remedies available in the event of a breach of this Agreement, any other party shall have a right to equitable relief, including, but not limited to, the remedy of specific performance.

h. Entire Agreement. This Agreement constitutes the entire final agreement among the parties with respect to and supersedes any and all prior agreements among the parties hereto both oral and written concerning the subject matter hereof and may not be amended, modified or terminated except by a writing signed by the parties hereto.

i. Enforceability. If any provision of this Agreement shall be held to be invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any way affect or render invalid or unenforceable any other provision of this Agreement, and this Agreement shall be carried out as if such invalid or unenforceable provision were not contained herein.

j. Counterparts. This Agreement may be executed in any number of counterparts, all of which together shall constitute one and the same instrument.

k. Waiver. A waiver of any breach or violation of any term, provision or covenant contained herein shall not be deemed a continuing waiver or a waiver of any future or past breach or violation.

l. Further Assurances. Each party hereto covenants and agrees with the other that each of them shall upon the reasonable request of the other of them do, execute or cause to be made, done or executed all such further and lawful acts, deeds, things, devices and assurances whatsoever for the better or more perfect and absolute performance of the terms, conditions and provisions of this Agreement.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the day and year first above written.

MEMBER:

BH WORLDWIDE REAL ESTATE HOLDINGS LLC,
a Delaware limited liability company

By:______________________________
Yizhak Toledano, as Manager

CONFIRMED AND ACCEPTED BY:

______________________________
Yizhak Toledano, Manager

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE A

SCHEDULE OF INTERESTS

| Name | Percentage Interest |
|---|---|
| BH WORLDWIDE REAL ESTATE HOLDINGS LLC, a Delaware limited liability company | 100% |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE D - 2

## OPERATING AGREEMENT OF BH SOUTHPLACE HOLDINGS LLC

(starts on next page)

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

# OPERATING AGREEMENT
# OF
# BH SOUTHPLACE HOLDINGS LLC

This Operating Agreement (the **"Agreement"**) of **BH SOUTHPLACE HOLDINGS LLC**, a Delaware limited liability company (the **"Company"**), effective as of September 1, 2022 (the **"Effective Date"**) is entered into by **BH WORLDWIDE REAL ESTATE HOLDINGS LLC**, a Delaware limited liability company (hereinafter also referred to as a **"Member"**).

## WITNESSETH:

**WHEREAS,** the Company was formed under the name "BH SOUTHPLACE HOLDINGS LLC", through its Certificate of Formation filed with the State of Delaware Division of Corporations on August 24, 2022;

**WHEREAS,** the Member is the owner of membership interests in the Company in accordance with the schedule of Interests set forth in Schedule A attached hereto (the **"Interests"**);

**WHEREAS,** the Member and the Company desire, as permitted by the Delaware Limited Liability Company Act, as amended from time to time (the **"Act"**), to enter into this Operating Agreement to set forth certain rights and obligations pertaining to the management, direction, and operation of the Company's business, including the selection of the Manager and officers of the Company; and

**NOW THEREFORE,** in consideration of the premises aforesaid, all of the covenants, agreements, terms and conditions hereinafter set forth and the sum of One Dollar ($1.00) and other good and valuable consideration paid by each of the parties to the other, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

1. RECITALS. The foregoing recitals are true and correct and are incorporated herein by reference.

2. CONFLICT. This Agreement, to the extent that it is inconsistent with any other instrument governing the affairs of the Company, including, but not limited to the Company's Certificate of Formation and Regulations shall supersede such instrument to the fullest extent permitted by law. The parties hereto shall take any and all actions required to effect the foregoing supersedure. A copy of this Agreement shall also be filed at the Company's principal office, if different that the location of the Company's Minute Book.

3. PRINCIPAL BUSINESS OFFICE. The principal place of business and office of the Company shall be located at, and the Company's business shall be conducted from, 2999 N.E. 191st Street, PH 2, Aventura, Florida 33180, or such other place or places as may hereafter be determined by the Manager.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

4. REGISTERED OFFICE AND REGISTERED AGENT. The name and address of the registered agent of the Company shall be: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

5. MANAGEMENT OF THE COMPANY. The management, control and operation of the Company shall be governed in accordance with the following:

a. Manager. The Manager of the Company shall be appointed by the Member of the Company and shall initially be YIZHAK TOLEDANO. The initial Manager shall remain the Manager until replaced by the Member.

b. Powers and Authority of the Manager. The Manager of the Company shall manage and conduct the Company's affairs and shall have the power and authority to make all decisions and take all action on behalf of the Company.

c. Duties and Obligations of the Manager. The Manager shall take all actions which may be necessary or appropriate for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Member or to enable the Company to conduct the business in which it is engaged.

6. BUSINESS OF THE COMPANY. The Company shall engage in any lawful business permitted by the Act, including, without limitation, becoming an investor in ELECTRA AMERICA SOUTHLAND 2 JV LLC, a Delaware limited liability company.

7. ENGAGEMENT OF THE MEMBER AND THEIR AFFILIATES.

a. The Company may employ Affiliates of the Member to perform services for the Company in accordance with fair and reasonable compensation.

b. The Company shall reimburse Affiliates of the Member for reasonable out of pocket costs and expenses incurred in connection with the performance of services for the Company subject to the prior approval of the Company or its designated representative.

8. TERMINATION. This Agreement and the obligations and restrictions placed on and the undertakings agreed to by the Member (and the Manager) hereunder shall terminate (except for the indemnifications provided for herein) immediately upon the occurrence of any of the following:

a. A final decree of bankruptcy against the Company or a dissolution of the Company pursuant to the applicable laws of the state of its organization; or

b. The execution of an instrument by all of the parties to this Agreement pursuant to which such parties agree to terminate this Agreement.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

9. NOTICES. All notices, demands, requests, consents and approvals which may or are required to be given or made pursuant to any provisions of this Agreement shall be given or made in writing and shall be served personally or mailed by prepaid certified or registered mail, return receipt requested, by telecopier, hand delivery or overnight courier service, to the address of each of the parties hereto as set forth beneath their respective signatures on the execution page(s) of this Agreement or such other address as any of the parties may from time to time advise the other parties hereto by notice in writing. The date of receipt of any such notice, demand or request shall be deemed to be the date of giving of such notice, demand or request if delivered personally, or if mailed, as aforesaid, the fifth (5th) day of business following the date of such mailing, provided that if any such notice, request, demand or other communication shall have been mailed and if regular mail service shall be interrupted by strikes or other irregularities, such notices, requests, demands or other communications shall be deemed to have been received five (5) business days following the resumption of normal mail service.

10. MISCELLANEOUS.

a. Governing Law. The parties acknowledge that this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

b. Binding Effect; No Assignment. This Agreement shall be binding upon the parties hereto, their heirs, administrators, successors, and assigns. No party may assign or transfer its Interests herein, or delegate its duties hereunder, without the written consent of the other party. Any assignment or delegation of duties in violation of this provision shall be null and void.

c. Amendment. The parties hereby irrevocably agree that no attempted amendment, modification, termination, discharge, or change (collectively, "**Amendment**") of this Agreement shall be valid and effective, unless the parties shall unanimously agree in writing to such Amendment.

d. No Waiver. No waiver of any provision of this Agreement shall be effective unless it is in writing and signed by the party against whom it is asserted, and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver.

e. Provisions Severable. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the parties do business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall, for any reason or to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be, affected thereby, but rather shall be enforced to the greatest extent permitted by law.

f. No Third-Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective heirs,

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person shall have any rights, Interests or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third-party beneficiary or otherwise.

g. Remedies. Each party hereto recognizes and agrees that the violation of any term, provision or condition of this Agreement may cause irreparable damage to the other parties which may be difficult to ascertain, and that the award of any sum of damages may not be adequate relief to such parties. Each party, therefore, agrees that, in addition to other remedies available in the event of a breach of this Agreement, any other party shall have a right to equitable relief, including, but not limited to, the remedy of specific performance.

h. Entire Agreement. This Agreement constitutes the entire final agreement among the parties with respect to and supersedes any and all prior agreements among the parties hereto both oral and written concerning the subject matter hereof and may not be amended, modified or terminated except by a writing signed by the parties hereto.

i. Enforceability. If any provision of this Agreement shall be held to be invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any way affect or render invalid or unenforceable any other provision of this Agreement, and this Agreement shall be carried out as if such invalid or unenforceable provision were not contained herein.

j. Counterparts. This Agreement may be executed in any number of counterparts, all of which together shall constitute one and the same instrument.

k. Waiver. A waiver of any breach or violation of any term, provision or covenant contained herein shall not be deemed a continuing waiver or a waiver of any future or past breach or violation.

l. Further Assurances. Each party hereto covenants and agrees with the other that each of them shall upon the reasonable request of the other of them do, execute or cause to be made, done or executed all such further and lawful acts, deeds, things, devices, and assurances whatsoever for the better or more perfect and absolute performance of the terms, conditions, and provisions of this Agreement.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals as of the day and year first above written.

**MEMBER:**

**BH WORLDWIDE REAL ESTATE HOLDINGS LLC,**
a Delaware limited liability company

By: ______________________________
Yizhak Toledano, as Manager

**CONFIRMED AND ACCEPTED BY:**

______________________________
Yizhak Toledano, as Manager

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE OF INTERESTS

## SCHEDULE A

| Name | Percentage Interest |
| --- | --- |
| BH WORLDWIDE REAL ESTATE HOLDINGS LLC, a Delaware limited liability company. | 100% |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE E - 1

## ELECTRA SD MALL JV OPERATING AGREEMENT (AND AMENDMENT)

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF ELECTRA AMERICA SD MALL JV LLC

DATED AS OF February 23, 2022

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## TABLE OF CONTENTS

Page

**Article 1 Definitions** .......... **1**

**Article 2 Formation** .......... **15**
Section 2.1 Formation of Company. .......... 15
Section 2.2 Name and Principal Place of Business. .......... 15
Section 2.3 Purposes. .......... 15
Section 2.4 Term. .......... 16
Section 2.5 Title to the Property. .......... 16

**Article 3 Capital Contributions; Electra member loan; Capital Accounts; Additonal Capital Contributions** .......... **16**
Section 3.1 Capital Contributions; Electra Member Loan. .......... 16
Section 3.2 Capital Accounts. .......... 17
Section 3.3 Interest and Right to Property. .......... 17
Section 3.4 Additional Capital Contributions. .......... 17
Section 3.5 Failure to Contribute Additional Capital Contributions. .......... 18

**Article 4 Management; Rights of Members; Fees and Expenses** .......... **19**
Section 4.1 Management. .......... 19
Section 4.2 Fees. .......... 20
Section 4.3 Reimbursement for Expenses. .......... 21
Section 4.4 Co-Developer Joint Marketing. .......... 21
Section 4.5 Manager's Time. .......... 21
Section 4.6 Non-Exclusivity. .......... 21
Section 4.7 No Liability and Indemnity. .......... 22
Section 4.8 Reliance by Third Parties. .......... 22
Section 4.9 Replacement of Manager. .......... 23
Section 4.10 Officers. .......... 23
Section 4.11 Subsidiaries. .......... 24
Section 4.12 Sale of Development Project. .......... 24

**Article 5 Rights of Members** .......... **25**
Section 5.1 Right to Participate in Management. .......... 25
Section 5.2 Indemnification; Limited Liability. .......... 25
Section 5.3 Restrictions on Members. .......... 26
Section 5.4 Action by Members Without a Meeting. .......... 26
Section 5.5 Intentionally Omitted. .......... 26
Section 5.6 Financing Guaranties. .......... 26

**Article 6 Transfer of Member Interests** .......... **27**
Section 6.1 Withdrawal and Transfers. .......... 27
Section 6.2 Additional Members. .......... 27
Section 6.3 Transfers by Members. .......... 27
Section 6.4 Buy-Sell. .......... 28
Section 6.5 Resignation, Bankruptcy or Dissolution of Manager. .......... 31

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 6.6 Bankruptcy or Dissolution of a Member. .....31
Section 6.7 Additional and Substituted Members.....32
Section 6.8 Non-Complying Assignments.....32
Section 6.9 Obligations of Successors. .....33
Section 6.10 Limitations on BH Member Permitted Transfers.....33

**Article 7 Distributions ..... 34**
Section 7.1 Distributions.....34
Section 7.2 Time for Distributions.....34

**Article 8 Allocation of Profits and Losses..... 35**
Section 8.1 Allocations. .....35
Section 8.2 Basis Adjustment. .....35
Section 8.3 Special Allocation Rules.....36
Section 8.4 Other Allocation Rules. .....37
Section 8.5 Tax Allocations.....37
Section 8.6 Curative Allocations. .....38
Section 8.7 Tax Matters. .....38

**Article 9 Records and Books of Account ..... 38**
Section 9.1 Records and Books of Account.....38
Section 9.2 Fiscal Year. .....39
Section 9.3 Banking. .....39
Section 9.4 Reports to Members. .....39
Section 9.5 Approved Budgets. .....40

**Article 10 Dissolution, Liquidation and Termination ..... 40**
Section 10.1 Dissolution. .....40
Section 10.2 Liquidation. .....41
Section 10.3 No Obligation to Restore Capital Accounts. .....41
Section 10.4 Termination. .....41

**Article 11 Status of the Company..... 41**

**Article 12 Miscellaneous..... 42**
Section 12.1 Indemnity. .....42
Section 12.2 Mediation; Litigation.....43
Section 12.3 Notices.....43
Section 12.4 Entire Agreement. .....44
Section 12.5 Waivers.....44
Section 12.6 Headings, Gender and Number. .....44
Section 12.7 Severability.....44
Section 12.8 Counterparts. .....45
Section 12.9 Benefit. .....45
Section 12.10 Further Actions.....45
Section 12.11 Interpretation. .....45
Section 12.12 No Third Party Beneficiaries.....45
Section 12.13 Intentionally Omitted. .....45
Section 12.14 Equitable Relief.....45

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**Article 13 Representations and Warranties** .......... **46**
Section 13.1 Representations, Warranties and Covenants of Electra Member. .......... 46
Section 13.2 Representations, Warranties and Covenants of BH Member. .......... 47
Section 13.3 Indemnification. .......... 49

**Exhibits and Schedules**

Exhibit A Description of Property
Exhibit B Capital Contributions and Percentage Interests of the Members
Exhibit C Business Plan
Exhibit D Intentionally Omitted
Exhibit E Addresses for Notice
Exhibit F Electra Member Chart
Exhibit G BH Member Chart

Schedule 4.1(a) Manager's Duties
Schedule 4.9(b) Rights Retained by Electra Member Upon Removal as Manager

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**SECOND AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
ELECTRA AMERICA SD MALL JV LLC**

This SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of Electra America SD Mall JV LLC (the "Company") is entered into on this 8th day of September with an effective date of the 23rd day of February, 2022 (the "Effective Date") by and between Electra America SD Mall Management LLC, a Delaware limited liability ("Electra Member"), and BH-SD Mall LLC, a Delaware limited liability company having an office at c/o BH Group, 2999 NE 91Street, PH2, Aventura, FL 33180 ("BH Member").

**WITNESSETH:**

WHEREAS, the Company was formed as a Delaware limited liability company pursuant to the filing of a Certificate of Formation in the office of the Secretary of State of the State of Delaware on January 21, 2022 (the "Certificate"), and the Members entered into that certain Amended and Restated Limited Liability Company Agreement entered into on September 28th, 2022 with an effective date of February 23rd, 2022 (the "Prior Agreement"); and

WHEREAS, the Company has been formed for the purpose of engaging in the Project, in each case through the Company and other legal entities in which the Company will invest, directly or indirectly, in connection with the Project (each, a "Project Entity") upon the closing on the transactions contemplated under the Assignment Agreement; and

WHEREAS, the Members desire to amend and restate the Prior Agreement as of the Effective Date to provide for the continued engagement in the Project by the Company, and to establish their respective rights and obligations in respect of the business and operation of the Company.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and conditions herein contained, and other good and valuable consideration, the receipt and sufficiency of which hereby is acknowledged, the parties hereto do hereby agree as follows:

**ARTICLE 1**

**DEFINITIONS**

As used herein, the following terms shall have the following meanings.

"Act" shall mean the Delaware Limited Liability Company, Delaware Code, Title 6, Section 18-101, et seq., as amended, and shall include any corresponding provision or provisions of any succeeding law.

"Adjusted Capital Account Deficit" shall mean a deficit balance as of the end of the relevant Fiscal Year in a Member's Capital Account after giving effect to any amounts the Member is obligated to contribute or restore to the Company pursuant to the penultimate sentences of

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and subsequently such Member's share of the items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The foregoing definition is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

"Additional Capital Contributions/Additional Capital Contribution" shall have the meaning ascribed to it in Section 3.4.

"Affiliate" shall mean, when used with reference to a specified Person, (a) any Person that directly or indirectly through one or more intermediaries Controls or is Controlled by or is under common Control with the specified Person and (b) any Person who is an officer or director of a specified Person or Person who serves in a similar capacity with respect to a specified Person or is a spouse or relative of a specified Person. Neither the Company nor any Subsidiary shall be deemed to be an Affiliate of any Member or the Manager for purposes of this Agreement. Each of Lubeck, American Landmark, Electra, Electra Parent, Miller and ALM and each of their respective Affiliates are deemed to be Affiliates of Electra Member for all purposes hereunder.

"Affiliated Purchaser" shall have the meaning ascribed to it in Section 4.12.

"Agreement" shall mean this Second Amended and Restated Limited Liability Company Agreement, as originally executed and as amended from time to time, as the context requires. Words such as "herein", "hereinafter", "hereof", "hereto", "hereby", "hereunder", when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

"ALM" means American Landmark Management LLC, a Delaware limited liability company that is an Affiliate of Electra Member.

"Alternate Key Person" means (x) James G. Miller, (y) Christine DeFilippis or (z) another replacement key person that has been proposed by Manager to replace the Key Person upon the death, permanent disability or incapacitation of all Key Persons, provided such replacement key person is at such time an executive vice president or other senior officer of American Landmark, or any of its Affiliates, that has not less than eight (8) years of commercial real estate experience in real estate asset ownership and operation.

"Approved Budget" shall have the meaning ascribed to it in Section 9.5.

"American Landmark" means American Landmark LLC, a Florida limited liability company and an Affiliate of Electra Member.

"Asset Management Fee" shall have the meaning ascribed to it in Section 4.2.

"Assignment Agreement" means the Agreement to Assign Membership Interests made and entered into as of February 23, 2022 by and between (i) Altostratus Investments, LLC, a Florida limited liability company, and Hamilton Holdings, LLC, a New Mexico limited liability company (jointly and severally, as the "Seller") and (ii) Electra America SD Mall JV LLC, a Delaware limited liability company, as amended.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Acquisition Fee" shall have the meaning ascribed to it in Section 4.2.

"Bankruptcy" or "Bankrupt" with respect to any Person shall mean:

(a) the institution by such Person of proceedings to be adjudged as bankrupt or insolvent, or for an order of relief or the consent by such Person to the institution of bankruptcy or insolvency proceedings against him or it, or the filing by such Person of a petition or answer or consent seeking reorganization or relief under the present or any future Federal bankruptcy statute or any other present or future applicable Federal, state, or foreign law regarding bankruptcy, insolvency or other relief for debtors, or the consent by such Person to the filing of any such petition or to the appointment of a receiver, liquidator, trustee (or other similar official) of such Person or of all or of a substantial part of the assets of such Person, or the making by such Person of any assignment for the benefit of creditors or the admission in writing by such Person of his or its inability to pay his or its debts generally as they come due or the commission by such Person of any act sufficient to sustain an order for relief under the present or any future Federal bankruptcy statute; or

(b) the entry by a court of competent jurisdiction of an order, judgment or decree judging such Person as bankrupt or insolvent or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of such Person under the present or any future Federal bankruptcy statute or any other present or future applicable Federal, state or foreign law relating to bankruptcy, insolvency, or other relief of debtors, or appointing a receiver, liquidator, trustee (or other similar official) of such Person or of all or a substantial part of the assets of such Person, or ordering the winding up or liquidation of the affairs of such Person, which order, judgment or decree shall remain unstayed and in effect for an aggregate of sixty (60) days (whether or not consecutive).

"Bankruptcy Code" shall mean Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., as the same may be amended.

"BH Member" shall have the meaning ascribed to it in the caption to this Agreement.

"BH Member Default" shall mean (a) any material misrepresentation, omission or breach on the part of BH Member or any of its Affiliates with respect to any of the representations, warranties or covenants contained herein, or (b) any default under any guaranty or other credit enhancement provided by BH Member or any of its Affiliates in connection with the Loan Documents that has not been cured or waived within two (2) Business Days prior to the expiration of any applicable notice and cure period provided therein.

"BH Member Indemnitees" shall have the meaning ascribed to it in Section 13.3(a).

"BH Worldwide" shall mean BH Worldwide Real Estate Holdings LLC, a Delaware limited liability company and the owner of one hundred percent (100%) of BH Member.

"Business Day" shall mean any day other than Saturday, Sunday or any other days on which commercial banks in County of Miami-Dade, State of Florida or New York, New York are generally closed for commercial banking business.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Business Plan" means the initial strategic plan attached hereto as Exhibit C covering the acquisition, Development, operation, improvement, marketing, financing, leasing, sale and/or other disposition of all or a portion of the Property, which plan includes, as a part thereof, the Operating Budget, the Development Budget and any other budgets prepared and implemented in accordance with such plan, and each future plan adopted by the Partnership from time to time in accordance with the terms of hereof.

"Calendar Quarter" shall mean any three (3) consecutive month period ending on March 31, June 30, September 30 and December 31 of any calendar year.

"Capital Account" shall have the meaning ascribed to it in Section 3.2.

"Capital Call Notice" shall have the meaning ascribed to it in Section 3.4.

"Capital Contribution" of a Member shall mean the amount of cash and the agreed upon fair market value (net of liabilities) of property contributed by such Member (or such Member's predecessor in interest) to the Company, including with respect to any Member, pursuant to Section 3.1 and Additional Capital Contributions contributed pursuant to Section 3.4.

"Cash Flow" shall mean, for any fiscal period, (a) the cash receipts of the Company during such period derived from all sources (including any reduction in any Reserves but excluding Capital Contributions), including from any proceeds from any Sale or Refinancing, minus (b) the sum of (i) all cash expenditures and payments made by the Company during such period (excluding expenditures made from Capital Contributions and Reserves during such period), plus (ii) additions to Reserves during such period.

"Certificate" shall have the meaning ascribed to it in the Recitals.

"Code" shall mean the United States Internal Revenue Code of 1986, as the same may be amended, the regulations promulgated thereunder ("Treasury Regulations"), and any corresponding provisions of subsequent law.

"Company" shall have the meaning ascribed to it in the caption to this Agreement.

"Company Assets" shall mean all right, title and interest of the Company in and to all or any portion of the assets of the Company and any business property (real or personal) or estate acquired in exchange therefor or in connection therewith, including the Property and any membership or other interest in any Subsidiary, or all or any portion of the assets of any Subsidiary or any business property (real or personal) or estate acquired in exchange therefor or in connection therewith.

"Consent Notice" shall have the meaning ascribed to it in Section 4.1(b).

"Construction Management Agreement" shall mean the construction management agreement between the Property Owner and the Construction Manager.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Construction Manager" shall initially mean ALM, or any Person or Persons who, at the time of reference thereto, has been appointed as a replacement construction manager for the Property, in each case in accordance with the terms and provisions of this Agreement.

"Control" (including its correlative meanings, "Controlled by," "Controlling" and "under common Control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether, in any case, through any of ownership of securities or partnership or other ownership interests, voting control, by contract or otherwise).

"Deadlock Event" shall mean a disagreement of the Members with respect to a Major Decision (subject to Section 4.1(b)), and the disagreement remains unresolved after the good faith negotiation of the Members (which shall be deemed to require the participation of Joseph G. Lubeck on behalf of Electra Member and Isaac Toledano on behalf of BH Member) for a period of thirty (30) days after delivery of written notice by a Member of the occurrence of a deadlock.

"Default Priority Loan" shall have the meaning ascribed to it in Section 3.5(a).

"Depreciation" shall mean, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period for federal income tax purposes; provided, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of any such year or other period, Depreciation shall be an amount that bears the same relationship to the Gross Asset Value of such asset as the depreciation, amortization, or other cost recovery deduction computed for federal income tax purposes with respect to such asset for the applicable period bears to the adjusted tax basis of such asset at the beginning of such period, or if such asset has a zero adjusted tax basis, Depreciation shall be an amount determined under any reasonable method selected by Managing Member. Notwithstanding the foregoing, if the Company uses the "remedial allocation method" pursuant to Regulations Section 1.704-(3)(d), then Depreciation shall instead be determined pursuant to and consistent with Regulations Section 1.704-(3)(d)(2).

"Development" shall mean any development, construction, building, positioning, and branding of the Property in accordance with the Business Plan (including the budgets included as a part thereof).

"Development Budget" shall mean the initial development budget set forth as part the Business Plan attached hereto as Exhibit C, and each future development budget included as part of the Approved Budget approved by the Members in accordance with Section 9.5.

"Development Parcel FMV" shall have the meaning ascribed to it in Section 4.12.

"Development Project" shall have the meaning ascribed to it in Section 4.12.

"Distribution" shall mean any cash, securities, property or other assets distributed to a Member by the Company.

"Dixie Property" shall have the meaning ascribed to it in the definition of Purchase Agreement.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Dixie Purchase Entity" shall mean the Person which was formed for the purpose of taking fee title to the Dixie Property, which on the Property Acquisition Date will become an indirect wholly-owned Subsidiary of the Company pursuant to the terms and conditions of the Assignment.

"Due Date" shall have the meaning ascribed to it in Section 3.4.

"Effective Date" shall have the meaning ascribed to it in the opening paragraph.

"Electra" shall mean Electra America Inc., a Delaware corporation and an Affiliate of Electra Member.

"Electra Bad Boy Event" means the occurrence of any of the following:

(a) The commission by Electra Member (whether in its capacity as "Manager" or "Member" hereunder) or any Key Person of fraud, theft or misappropriation relating to or affecting the Company, any Subsidiary, the Property or any other Company Assets;

(b) The commission by Electra Member (whether in its capacity as "Manager" or "Member" hereunder) or any Key Person of gross negligence or willful misconduct (i) in connection with the performance of duties hereunder or under any Electra Member Affiliate Agreement or (ii) relating to or affecting the Company, any Subsidiary, the Property or any other Company Assets;

(c) The conviction, guilty plea or plea bargain by Electra Member or any Key Person for any crime constituting a felony relating to or affecting the Company, any Subsidiary, the Property or any other Company Assets;

(d) If Electra Member, American Landmark, Electra Parent, or Lubeck is the subject of a Bankruptcy;

(e) Any of Electra Member, American Landmark, Electra Parent, any Key Person, or any Person that directly or indirectly through one or more intermediaries Controls or is Controlled by or is under common Control with, Electra Member, American Landmark, Electra Parent, any Key Person, or any officer, director or Person who serves in a similar capacity with respect to any of the foregoing, becomes a Prohibited Person, subject in each case to the Non-Executive Cure Right;

(f) A Key Person is no longer involved in the day-to-day operation of Electra Member (whether in its capacity as "Manager" or "Member" hereunder) for any reason, or no longer has Control, exercisable without the consent or approval of any other Person, over the business and affairs of Electra Member, subject only to certain major decision veto rights of Electra and Miller;

(g) Any intentional misrepresentation, omission or breach on the part of Electra Member, Electra, American Landmark, Electra Parent, Lubeck, or any Affiliate of any of the foregoing with respect to any of the representations, warranties or covenants contained herein or in any Electra Member Affiliate Agreement that causes a material adverse economic consequence to the Company.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Electra Member" shall have the meaning ascribed to it in the caption to this Agreement.

"Electra Member Affiliate Agreement" means any agreement between or among the Company (and/or any Subsidiary(ies)), on the one hand, and Electra Member, American Landmark, Electra, Electra Parent, Lubeck, Miller and/or any Affiliate(s) of any of the foregoing, on the other hand (including each of the property management agreement and the construction management agreement for the Property in effect as of the date hereof).

"Electra Member Loan" shall have the meaning ascribed to it in Section 3.1(c).

"Electra Member Indemnitees" shall have the meaning ascribed to it in Section 13.3(b).

"Electra Parent" means Electra Real Estate Ltd., an Israeli public company and an Affiliate of Electra Member.

"Emergency Expenses" shall mean the minimum amount necessary to perform any construction, repairs or rehabilitation to the Property which is immediately necessary to protect the life, health or safety of any person from imminent bodily harm or to prevent or mitigate imminent danger of material damage or harm to the Property or any material portion thereof.

"Existing Lender Approval(s)" shall have the meaning ascribed to it in Section 6.4(i).

"Fiscal Year" shall have the meaning ascribed to it in Section 9.2.

"Funding Member" shall have the meaning ascribed to it in Section 3.5(a).

"Good Faith Deposit" or "Good Faith Deposits" shall have the meaning ascribed to it in Section 6.4(c).

"Gross Asset Value" shall mean, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(a) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as reasonably agreed to by the contributing Member and the Manager;

(b) The Gross Asset Value of all Company Assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Manager and taking into account Code Section 7701(g), as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the Distribution by the Company to a Member of more than a de minimis amount of cash or Company Assets as consideration for an interest in the Company; (iii) the grant of more than a de minimis interest in the Company as consideration for the provisions of services to or for the benefit of the Company by an existing Member acting in such capacity, or by a new Member acting in such capacity or in anticipation of being a Member; and (iv) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i), (ii) and (iii) of this sentence shall be made only

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(c) The Gross Asset Value of any Company asset Distributed to any Member shall be the gross fair market value of such asset on the date of Distribution, as reasonably determined by the Manager and taking into account Code Section 7701(g).

The Gross Asset Values of Company Assets shall be adjusted to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Paragraph (a) or Paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Interest" shall mean the interest of a Member in the Company, including the right of such Member in the capital, profits and losses of, and Distributions from, the Company, and the right of such Member to any and all benefits to which such Member may be entitled under this Agreement.

"Internal Rate of Return" shall mean the discount rate at which the net present value of the applicable Member's Capital Contributions to and Distributions from the Company equals zero, calculated for each such Capital Contribution from the actual date such Capital Contribution was made or the actual date such Distribution was received, as the case may be. The Member's Internal Rate of Return shall be calculated on the basis of the actual number of days elapsed over a 365 or 366-day year, as the case may be. Each Internal Rate of Return calculation shall be determined from and including the actual date upon which each such Capital Contribution was made by the Members (including if made prior to the date of this Agreement) to and including the actual date of any Distribution is made on account thereof. Internal Rate of Return will be calculated using the Microsoft Excel function "XIRR". This function requires dates and amounts. All dates and amounts thereafter will be as they appear in the Company bank statements. All Distribution amounts shall be based on the amount of the Distribution prior to the application of any federal, state or local taxation to Members (including any withholding or deduction requirements).

"Key Person" means, initially, Lubeck. If and when an Alternate Key Person is appointed, if required in accordance herewith, such Alternate Key Person(s) shall be a Key Person for all purposes hereunder thereafter.

"Loan" shall mean each mortgage loan made to, or assumed by, the Property Owner and secured by a Property as of the Property Acquisition Date, as same may be amended, modified and/or restated from time to time, and any additional or supplemental loans obtained by the Property Owner and secured by the Property after the Property Acquisition Date, as same may be amended, modified and/or restated from time to time (but expressly excluding any Default Priority Loans described in Section 3.4).

"Loan Agreement" shall mean each loan agreement pursuant to which the Property Owner obtains a Loan, as the same may be amended, modified and/or restated from time to time.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Loan Documents" shall mean, with respect to the Property, the related Loan Agreement, together with the other "Loan Documents" (as defined in such Loan Agreement), as the same may be amended, modified and/or restated from time to time.

"Lubeck" means Joseph G. Lubeck, an individual and an Affiliate of Electra Member.

"Macy's Property" shall have the meaning ascribed to it in the definition of Purchase Agreement.

"Macy's Purchase Entity" shall mean the Person which was formed for the purpose of taking fee title to the Macy's Property, which on the Property Acquisition Date will become an indirect wholly-owned Subsidiary of the Company pursuant to the terms and conditions of the Assignment.

"Major Decision" shall mean to make any decision:

(a) that constitutes a Sale;

(b) that results in the Company or any Subsidiary entering into a Loan or Refinancing;

(c) in respect to the Company or any Subsidiary entering into any transaction or related transactions to acquire any material assets outside of the ordinary course of the Company's business;

(d) to materially revise or amend the Approved Budget;

(e) in respect to (i) the filing of a voluntary petition or the initiation of proceedings to have the Company or any Subsidiary adjudicated bankrupt or insolvent, or the consent to the institution of bankruptcy or insolvency proceedings against the Company or any Subsidiary; (ii) a petition seeking or consenting to reorganization or relief of the Company or any Subsidiary as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Company or any Subsidiary; (iii) seeking or consenting to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Company or any Subsidiary of all or any substantial part of the properties and assets of the Company; or making any general assignment for the benefit of creditors of the Company or any Subsidiary; or (iv) admitting in writing the inability of the Company or any Subsidiary to pay its debts generally as they become due or declare or effect a moratorium on the Company debt or take any action in furtherance of any such action; or

(f) determining (a) any salary to be paid to any employee of the Company or any Subsidiary or (b) any fee to be paid to a Member or an Affiliate of a Member, in each case to the extent not specified in this Agreement.

"Manager" shall initially mean Electra Member, and thereafter any Person or Persons who, at the time of reference thereto, has been appointed as a replacement Manager, in each case in

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

accordance with Sections 4.1(a) and/or 4.9(a). Managers shall refer to all Managers then acting as such at the time of reference thereto.

"Marketing Material" shall have the meaning ascribed to it in Section 4.4.

"Member" shall mean any Person who is a member (including additional Members and Substituted Members) of the Company at the time of reference thereto. Members shall refer to all Members at the time of reference thereto. The initial Members of the Company are Electra Member and BH Member.

"Member's Investment" shall have the meaning ascribed to it in Section 4.12.

"Miller" shall mean James G. Miller, a member of American Landmark and Affiliate of Electra Member.

"Necessary Expenses" shall mean (a) any expense expressly provided for in an Approved Budget, (b) the actual amount of any Uncontrollable Expenses, (c) the actual amount of any Emergency Expenses, (d) the minimum amount necessary in order for the Company or any Subsidiary to (i) perform its non-discretionary contractual obligations entered into in accordance with the terms hereof, and (ii) comply with any final court orders, judgments or other judicial or governmental proceedings (including all costs and expenses related thereto), and (e) any costs required by the Company or any Subsidiary in order to avoid or cure a default under any loan documents to which the Company or any Subsidiary is party (including the Loan Documents) or any lease under which the Company or any Subsidiary is lessor.

"Non-Funding Member" shall have the meaning ascribed to it in Section 3.5(a).

"Non-Executive Cure Right" means that an employee of Electra Member or any Affiliate thereof becoming a Prohibited Person shall not constitute an Electra Bad Boy Event pursuant to clause (f) of the definition thereof so long as each of the following conditions are satisfied:

(a) such employee was not a corporate officer or member of senior management of Electra Member or any Affiliate thereof;

(b) any action or omission resulting in such employee becoming a Prohibited Person was not committed at the direction of, or with the knowledge of, or as a result of the negligent supervision of, any corporate officer or member of senior management of Electra Member or any Affiliate thereof;

(c) Electra Member or an applicable Affiliate causes the full restitution to the Company of any and all losses sustained by the Company as a result of such employee becoming a Prohibited Person within ten (10) Business Days after receipt of the demand for payment therefor;

(d) within ten (10) Business Day after the date that a corporate officer or member of senior management of Electra Member or any Affiliate thereof acquires knowledge of such employee becoming a Prohibited Person, and subject to compliance with all relevant local employment laws, Electra Member or an applicable Affiliate causes the removal (at its sole

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

expense) of such employee from all involvement with the Company, all Subsidiaries and the Company Assets; and

(e) no more than two (2) employees of Electra Member or any Affiliate thereof have previously become Prohibited Persons.

"Notice" shall have the meaning ascribed to it in Section 12.3 hereof.

"Offeror" shall have the meaning ascribed to it in Section 6.4(a) hereof.

"Offeror Good Faith Deposit" shall have the meaning ascribed to it in Section 6.4(a).

"Operating Budget" means the initial operating budget set forth as part of the Business Plan attached hereto as Exhibit C and each annual operating budget included as part of the Approved Budget approved by the Members in accordance with Section 9.5.

"Other Members" shall have the meaning ascribed to it in Section 6.4(a).

"Other Members Good Faith Deposit" shall have the meaning ascribed to it in Section 6.4(c).

"Percentage Interest" means, initially, seventy five percent (75%) for the Electra Member and twenty five percent (25%) for the BH Member, and with respect to any Member at any time after the Effective Date, such Member's Interest expressed as a percentage, obtained by dividing the Capital Contributions made by such Member by the Capital Contributions made by all Members, as same may be adjusted from time to time pursuant to Section 3.5(c), and provided that, for purposes of this definition, a Default Priority Loan shall not be deemed a Capital Contribution.

"Permitted Transfer" shall mean any of the following, provided that such Transfer is permitted under the Loan Documents, and provided further that, notwithstanding anything to the contrary contained herein, the rights of the Members below are subject in all cases to the applicable provisions of this Agreement:

(a) If the Transferring Member is BH Member, any direct or indirect Transfer of BH Member's Interest (as opposed to a direct Transfer of BH Member's Interest in the Company), (i) to any Person 100% of whose outstanding securities and other indicia of ownership and all economic, profits, voting and other equity interests are directly or indirectly owned, Controlled and held with power to vote by Toledano, and (ii) as a result of the death of a natural person, held by the decedent in question to the Person or Persons lawfully entitled thereto.

(b) If the Transferring Member is Electra Member, any direct or indirect Transfer of an interest in Electra Member (including any direct or indirect interest in Electra Member) in whole or in part, to any Person, in each case so long as following any such Transfer exclusive Control that is exercisable without the consent or approval of any other Person over the business and affairs of Electra Member (including Electra Member's Interest) remains vested in a Key Person (or a Key Person together with Electra Parent), subject only to certain major decision veto rights of a Key Person Affiliate.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Person" shall mean any individual and any partnership, company, corporation, joint venture, trust, business trust, cooperative, association, limited liability company and other entity and the heirs, executors, administrators, successors and assigns thereof.

"Profits" or "Losses" shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(a) any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b) any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(c) in the event the Gross Asset Value of any Company asset is adjusted in accordance with Paragraph (b) or Paragraph (c) of the definition of "Gross Asset Value" above, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d) gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e) in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance Gross Asset Value of such property; and

(f) notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 8.3 hereof shall not be taken into account in computing Profits or Losses.

"Prohibited Person" shall mean a Person with whom a U.S. Person is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC, including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. persons may not transact business or must limit their interactions to types approved by OFAC or otherwise.

"Project" shall mean engaging, directly and indirectly, in transactions involving acquisition, ownership, management, development, renovation, operation, funding, financing,

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

selling, transferring, exchanging or otherwise disposing of one or more of the Properties by the Project Entities.

"Project Entities" shall have the meaning ascribed to it in the Recitals.

"Promote Clause" shall have the meaning ascribed to it in Section 3.4.

"Promote Share" means twenty-five percent (25%), as may be adjusted from time to time in accordance with Section 3.5(d).

"Proposal Notice" shall have the meaning ascribed to it in Section 6.4(a).

"Proposed Budget" shall have the meaning ascribed to it in Section 9.5.

"Property" shall mean collectively that certain mixed use real property located in Cutler Bay, Florida, commonly known as "Southland Mall" and consisting of approximately 70 acres of total land area and approximately 808,776 leasable square feet, as more particularly described on Exhibit A hereto, including without limitation the Macy's Property and the Dixie Property.

"Property Acquisition Date" shall mean the date on which a Property Owner obtains fee simple title to a Property.

"Property Management Agreement" shall mean the property management agreement between the Property Owner and the Property Manager.

"Property Manager" shall initially mean an entity related to or controlled by Urban Retail Properties, LLC or any Person or Persons who, at the time of reference thereto, has been appointed as a replacement property manager for the Property, in each case in accordance with the terms and provisions of this Agreement.

"Property Owner" shall mean each of the Dixie Purchase Entity and Macy's Purchase Entity, and each other direct or indirect Subsidiary of the Company formed for the purpose of taking fee simple title to a Property.

"Purchase Agreements" shall mean that certain Purchase and Sale Agreement dated September 3, 2021 between 20505 S DIXIE HIGHWAY – 10093326 LLC, a Delaware limited liability company, as seller, and Altostratus Investments, LLC, a Florida limited liability company, as buyer, as amended by First Amendment to Purchase and Sale Agreement dated September 30, 2021; Second Amendment to Purchase and Sale Agreement dated October 7, 2021; and Third Amendment to Purchase and Sale Agreement dated January 6, 2022, relating to that certain real property located at 20505 South Dixie Highway, Cutler Bay, Florida 33189, as more particularly described therein (the "Dixie Property"); and that certain Purchase and Sale Agreement dated February 2, 2022 between Macy's Retail Holdings, LLC, an Ohio limited liability company, as seller and Hamilton Holdings, LLC, a New Mexico limited liability company, as buyer, relating to the approximately 9.86 acres of land, and improvements thereon, as more particularly described therein (the "Macy's Property").

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Refinancing" shall mean the replacement, increase, consolidation, modification or extension of any mortgage (or mezzanine) loans on the Property or any portion thereof (including the Loan) or the placement of a mortgage (or mezzanine) loan on the Property or any portion thereof after the date hereof.

"Renovation Reserve(s)" shall mean a Company reserve account for funds held to pay for capital improvements as reflected in the Approved Budget. The Renovation Reserve referenced in the foregoing sentence shall be deemed a Reserve for all purposes hereunder.

"Required Approval" shall mean the approval of Members with a Percentage Interest equal to 50% or more, provided, however, that so long as (i) no BH Member Default has occurred and is continuing, and (ii) BH Member continues to own an Interest in the Company, the approval of BH Member shall be required for Required Approval.

"Reserves" means funds or other amounts set aside or otherwise allocated or designated for any valid purpose relating to the Property or the Company (including any amounts as to working capital), as may be required under any mortgage (or mezzanine) loans or other financing with respect to the Property or the Company or determined from time to time in accordance with, and subject to, the applicable provisions of this Agreement (including the Approved Budget and the Loan Documents).

"Residual Share" means, as of any date:

(a) With respect to BH Member, a percentage equal to (i) its Percentage Interest in the Company as of such date plus (ii) the Promote Share as of such date; and

(b) With respect to Electra Member, a percentage equal to its Percentage Interest in the Company as of such date less (ii) the Promote Share as of such date.

"Response Notice" shall have the meaning ascribed to it in Section 6.4(c).

"Response Period" shall have the meaning ascribed to it in Section 6.4(c).

"Sale" shall mean (whether in a single transaction or series of transactions): (i) a sale of the Property and any and all other Company Assets or any material portion thereof, (ii) a material condemnation, voluntary or involuntary conversion, insured material casualty or other disposition of the Property and any and all other Company Assets or any material portion thereof or (iii) a sale or other transfer of all of the membership interests in the Company (or, if applicable, in a Subsidiary).

"Subsidiary" means any entity directly or indirectly owned in whole or in part by the Company, including each Project Entity and Property Owner.

"Substituted Member" shall mean any Person who is an assignee of a transferred Interest and who is admitted to the Company as a Member pursuant to the provisions of Section 6.7.

"Target Amount" shall have the meaning ascribed to it in Section 8.1(a).

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Toledano" means Yizhak Toledano, and individual that is an Affiliate of BH Member. In the event of the death, disability or incapacity of Yizhak Toledano, his wife Liat Toledano shall be deemed to have replaced "Toledano" for all purposes hereunder.

"Transfer" shall have the meaning ascribed to it in Section 6.1.

"Transfer Notice" shall have the meaning ascribed to it in Section 6.10.

"Uncontrollable Expenses" shall mean the following expenditures: (x) real estate taxes, (y) utility charges, and (z) premiums for approved insurance.

"Valuation" shall have the meaning ascribed to it in Section 6.4(a).

## ARTICLE 2

## FORMATION

Section 2.1 Formation of Company.

The Company was formed as a Delaware limited liability company under and pursuant to the Act by the filing of the Certificate.

Section 2.2 Name and Principal Place of Business.

The Company shall conduct its business and promote its purposes under the firm name of Electra America SD Mall JV LLC, or such other name or names as the Members may from time to time agree to. The Company's principal office for the transaction of business shall be at 1331 South Killian Drive, Suite A, Lake Park, Florida, 33403, or such other place or places as the Manager may select.

Section 2.3 Purposes.

Except as otherwise expressly provided herein, the purpose of the Company shall be to conduct and engage in the following activities: (a) directly or indirectly (through one or more Subsidiaries or other Persons) acquire, purchase, own, hold, manage, develop, operate, improve, renovate, rent, lease, fund, finance, encumber, sell, transfer, exchange, dispose of, invest in, or otherwise deal with, the Property and any other Company Assets, (b) to own, directly or indirectly, a limited liability company or other interest in, and act as a member of each Subsidiary, (c) to conduct such other lawful business activities related or incidental thereto or as the Members may otherwise determine in accordance with this Agreement and (d) to exercise all powers enumerated in the Act necessary to the conduct, promotion or attainment of the purposes set forth herein and for the protection and benefit of the Company. The Company is authorized and empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of its purposes and for the protection and benefit of the Company, including all acts and things permitted under the Act and this Agreement.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 2.4 Term.

The term of the Company began as of the date of the filing of the Certificate of Formation with the Secretary of State of the State of Delaware hereof and shall continue unless and until the Company shall be dissolved and terminated pursuant to the laws of the State of Delaware or Article 10 hereof.

Section 2.5 Title to the Property.

Each of the Members hereby acknowledges and agrees that title to the Property and all other Company Assets shall be held in the name of the Company (or, if applicable, a Subsidiary).

## ARTICLE 3

## CAPITAL CONTRIBUTIONS; ELECTRA MEMBER LOAN; CAPITAL ACCOUNTS; ADDITONAL CAPITAL CONTRIBUTIONS

Section 3.1 Capital Contributions; Electra Member Loan.

(a) On or before the Property Acquisition Date, Electra Member shall make a Capital Contribution to the Company in an amount which is equal to seventy five percent (75%) of the equity required by the Company and the Property Owner to close on its acquisition of the Property and to fund the Renovation Reserves and a working capital reserve to be established for the Company. Electra Member's Capital Account shall be credited with the aforesaid amount upon its funding of same.

(b) Subject to Section 3.1(c), on or before the Property Acquisition Date, BH Member shall make a Capital Contribution to the Company in an amount which is equal to twenty five percent (25%) of the equity required by the Company and the Property Owner to close on its acquisition of the Property and to fund the Renovation Reserves and a working capital reserve to be established for the Company. BH Member's Capital Account shall be credited with the aforesaid amount upon its funding of same.

(c) Electra Member agrees to contribute to the Company on behalf of BH Member forty percent (40%) of the amount of BH Member's Capital Contributions (including any Additional Capital Contributions) as called for by this Agreement (i.e., 10% of the total initial required Capital Contributions by the Members). The amount so contributed under this Section 3.1(c) by Electra Member on behalf of BH Member towards it Capital Contributions shall be deemed (i) a loan from Electra Member to BH Member (an "***Electra Member Loan***"), which Electra Member Loan shall bear interest until repaid at a rate per annum equal to ten percent (10%) per annum, compounded annually, during the term of the Electra Member Loan; and (ii) a Capital Contribution from BH Member to the Company. Each Electra Member Loan shall be payable from any Distributions to be made by the Company to BH Member, and until such Electra Member Loan is paid in full the Company, and the Manager, on behalf of the Company, is irrevocably authorized and directed by the Members to pay to Electra Member from Distributions otherwise payable to BH Member by the Company the principal of, and accrued interest on, such Electra Member Loan. The Manager shall maintain records of the Electra Member Loans, including the calculation of the principal amount advanced and the accrued interest thereon, and provide the

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Members information on same upon request. All applicable amounts otherwise distributable to BH Member under this Agreement shall first be paid to Electra Member to be applied first to interest on such Electra Member Loan and then to the principal thereof. The Electra Member Loan is secured by a pledge by BH Member of its Interest in the Company to Electra Member.

(d) No Member shall be required to make any Capital Contributions in excess of the amount set forth in this Section 3.1 or loan any amount to the Company except as expressly provided in this Agreement.

Section 3.2 Capital Accounts.

A separate capital account (each a "Capital Account") shall be maintained for each Member, which shall consist of such Member's Capital Contribution, increased by such Member's share of Company profits pursuant to Article 8 hereof and by any Additional Capital Contributions, and decreased by Distributions to such Member by the Company pursuant to Sections 7.1 and 10.3 hereof, by such Member's share of Company losses pursuant to Article 8 hereof and by operation of Section 3.5(a). No Member shall be permitted to make any withdrawals from such Member's Capital Account, except as otherwise expressly provided herein. Capital Accounts shall be maintained in accordance with Code Section 704 and the regulations promulgated thereunder.

Section 3.3 Interest and Right to Property.

Except as expressly set forth herein, no interest or preferred return shall be paid on the Capital Contribution of any Member, nor shall any Member have the right to demand and receive property, other than cash, in return for such Member's Capital Contribution.

Section 3.4 Additional Capital Contributions.

If the Manager determines in its reasonable opinion that the Company does not have sufficient funds to pay all Necessary Expenses, then the Manager shall be entitled to send a written notice to all Members calling for such additional Capital Contributions ("Capital Call Notice") from the Members for the purpose of funding such shortfall. A Capital Call Notice shall state, among other things, the aggregate amount of additional capital that is required to be funded by the Members (subject to Section 3.1(c)) on a pro rata basis in accordance with their Percentage Interests, the purpose for which such additional capital is required and the date by which such additional Capital Contributions are required to be made (which shall be no sooner than thirty (30) days after the date all Members received such Capital Call Notice (other than with respect to Emergency Expenses which required funding date will be as reasonably set forth in the subject Capital Call Notice)("Due Date"). Such additional Capital Contributions actually received by the Company shall be referred to herein as the "Additional Capital Contributions" and individually, an "Additional Capital Contribution". Notwithstanding anything to the contrary in this Agreement, if any Additional Capital Contribution is to be made after any amount has been distributed under Section 7.1(a)(iii) (the "Promote Clause Clause"), then such Additional Capital Contribution shall be made in accordance with the Members' respective proportionate shares of the distributions made under the Promote Clause unless (and until) on the date of such Additional Capital Contribution, (1) the aggregate amount of Capital Contributions then or theretofore made

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

in accordance with such proportionate shares equals (2) the aggregate amount of distributions then or theretofore made under such Promote Clause.

Section 3.5 Failure to Contribute Additional Capital Contributions.

(a) Any Member which fails to timely contribute all or any portion of any Additional Capital Contributions shall be considered a "Non-Funding Member". If a Member fails to make an Additional Capital Contribution, then the Company shall, upon notice to the Non-Funding Member, permit the other Member (the "Funding Member"), to advance all or any portion of the Additional Capital Contribution that the Non-Funding Member has failed to timely contribute and elect to either (i) treat such contribution, together with the Funding Member's contribution made in respect of the same Capital Call Notice, as a default loan to the Company and not as an Additional Capital Contribution (each, a "Default Priority Loan"), or (ii) treat such contribution as an Additional Capital Contribution. The Funding Member shall promptly provide the Non-Funding Member and the Company with written notice if it elects to exercise such right, including how it elects to treat such contribution.

(b) A Default Priority Loan shall bear interest at the fixed rate equal to twenty percent (20%) per annum, compounded quarterly, calculated on the basis of 365 or 366 days, as applicable for the number of days elapsed and shall be repaid from distributions in accordance with Section 7.1.

(c) If a Funding Member elects to treat its contribution on behalf of the Non-Funding Member as an Additional Capital Contribution, such Funding Member shall be deemed to have made an Additional Capital Contribution to the Company in an amount equal to the product of (A) two (2) and (B) the amount contributed by the Funding Member on account of the Non-Funding Member, and the Percentage Interests of the Members shall be adjusted accordingly.

(d) If BH Member is the Non-Funding Member, and Electra exercised its rights under clause (c) above, the Promote Share shall be reduced in proportion to the reduction in BH's Percentage Interest, and the amounts not distributed to BH as Promote Share from and after the date of such reduction shall instead be made to the Members, pro rata in accordance with their respective Percentage Interests. By way of example, if BH Member's Percentage Interest is (pursuant to clause (c) above), reduced from twenty five percent (25%) to twenty percent (20%)(i.e., a 20% reduction), then Distributions of the Promote Share to the BH Member shall be subject to a twenty percent (20%) reduction, from twenty five percent (25%) to twenty percent (20%), and Distributions made in respect of the forfeited five percent (5%) Promote Share from and after the date of such reduction shall be distributed to the Members, pro rata in accordance with their respective Percentage Interest as so adjusted (i.e., four percent (4%) to Electra Member and one percent (1%) to BH Member).

(e) Each Member acknowledges and agrees that the other Member would not be entering into this Agreement were it not for (i) the Members agreeing to make the Capital Contributions provided for in Section 3.01 and Section 3.4 of this Agreement and (ii) the remedy provisions above in this Section 3.5. Each Member acknowledges and agrees that if any Member fails to make its Capital Contributions pursuant to this Agreement, the other Member will suffer substantial damages and the remedy provisions set forth above are fair, just and equitable in all

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

respects and administratively superior to any other method for determining such damages. If a Member fails to timely contribute its full share of any Additional Capital Contribution called for pursuant to Section 3.4, the sole and exclusive remedy of the other Members and the Company on account of such failure shall be as set forth in Sections 3.5, 4.9 and 6.4 which shall be cumulative remedies (and no other recourse shall be available in connection therewith); provided, however, that notwithstanding the foregoing, each Member and any of its Affiliate shall be and remain liable for the payment of all amounts due from such Member or any of its Affiliate pursuant to any guaranties or indemnities given to the Company (or any other Person) by such Member or any Affiliate in connection with this Agreement and the Project.

## ARTICLE 4

## MANAGEMENT; RIGHTS OF MEMBERS; FEES AND EXPENSES

Section 4.1 Management.

(a) The business affairs of the Company shall be managed by a Manager, who may but need not be a Member. Except as otherwise provided herein, the Manager shall be designated by the Members only with Required Approval. The Members hereby appoint Electra Member as the initial Manager. The Manager shall be responsible to do all things and to prepare and make such filings and reports and otherwise to cause the Company, each Subsidiary and the Property to comply with the laws, rules, regulations and orders of applicable governmental authorities and to comply with (x) the provisions of the mortgages and financings of the Property, the Company and any Subsidiary (including the Loan and the Loan Documents), as well as (y) the then Approved Budget, among other things. The Manager shall perform all of its obligations under this Agreement with reasonable diligence and in a prompt and businesslike manner, exercising such care and skill as a prudent investor with sophistication and experience in acquiring, owning, operating and managing property like the Property would exercise in dealing with its own assets. As such, to the maximum extent permitted by applicable Law, neither the Manager nor any of its Affiliates shall owe any duties (including any fiduciary duties) to the Company, any Subsidiary or to any Member, assignee of any Member, or any other Person that is a party to or is otherwise bound by this Agreement, any and all such duties being hereby specifically disclaimed and eliminated in all respects; provided, that all such Persons shall be liable for any bad faith violation of the implied contractual covenant of good faith and fair dealing as and to the extent set forth in Section 18-1101(e) of the Act. Without limiting the generality of the foregoing, subject to Section 4.1(b), the Manager shall have the right and duty to do, accomplish and complete, for and on behalf of the Company, each Subsidiary and the Property all of the actions set forth on Schedule 4.1(a) hereto.

(b) Any Major Decision will require Required Approval. Either Member shall have the right to make a request for approval by Members to any Major Decision. All requests for approval to a Major Decision shall (a) be made in writing, sent pursuant to and in accordance with Section 12.3, (b) specify the date by which the Members must respond to such request, which date shall be not less than ten (10) Business Days after delivery of such request, and (c) be accompanied by (i) reasonable information regarding such proposed Major Decision and (ii) a description of the Major Decision proposed to be taken by the Company or applicable Subsidiary (any such request that satisfies the forgoing conditions, a "Consent Notice"). If a Member fails to deliver a written

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

response to a proposed Major Decision prior to the date specified in the Consent Notice pertaining thereto, then the Member requesting the Major Decision may (but shall have no obligation to) deliver a second (2nd) Consent Notice to the Manager and the applicable Member with bold font in all capital letters stating "THIS IS A SECOND NOTICE. YOU MUST RESPOND IN WRITING WITHIN FIVE (5) BUSINESS DAYS OR YOU WILL BE IRREVOCABLY DEEMED TO HAVE APPROVED THE MATTERS SET FORTH BELOW." Except as expressly provided in this Section 4.1(a), if a Member(s) fails to deliver a written response within five (5) Business Days after delivery of the second (2nd) Consent Notice, then the Manager and the Member(s) shall be deemed to have granted their consent to the Major Decision. If the applicable Member(s) timely deliver a written response to the Consent Notice, or if the applicable Member requesting the Major Decision does not deliver a second (2nd) Consent Notice, then the applicable Member(s) shall be deemed to have rejected the proposed Major Decision.

(c) It is acknowledged that the initial Property Manager shall serve as the initial property manager for the retail component of the Property pursuant to the Property Management Agreement, pursuant to which, among other things, (i) the Property Manager shall be entitled to an annual management fee in an amount set forth in the applicable Property Management Agreement, and (ii) the Company (or applicable Subsidiary) shall have the right to terminate the Property Management Agreement in accordance with the terms thereof. The Manager shall cause the Property Manager to undertake to pay, from the operating account of the Company (or applicable Subsidiary) with respect to which the Property Manager has disbursement authority, the amounts of Cash Flow that the Members are entitled to receive pursuant to Section 7.1 directly to such Members.

(d) It is acknowledged that the initial Construction Manager shall serve as the initial construction manager for the Property pursuant to the Construction Management Agreement, pursuant to which, among other things, (i) the Construction Manager shall be entitled to a construction management fee in an amount equal to three percent (3%) of all budgeted hard costs for major property repairs and capital improvements, as such repairs and improvements are determined pursuant to the Construction Management Agreement with the Construction Manager with respect to the Property for the applicable period over which the Construction Manager serves as construction supervisor and/or inspecting agent, and (ii) the Company (or applicable Subsidiary) shall have the right to terminate the Construction Management Agreement in accordance with the terms thereof (including upon thirty (30) days prior written notice to the Construction Manager).

Section 4.2 Fees.

Except as expressly provided in this Agreement and subject to the then Approved Budget, Members and their Affiliates shall not be entitled to receive any fees or other compensation from the Company or any Subsidiary, including property management brokerage fees on the sale or lease of apartments at the Property or other fees or compensation in connection with the acquisition, construction, development, operation, management, financing or refinancing of the Property, the Company or any Subsidiary, and any such fees or other compensation received by any Member or its Affiliate shall be property of the Company and shall be held in trust for the benefit of, and promptly turned over, to the Company. Notwithstanding the foregoing: (i) on the Property Acquisition Date, the Members (or their respective designee) shall be paid a one-time acquisition fee in an amount equal to one percent (1%) of the all-in purchase price for the Property

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

set forth in the Purchase Agreement (the "Acquisition Fee"), which Acquisition Fee shall be split equally between the Members (i.e., fifty percent (50%) to each Member); and (ii) the Members (or their respective designee) shall be paid an annual asset management fee equal to one percent (1%) of gross operating revenues of the Property (the "Asset Management Fee") payable monthly in arrears, which Asset Management Fee shall be paid to the Members or respective designees in accordance with then Percentage Interest of the Members for so long as such Member owns an Interest in the Company.

Section 4.3 Reimbursement for Expenses.

Each of the Members shall be responsible fall all out-of-pocket expenses incurred by it in connection with the Project, including, without limitation cost and fees incurred by each in connection with the preparation and negotiation of this Agreement. On the Property Acquisition Date, the approved pursuit costs and other expense items of each of the Members and their respective Affiliates incurred in connection with the Project and the acquisition by the Company of the Property (and the transactions contemplated hereby) shall be reimbursed by the Company to the Members in full. Following the Property Acquisition Date, each Member shall be entitled to reimbursement by the Company for all out-of-pocket expenses paid or incurred by it pursuant to the discharge of its obligations under this Agreement which are set forth in the then Approved Budget.

Section 4.4 Co-Developer Joint Marketing.

The content of all advertising, digital websites and online information, collateral marketing materials, press releases and all other media relating to any Project (collectively "Marketing Material") shall refer to both Electra Member and BH Member as "co-developers". All Marketing Material shall be delivered to Electra Member before being placed into circulation, and shall be subject to Electra Member's sole and absolute approval in all respects.

Section 4.5 Manager's Time.

The Manager shall devote such time to the Company and its business and affairs as shall be necessary to conduct the business and affairs of the Company and any Subsidiary in an efficient and businesslike manner and to carry out the Manager's responsibilities as set forth herein, and notwithstanding anything to the contrary to the foregoing, shall apply reasonable and diligent business practices in the performance of its responsibilities as Manager hereunder in a commercially reasonable manner.

Section 4.6 Non-Exclusivity.

Each Member and its Affiliates may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, brokerage and development of real property (competing or non-competing with the Property), and neither the Company nor any Member thereof shall have any right by virtue of this Agreement to participate in any way in any such independent ventures (whether presently existing or hereafter established or created) or to the income, profits or losses derived therefrom. No Member shall be obligated to

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

present any particular investment opportunity to the Company even if such opportunity is of a character which, if presented to the Company, could be taken by the Company, and each Member shall have the right to take any such particular investment opportunity for its own account or to recommend same to others including such Member's Affiliates.

Section 4.7 <u>No Liability and Indemnity.</u>

Subject to the terms hereof (including Section 12.1 and Section 13.3), Manager shall not be liable, responsible or accountable to the Company or any Member for any act or omission performed or omitted pursuant to the authority granted to him or it hereunder or by law, or for a loss resulting from any mistake or error in judgment on its part, provided that such act, omission, mistake or error in judgment, as the case may be, did not result from the willful misconduct, gross negligence or fraud of such Manager, or the breach by the Manager of any provision of this Agreement in any material respect. A Manager may consult with legal counsel and any action taken or omitted in good faith in reliance upon and in accordance with the opinion or advice of such counsel shall be full protection and justification of a Manager with respect to the action so taken or omitted. Subject to Section 3.5, Section 12.1 and Section 13.3, the Company shall indemnify, defend and save harmless, solely from Company Assets, the Manager and its Affiliates, agents and/or representatives from any loss, damage, liability or expense incurred or sustained by it by reason of any act performed or omitted to be performed for or on behalf of the Company in accordance with this Agreement, but this indemnity shall not be applicable to any loss, damage, liability or expense resulting from the willful misconduct, gross negligence, or fraud of such Person or from any other events for which such Person or any of its Affiliates must indemnify the Company, any Member or any other Person pursuant to the terms hereof (or pursuant to any Electra Member Affiliate Agreement), nor shall it be applicable to the breach by such Person of any provision of this Agreement in any material respect, nor shall it be construed as a guaranty of payment as to any obligations of the Manager or its Affiliates hereunder. For the avoidance of doubt, none of Electra Member (whether in its capacity as "Manager" or "Member" hereunder), Electra Parent or any of their respective Affiliates shall be entitled to indemnification or reimbursement on account of any loss, damage, liability or expense incurred or sustained on account of, or in connection with, any Electra Bad Boy Event.

Section 4.8 <u>Reliance by Third Parties.</u>

Third parties dealing with the Company may rely conclusively upon the power and authority of Manager (or Lubeck (as applicable), acting in accordance with the applicable terms of this Agreement) to act as set forth herein and shall not be required to inquire into or ascertain the authority of Manager (or Lubeck, acting in accordance with the applicable terms of this Agreement) to so act; provided that the Manager shall not have any right or authority to assume or create any obligation or responsibility, express or implied, on behalf of or in the name of the Company, any Subsidiary or any of their respective Affiliates, or to bind the Company, any Subsidiary or any of their respective Affiliates in any manner, except as authorized by this Agreement, and the Manager shall not make any contrary representation to any third party.

NOT AN OFFICIAL COPY-PUBLIC ACCESS-NOT AN OFFICIAL COPY-PUBLIC ACCESS

Section 4.9 Replacement of Manager.

(a) Notwithstanding anything to the contrary set forth herein (but subject to Section 4.9(c)), BH Member shall unilaterally and in BH Member's sole discretion be entitled to remove Electra Member as Manager (and/or terminate any or all Electra Member Affiliate Agreements), and appoint BH Member (or any designee of BH Member) as the Manager of the Company at any time following the occurrence of any Electra Bad Boy Event; provided, however, that prior to BH Member exercising its right to remove Electra Member from its capacity as "Manager," BH Member shall be required to provide Electra Member with written notice of the specific event alleged to have fallen within the definition of an Electra Bad Boy Event and, solely to the extent such event is curable, BH Member shall grant Electra Member a period of twenty (20) Business Days after the receipt by Electra Member of such notice to cure such breach, and upon the failure by Electra Member to cure such breach within such cure period (as determined in BH Member's discretion), BH Member shall have the right to remove Electra Member from its capacity as "Manager".

(b) Notwithstanding anything to the contrary set forth in this Section 4.9: (i) BH Member shall not be entitled to remove the Manager if doing so would result in an "Event of Default" under the Loan; and (ii) BH Member shall not be entitled to remove the Manager if the Manager or any Affiliate thereof (including Lubeck) is a guarantor on a mortgage loan encumbering the Property, including without limitation, any non-recourse carve out guaranty, unless BH Member has, prior to, or concurrently with, such removal, either (x) arranged for such guarantor to be released from such guaranty for wrongful acts occurring after BH Member (or its designee) assumes the position of "Manager" hereunder, ***or*** (y) BH Member causes either BH Member, or another person or entity which is credit-worthy and reasonably acceptable to Electra Member, to provide indemnification to such guarantor with respect to any liability under such guaranty arising from the actions of BH Member or any replacement "Manager" designated by BH Member (including actions taken on behalf of or through the Company or any Subsidiary), after removal of Electra Member as "Manager" hereunder.

(c) Upon the removal of Electra Member as Manager pursuant to Section 4.9(a), (i) Electra Member shall use commercially reasonable efforts to describe to the Company all of the uncompleted business of the Manager and return all materials, records, documents and other items and information that belong to the Company or any Subsidiary or are used in connection with such former duties and responsibilities and reasonably cooperate with BH Member in transitioning and transferring any such duties and responsibilities of the Manager, including by executing any documents reasonably requested by BH Member in connection therewith, all at the reasonable expense of Electra Member, and (ii) none of Electra Member, Electra Parent or any of their respective Affiliates shall be entitled to any further fees from the Company or any Subsidiary (including those fees contemplated in Section 4.1(b)).

Section 4.10 Officers.

The Manager may, from time to time, appoint officers or other agents of the Company, who may but need not have titles, and shall exercise and perform such powers and duties as shall be assigned and delegated to them from time to time. Any officer or other agent may be removed at any time by the Manager, with or without cause. Each officer and other agent shall hold office

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

until his or her successor is elected and qualified, unless earlier removed in accordance with this Section. Any number of offices may be held by the same individual. The officers and such other agents, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Manager not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business and the actions of the officers and such agents taken in accordance with such powers shall bind the Company.

Section 4.11 Subsidiaries.

All of the provisions of this Agreement regarding the management and governance of the Company shall apply to the management and governance of any and each Subsidiary, whether any such Subsidiary is managed or controlled directly or indirectly by the Company, as member, manager or otherwise. Any action to be taken by any Subsidiary shall for all purposes hereof be construed as an action taken by the Company and shall be subject to the same rights and limitations granted and imposed on the Members under this Agreement, subject to any additional rights and limitations granted or imposed in the governing documents of such Subsidiary. Any and all references herein to the Company or any Manager or Member causing or directing any action shall be deemed to refer to the Company causing (or such Manager or Member causing the Company to cause), in its capacity as member or manager of such Subsidiary, such action to be taken for and on behalf of such Subsidiary. In the event that the Company conducts its business through one or more Subsidiaries, the Manager shall perform, with no additional compensation, the same or substantially identical services for each such Subsidiary as the Manager performs for the Company, subject to the terms, conditions, limitations and restrictions set forth in this Agreement. The Manager agrees to perform such duties, and in such circumstances and with regard to such duties, the Manager shall be subject to the same standards of conduct and shall have the same duties and obligations in performing or such services on behalf of each such Subsidiary as are set forth in this Agreement. Without limiting the generality of the foregoing (and notwithstanding anything contained herein to the contrary), any action or decision to be taken or made by or on behalf of a Subsidiary that, if taken or made by or on behalf of the Company would otherwise require the direction or approval of one or more Members under this Agreement, will require the direction or approval of the same. The Members agree that the Manager shall ensure (and the Manager hereby acknowledges and agrees) that the organizational documents of any Subsidiary will include any special purpose entity provisions required by any lender to any such Subsidiary.

Section 4.12 Sale of Development Project.

As part of its Business Plan, the Company contemplates selling land parcels with entitlements to develop apartment units (the "Development Project") at such parcel's then current fair market value (the "Development Parcel FMV") to either an unrelated third party, or to an Affiliate of either Member (as the case may be, each an "Affiliated Purchaser") for a purchase price no less than the Development Parcel FMV. In the event that the purchaser of the Development Project is an Affiliated Purchaser, then each Member (and or its Affiliates) may invest in Development Project, subject in each case to all of the following conditions: (i) the other investors of such Affiliated Purchaser permit such Member to co-invest in such Development Project, (ii) the dollar amount of such Member's co-investment shall be as agreed upon between such Member and the Affiliated Purchaser at the time of such co-investment (the "Member's Investment"), and (iii) such Member shall not be entitled to receive any promote or carried interest

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

payments on such Member's Investment, nor shall such Member's Investment be subject to or bear any promote or carried interest payments to others.

## ARTICLE 5
## RIGHTS OF MEMBERS

Section 5.1 Right to Participate in Management.

Notwithstanding anything to the contrary contained herein, BH Member shall have those certain rights to participate in the management of the Company as expressly set forth in this Agreement. Except as expressly provided herein, Members (other than Manager) shall have no right to, nor shall they take any part in or interfere in any manner with the conduct, control or management of the Company's business and shall have no right or authority to act for or bind the Company, said powers being vested solely and exclusively in the Manager.

Section 5.2 Indemnification; Limited Liability.

(a) Subject to the terms hereof (including Section 3.5, Section 12.1 and Section 13.3), the Company shall indemnify, defend and hold harmless, solely from Company Assets, any Member (solely in its capacity as such, and for the avoidance of doubt, not in its capacity as a "Manager" or any other capacity hereunder), and its members, managers, directors, shareholders, limited partners, general partners, Affiliates, officers, employees, agents and/or other representatives from any loss, damage, liability or expense incurred or sustained by it by reason of any act performed, omitted to be performed for or on behalf of the Company (solely in its capacity as a "Member" hereunder and not, for the avoidance of doubt, it its capacity as a "Manager" or any other capacity hereunder) and in furtherance of its Interest, but this indemnity shall not be applicable to loss, damage, liability or expense to the extent resulting from the willful misconduct, gross negligence or fraud of such Person or from any other events for which such Person or any of its Affiliates must indemnify the Company, any Member or any other Person pursuant to the terms hereof (or pursuant to any Electra Member Affiliate Agreement), nor shall it be construed as a guaranty of payment as to any obligations of a Member (or any Affiliate thereof) hereunder, including as to the obligations of Electra Member (whether in its capacity as "Manager" or "Member" hereunder) or any applicable Affiliate of any of the foregoing, as applicable, under (or as contemplated by) the terms hereof (including Section 5.6). For the avoidance of doubt, none of Electra Member (whether in its capacity as "Manager" or "Member" hereunder), Electra Parent or any of their respective Affiliates shall be entitled to indemnification or reimbursement on account of any loss, damage, liability or expense incurred or sustained on account of, or in connection with, any Electra Bad Boy Event.

(b) Except as expressly provided herein or in any guaranty or indemnity documents executed by a Member in connection with any financing with respect to the Property (or in any Electra Member Affiliate Agreement), no Member shall be liable for the debts, liabilities, losses, contracts or any other obligations of the Company, except to the extent any of the foregoing was caused by the willful misconduct, gross negligence or fraud of such Member. A Member shall be liable only to make its Capital Contribution and shall not be required to lend any funds to the Company or, other than its required share of any Additional Capital Contribution, to make any

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

further Capital Contribution to the Company. No Member shall have any personal liability for the repayment of the Capital Contribution of any Member.

Section 5.3 Restrictions on Members.

No Member shall have the right or power to:

(a) Withdraw or reduce its Capital Contribution to the Company except provided by the Agreement or the Act;

(b) Bring an action for partition against the Company; or

(c) Cause the termination and dissolution of the Company by court decree or otherwise (except in compliance with this Agreement).

Section 5.4 Action by Members Without a Meeting.

Whenever the Members of the Company are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members who hold Percentage Interests having not less than the minimum percentage that would be necessary to authorize or take such action at a meeting at which all of the Members entitled to vote thereon were present and voted and shall be delivered to the office of the Company.

Section 5.5 Intentionally Omitted.

Section 5.6 Financing Guaranties.

Notwithstanding anything to the contrary set forth herein, no payment made by a Member or any Affiliate thereof pursuant to any guaranty, indemnity, credit enhancement or other agreement entered into pursuant to or in connection with the requirements of the Loan Documents (including any non-recourse carve out guaranty and hazardous materials indemnification agreement) shall be treated as a Necessary Expense, or as a Capital Contribution or Additional Capital Contribution by such Member, or increase such Member's Capital Account, and shall not entitle such Member or its Affiliates to reimbursement or indemnification by the Company, any Subsidiary or any other Member or its Affiliates in any manner or form. Without limiting the generality of the foregoing, Lubeck, Electra Member, Toledo, BH Member, and/or one or more of their respective Affiliates will be required to furnish in connection with the Loan, any and all usual and customary non-recourse carve out guaranties and hazardous materials indemnification agreements (or any other required guaranties/indemnities) on terms and conditions reasonably acceptably to such guarantors, and except as otherwise provided for herein, neither Member nor any of its Affiliates shall be required to indemnify or reimburse any such guarantors with respect to any such guaranty or agreement (nor shall any amount funded under any such guaranties or agreements constitute a Necessary Expense or Capital Contribution).

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

## ARTICLE 6

## TRANSFER OF MEMBER INTERESTS

Section 6.1 Withdrawal and Transfers.

Except as otherwise provided herein or with the consent of all the Members, no Member may (a) resign, withdraw or retire voluntarily from the Company, or (b) directly or indirectly, assign, sell, exchange, transfer, pledge, encumber, hypothecate or otherwise dispose of all or any part of its Interest, including any non-economic right provided to a Member, or any direct or indirect interest (whether legal or beneficial) in such Member (any direct or indirect assignment, sale, exchange, transfer, pledge, encumbrance, hypothecation or other disposition of an Interest being herein collectively called a "Transfer") to any Person. Notwithstanding the foregoing, no Member's consent shall be required with respect to (i) any Permitted Transfer, provided that in the case of any Transfer by the BH Member the provisions of Section 6.10 are satisfied, or (ii) Transfers made in accordance with the terms of Section 6.4.

Section 6.2 Additional Members.

Additional Members may only be admitted to the Company in compliance with this Article 6.

Section 6.3 Transfers by Members.

(a) In the event that any Member at any time attempts to make a Transfer of its Interest in violation of the provisions of this Agreement, the other Members or any one of them, shall in addition to all other rights and remedies which they may have at law, in equity or under the provisions of this Agreement, be entitled to a decree or order restraining such attempted Transfer and the offending Member shall not plead in defense thereto that there would be an adequate remedy at law, it being recognized and agreed that the injury and damage resulting from such a breach would be impossible to measure monetarily.

(b) If any Interest of a Member is Transferred during any accounting period in compliance with the provisions of this Article 6, each item of income, gain, loss, expense, deduction and credit and all other items attributable to such Interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying Interests during such period in accordance with Section 706(d) of the Code, using any conventions permitted by law. All Distributions on or before the date of such Transfer shall be made to the transferor, and all Distributions thereafter shall be made to the transferee.

(c) Anything in this Agreement to the contrary notwithstanding, no Member may Transfer any of its Interest to a Person that is a Prohibited Person, no Member may Transfer any of its Interest if such Transfer could cause the Company to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the regulations promulgated thereunder, could cause a termination of the Company within the meaning of the Code, or under applicable state or local tax laws and/or regulations, or could jeopardize the status of the Company as a partnership for federal income tax purposes and no Member may Transfer its Interest if such Transfer would require filing of a registration statement under the Securities Act of 1933, as

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

amended, and the regulations promulgated thereunder, or cause the Company not to be entitled to an exemption from registration as an "investment company" pursuant to the Investment Company Act of 1940, as amended, or would otherwise violate or cause the Company to violate any applicable federal, state or foreign securities laws or regulations. Prior to the transfer of any Interest by a Member, the transferor shall be required to repay all Member Loans then outstanding and payable by such transferor, together with all interest accrued thereon.

(d) Except as otherwise provided herein, to the extent that any Transfer of a direct or indirect interest in any Member results in the Company or any Subsidiary being required to pay any review fee, legal fee or other cost or expense of the holder of any Loan and/or Refinancing, the Person(s) seeking to effect such Transfer (or the Member whose direct or indirect interest is so Transferred) shall pay to the holder of such Loan or Refinancing, or to the Company or applicable Subsidiary, all such fees, costs and expenses, and such payment(s) shall be made no later than the effective date of such Transfer.

Section 6.4 Buy-Sell.

(a) Following the first to occur of (i) the eighteen (18) month anniversary of Property Acquisition Date, in the event of a Deadlock Event, or (ii) the date on which Electra Member is actually removed as the Manager hereunder by virtue of a Electra Bad Boy Event, either Member (the "Offeror") shall (subject to the last sentence of this Section 6.4(a)) have the right (the "Buy-Sell Right") to give written notice (the "Proposal Notice") to the other Member (the "Other Member") stating that it is exercising its Buy-Sell Right under this Section 6.4, and provide in such Proposal Notice, a valuation stating the aggregate dollar amount (the "Valuation") that the Offeror would be willing to pay in immediately available funds if it were a third party for all of the Company Assets as of that date free and clear of all liabilities on such assets, and together with such Proposal Notice remit via wire transfer to First American Title Insurance Company, as escrow agent, funds in the amount of ten percent (10%) of the applicable purchase price that the Other Member would be entitled to receive if it elects to sell its Interests to the Offeror pursuant to this Section 6.4 (calculated in accordance with Section 6.4(b)) (the "Offeror Good Faith Deposit"). Notwithstanding the foregoing or anything to the contrary contained in this Agreement, (A) no Member shall have the right to exercise the Buy-Sell Right while (1) any Buy-Sell Right previously exercised is then pending and the procedures for the consummation of the transactions contemplated thereby have not yet been completed or terminated in accordance with the applicable provisions of this Agreement, or (2) the Company or any Subsidiary has contracted to sell the Property to a third party pursuant to a legally binding agreement that has not been terminated.

(b) Upon receipt of the Proposal Notice, the Other Member shall have the obligation to choose one of the following options:

(i) to the extent applicable, provide written notice to Offeror that such Other Partner approve the Major Decision that the Offeror wanted approved as a Major Decision hereunder; or

(ii) to purchase the full Interest of the Offeror for a purchase price equal to the amount the Offeror would have been entitled to receive if the Company caused all the Company Assets to be sold for the Valuation and paid all the Company's outstanding

NOT AN OFFICIAL COPY. PUBLIC ACCESS. NOT AN OFFICIAL COPY. PUBLIC ACCESS

indebtedness and other liabilities (including, if then outstanding, any mortgage or other financing) on the closing date of such buy-sell transaction and the Company Distributed the remaining net proceeds (after deducting the amount of any transfer taxes due and payable in connection with such sale), in accordance with this Agreement; or

(iii) to sell their full Interests to the Offeror, for a total purchase price equal to the amount the Other Members would have been entitled to receive if the Company caused all the Company Assets to be sold for the Valuation and paid all the Company's outstanding indebtedness and other liabilities (including, if then outstanding, any mortgage or other financing) on the closing date of such buy-sell transaction and the Company Distributed the remaining net proceeds (after deducting the amount of any transfer taxes due and payable in connection with such sale), in accordance with this Agreement.

Notwithstanding anything to the contrary herein, (i) no Member shall be permitted to sell less than all of its Interest in the Company pursuant to this Section 6.4, (ii) any assumption fees with respect to any Loan (or Refinancing) triggered by the transactions contemplated by this Section 6.4 shall be the sole responsibility of the purchasing Member, and (iii) any transfer taxes due and payable in connection with any such sale of Interest shall be paid by the Company.

(c) Such option shall be exercised upon the Other Member giving written notice thereof to the Offeror (the "Response Notice") within thirty (30) days after the receipt of the Proposal Notice (the "Response Period"). To the extent applicable, if the Other Member elects to approve the Major Decision which gave rise to the Deadlock Event, then such Major Action shall be deemed approved, the Offeror Good Faith Deposit shall be returned to Offeror, and Offeror shall have no further right to exercise the Buy-Sell Right regarding such Major Action which gave rise to the Deadlock Event. If the Other Member elects to purchase the Interest of the Offeror, simultaneously with the delivery of the Response Notice the Other Member shall remit via wire transfer to First American Title Insurance Company, as escrow agent, immediately available federal funds in the amount of ten percent (10%) of the applicable purchase price that the Offeror would be entitled to receive upon closing of such buy-sell transaction (calculated in accordance with Section 6.4(b)) (the "Other Member's Good Faith Deposit", together with the Offeror Good Faith Deposit, the "Good Faith Deposits" and each individually, a "Good Faith Deposit"), whereupon the Offeror's Good Faith Deposit will be returned to Offeror (it being acknowledged that the Offeror Good Faith Deposit must be returned to the Offeror in full as a condition to any such election by the Other Member). If the Offeror has not received such a Response Notice from the Other Member prior to the expiration of the Response Period, then and in such event the Other Member shall for all purposes be conclusively and irrevocably deemed to have delivered a Response Notice on the last day of the Response Period electing to sell its Interests to the Offeror, and the Offeror shall be required to purchase the Other Member's Interests for the same purchase price calculated pursuant to Section 6.4(b) above.

(d) The closing of the sale of the applicable Interest(s) pursuant to this Section 6.4 shall take place (at the location set forth in the Proposal Notice, which shall be within the New York metropolitan area or may be through the mail through escrow with First American Title Insurance Company) within sixty (60) days after receipt (or deemed receipt) by the Offeror of the Response Notice. At the closing, the purchaser shall pay the purchase price for the Interest(s) so purchased by wire transfer of immediately available federal funds. The seller shall

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

execute, acknowledge and deliver to the purchaser such instruments of conveyance as shall be necessary or reasonably desirable to convey to the purchaser the Interest(s) of the seller free and clear of any liens, claims and encumbrances, and the seller shall be responsible for all gains taxes in connection therewith. The Good Faith Deposit made by the purchaser shall be credited toward the purchase price of the Interest(s) being sold at the closing and paid to the seller. In connection with the closing, the purchaser, at its or their sole cost, expense and liability, shall have the right to refinance any outstanding third party indebtedness of the Company (and the seller will reasonably cooperate with the purchaser(s) in connection therewith at no liability, cost or expense to the seller); provided, however, that the purchaser may not incur any liabilities, costs or expenses on behalf of the Company in connection with such refinancing (except for any liabilities, costs or expenses incurred upon or after the buy/sell closing which shall in no event be the responsibility of the seller), provided that the closing of such refinancing shall not be a condition to purchaser's obligation to close.

(e) Anything in this Agreement to the contrary notwithstanding, in the event of an offer by any Member pursuant to Section 6.4 hereof, the Manager agrees to conduct the usual affairs of the Company in the ordinary course until such time as the closing contemplated in paragraph (d) of this Section 6.4 shall have occurred; provided that no Distributions shall be made during such period, except that ordinary net operating income for solely the period between the Proposal Notice and closing shall instead accrue and a Distribution thereof shall be made concurrently with the closing in accordance with the terms hereof.

(f) If the seller breach its obligations under Section 6.4(d), then (i) the purchaser shall be entitled to all rights and remedies at law or in equity on account thereof (including specific performance but excluding the right to obtain consequential or punitive damages), and (ii) the seller shall thereafter have no further right to invoke the provisions of this Section 6.4. If the purchaser breach its obligations under Section 6.4(d), then (i) the seller shall be entitled to retain the Good Faith Deposit as liquidated damages (but not in reduction of their Capital Accounts), and (ii) the purchaser shall have no further right to invoke the provisions of this Section 6.4. The parties acknowledge that it would be impractical and extremely difficult to estimate the damages which the seller may suffer in connection with a default by the purchaser under Section 6.4(d). Therefore, the parties have agreed that a reasonable estimate of the total net detriment that the seller would suffer in such event is and, accordingly, such liquidated damages are not intended as a forfeiture or penalty within the meaning of applicable law.

(g) Each Member expressly agrees and acknowledges that TIME IS OF THE ESSENCE with respect to all time requirements, delivery and payment dates and other deadlines set forth in this Section 6.4. In that regard, all payments and other actions or documents required to be paid, delivered, received or taken on or prior to a specified date shall be so paid, delivered, received or taken on or prior to the specified or required date unless such date is extended in writing by the Member(s) entitled to such performance or payment and failure to make such payment or performance by such date shall be a default under this Agreement by such party.

(h) Notwithstanding anything to the contrary set forth in this Section 6.4, no Member shall be obligated or entitled to purchase the Interest of another Member hereunder if such other Member or its Affiliate (including Lubeck) is a guarantor on a mortgage loan encumbering the Property, including a non-recourse carve-out guaranty, unless the purchasing

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

Member has, either prior to, or concurrently with, such purchase, either (x) arranged for such guarantor to be released from such guaranty for wrongful acts occurring after the purchasing Member closes on the acquisition of the Interest of the selling Member hereunder, or (y) the purchasing Member causes a credit-worthy person or entity reasonably acceptable to the selling Member to provide an indemnification to such guarantor pursuant to an agreement reasonably acceptable to both the selling and purchasing Members with respect to any liability under such guaranty arising from the actions of the purchasing Member or any replacement "Manager" designated by the purchasing Member (including actions taken on behalf of or through the Company or any Subsidiary), after closing of the acquisition of the selling Member's Interest.

(i) Notwithstanding the foregoing, or anything to the contrary set forth herein, in the event that the consummation of the buy-sell transaction described in this Section 6.4 would constitute a breach or default under any of the Loan Documents, or any documents or instruments evidencing and/or securing any Refinancing, the obligations of the purchasing Member(s) under this Section 6.4 shall be subject to and conditioned upon obtaining the approval of the holder(s) of the Loan and/or any Refinancing (in each case to the extent outstanding) to the extent the sale of the Interest(s) of the selling Member(s) as contemplated under this Section 6.4 would constitute or result in such a breach or default (the "Existing Lender Approval(s)"). The Members agree to use commercially reasonable efforts (without being required to incur costs in connection therewith, unless the Member(s) desiring to cause such consent agree to reimburse the other Member(s) for such costs), during the period beginning on the date that Offeror receives (or is deemed to have received) the Response Notice, and ending on the date which is sixty (60) days thereafter, to obtain the Existing Lender Approval(s) with respect to any transfer contemplated under this Section 6.4. In the event the Members fail to obtain the Existing Lender Approval(s) with respect to any such transfer within such sixty (60) day period, then (i) the applicable Buy-Sell Right shall be deemed to have been terminated, and (ii) First American Title Insurance Company will be required to return any applicable Good Faith Deposit to the Member(s) that deposited such funds.

Section 6.5 Resignation, Bankruptcy or Dissolution of Manager.

The resignation, Bankruptcy or dissolution of a Manager, or any other event that effectively precludes a Manager from fulfilling its responsibilities as Manager, shall not cause a dissolution of the Company unless within ninety (90) days thereafter, all of the remaining Members (other than any Affiliate of such Manager) agree in writing to dissolve the Company. Subject to Section 4.9, upon the resignation, Bankruptcy or dissolution of, or other such event with respect to, a Manager, such Manager shall thereafter no longer be a Manager and the Members with Required Approval (other than such Manager or any Affiliate thereof, if applicable) shall appoint a replacement Manager. Except as expressly provided in this Agreement, the resignation, Bankruptcy or dissolution of, or other such event with respect to, a Manager, shall not affect any Interest it holds as a Member.

Section 6.6 Bankruptcy or Dissolution of a Member.

The Bankruptcy, dissolution or any other event that effectively terminates the continued membership of any Member, shall not cause a dissolution of the Company unless within ninety (90) days thereafter, all of the other Members (other than any Affiliate of such Member) agree in writing to dissolve the Company. Upon the Bankruptcy, dissolution or any other event that

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

effectively terminates the continued membership of any Member, the representative or successor-in-interest thereof, as the case may be, shall be deemed to be an assignee of the economic interest of the Member in the Company and may apply for admission to the Company as a Substituted Member upon compliance with this Article 6 (including Section 6.7 hereof); provided, however, that in the event of the Bankruptcy of a Member, if such representative or successor in interest shall not comply with Section 6.7 hereof, then the interest of such Bankrupt Member shall be dealt with in accordance with applicable law at the earliest practicable time.

Section 6.7 Additional and Substituted Members.

(a) Anything herein contained to the contrary notwithstanding, no successor-in-interest of a Member and no assignee or transferee of all or any part of a Member's Interest, nor any Person to be admitted as an additional Member, shall be admitted to the Company as a Member except upon:

(i) submitting to the Manager (or to the Member(s) who are unaffiliated with the Manager if the transferor or transferee is the Manager or an Affiliate thereof) a duly executed and acknowledged counterpart of the instrument or instruments making such Transfer (except for an additional Member), together with such other instrument or instrument, including a counterpart of this Agreement as it then may have been amended, signifying such transferee's agreement to be bound by all of the provisions of the Company and this Agreement, including the restrictions upon Transfers of Interests (direct or indirect) therein and thereto, all of the foregoing in such form and substance as shall be reasonably satisfactory to the Manager (or to the Member(s) who are unaffiliated with the Manager if the transferor or transferee is the Manager or an Affiliate thereof); and

(ii) agreeing to bear all costs and expenses, including legal fees of the Company, incurred in affecting such substitution or admission.

Upon such Person's compliance with the foregoing provision, each of the Members shall take all actions reasonably required to effectuate the recognition of the effectiveness of such Transfer (if applicable) and the admission of such Person to the Company as an additional Member or a Substituted Member, as applicable, including transferring any such Interest in and to the Company, its capital, profits and losses upon the books thereof and executing, acknowledging and causing to be filed any necessary or appropriate amendment to this Agreement.

(b) The Manager (or the Members who are not affiliated with the Manager if the transferor or transferee is the Manager or an Affiliate thereof) shall not consent to the admission of any such assignee as a Substituted Member if, in its reasonable opinion, the applicable Transfer would violate any provision of this Article 6.

Section 6.8 Non-Complying Assignments.

Any assignment, sale, exchange or other Transfer in contravention of any of the provisions of this Article 6 shall be void and ineffectual, and shall not bind or be recognized by the Company.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 6.9 Obligations of Successors.

Any Person who acquires an Interest in the Company by assignment or is admitted to the Company as a Substituted Member shall be subject to and bound by all the provisions of this Agreement as if originally a party to this Agreement.

Section 6.10 Limitations on BH Member Permitted Transfers.

Any Transfer by BH Member described in subsection (a) of the definition of Permitted Transfer must satisfy all the conditions stated below unless otherwise waived in writing by Electra Member:

(a) after the Transfer, (x) Toledano shall continue to have (A) the sole and exclusive Control of the BH Member and sole and exclusive authority to approve or vote on all other matters affecting the Company on behalf of the BH Member, and (B) one hundred percent (100%) direct or indirect ownership, economic and beneficial interest in the BH Member; and (y) directly or through family trusts and/or family-controlled entities shall continue to own one hundred percent (100%) direct or indirect ownership, economic and beneficial interest in BH Worldwide;

(b) Electra Member has not notified BH Member in writing that it has reasonably determined that the transferee is a competitor of Electra Member or any Electra Member Affiliate in any significant market or activity;

(c) if an individual, the transferee is a U.S. citizen or resident, unless otherwise approved by Electra Member and to the extent such transferee is not a U.S. citizen or resident, such Transfer shall be subject to providing Electra Member with thirty (30) days prior notice and satisfactory completion by Electra Parent of its OFAC and "Know Your Customer" searches and review;

(d) if a legal entity of any type, the transferee is formed or organized under the laws of any state of the United States, unless otherwise approved by Electra Member and to the extent such transferee is not a U.S. citizen or resident, such Transfer shall be subject to providing Electra Member with thirty (30) days prior notice and satisfactory completion by Electra Parent of its OFAC and "Know Your Customer" searches and review;

(e) Electra Member has not notified BH Member in writing that it has reasonably determined that one or more Transfers are part of a series of Transfers is not a Permitted Transfer;

(f) if a Transfer results in any Person who did not previously own ten percent (10%) or more of BH Member's Interest on the Effective Date or who was not otherwise known by the Electra Member as being an owner of ten percent (10%) or more of BH Member, then BH Member shall provide Electra Member with thirty (30) days prior notice and shall be subject to providing Electra Member with thirty (30) days prior notice and satisfactory completion by Electra Parent of its OFAC and "Know Your Customer" searches and review; and

(g) the Person is not a Prohibited Person.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Notwithstanding anything herein to the contrary, neither the BH Member nor any Affiliate shall proceed with a Permitted Transfer without first offering Electra Member and its Affiliates the right to acquire the BH Member Interest subject to such Transfer on substantially the same terms and conditions as being proposed to the transferee of such Interests. If BH Member desires to proceed with the Transfer, BH Member shall deliver notice thereof to Electra Member (an "***Transfer Notice***"), which Transfer Notice shall set forth the material business terms of such proposal including, without limitation, the financial terms of the Transfer. Electra Member or any Affiliate thereof shall have the option to acquire the subject Interests, which Electra Member or any Affiliate thereof shall exercise by delivering notice to the BH Member or its Affiliate, as applicable, within thirty (30) days of its receipt of the Transfer Notice. If Electra Partner declines or fails to exercise its right of first offer within such thirty (30) day period such failure shall be deemed a waiver of any such right only in respect to the subject Interest, and the forgoing provisions shall be applicable to any subsequent proposed Permitted Transfer by BH Member.

## ARTICLE 7

## DISTRIBUTIONS

Section 7.1 Distributions.

(a) The Manager shall cause all Distributions of Cash Flow to be applied and Distributed to the Members in the following amounts and order of priority:

(i) first, to the Members who have made Default Priority Loans, pro rata, in accordance with the amount of such Default Priority Loans held by such Members, to repay all accrued interest and principal on all Default Priority Loans, with amounts distributed under this clause (a) applied first to interest on such Default Priority Loans and then to principal of such Default Priority Loans;

(ii) second, pro rata to the Members in proportion to their respective Percentage Interests at the time of such Distribution until each of the Members has received, pursuant to this subsection (ii), aggregate Distributions equal to an Internal Rate of Return of eight percent (8%) as of the date of such Distribution;

(iii) thereafter, to the Members in proportion to their respective Residual Share at the time of such Distribution.

Section 7.2 Time for Distributions.

Distributions of Cash Flow shall be made from time to time and at such time or times as the Manager may determine; provided, however, that Distributions of all then available Cash Flow shall be made at least monthly. Distributions of Cash Flow from a Refinancing or Sale shall be made concurrently with the closing of any such transaction. The Members acknowledge and agree that there is no express right to accelerate the payment of any Distribution as a result of the failure (or impending failure) of the Manager to satisfy the provisions of Section 4.9(a)(v).

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

## ARTICLE 8

## ALLOCATION OF PROFITS AND LOSSES

Section 8.1 Allocations.

(a) For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and Distributions during such Fiscal Year and all special allocations pursuant to Section 8.3 with respect to such Fiscal Year, all Profits and Losses (other than items of income, gain, loss and deduction specially allocated pursuant to Section 8.3) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (a) the amount which would be Distributed to such Member, determined as if the Company were to sell all of its assets for the Gross Asset Value thereof, pay all liabilities allocable to such assets according to their terms (limited, with respect to each nonrecourse liability, to the Gross Asset Value of the assets securing such liability) and Distribute the proceeds thereof pursuant to Section 10.2, hereof, minus (b) the sum of (i) such Member's share of Company Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(d) and (g)(3)) and Member Nonrecourse Debt Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(i)) and (ii) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Year (the "Target Amount"). Notwithstanding the foregoing, in the event that the amount of Profits or Losses for a Fiscal Year will not result in Capital Account balances for each Member being equal to each Member's Target Amount, items of income, gain, loss and deduction shall first be allocated to the Members so that the allocation of Profits or Losses for such Fiscal Year, (determined after taking into account the individual allocation of items of income, gain, loss and deduction) shall result in Capital Account balances for each Member being equal to each Member's Target Amount.

(b) Notwithstanding anything to the contrary in this Section 8.1, the amount of items of Company expense and loss allocated pursuant to this Section 8.1 to any Member shall not exceed the maximum amount of such items that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of any taxable year. All such items in excess of the limitation set forth in this Section 8.1 shall be allocated first to Members who would not have an Adjusted Capital Account Deficit, pro rata in proportion to their Capital Account balances as adjusted in accordance with the definition of Adjusted Capital Account Deficit.

Section 8.2 Basis Adjustment.

In the event of a transfer of an Interest in the Company, its capital, profits and losses, or the Distribution of any Company property to a Member, the Manager, upon the request of the transferee or distributee, as the case may be, may elect on behalf of the Company under the applicable provisions of the Code to cause the basis of the Company's property to be adjusted, for Federal income tax purposes, in the manner provided in the Code Sections 754, 734(b) and 743(b) and any corresponding provisions of state and local tax laws, to the extent applicable.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 8.3 Special Allocation Rules.

Before any allocations are made pursuant to Section 8.1 the following special allocations shall be made in the following order:

(a) If the Company incurs any "nonrecourse liability" or "partner nonrecourse debt" (as those terms are defined in Sections 1.704-2(b)(3) and 1.704-2(b)(4) of the Treasury Regulations, respectively), the Company shall make such allocations of items of income upon decreases in the "partnership minimum gain" or of "partner nonrecourse debt minimum gain" (determined in accordance with Sections 1.704-2(b)(2), 1.704-2(d) and 1.704-2(i)(3) of the Treasury Regulations), as the case may be, with respect thereto as are necessary to comply with the "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions of Sections 1.704-2(f), 1.704-2(i), 1.704-2(j) and 1.704-2(k) of the Treasury Regulations, taking into account all exceptions provided by such provisions to the applicability of this Section 8.3(a).

(b) All "nonrecourse deductions", computed and determined in accordance with Sections 1.704-2(b)(1), 1.704-2(c) and 1.704-2(j) of the Treasury Regulations, of the Company shall be allocated to the Members pro rata in accordance with their Percentage Interests.

(c) All "partner nonrecourse deductions" computed and determined in accordance with Sections 1.704-2(i)(1), 1.704-2(i)(2) and 1.704-2(j) of the Treasury Regulations, with respect to any "partner nonrecourse debt", as defined in Section 1.704-2(b)(4) of the Treasury Regulations, of the Company, including any liability of a subsidiary partnership that is treated as a "partner nonrecourse debt" pursuant to Section 1.704-2(k) of the Treasury Regulations, shall be allocated to the Members who bear the economic risk of loss for such debt in compliance with Sections 1.704-2(i) and 1.704-2(k) of the Treasury Regulations.

(d) If the Company incurs any "nonrecourse liability", as defined in Section 1.704-2(b)(3) of the Treasury Regulations, that is not secured by any specific property of the Company and that is recourse to the Company as an entity but expressly not recourse to any member or any partner of any partnership that is a Member, the Manager shall make allocations with respect to such "nonrecourse liability" in a manner which it reasonably determines to be in accordance the principles of Section 704(b) of the Code and the Treasury Regulations thereunder provided that if permitted by the Treasury Regulations, the Company will make such allocations to the Members pro rata in accordance with their Percentage Interests. .

(e) If any Member unexpectedly receives any adjustment, allocation or distribution described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations which causes it to have a, or increases the amount of its, deficit Capital Account, items of Company income shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, such Member's deficit Capital Account as quickly as possible, provided that an allocation pursuant to this Section 8.3(e) shall be made to a Member only if and to the extent that such Member would have a deficit Capital Account after all other allocations provided for in this Article 8 have been tentatively made as if this Section 8.3(e) were not in this Agreement. This

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 8.3(e) is intended to constitute a "qualified income offset" as defined in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(f) If any Member has a deficit Capital Account balance as of the end of any Fiscal Year or other accounting period that is in excess of the amount such Member is obligated to restore to its Capital Account hereunder or is deemed to be obligated to restore to its Capital Account pursuant to the penultimate sentences of Section 1.704-2(g)(1) and 1.704-2(h)(5) of the Treasury Regulations, items of Company income and gain in the amount of such excess shall be specially allocated to such Member as quickly as possible, provided that an allocation pursuant to this Section 8.3(f) shall be made to a Member only if and to the extent that such Member would have a deficit Capital Account balance that is in excess of the amount such Member is obligated to restore to its Capital Account hereunder or is deemed to be obligated to restore to his or its Capital Account pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(h)(5) of the Treasury Regulations after all other allocations provided for in this Article 8 have been tentatively made as if this Section 8.3(f) were not in this Agreement.

Section 8.4 Other Allocation Rules.

(a) Allocations of income, gain, loss and deductions for any period during which the Members' relative interests in the Company have changed shall be made by the Manager using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b) Solely for purposes of determining the Members' shares of the Company's "excess nonrecourse liabilities" under Section 1.752-3(a)(3) of the Treasury Regulations, the Members' interests in Company profits shall be their Percentage Interests as then in effect.

(c) To the extent permitted by Sections 1.704-2(h) and 1.704-2(i)(6) of the Treasury Regulations, the Manager shall use its best efforts to treat a cash Distribution to any Member hereunder as having been made from the proceeds of a "nonrecourse liability" or "partner nonrecourse debt" (as those terms are defined in Sections 1.704-2(b)(3) and 1.704-2(b)(4) of the Treasury Regulations, respectively) of the Company, including any liability of a subsidiary partnership that is so treated pursuant to Section 1.704-2(k) of the Treasury Regulations, only to the extent that such Distribution would otherwise cause such Member to have a deficit Capital Account balance that is in excess of the amount such member is obligated to restore to its Capital Account, within the meaning of Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as of the end of the Fiscal Year during which the Distribution is made.

Section 8.5 Tax Allocations.

Federal tax allocations for each Fiscal Year or other accounting period of the Company shall be made consistent with the allocations of income, gain, loss and deduction specially allocated pursuant to this Article 8 for such year or period, except that, solely for tax purposes, (i) items of taxable income, gain, loss and deduction with respect to the Company Assets reflected hereunder in the Members' Capital Accounts and on the books of the Company at values that differ from the Company's adjusted tax basis in such assets shall be allocated among the Members so as to take account of those differences in accordance with the principles of Code Section 704(c) and with Sections 1.704-1(b)(2)(iv)(f), 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4)(i) of the Treasury

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Regulations, and (ii) adjustments made pursuant to Section 734(b) or Section 743(b) of the Code shall be taken into account. The Members are aware of the federal income tax consequences of the allocations made by this Article 8 and agree to report their shares of Company income, gain, loss, deduction and credit for income tax purposes in accordance with this Article 8.

Section 8.6 Curative Allocations.

If the Tax Matters Partner determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss, deduction or credit is not specified in this Article 8 (an "unallocated item"), or that the allocation of any item of Company income, gain, loss, deduction or credit hereunder is clearly inconsistent with the Member's economic interests in the Company (determined by reference to the general principles of Treasury Regulation Section 1.704-1(b) and the factors set forth in Treasury Regulation Section 1.704-1(b)(3)(ii)) (a "misallocated item"), then the Manager (with Spoke Consent) may allocate such unallocated items, or reallocate such misallocated items, to reflect such economic interests; provided, that no such allocation will be made without the prior consent of each Member that would be affected thereby (which consent shall not be unreasonably withhold) and provided, further, that no such allocation will have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

Section 8.7 Tax Matters.

Electra Member shall have the sole and exclusive right and the authority to (a) make any decision that pertains to taxes or tax matters with respect to the Company or any Subsidiary, including any decision regarding making or revoking any tax election, adopting or changing any tax accounting method by or on behalf of the Company or any Subsidiary, accepting, contesting or compromising any adjustment proposed by any tax authority or that the "partnership representative" is entitled to make under the amendments to Subchapter C of Chapter 63 of the Code made by the Bipartisan Budget Act of 2015; (b) change the taxable year for federal, state or foreign income tax purposes of the Company or any Subsidiary or (c) file any tax return or tax report on behalf of the company or cause any Subsidiary to file any tax return or tax report on behalf of such Subsidiary or take any tax position or make any tax election.

## ARTICLE 9

## RECORDS AND BOOKS OF ACCOUNT

Section 9.1 Records and Books of Account.

Manager shall maintain or cause to be maintained, at the Company's principal office or at such other place or places as the Manager from time to time may determine, full and accurate records and books of account of the Company's business. Such records and books of account shall be maintained in accordance with generally accepted accounting principles. Each Member shall be afforded full and complete access to all such records and books of account during reasonable business hours and, at such hours, shall have the right of inspection and copying of such records and books of account, at his expense. The Manager shall hire such accountant or accounting firm as Manager shall determine (with the prior written approval of BH Member, not to be unreasonably withheld).

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 9.2 Fiscal Year.

The fiscal year and taxable year of the Company (the "Fiscal Year") shall be a calendar year commencing on January 1 and ending on December 31.

Section 9.3 Banking.

An account or accounts in the name of the Company and/or any Subsidiary shall be maintained at such bank or banks as the Manager (subject to Section 4.4) may select, which bank or banks may or may not be affiliates of any Member. All uninvested funds of the Company or any Subsidiary shall be deposited in a bank account of the Company or such Subsidiary, as the case may be. All funds so credited to the Company or any Subsidiary in any such account shall be subject to withdrawal by checks made in the name of the Company or such Subsidiary and signed in such manner as determined by the Manager. Manager shall not be responsible for the failure of the institution in which the funds of the Company or any Subsidiary are held even if such institution is an Affiliate of any Member.

Section 9.4 Reports to Members.

(a) As soon as reasonably practical, but in no event later than ninety (90) days after the close of each Fiscal Year of the Company, Manager shall cause to be prepared and furnished to each Member:

(i) The information necessary for the preparation by each Member of his Federal, state and other income tax returns;

(ii) Updates as to any construction, renovation and/or leasing projects related to the Company or any Subsidiary, together with a reconciliation of the status thereof relative to the plans and specifications, scope of work, construction schedule and timeline therefor, and copies of all change orders approved in accordance with the terms hereof and draw requests submitted in accordance with the terms hereof during such month;

(iii) The amount in the Capital Account of such Member as of the last day of such Fiscal Year; and

(iv) An income statement and balance sheet of the Company as of the last day of such Fiscal Year.

(b) By the fifteenth (12th) day of each month, Manager shall cause to be prepared and furnished to each Member:

(i) A monthly report of Cash Flow of the Company and its Subsidiaries;

(ii) Copies of all reports, if any, given during such month to providers of financing to the Company and/or any of its Subsidiaries; and

(iii) Such other information as the Manager deems reasonably necessary for the Members to be advised of the current status of the Company and its business.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(c) Manager shall deliver to the Members certificates of insurance and, upon request by any Member, copies of the original policies evidencing such insurance coverage so as to evidence that such insurance coverage is at all times maintained in full force and effect without any lapse in coverage.

(d) Manager shall deliver to the Members promptly upon the receipt or sending thereof on behalf of the Company or any Subsidiary, copies of any material correspondence with any municipality as well as all material notices, material reports and material communications between the Company or any Subsidiary on the one hand, and any lender under any loan or any holder of any mortgage (or mezzanine loan) secured by all or any portion of the Property or any of the other Company Assets (including the Loan and any Refinancing).

Section 9.5 Approved Budgets.

Annually, the Manager shall prepare and submit to the Members a projected Operating Budget and Development Budget for the Company, all Subsidiaries and the Project for each Fiscal Year (each of the foregoing budgets shall be collectively referred to herein as the "Proposed Budget"). The Members shall consider such Proposed Budget and consult with the Manager to agree on an approved operating budget and an approved development budget for the Fiscal Year in question (such budgets, when approved by all the Members, being collectively referred to herein as an "Approved Budget"). The Members agree that the Business Plan for the initial Fiscal Year of the Company (or the remainder thereof) is as attached hereto as Exhibit C. Subsequent Proposed Budgets shall be prepared by the Manager and distributed to all Members no later than forty-five (45) days prior to the commencement of the Fiscal Year in question, and the Manager shall also furnish to the Members such reasonable financial information relating to the Company, all Subsidiaries and the Property as may be requested by any Member to the extent same is reasonably available to Manager. As to any portion of a Proposed Budget for a given Fiscal Year that has not been approved by the Members, the Manager shall cause the Company, all Subsidiaries and the Property to be operated in accordance with the applicable portion of the Approved Budget for the immediately preceding Fiscal Year.

## ARTICLE 10

## DISSOLUTION, LIQUIDATION AND TERMINATION

Section 10.1 Dissolution.

The Company shall be dissolved upon the first to occur of any of the following events;

(a) The consent of the Members pursuant to Section 6.5 or Section 6.6;

(b) The sale of all or substantially all of its assets, and the collection and Distribution of the proceeds thereof in accordance herewith; or

(c) Required Approval in writing for such dissolution has been obtained.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 10.2 Liquidation.

(a) Upon the dissolution of the Company, Manager shall take or cause to be taken a full accounting of the Company's assets and liabilities as of the date of such dissolution and shall proceed with reasonable promptness to liquidate the Company's assets and to terminate its business. The cash proceeds from the liquidation, as and when available therefor (after payment of expenses of liquidation and dissolution, discharge of liabilities to creditors (including Members who are creditors) or the making of reasonable provision therefore and the setting up of reasonable reserves as provided in the Act), shall be applied and Distributed in the order of priority set forth above in Section 7.1(a).

(b) The Manager shall administer the liquidation of the Company and the termination of its business. The Manager shall be allowed a reasonable time for the orderly liquidation of the Company's assets and the discharge of liabilities to creditors, so as to minimize losses resulting from the liquidation of the Company's assets.

(c) Anything herein contained to the contrary notwithstanding, a Manager shall not be personally liable for the return of any Member's Capital Contributions, or any part thereof upon such liquidation. Any such return shall be made solely from the Company's assets.

(d) Except as otherwise provided herein, no dissolution or termination of the Company shall relieve, release or discharge any Member, or any of his successors, assigns, heirs or legal representatives, from any previous breach or default of, or any obligation theretofore incurred or accrued under any provision of this Agreement, and any and all such liabilities, claims, demands or causes of action arising from any such breaches, defaults and obligations shall survive such dissolution and termination.

Section 10.3 No Obligation to Restore Capital Accounts.

Except as may otherwise be required by law, no Member whose Capital Account balance is a deficit amount (either during the existence of the Company or upon liquidation) shall have any obligation to return any amounts previously distributed to such Member or to contribute cash or other assets to the Company to restore or make up the deficit in such Member's Capital Account.

Section 10.4 Termination.

Upon compliance with the foregoing plan of liquidation and Distribution, the Manager shall file or cause to be filed the appropriate termination documents required to effectuate the dissolution and termination of the Company and the Company thereupon shall be terminated.

## ARTICLE 11

## STATUS OF THE COMPANY

The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member or officer shall be a partner or joint venturer of any other Member or officer, for any purposes other than federal and, if applicable, state income tax classification purposes, and this Agreement shall not be construed to the contrary. The

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

Members and the Manager intend that the Company shall be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

## ARTICLE 12

## MISCELLANEOUS

Section 12.1 Indemnity.

(a) Electra Member shall indemnify, defend and hold the Company, each Subsidiary, BH Member and the other BH Member Indemnitees harmless from, against and in respect of any and all damages, liabilities, obligations, losses, costs, expenses, (including costs incurred in investigation and defense and reasonable attorney fees), penalties, fines and other judgments (at equity or at law) incurred by the Company, any Subsidiary, BH Member and/or any of the other BH Member Indemnitee in connection with or arising from any Electra Bad Boy Event. The provisions of this Section 12.1(a) shall survive any termination of this Agreement or the withdrawal, termination or de-affiliation of any Person(s) hereunder.

(b) BH Member shall indemnify, defend and hold the Company, each Subsidiary, Electra Member and the other Electra Member Indemnitees harmless from, against and in respect of any and all damages, liabilities, obligations, losses, costs, expenses, (including costs incurred in investigation and defense and reasonable attorney fees), penalties, fines and other judgments (at equity or at law) incurred by the Company, any Subsidiary, Electra Member and/or any of the other Electra Member Indemnitee in connection with or arising from any BH Member Default. All sums distributable or payable to BH Member or its Affiliate or designee hereunder shall be offset against any damages, liabilities, obligations, losses, costs, expenses, (including costs incurred in investigation and defense and reasonable attorney fees), penalties, fines, judgments (at equity or at law), or other amounts due to Electra Member, any Electra Indemnitee or the Company (or any Subsidiaries) from BH Member or any Affiliate of any of the foregoing pursuant to this Section 12.1(b), in such amounts as are determined pursuant to the terms of this Agreement, and shall be paid instead to Electra Member, the other Electra Indemnitees, the Company or the applicable Subsidiary, in such order as Electra Member shall determine (with the claims of Electra Member and the other Electra Indemnitees to any such distributions, account or funds being prior to the claims of the Company and the Subsidiaries); the claims of BH Member and BH Member Indemnitees and any of their respective Affiliates to any such distributions, payments, accounts or funds shall be junior and subordinate to the claims of the indemnified parties under this Section 12.1(b). Each of Toledano, BH Worldwide, and BH Member represents and warrants to Electra Member and the Company that Electra Member's agreement to enter into this Agreement is of substantial and material benefit to each of the foregoing, and that this Agreement is the valid and binding obligation of each of the foregoing enforceable against such Persons in accordance with its terms. The provisions of this Section 12.1(b) shall survive any termination of this Agreement or the withdrawal, termination or de-affiliation of any Person(s) hereunder.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 12.2 Mediation; Litigation.

Subject to first satisfying the following mediation requirements set forth in this Section 12.2, and except to the extent that the disputants then agree in writing to any other method of resolution of a given dispute or except to the extent the resolution of any question is final, binding and conclusive upon the Members under the terms of this Agreement, any dispute arising among the Members, or any of them, or their successors-in-interest, or the estate of a deceased Member, or a Member and the Company, concerning the meaning or interpretation of this Agreement, or the rights, duties, or obligations of the Members, including the successors-in-interest and the estate of a deceased Member arising between the Members or between any Member and the Company shall be resolved by litigation in the state or federal courts lying in New Castle County, Delaware, with the laws of the State of Delaware to govern all matters relating to the interpretation and effect of this Agreement. Notwithstanding the foregoing, neither Member (nor any successor in interest or estate of a deceased Member) nor the Company shall initiate any such litigation unless an opportunity for non-binding mediation, as hereafter provided, is offered to the Person against whom a claim is to be filed (the "Respondent") and, if the Respondent so elects, the non-binding mediation is held and concluded. Prior to filing any claim against another Member or the Company, the Company and/or Member (or successor in interest or estate of a deceased Member) that desires to file the claim ("Petitioner") shall serve notice ("Claim Notice") on the Respondent(s) setting forth a description of the claims the Petitioner intends to make ("Claim") and offering the Respondent the opportunity to elect to submit such Claim to non-binding mediation. If, within ten (10) days of delivery of the Claim Notice, the Respondent has not delivered a notice ("Mediation Notice") to the Petitioner electing to have the Claim submitted to non-binding mediation, the Petitioner may thereafter pursue the claim through litigation in the courts as above provided. If the Respondent does timely serve a Mediation Notice, then the Petitioner shall not initiate litigation with respect to the Claim until such Claim has been submitted to non-binding mediation and such mediation proceeding has concluded. Any non-binding mediation shall be submitted to mediation under the auspices of the American Arbitration Association in New Castle County, Delaware, in accordance with its rules then in force and effect, and any resolution achieved in such mediation proceeding may be adopted and complied with by the parties to such proceeding and the Company but such resolution shall not be entitled to be made part of a judgment of a court of competent jurisdiction and shall not be entitled to any court ordered specific performance.

Section 12.3 Notices.

Unless otherwise provided herein, any offer, acceptance, election, approval, consent, certification, request, waiver, notice or other communication required or permitted to be given hereunder (hereinafter collectively referred to as a "Notice") shall be deemed given only if in writing and either (i) sent by certified or registered mail, postage prepaid and return receipt requested, or (ii) delivered by a reputable overnight carrier, delivery prepaid for delivery on the next Business Day, and in either case addressed to the Company at its then principal office and to the Member or Members to whom any such Notice is addressed at the addresses set forth on Exhibit E attached hereto. Notices sent by mail shall be effective three (3) Business Days following their deposit with the U.S. Post Office and notices sent by overnight courier shall be effective the next Business Day following their deposit with a reputable overnight carrier. Any Member may change its address set forth on Exhibit E attached hereto by written notice to the

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Company and each Member and shall be effective ten (10) days following the effective date of the Notice provided that a notice of change of address of any Member shall not be deemed to have been given until actual receipt by the Company. Notices on behalf of the Company or any Member may be given by their respective attorneys.

Section 12.4 Entire Agreement.

This Agreement contains the entire agreement of the parties hereto and supersedes all prior agreements and understandings, oral or otherwise, among the parties hereto with respect to the matters contained herein and (except as specifically noted herein) it cannot be modified or amended except by a writing signed by all Members; provided, however, that the Manager shall have the right to unilaterally amend this Agreement as contemplated by the definition of Permitted Transfer; provided, further, that if Electra Member is removed as Manager pursuant to Section 4.9(a), the replacement manager shall thereafter have the unilateral right to modify or amend this Agreement without the consent of Electra Member (or, if applicable, any other Member), subject in all cases to the rights afforded to Electra Member set forth in Schedule 4.9(b) attached hereto and provided further that any such modification or amendment does not constitute an event of default pursuant to the terms of any loan documents (including the Loan Documents) to which the Company (or a Subsidiary) is a party.

Section 12.5 Waivers.

Except as otherwise expressly provided herein, no purported waiver by any party of any breach by another party of any of its obligations, agreements or covenants hereunder, or any part thereof, shall be effective unless made in writing subscribed by the party or parties sought to be bound thereby, and no failure to pursue or elect any remedy with respect to any default under or breach of any provision of this Agreement, or any part thereof, shall be deemed to be a waiver of any other subsequent similar or different default or breach, or any election of remedies available in connection therewith, nor shall the acceptance or receipt by any party of any money or other consideration due it under this Agreement, with or without knowledge of any breach hereunder, constitute a waiver of any provision of this Agreement with respect to such or any other breach.

Section 12.6 Headings, Gender and Number.

The section headings herein contained have been inserted only as a matter of convenience of reference and in no way define, limit or describe the scope or intent of any provisions of this Agreement nor in any way affect any such provisions. Where appropriate as used herein, the masculine gender shall be deemed to include the feminine, the feminine gender shall be deemed to include the masculine, the singular number shall be deemed to include the plural and the plural number shall be deemed to include the singular. As used herein, the word "including" means "including, but not limited to".

Section 12.7 Severability.

Each provision of this Agreement shall be considered to be severable and if, for any reason, any such provision or provisions, or any part thereof, is determined to be invalid and contrary to any existing or future applicable law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, but this Agreement shall be construed and

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

enforced in all respects as if such invalid or unenforceable provision or provisions had been omitted; provided, however, that the status of this Company, as a limited liability company taxed as a partnership, shall not be prejudiced.

Section 12.8 Counterparts.

This Agreement may be executed in one or more counterparts and each of such counterparts, for all purposes, shall be deemed to be an original but all of such counterparts together shall constitute but one and the same instrument, binding upon all parties hereto, notwithstanding that all of such parties may not have executed the same counterpart.

Section 12.9 Benefit.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective executors, administrators and successors, but shall not be deemed for the benefit of creditors of any other persons, nor shall it be deemed to permit any assignment by a Member of any of his rights or obligations hereunder except as expressly provided herein.

Section 12.10 Further Actions.

Each of the Members hereby agrees that he or it shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms thereof.

Section 12.11 Interpretation.

This Agreement and all matters pertaining thereto shall be governed by the laws of the State of Delaware. This Agreement shall not be construed against the party that caused the initial draft of this Agreement to be prepared as all parties hereto have had the opportunity to review and negotiate the form of this Agreement with counsel of their choosing.

Section 12.12 No Third Party Beneficiaries.

Other than as explicitly set forth herein, the provisions of this Agreement are not intended to be for the benefit of any creditor or other person (other than a Member in his capacity as a Member) to whom any debts, liabilities, or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members; and no such creditor or other person shall obtain any benefit from such provisions or shall, by reason of any such foregoing provision, make any claim in respect of any debt, liability, or obligation against the Company or any of the Members.

Section 12.13 Intentionally Omitted.

Section 12.14 Equitable Relief.

The Members hereby confirm that damages at law may be an inadequate remedy for a breach or threatened breach of this Agreement and agree that, except as provided in Section 3.5, in the event of a breach or threatened breach of any provision hereof, the respective rights and

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but, nothing herein contained is intended to, nor shall it, limit or affect any right or rights at law or by statute or otherwise of a Member aggrieved as against the other for a breach or threatened breach of any provision hereof, it being the intention by this Section 12.14 to make clear the agreement of the Members that the respective rights and obligations of the Members hereunder shall be enforceable in equity as well as at law or otherwise and that the mention herein of any particular remedy shall not preclude a Member from any other remedy it or he might have, either in law or in equity.

## ARTICLE 13

## REPRESENTATIONS AND WARRANTIES

Section 13.1 Representations, Warranties and Covenants of Electra Member.

Electra Member hereby represents, warrants and covenants the following to BH Member:

(a) It is a limited liability company, duly formed and validly existing and in good standing under the laws of the state of its formation; it has all requisite power and authority to enter into this Agreement, to acquire and hold its Interest (as applicable) and to perform its obligations hereunder. The execution and delivery of this Agreement by it and the performance by it of the transactions contemplated hereby have been duly authorized by all requisite limited liability company actions or proceedings. This Agreement constitutes a legal, valid and binding obligation of Electra Member enforceable in accordance with its terms, subject to bankruptcy, general principles of equity and other laws effecting creditors' rights generally.

(b) The execution of this Agreement and the performance of the transactions contemplated hereby will not violate any provision of law, any order of any court binding on Electra Member, or any provision of any indenture, agreement, or other instrument to which Electra Member is a party, or be in conflict with, result in a breach of or constitute a default under any such indenture, agreement or other instrument to which Electra Member is a party or is otherwise bound.

(c) No actions, suits, attachments, proceedings, assignments for the benefit of creditors, insolvency, event of Bankruptcy, reorganization or other proceedings are pending or, to its knowledge, threatened, against it.

(d) Electra Member has not engaged any broker or finder in connection with this Agreement or the transactions contemplated hereby. Electra Member shall indemnify BH Member and its Affiliates for all costs, damages and expenses (including reasonable attorneys' fees) which may arise out of a breach of the aforesaid representation and warranty. Electra Member agrees to pay any applicable fees and expenses due any broker or finder that Electra Member or any of its Affiliates has engaged, except as otherwise provided above.

(e) It is not a Prohibited Person.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(f) It is familiar with the definition of "accredited investor" in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended, and it represents that it is an "accredited investor" within the meaning of that Rule.

(g) It is not required to register as an "investment company" within the meaning ascribed to such term by the Investment Company Act of 1940, as amended, and covenants that it shall at no time while it is a Member of the Company conduct its business in a manner that requires it to register as an "investment company."

(h) It shall comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect and shall immediately notify the other Members in writing if it becomes aware that any of the foregoing representations, warranties or covenants are no longer true or have been breached or if Electra Member has a reasonable basis to believe that they may no longer be true or have been breached.

(i) The true and complete ownership and control structure of Electra Member and any of its Affiliates involved in the acquisition of the Property as of the date hereof is shown on Exhibit F and Electra Member shall promptly notify BH Member of any changes in the ownership structure or control from what is shown on such Exhibit.

(j) At all times during the existence of the Company, a Key Person shall continuously maintain exclusive Control, exercisable without the consent or approval of any other Person, over the business and affairs of Electra Member, subject only to certain major decision veto rights of Electra Parent, and/or Miller.

Section 13.2 Representations, Warranties and Covenants of BH Member.

BH Member hereby represents, warrants and covenants the following to Electra Member:

(a) It is a limited liability company, duly formed and validly existing and in good standing under the laws of the state of its formation; it has all requisite power and authority to enter into this Agreement, to acquire and hold its Interest and to perform its obligations hereunder. The execution and delivery of this Agreement by BH Member and the performance by BH Member of the transactions contemplated hereby have been duly authorized by all requisite limited liability company actions or proceedings. This Agreement constitutes a legal, valid and binding obligation of BH Member enforceable in accordance with its terms, subject to bankruptcy, general principles of equity and other laws effecting creditors' rights generally.

(b) The execution of this Agreement and the performance of the transactions contemplated hereby will not violate any provision of law, any order of any court binding on BH Member, or any provision of any indenture, agreement, or other instrument to which BH Member is a party, or be in conflict with, result in a breach of or constitute a default under any such indenture, agreement or other instrument to which BH Member is a party or is otherwise bound.

(c) No actions, suits, attachments, execution proceedings, assignments for the benefit of creditors, insolvency, event of Bankruptcy, reorganization or other proceedings are pending or, to BH Member's knowledge, threatened, against BH Member.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(d) BH Member has not engaged any broker or finder in connection with this Agreement or the transactions contemplated hereby. BH Member shall indemnify Electra Member and its Affiliates for all costs, damages and expenses (including reasonable attorneys' fees) which may arise out of a breach of the aforesaid representation and warranty. BH Member agrees to pay any applicable fees and expenses due any broker or finder that BH Member or its Affiliates has engaged.

(e) BH Member is not a Prohibited Person.

(f) It is familiar with the definition of "accredited investor" in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended, and it represents that it is an "accredited investor" within the meaning of that Rule.

(g) It is not required to register as an "investment company" within the meaning ascribed to such term by the Investment Company Act of 1940, as amended, and covenants that it shall at no time while it is a Member of the Company conduct its business in a manner that requires it to register as an "investment company."

(h) It shall comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect and shall immediately notify the other Members in writing if it becomes aware that any of the foregoing representations, warranties or covenants are no longer true or have been breached or if the Member has a reasonable basis to believe that they may no longer be true or have been breached.

(i) BH Member has furnished to Electra Member a true, correct and complete copy of the Purchase Agreement and all amendments and modifications thereto, (ii) to the best of BH Member's knowledge, the Purchase Agreement is enforceable against all of the parties thereto in accordance with its terms, subject to bankruptcy, general principles of equity and other laws effecting creditors' rights generally, (iii) the Purchase Agreement has not been amended or modified (other than such amendments or modifications provided to Electra Member), (iv) to the best of BH Member's knowledge, no party to the Purchase Agreement is in default thereunder, (v) BH Member has provided Electra Member with all material due diligence documents in its possession with respect to the Property, and (vi) to the best of BH Member's knowledge, BH Member has not misrepresented or omitted to disclose any material facts with respect to any of the Purchase Agreement or the Property.

(j) The true and complete ownership and control structure of BH Member and any of its Affiliates involved in the acquisition of the Property as of the date hereof is shown on Exhibit G and BH Member shall promptly notify Electra Member of any changes in the ownership structure or control from what is shown on such Exhibit.

(k) At all times during the existence of the Company, Toledano shall continuously (i) maintain exclusive Control, exercisable without the consent or approval of any other Person, over the business and affairs of BH Member, and (ii) cause all of BH Member's Capital Contributions required under this Agreement to be satisfied with Toledano's personal funds.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 13.3 Indemnification.

(a) Electra Member shall indemnify, defend and hold BH Member, its members, officers, Affiliates, employees, agents and/or other representatives ("BH Member Indemnitees") harmless from, against and in respect of any and all damages (but excluding lost profits, incidental, punitive, special or consequential damages), liabilities, obligations, losses, costs, expenses, (including costs incurred in investigation and defense and reasonable attorney fees), penalties, fines and other judgments (at equity or at law) incurred by any BH Member Indemnitee in connection with or arising from (i) the breach by Electra Member (whether in its capacity as "Manager" or "Member" hereunder) of Section 12.1(a) hereof, and/or (ii) the breach of any representation, warranty or covenant of Electra Member set forth in Section 13.1.

(b) BH Member shall indemnify, defend and hold Electra Member, its members, officers, Affiliates, employees, agents and/or other representatives ("Electra Member Indemnitees") harmless from, against and in respect of any and all damages (but excluding lost profits, incidental, punitive, special or consequential damages), liabilities, obligations, losses, costs, expenses, (including costs incurred in investigation and defense and reasonable attorney fees), penalties, fines and other judgments (at equity or at law) incurred by any Electra Member Indemnitee in connection with or arising from (i) the breach by BH Member of Section 12.1(b) hereof, an/or (ii) the breach of any representation, warranty or covenant of BH Member set forth in Section 13.2.

*[Signature Pages Follow]*

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**IN WITNESS WHEREOF**, the Members have hereunto executed this Agreement as of the day and year first above written.

**ELECTRA AMERICA SD MALL MANAGEMENT LLC,**
a Delaware limited liability company

By: American Landmark LLC, a Florida limited liability company, its Manager

By:______________________________
Name: Joseph G. Lubeck
Title: Manager

**BH-SD MALL LLC,**
a Delaware limited liability company

By:______________________________
Name:
Title:

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**IN WITNESS WHEREOF**, the Members have hereunto executed this Agreement as of the day and year first above written.

**ELECTRA AMERICA SD MALL MANAGEMENT LLC,**
a Delaware limited liability company

By: American Landmark LLC, a Florida limited liability company, its Manager

By:________________________
Name: Joseph G. Lubeck
Title: Manager

**BH-SD MALL LLC,**
a Delaware limited liability company

By:________________________
Name: ISAAC TOLEDANO
Title: AUTHORIZED SIGNATORY

*[Signature Page to A/R LLC Agreement of Electra America SD Mall JV LLC]*

51623831v.1

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT A

Description of Property

[See Attached]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

LEGAL DESCRIPTION FOR MACY'S PARCEL

PARCEL I: (Fee Simple)

A parcel of land lying in Section 7, Township 56 South, Range 40 East, Dade County, Florida and being more particularly described as follows:

Commencing at the center of said Section 7, said point also being the centerline of Southwest 112th Avenue, thence S 01°01'34" E along said centerline, said line also being the West line of S.E. 1/4 of said Section, a distance of 843.32 feet to a point of intersect with the Northerly right-of-way line of Cutler Ridge Boulevard (S.W. 211th Street) extended; thence N 88°58'26" E along the extended portion of/and the said Northerly line a distance of 555.01 feet to the principal point and place of beginning of the following description:

Thence 39.27 feet along an arc to the left having a radius of 25.00 feet and a chord of 35.35 feet with delta angle being 90°00'00"; thence N 01°01'34" W a distance of 310.03 feet to a point; thence 39.27 feet along an arc to the left having a radius of 25.00 feet and a chord of 35.36 feet with delta angle being 90°00'09"; Thence N 88°58'17" E a distance of 87.98 feet to a point; Thence N 41°18'37" E a distance of 428.37 feet to a point; Thence N 48°41'23" W a distance 204.70 feet to a point; Thence N 41°18'37" E a distance of 229.00 feet to a point; Thence S 48°41'23" E a distance of 54.00 feet to a point; Thence N 74°34'49" E a distance of 110.70 feet to a point; Thence S 66°39'39" E a distance of 110.59 feet to a point; Thence N 41°19'22" E a distance of 36.50 feet to a point; Thence S 48°40'38" E a distance of 177.00 feet to a point; Thence S 41°19'22" W a distance of 75.00 feet to a point; Thence S 48°40'38" E a distance of 108.00 feet to a point; Thence S 41°19'22" W a distance of 330.20 feet to a point; Thence S 03°40' 38" E a distance of 199.12 feet to a point; Thence S 41°19'22" W a distance of 91.31 feet to a point; Thence N 80°54'00" W a distance of 105.37 feet to a point; Thence S 01°01'34" E a distance of 142.01 feet to a point; Thence S 88°58'26" W a distance of 31.50 feet to a point; Thence S 01°01'34" E a distance of 75.00 feet to a point on the aforementioned Northerly right-of-way line of Cutler Ridge Boulevard (S.W. 211th Street); thence S88°58'26" W along said Northerly line a distance of 402.00 feet to the point of beginning.

PARCEL II: (Easement)

The reciprocal and non-exclusive easements and privileges of use, ingress, egress, parking and for utility and other purposes created and granted as an appurtenance to Developer's Parcel by that certain Easement and Operating Agreement by and among Alstores Realty Corporation and Jordan Marsh Company and Cutler Ridge Associates, recorded February 25, 1981 in Official Records Book 11025, Page 1689, together with unrecorded First Amendment to Easement and Operating Agreement, dated January 21, 1991; Second Amendment to Easement and Operating Agreement recorded February 23, 1998 in Official Records Book 17990, Page 2640; Third Amendment to Operating Agreement recorded May 23, 2006 in Official Records Book 24555, Page 5; Fourth Amendment to Easement and Operating Agreement recorded December 28, 2010 in Official Records Book 27535, Page 1678; Amended and Restated Fourth Amendment to Easement and Operating Agreement recorded July 20, 2011 in Official Records Book 27762, Page 4159; and Fifth Amendment to Easement and Operating Agreement recorded March 5, 2012 in Official Records Book 28018, Page 4583, all of the Public Records of Miami-Dade County, Florida, in, on, over, upon and under certain adjoining real property therein more particularly described together with all of the rights, powers, privileges and benefits under said Operating Agreements accruing to the owner of said Developer's Parcel, its successors, legal representatives and

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

assigns.

PARCEL III: (Easement)

Together with non-exclusive easement for the benefit of Parcel I described above, created and defined in the Declaration of Easements made by Joseph B. Reisman, Trustee, dated January 1,1978 and recorded January 16,1978 in Official Records Book 9915, Page 707, of the Public Records of Miami-Dade County, Florida.

NOT AN OFFICIAL COPY PUBLIC ACCESS NOT AN OFFICIAL COPY PUBLIC ACCESS

Legal Description for Mall Parcel Survey:

**Parcel I:**

A parcel of land lying in Section 7, Township 56 South, Range 40 East, Miami-Dade County, Florida and being more particularly described as follows:

Commencing at the center of said Section 7, said point also being the centerline of Southwest 112th Avenue; thence South 01°01'34" East along said centerline, said line also being the West line of Southeast One-Quarter (SE 1/4) of said Section, a distance of 843.32 feet to a point of intersect with the Northerly right-of- way line of Cutler Ridge Boulevard (Southwest 211 Street) extended; thence North 88°58'26" East along the extended portion of and the said Northerly line a distance of 957.01 feet to the Principal Point and Place of Beginning of the following description:

Thence North 01°01'34" West, a distance of 75.00 feet to a point; thence North 88°58'26" East, a distance of 31.50 feet to a point; thence North 01°01'34" West, a distance of 142.01 feet: to a point; thence South 80°54'00" East, a distance of 105.37 feet to a point; thence North 41°19'22" East, a distance of 91.31 feet to a point; thence North 03°40'38" West, a distance of 199.12 feet to a point; thence North 41°19'22" East, a distance of 330.20 feet to a point; thence North 48°40'38" West, a distance of 108.00 feet to a point; thence North 41°19'22" East, a distance of 75.00 feet to a point; thence North 48°40'38" West, a distance of 177.00 feet to a point; thence South 41°19'22" West, a distance of 36.50 feet to a point; thence North 66°39'39" West, a distance of 110.59 feet to a point; thence South 74°34'49" West, a distance of 110.70 feet to a point; thence North 48°41'23" West, a distance of 54.00 feet to a Point; thence South 41°18'37" West, a distance of 229.00 feet to a point; thence South 48°41'23" East, a distance of 204.70 feet to a point; thence South 41°18'37" West, a distance of 60.17 feet to a point, thence North 48°41'23" West, a distance of 260.00 feet to a point; thence North 41°18'37" East, a distance of 160.00 feet to a point; thence North 48°41'23" West, a distance of 550.00 feet to a point; thence North 01°01'43" West, a distance of 230.00 feet to a point; thence North 48°39'43" West, a distance of 14.65 feet to a Point; thence South 86°38'38" West, a distance of 44.39 feet to a point; thence North 03°21'22" West, a distance of 43.92 feet to a point; thence North 48°39'43" West, a distance of 214.20 feet to a point on the Southeasterly right-of-way line of U.S. Highway No. 1 (SR 5); thence along said right-of-way line North 41°19'49" East, a distance of 942.26 feet to a point; thence South 48°40'11" East, a distance of 127.00 feet to a point; thence North 41°19'49" East, a distance of 257.24 feet to a point; thence North 48°40'11" West, a distance of 127.00 feet to a point on the said Southeasterly line of U.S. Highway No. 1; thence North 41°19'49" East, a distance of 110.50 feet to a point; thence South 48°40'11" East a distance of 40.00 feet to a point; thence South 41°19'49" West, a distance of 20.00 feet to a point; thence South 48°40'11" East, a distance of 33.33 feet to a point; thence South 43°04'52" East, a distance of 76.11 feet to a point; thence North 56°18'31" East, a distance of 286.01 feet to a point; thence North 41°19'49" East, a distance of 101.83 feet to a point on the Southerly right-of-way line of Caribbean Boulevard; thence South 48°41'31" East along said Southerly line, a distance of 466.00 feet to a point; thence South 41°19'49" West, a distance of 153.83 feet to a point; thence South 48°41'31" East, a distance of 142.00 feet to a point; thence North 41°19'49" East, a distance of 148.82 feet to a point; thence 5.04 feet along an arc to the left having a radius of 25.00 feet and a chord of 5.03 feet with delta angle being 11°33'33", to a point on said Southerly right-of-way line; thence South 48°41'31" East along the said Southerly line, a distance of 52.98 feet to a Point; thence South 41°19'49" West, a distance of 158.00 feet

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

to a point; thence 28.41 feet along an arc to the left having a radius of 20.00 feet and chord of 26.08 feet with delta angle being 81°23'19" thence 20.28 feet along an arc to the right having a radius of 20.00 feet and a chord of 19.42 feet with delta angle being 58°06'22"; thence South 18°02'52" West, a distance of 218.21 feet to a point; thence 126.85 feet along an arc to the right having a radius of 935.00 feet: and a chord of 126.75 feet with delta angle being 07°46'24"; thence 342.39 feet along an arc to the right having a radius of 310.00 feet and a chord of 325.25 feet with delta angle being 63°16'57"; thence South 08°40'11" East, a distance of 75.46 feet to a point; thence 42.67 feet along an arc to the left having a radius of 25.00 feet and a chord of 37.67 feet with delta angle being 97°46'54"; thence North 73°32'55" East, a distance of 221.99 feet to a point; thence 39.27 feet along an arc to the left having a radius of 25.00 feet and a chord of 35.35 feet with delta angle being 90°00'00", to a point on the Westerly right-of-way line of SR 821; thence South 16°27'05" East along said Westerly line, a distance of 700.00 feet to a point; thence 39.27 feet along an arc to the left having a radius of 25.00 feet and a chord of 35.35 feet with delta angle being 90°00'00"; thence South 73°32'55" West, a distance of 317.65 feet to a point; thence 35.87 feet along an arc to the left having a radius of 25.00 feet and a chord of 32.87 feet with delta angle being 82°13'06"; thence South 08°40'11" East, a distance of 84.39 feet to a point; thence 292.34 feet along an arc to the right having a radius of 335.00 feet and a chord of 283.15 feet with delta angle being 50°00'00"; thence South 41°19'49" West, a distance of 25.00 feet to a point; thence 39.27 feet along an arc to the left having a radius of 25.00 feet and a chord of 35.35 feet with delta angle being 90°00'00"; thence South 48°40'11" East, a distance of 18.85 feet to a point; thence 95.21 feet along an arc to the right having a radius of 200.00 feet and a chord of 94.31 feet with delta angle being 27°16'30"; thence South 21°23'41" East, a distance of 70.03 feet to a point; thence 39.27 feet along an arc to the left having a radius of 25.00 feet and a chord of 35.35 feet with delta angle being 90°00'00"; to a point on the Northerly right-of-way line of Cutler Ridge Boulevard (Southwest 211 Street); thence South 68°36'19" West along said Northerly line, a distance of 664.78 feet to a point; thence 659.40 feet along an arc to the right having a radius of 1854.86 feet and a chord of 655.93 feet with delta angle being 20°22'07"; thence continuing along said Northerly line South 88°58'26" West, a distance of 22.67 feet to a Point of Beginning.

LESS AND EXCEPT (EXCLUDED PARCEL "B")

A Parcel of Land lying in Section 7, Township 56 South, Range 40 East, Miami-Dade County, Florida and being more particularly described as follows:

Commencing at the center of said Section 7, said point also being the centerline of Southwest 112th avenue; thence South 01°01'34" East along the centerline, said line also being the West line of Southeast One-Quarter (SE 1/4) of said Section, a distance of 843.32 feet to a point of intersection with the Northerly Right-of-Way line of Cutler Ridge Boulevard (Southwest 211th Street) extended:

Thence North 88°58'26" East along the extended portion of and the said Northerly line a distance of 979.68 feet; thence 659.40 feet along an arc to the left having a radius of 1854.86 feet and a chord of 655.93 feet with the delta angle being 20°22'07"; thence North 68°36'19" East, a distance of 664.78 feet to a point of cusp (the last two courses and distances being coincident with the said Northerly line); thence 39.27 feet along an arc to the right having a radius of 25.00 feet and a Chord of 35.36 feet with delta angle being 90°00'00"; thence North 21°23'41" West, a distance of 70.03 feet to a point; thence 95.21 feet along an arc to the left having a radius of 200.00 feet and a chord of 94.31 feet with

NOT AN OFFICIAL COPY PUBLIC ACCESS NOT AN OFFICIAL COPY PUBLIC ACCESS

delta angle being 27°16'30"; thence North 48°40'11" West, a distance of 18.85 feet to a point; thence 39.27 feet along an arc to the right having a radius of 25.00 feet and a chord of 35.36 feet with delta angle being 90°00'00"; thence North 41°19'49" East, a distance of 25.00 feet to a point; thence 292.34 feet along an arc to the left having a radius of 335.00 feet and a chord of 283.15 feet with delta angle being 50°00'00"; thence North 08°40'11" West, a distance of 84.39 feet to the principal point and place of beginning of the following description:

Thence continue North 08°40'11" West, a distance of 333.07 feet to a point; thence 35.87 feet along an arc to the right having a radius 25.00 feet and chord of 32.87 feet with the delta angle 82°13'06"; thence North 73°32'55" East, a distance of 297.55 feet to a point on the Westerly Right-of-Way line of S.R. 821; thence South 16°027'05" East along said Westerly line, a distance of 355.00 feet to a point of cusp; thence 39.27 feet along an arc to the left having a radius 25.00 feet and a chord 35.36 feet with delta angle being 90°00'00"; thence South 73°32'55" West, a distance of 317.65 feet to a point; thence 35.87 feet (38.57 feet per Deed call): along an arc to the left having a radius of 25.00 feet and a chord of 32.87 feet with delta angle being 82°13'06" to the Point of Beginning.

AND LESS AND EXCEPT (EXCLUDED PARCEL "C")

A Parcel of Land lying in Section 7, Township 56 South, Range 40 East, Miami-Dade County, Florida and being more particularly described as follows:

Commencing at the center of said Section 7, said point also being the centerline of Southwest 112th Avenue; thence South 01°01'34" East along said centerline, said line also being the West line of Southeast One-Quarter (SE 1/4) of said Section, a distance of 843.32 fed to a point of intersection with the Northerly Right-of-Way line of Cutler Ridge Boulevard (SW 211th Street) extended; thence North 88°58'26" East, along the extended portion of and said Northerly line a distance of 979.68 fed to the point of curvature, of a circular curve to the left, having a radius of 1854.86 feet and a central angle of 17°53'44", a distance of 579.34 feet to the Point of Beginning, said point being on the arc of a circular curve to the right, at which the radius point bears North 23°51'21" East; thence Northwesterly, and northerly along the arc of said curve, having a radius of 65.00 feet and a central angle 45°12'39", a distance of 51.29 feet to the point of tangency; thence North 20°56'00" West, a distance of 7.81 feet to the point of curvature of a circular curve to the right; thence Northerly, Northeasterly and Easterly along the arc of said curve having a radius of 35.00 feet and a central angle of 98°12'03", a distance of 59.99 fed to the point of reverse curvature of a circular curve to the left; thence Easterly along the arc of said curve having a radius of 600.00 feet and a central angle 08°34'15", a distance of 89.75 fed to the point of tangency; thence North 68°41'48" East, a distance of 155.73 feet to the point of curvature of a circular curve to the left; thence Easterly, and Northeasterly along the arc of said curve having a radius of 550.00 feet and a central angle of 27°21'59", a distance of 262.70 feet to the point of tangency; thence North 41°19'49" East, a distance of 102.69 feet to the point of curvature of a circular curve to the right; thence Northeasterly, Easterly and Southerly along the arc of said curve having a radius of 25.00 feet and a central angle of 90°00'00", a distance of 39.27 feet to the point of tangency; thence South 48°40'11" East, a distance of 18.85 feet to the point of curvature of a circular curve to the right; thence Southeasterly, and Southerly along the arc of said curve having a radius of 150.00 feet and a central angle of 27°16'30", a distance of 71.41 feet to the point of tangency; thence South 21°23'41" East, a distance of 70.03 feet to the point of curvature of a circular curve to the right; thence Southerly, Southwesterly, and Westerly along the arc of said curve having a radius of 25.00

NOT AN OFFICIAL COPY PUBLIC ACCESS NOT AN OFFICIAL COPY PUBLIC ACCESS

fed and a central angle of 90°00'00", a distance of 39.27 feet to the point of tangency; thence South 68°36'19" West, a distance of 564.78 fed to the point of curvature of a circular curve to the right; thence Westerly along the arc of said curve having a Radius of 1854.86 feet and a central angle of 02°28'23", a distance of 80.06 fed to the Point of Beginning (the last two courses and distances being coincident with the Northerly Right-of-Way line of Cutler Ridge Boulevard (SW 211 Street).

AND FURTHER LESS AND EXCEPT (OUTPARCEL 1):

A portion of Tract E of CUTLER RIDGE MALL SUBDIVISION SECTION ONE, according to the plat thereof, as recorded in Plat 111 at Page 49, of the Public Records of Miami-Dade County, being more particularly described as follows:

Commencing at the center of Section 7, Township 56 South, Range 40 East, Miami-Dade County, Florida; thence run North 88°58'26" East, a distance of 50.00 feet to a point on the East right of way line of SW 112th avenue; thence run North 01°01'34" West along the said East right-of-way line of SW 112th avenue, a distance of 730.93 feet to a point of intersection with the Southeasterly right-of-way line of U.S. Highway No. 1 (SR 5); thence run North 41°19'49" East, along the said Southeasterly right-of-way line a distance of 200.00 feet to the most Westerly corner of said tract E; thence continue North 41°19'49" East, along the said Southeasterly right-of-way line the same being the Northwesterly line of said Tract E, a distance of 645.76 feet to the Point of Beginning; thence continue North 41°19'49" East, along the said Southeasterly right-of-way line, a distance of 296.50 feet to the most Westerly corner of that certain parcel of land described in the Special Warranty Deed, recorded in Official Records Book 11114, Page 320, of the Public Records of Miami-Dade County; thence run South 48°40'11" East for a distance of 127.00 feet to the most Southerly corner of the said parcel described in Special Warranty Deed and a point on the Northerly line of the Revised Access Easement Area described in the Modification of Access Easement recorded in Official Records Book 16274, Page 2567, of the Public Records of Miami-Dade County; thence run South 11°19'49" West, along the Northerly line of the said Revised Access Easement Area, for a distance of 46.00 feet to a point; thence run South 41°19'49" West for a distance of 54.69 feet to a point on the Northerly line of the said Revised Access Easement Area; thence continue South 41°19'49" West for a distance of 186.07 feet to the point of curvature of a circular curve to the right; thence run Southwesterly and Northwesterly along the arc of said curve having a radius of 35.00 feet and a central angle of 90°00'00", for an arc distance of 54.98 feet to the point of tangency; thence run North 48°40'11" West for a distance of 78.20 feet to a point; thence run North 21°14'27" West for a distance of 41.43 feet to the Point of Beginning, (the last four courses and distances being coincident with the said Northerly line of the Revised Access Easement Area).

AND LESS AND EXCEPT (OUTPARCEL 2):

A portion of Tracts "E", "F" And "G" of CUTLER RIDGE MALL SUBDIVISION SECTION ONE, according to the plat thereof as recorded in Plat Book 111, Page 49 of the Public Records of Miami-Dade County, Florida, being more particularly described as follows:

Commence at the most Southerly South corner of said Tract "F"; thence North 41°19'22" East on a Southeast line of said Tract "F" 330.00 feet; thence North 65°00'00" East on a Southeast line of said Tract "F" 294.37 feet to the Point of Beginning; thence North 00°08'38" West 34.91 feet; thence North 18°35'13" East 46.73 feet; thence North

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

81°19'49" East and radial to the next described curve 5.61 feet to the intersection with the Southerly boundary of Tract "A" of CUTLER RIDGE OFFICE PARK according to the plat thereof as recorded in Plat Book 128, Page 37 of said Public Records, a point on the arc of a circular curve, concave Northeasterly; thence on the boundary of said Tract" A" the following 3 courses and distances:

1 ) Southeasterly on the arc of said curve, with a radius of 25.00 feet and a central angle of 97°46'54" an arc distance of 42.67 feet to a point of tangency; 2) North 73°32'55" East 221.99 feet to a point of curvature of a circular curve, concave Northwesterly; 3) Northeasterly on the arc of said curve, with a radius of 25.00 feet and a central angle of 90°00'00" an arc distance of 39.27 feet to the intersection with the most Easterly East line of said Tract "F", a point of cusp; thence South 16°27'05" East on said most Easterly East line and on the most Easterly East line of said Tract "E" 296.08 feet to a point of curvature of a circular curve, concave Northwesterly, (said point lies 48.92 feet Northwesterly of the most Northerly corner of Tract "A" of B.U. MOTORS, according to the plat thereof, recorded in Plat Book 164 at Page 90, of the said Public Records, as measured along the most Easterly East line of said Tract "E"); thence Southwesterly on the arc of said curve, with a radius of 25.00 feet and a central angle of 90°00'00" an arc distance of 39.27 feet to a point of tangency; thence South 73°32'55" West 63.13 feet; thence South 82°02'36" West 81.23 feet; thence South 73°32'55" West 182.63 feet; thence North 52°43'45" West 40.32 feet; thence North 00°08'38" West 217.64 feet (North 00°08'36" West 217.64 feet (Deeded Call) to the Point of Beginning.

ALSO BEING DESCRIBED AS:

A parcel of land lying in Section 7, Township 56 South, Range 40 East, Miami-Dade County, Florida and being more particularly described as follows:

Commencing at the center of said Section 7, said point also being the centerline of Southwest 112th Avenue; thence South 01°01'34" East along said centerline, said line also being the West line of Southeast One-Quarter (SE 1/4) of said Section, a distance of 843.32 feet to a point of intersect with the Northerly right-of- way line of Cutler Ridge Boulevard (Southwest 211 Street) extended; thence North 88°58'26" East along the extended portion of and the said Northerly line a distance of 957.01 feet to the Principal Point and Place of Beginning of the following description:

Thence North 01°01'34" West, a distance of 75.00 feet to a point; thence North 88°58'26" East, a distance of 31.50 feet to a point; thence North 01°01'34" West, a distance of 142.01 feet to a point; thence South 80°54'00" East, a distance of 105.37 feet to a point; thence North 41°19'22" East, a distance of 91.31 feet to a point; thence North 03°40'38" West, a distance of 199.12 feet to a point; thence North 41°19'22" East, a distance of 330.20 feet to a point; thence North 48°40'38" West, a distance of 108.00 feet to a point; thence North 41°19'22" East, a distance of 75.00 feet to a point; thence North 48°40'38" West, a distance of 177.00 feet to a point; thence South 41°19'22" West, a distance of 36.50 feet to a point; thence North 66°39'39" West, a distance of 110.59 feet to a point; thence South 74°34'49" West, a distance of 110.70 feet to a point; thence North 48°41'23" West, a distance of 54.00 feet to a Point; thence South 41°18'37" West, a distance of 229.00 feet to a point; thence South 48°41'23" East, a distance of 204.70 feet to a point; thence South 41°18'37" West, a distance of 60.17 feet to a point, thence North 48°41'23" West, a distance of 260.00 feet to a point; thence North 41°18'37" East, a distance of 160.00 feet to a point; thence North 48°41'23" West, a distance of 550.00 feet to a point; thence North 01°01'43" West, a distance of 230.00 feet to a point; thence North 48°39'43" West, a distance of 14.65 feet to

NOT AN OFFICIAL COPY. PUBLIC ACCESS NOT AN OFFICIAL COPY. PUBLIC ACCESS

a Point; thence South 86°38'38" West, a distance of 44.39 feet to a point; thence North 03°21'22" West, a distance of 43.92 feet to a point; thence North 48°39'43" West, a distance of 214.20 feet to a point on the Southeasterly right-of-way line of U.S. Highway No. 1 (SR 5); thence along said right-of-way line North 41°19'49" East, a distance of 645.76 feet to a point; thence South 21°14'27" East, a distance of 41.43 feet to a point; thence South 48°40'11" East, a distance of 78.20 feet to a point; thence along an arc to the left having a radius of 35.00 feet and a delta angle of 90°00'00", for an arc distance of 54.98 feet to a point; thence North 41°19'49" East, a distance of 240.76 feet to a point on the Northerly line of the said Revised Access Easement Area; thence North 11°19'49" East, along the prolongation of Northerly line of the said Revised Access Easement Area, a distance of 46.00 feet to a point; thence North 41°19'49" East, a distance of 257.24 feet to a point; thence North 48°40'11" West, a distance of 127.00 feet to a point on the said Southeasterly right-of-way line of U.S. Highway No. 1; thence along said right-of-way line North 41°19'49" East, a distance of 110.50 feet to a point; thence South 48°40'11" East, a distance of 40.00 feet to a point; thence South 41°19'49" West, a distance of 20.00 feet to a point; thence South 48°40'11" East, a distance of 33.33 feet to a point; thence South 43°04'52" East, a distance of 76.11 feet to a point; thence North 56°18'31" East, a distance of 286.01 feet to a point; thence North 41°19'49" East, a distance of 101.83 feet to a point on the Southerly right-of-way line of Caribbean Boulevard; thence South 48°41'31" East along said Southerly line, a distance of 466.00 feet to a point; thence South 41°19'49" West, a distance of 153.83 feet to a point; thence South 48°41'31" East, a distance of 142.00 feet to a point; thence North 41°19'49" East, a distance of 148.82 feet to a point; thence 5.04 feet along an arc to the left having a radius of 25.00 feet and a chord of 5.03 feet with delta angle being 11°33'33", to a point on said Southerly right-of-way line; thence South 48°41'31" East along the said Southerly line, a distance of 52.98 feet to a Point; thence South 41°19'49" West, a distance of 158.00 feet to a point; thence 28.41 feet along an arc to the left having a radius of 20.00 feet and chord of 26.08 feet with delta angle being 81°23'19" to a point of a reverse curve; thence 20.28 feet along said curve having a radius of 20.00 feet and a chord of 19.42 feet with delta angle being 58°06'22" to a point; thence South 18°02'52" West, a distance of 218.21 feet to a point of intersection with a circular carve concave to the Southeast and having for its elements a radius of 935.00 feet and a radial bearing of South 10°16'28" West to the center of said curve; thence 126.85 feet along said curve with delta angle being 07°46'24" to a point on a compound curve; thence 342.39 feet along said curve having a radius of 310.00 feet and a chord of 325.25 feet with delta angle being 63°16'57" to a point; thence South 08°40'11" East, a distance of 75.46 feet to a point; thence South 81°19'49" West and radial to the next described line 5.61 feet to a point; thence South 18°35'13" West, a distance of 46.73 feet to a point; thence South 00°08'38" East, a distance of 34.91 feet to a point; thence South 00°08'38" East, a distance of 217.64 feet to a point; thence South 52°43'45" East, a distance of 40.32 feet to a point; thence North 73°32'55" East, a distance of 182.63 feet to a point; thence North 82°02'36" East, a distance of 81.23 feet to a point; thence North 73°32'55" East, a distance of 63.13 feet to a point; thence 39.27 feet along an arc to the left, with a radius of 25.00 feet and a delta angle of 90°00'00" to a point on the Westerly Right-of-Way Line of State Road 821; thence South 16°27'05" East along said Right-of-Way Line, a distance of 48.92 feet to a point; thence South 73°32'55" West, a distance of 297.55 feet to a point; thence 35.87 feet along an arc to the left having a radius 25.00 feet and chord of 32.87 feet with the delta angle 82°13'06"; Thence South 08°40'11" East to a distance of 417.46 feet to a point; thence 292.34 feet along an arc to the right having a radius of 335.00 feet and a chord of 283.15 feet with delta angle being 50°00'00"; thence South 41°19'49" West, a distance of 25.00 feet to a point; thence 39.27 feet along an arc to the left having a radius of 25.00 feet and a chord of 35.36 feet with delta angle being 90°00'00"; thence South 48°40'11" East, a distance of 18.85 feet to a point; thence

NOT AN OFFICIAL COPY PUBLIC ACCESS - NOT AN OFFICIAL COPY PUBLIC ACCESS

95.21 feet along an arc to the right having a radius of 200.00 feet and a chord of 94.31 feet with delta angle being 27°16'30"; thence South 21°23'41" East for a distance of 70.03 feet to a point; thence 39.27 feet along an arc to the left having a radius of 25.00 feet and a Chord of 35.36 feet with delta angle being 90°00'00" to a point on the Northerly Right-of-Way Line of Cutler Ridge Boulevard; thence South 68°36'19" West along said Northerly Right-of-Way Line, a distance of 100.00 feet to a point of intersection with a circular carve concave to the Northeast and having for its elements a radius of 25.00 feet and a radial bearing of North 21°24'30" East to the center of said curve; thence along said arc having a radius of 25.00 feet and a delta angle of 90°00'00", a distance of 39.27 feet to a point; thence North 21°23'41" West, a distance of 70.03 feet to a point; thence along an arc to the left having a radius of 150.00 feet and a delta angle of 27°16'30", a distance of 71.41 feet to a point; thence North 48°40'11" West, a distance of 18.85 feet to a point; thence along an arc to the left having a radius of 25.00 feet and a delta angle of 90°00'00", a distance of 39.27 feet to a point; thence South 41°19'49" West, a distance of 102.69 feet to a point; thence along an arc to the right having a radius of 550.00 feet and a delta angle of 27°21'59", a distance of 262.70 feet to a point; thence South 68°41'48" West, a distance of 155.73 feet to a point; thence along the arc to the right curve having a radius of 600.00 feet and a delta angle 08°34'15", a distance of 89.75 feet to a point of a reverse curve; thence along said curve having a radius of 35.00 feet and a delta angle of 98°12'03", a distance of 59.99 feet to a point; thence South 20°56'00" East, a distance of 7.81 feet to a point; thence along an arc to the left, having a radius of 65.00 feet and a delta angle 45°12'39", a distance of 51.29 feet to a point on the Northerly right-of-way line of Cutler Ridge Boulevard (Southwest 211 Street); thence 659.40 feet along an arc with a radial bearing of North 18°55'21" West having a radius of 1854.86 feet and a chord of 655.93 feet with delta angle being 20°22'07"; thence continuing along said Northerly line South 88°58'26" West, a distance of 22.67 feet to the Point of Beginning.

LESS AND EXCEPT (KMART/ROSS PARCEL):

A portion of Tracts "E", CUTLER RIDGE MALL SUBDIVISION SECTION ONE, according to the plat thereof as recorded in Plat Book 111, Page 49 of the Public Records of Miami-Dade County, Florida, and a portion of the Northeast 1/4 of Section 7, Township 56 South, Range 40 East, Miami-Dade County, Florida, being more particularly described as follows:

Commencing at the most Northerly corner of said Tract "E", a point on the Southwesterly right-of-way line of Caribbean Boulevard as shown on the said plat of CUTLER RIDGE MALL SUBDIVISION SECTION ONE; thence run South 48°41'31" East, along the Northeasterly line of said Tract "E" and the said Southwesterly right-of-way line of Caribbean Boulevard, for a distance of 73.00 feet to a point; thence continue South 48°41'31" East, along the said Southwesterly right-of-way line of Caribbean Boulevard, for a distance of 60.79 feet to a point in the Southeasterly line of that certain access easement described in Exhibit "B" to the ACCESS EASEMENT, recorded in Official Records Book 16502 at Page 700 of the Public Records of Miami-Dade County, Florida; thence departing said Southwesterly right-of-way line run South 41°19'49" West, along the said Southeasterly line of the said access easement, for a distance of 30.57 feet to a point; thence run South 56°18'31" West, along the said Southeasterly line of the said access easement, for a distance of 434.42 feet to a point of intersection with the Southeasterly line of that certain revised access easement area described in Exhibit "C" to the MODIFICATION OF ACCESS EASEMENT, recorded in Official Records Book 16274 at Page 2567 of the Public Records of Miami-Dade County, Florida; thence run South 41°19'49" West, along the said Southeasterly line of the said revised access easement

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

area, for a distance of 268.25 feet to a point of curvature with a circular curve concave to the Southeast, having a radius of 135.00 feet and a central angle of 33°47'13"; thence run Southwesterly along the arc of said curve to the left, the same being the Southeasterly line of the said revised access easement area, for an arc distance of 79.61 feet to a point of intersection with a non-tangential line; thence run South 87°56'29" West for a distance of 15.57 feet to a point; thence run South 41°19'49" West for a distance of 3.92 feet to a point; thence run South 48°46'54" East for a distance of 380.38 feet to a point; thence run North 86°55'00" East for a distance of 494.02 feet to a point; thence run North 09°59'01" West for a distance of 356.93 feet to a point; thence run North 27°32'49" East for a distance of 48.04 feet to a point; thence run North 41°30'41" East for a distance of 192.07 feet to a point of intersection with the Southwesterly right-of-way line of Caribbean Boulevard; thence run North 48°41'31" West, along the said Southwesterly right-of-way line of Caribbean Boulevard, for a distance of 343.02 feet to the Point of Beginning.

Together with:

The reciprocal and non-exclusive easements and privileges of use, ingress, egress, parking for utility and other purposes created and granted as an appurtenance to Developer's Parcel by that certain Easement and Operating Agreement by and among Alstores Realty Corporation and Jordan Marsh Company and Cutler Ridge Associates, recorded February 25, 1981 in Official Records Book 11025, Page 1689, together with unrecorded First Amendment to Easement and Operating Agreement, dated January 21, 1991; Second Amendment to Easement and Operating Agreement recorded February 23, 1998 in Official Records Book 17990, Page 2640; Third Amendment to Operating Agreement recorded May 23, 2006 in Official Records Book 24555, Page 5; Fourth Amendment to Easement and Operating Agreement recorded December 28, 2010 in Official Records Book 27535, Page 1678; Amended and Restated Fourth Amendment to Easement and Operating Agreement recorded July 20, 2011 in Official Records Book 27762, Page 4159; and Fifth Amendment to Easement and Operating Agreement recorded March 5, 2012 in Official Records Book 28018, Page 4583, as affected by Assignment and Assumption Agreement by and between Macy's Retail Holdings, LLC, an Ohio limited liability company ("Assignor"), and BH Retail South Dixie, LLC, a Delaware limited company ("Assignee"), entered into as of _______________, 2022, recorded _____________, 2022 in Official Records Book _______, page ________, all of the Public Records of Miami-Dade County, Florida, in, on, over, upon and under certain adjoining real property therein more particularly described together with all of the rights, powers, privileges and benefits under said Operating Agreements accruing to the owner of said Developer's Parcel, its successors, legal representatives and assigns.

AND:

Together with non-exclusive easement for the benefit of Parcel I described above, created and defined in the Declaration of Easements made by Joseph B. Reisman, Trustee, dated January 1,1978 and recorded January 16,1978 in Official Records Book 9915, Page 707, as affected by that certain Termination of Easement (As to Easement Parcel G and Easement Parcel H only) recorded December 28, 2010 in Official Records Book 27535, Page 1712, of the Public Records of Miami-Dade County, Florida.

AND:

Together with non-exclusive easement for the benefit of Parcel I described above, created and defined in the Special Warranty Deed dated September 2, 1994 and recorded September 6,1994 in Official Records Book 16502, Page 690, of the Public Records of Miami-Dade County, Florida.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**K-Mart/ROSS PARCEL:**

A portion of Tracts "E", CUTLER RIDGE MALL SUBDIVISION SECTION ONE, according to the plat thereof as recorded in Plat Book 111, Page 49 of the Public Records of Miami-Dade County, Florida, and a portion of the Northeast 1/4 of Section 7, Township 56 South, Range 40 East, Miami-Dade County, Florida, being more particularly described as follows:

Commencing at the most Northerly corner of said Tract "E", a point on the Southwesterly right-of-way line of Caribbean Boulevard as shown on the said plat of CUTLER RIDGE MALL SUBDIVISION SECTION ONE; thence run South 48°41'31" East, along the Northeasterly line of said Tract "E" and the said Southwesterly right-of-way line of Caribbean Boulevard, for a distance of 73.00 feet to a point; thence continue South 48°41'31" East, along the said Southwesterly right-of-way line of Caribbean Boulevard, for a distance of 60.79 feet to a point in the Southeasterly line of that certain access easement described in Exhibit "B" to the ACCESS EASEMENT, recorded in Official Records Book 16502 at Page 700 of the Public Records of Miami-Dade County, Florida; thence departing said Southwesterly right-of-way line run South 41°19'49" West, along the said Southeasterly line of the said access easement, for a distance of 30.57 feet to a point; thence run South 56°18'31" West, along the said Southeasterly line of the said access easement, for a distance of 434.42 feet to a point of intersection with the Southeasterly line of that certain revised access easement area described in Exhibit "C" to the MODIFICATION OF ACCESS EASEMENT, recorded in Official Records Book 16274 at Page 2567 of the Public Records of Miami-Dade County, Florida; thence run South 41°19'49" West, along the said Southeasterly line of the said revised access easement area, for a distance of 268.25 feet to a point of curvature with a circular curve concave to the Southeast, having a radius of 135.00 feet and a central angle of 33°47'13"; thence run Southwesterly along the arc of said curve to the left, the same being the Southeasterly line of the said revised access easement area, for an arc distance of 79.61 feet to a point of intersection with a non-tangential line; thence run South 87°56'29" West for a distance of 15.57 feet to a point; thence run South 41°19'49" West for a distance of 3.92 feet to a point; thence run South 48°46'54" East for a distance of 380.38 feet to a point; thence run North 86°55'00" East for a distance of 494.02 feet to a point; thence run North 09°59'01" West for a distance of 356.93 feet to a point; thence run North 27°32'49" East for a distance of 48.04 feet to a point; thence run North 41°30'41" East for a distance of 192.07 feet to a point of intersection with the Southwesterly right-of-way line of Caribbean Boulevard; thence run North 48°41'31" West, along the said Southwesterly right-of-way line of Caribbean Boulevard, for a distance of 343.02 feet to the Point of Beginning.

Together with:

The reciprocal and non-exclusive easements and privileges of use, ingress, egress, parking for utility and other purposes created and granted as an appurtenance to Developer's Parcel by that certain Easement and Operating Agreement by and among Alstores Realty Corporation and Jordan Marsh Company and Cutler Ridge Associates, recorded February 25, 1981 in Official Records Book 11025, Page 1689, together with unrecorded First Amendment to Easement and Operating Agreement, dated January 21, 1991; Second Amendment to Easement and Operating Agreement recorded February 23, 1998 in Official Records Book 17990, Page 2640; Third Amendment to Operating Agreement recorded May 23, 2006 in Official Records Book 24555, Page 5; Fourth Amendment to Easement and Operating Agreement recorded December 28, 2010 in Official Records Book 27535, Page 1678; Amended and Restated Fourth Amendment to Easement and Operating Agreement recorded July 20, 2011 in Official Records Book 27762, Page 4159; and Fifth Amendment to Easement and Operating Agreement recorded March 5, 2012 in Official Records Book 28018, Page 4583, as

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

affected by Assignment and Assumption Agreement by and between Macy's Retail Holdings, LLC, an Ohio limited liability company ("Assignor"), and BH Retail South Dixie, LLC, a Delaware limited company ("Assignee"), entered into as of ________________, 2022, recorded ______________, 2022 in Official Records Book ________, page _________, all of the Public Records of Miami-Dade County, Florida, in, on, over, upon and under certain adjoining real property therein more particularly described together with all of the rights, powers, privileges and benefits under said Operating Agreements accruing to the owner of said Developer's Parcel, its successors, legal representatives and assigns.

AND:

Together with non-exclusive easement for the benefit of Parcel I described above, created and defined in the Declaration of Easements made by Joseph B. Reisman, Trustee, dated January 1,1978 and recorded January 16,1978 in Official Records Book 9915, Page 707, as affected by that certain Termination of Easement (As to Easement Parcel G and Easement Parcel H only) recorded December 28, 2010 in Official Records Book 27535, Page 1712, of the Public Records of Miami-Dade County, Florida.

AND:

Together with non-exclusive easement for the benefit of Parcel I described above, created and defined in the Special Warranty Deed dated September 2, 1994 and recorded September 6,1994 in Official Records Book 16502, Page 690, of the Public Records of Miami-Dade County, Florida.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT B*

Capital Contributions and Percentage Interests

| Members | Capital Contributions | Percentage Interests |
|---|---|---|
| Electra America SD Mall Management LLC | $[32,250,000] | 75% |
| BH-SD Mall LLC | $[10,750,000] | 25% |

To be updated once Assignment has been executed and at the time of the Property Acquisition Date.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT C

Business Plan

TO COME.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT D

[Intentionally Omitted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# EXHIBIT E

## Addresses for Notice

Notices should be addressed as follows:

| | |
|---|---|
| if to Electra Member: | c/o American Landmark LLC<br>1331 South Killian Drive<br>Suite A<br>Lake Park, Florida, 33403<br>Attn: Joseph Lubeck |
| with a copy to: | Greenspoon Marder LLP<br>600 Brickell Avenue<br>36th Floor<br>Miami, FL 33131<br>Attn: John A. Gelety |
| If to Class B Member | c/o American Landmark LLC<br>1331 South Killian Drive<br>Suite A<br>Lake Park, Florida, 33403<br>Attn: Joseph Lubeck |
| with a copy to: | Greenspoon Marder LLP<br>600 Brickell Avenue<br>36th Floor<br>Miami, FL 33131<br>Attn: John A. Gelety |
| if to BH Member: | BH-SD Mall LLC<br>c/o BH Group<br>2999 NE 91Street, PH2<br>Aventura, FL 33180<br>Attn: Yizhak Toledano |
| with a copy to: | Ronald R. Fieldstone, Esq.<br>Saul Ewing Arnstein & Lehr LLP<br>Attorney at Law<br>701 Brickell Avenue, 17th Floor<br>Miami, Florida 33131-2395 |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT F

Electra Member Chart

[See Attached]

Slide 1

# Electra America SD Mall JV LLC




** See Slide 2 for ownership detail

49462743 3.pptx

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Slide 2

# American Landmark LLC




* Electra Real Estate Ltd. owns 100% of Electra America Inc. directly and indirectly thru its wholly-owned subsidiary Electech Real Estate BV, a Dutch private limited company.

49462743.3.pptx

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT G

BH Member Chart

[See Attached]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS



NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

SCHEDULE 4.1(a)

Manager's Duties

In addition to its specified duties and obligations in the body of the Agreement, the Manager shall have the following additional duties and responsibilities (subject in each instance to any requirement set forth in the Agreement for the Manager to obtain the consent of all or any portion of the Members (including as set forth in Sections 4.4 of the Agreement):

1. Administer the day-to-day operations of the Property pursuant to the Approved Budget.

2. Oversee and manage all professionals, consultants, advisors and other contractors retained by the Company or any Subsidiary (and at any time that the Property is subject to any construction, renovation or rehabilitation, verify that appropriate insurance and bonding (including any required by the terms of any other Loan Documents) is maintained by each contractor and subcontractor performing work on the Property).

3. Perform such advisory, consultation and asset management services as are customarily provided in asset management agreements for properties similar to the Property.

4. Upon learning thereof, promptly notify the Members of any material event, occurrence or condition that occurs or arises with respect to the Company Assets or any portion thereof, including the Property, and provide the Members with such information as any Member may reasonably request from time to time with respect thereto.

5. Cause the Company and the Subsidiaries to take such actions as may be necessary to cause the Company and the Subsidiaries to comply, in all material respects (and in any event to prevent the incurrence of any criminal penalties or sanctions or any material civil fines or penalties), with all laws, rules, and regulations and any and all orders or requirements of any governmental authority having jurisdiction over the Company, any Subsidiary or the Property, as well as all restrictive covenants and easement agreements affecting the Property.

6. Cause the Company and the Subsidiaries to comply with the terms and provisions of all Loan Documents.

7. Implement fully each decision approved in accordance with any other relevant provisions of the Agreement until such action is fully implemented.

8. Cause the Company and each Subsidiary to comply with the provisions of all leases, property management, construction management and service agreements covering the Property, and other agreements and contracts binding on the Company, any Subsidiary and/or the Property.

9. Cause the Company and the Subsidiaries to maintain at all times (to the extent of funds available to such party), those policies of liability and property (including business income coverage) insurance and other policies of insurance as shall be required under the Approved Budget, or otherwise required by hereunder. Manager shall promptly notify the Members

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

regarding any occurrence, claim or potential claim that may be covered by insurance. Manager shall deliver to the Members certificates of insurance and, upon request by any Member, copies of the original policies evidencing such insurance coverage so as to evidence that such insurance coverage is at all times maintained in full force and effect as required by the Agreement without any lapse in coverage, and Manager shall verify compliance with all insurance and/or bonding required by the Agreement or required to be maintained by the Company or any Subsidiary. Manager shall also obtain insurance certificates evidencing any other insurance coverage required under any property management agreement or construction management agreement.

10. Coordinate the defense of any claims, demands, suits or legal proceedings made or instituted against the Company or any Subsidiary through legal counsel for the Company or applicable Subsidiary and otherwise engaged in accordance with the terms of the Agreement.

11. Cause the Company and each Subsidiary: (i) to open, maintain and close bank accounts on behalf of such party at such banks or other financial institutions as are approved by Electra Member, (ii) to promptly deposit any and all revenues, receipts and all other payments, cash and/or income of any kind, type or nature, received by the Company or any Subsidiary into such bank accounts for the benefit of such party.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

SCHEDULE 4.9(b)

Rights Retained by Electra Member Upon Removal as Manager

1. Except as otherwise provided in the Agreement, admit new members to the Company in a manner that dilutes Electra Member's Interest by a higher percentage than the percentage by which BII Member's Interest is diluted in connection with such admission.

2. Amend the Agreement in a manner that (i) diminishes the economic rights or economic entitlements of any Member not executing such amendment (as compared to the Members executing such amendment), (ii) increases the economic obligations of any Member not executing such amendment (as compared to the Members executing such amendment) or (iii) increases the liabilities under the Agreement of any Member not executing such amendment (as compared to the Members executing such amendment).

3. Cause the Company or a Subsidiary to undertake a Bankruptcy.

4. Cause the Company or a Subsidiary to merge or consolidate with another Person.

5. Cause the Company or a Subsidiary to enter into (or modify) any agreement between or among the Company (and/or any Subsidiary(ies)), on the one hand, and BH Member and/or any of its Affiliate(s), on the other hand, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties.

NOT AN OFFICIAL COPY PUBLIC ACCESS- NOT AN OFFICIAL COPY PUBLIC ACCESS

**AMENDMENT TO**
**SECOND AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**ELECTRA AMERICA SD MALL JV LLC**

This Amendment (this "***Amendment***") to the Second Amended and Restated Limited Liability Company Agreement of Electra America SD Mall JV LLC, a Delaware limited liability company (the "***Company***") is made as of October 27, 2022 and effective as of January 20, 2022 (the "***Effective Date***"), among Electra America SD Mall Management LLC, a Delaware limited liability company ("***Electra Member***") and BH-SD Mall LLC, a Delaware limited liability company ("***BH Member***"). Any defined (capitalized) terms used, but not defined, in this Amendment shall have the same meaning as ascribed to such term in the Agreement (as hereafter defined).

**RECITALS**

**WHEREAS**, the Company was organized by filing a Certificate of Formation with the Secretary of the State of Delaware on January 20, 2022 and, the Members entered into that certain Second Amended and Restated Limited Liability Company Agreement of the Company on September 8, 2022 (the "***Agreement***") to govern their respective rights and obligations as Members of the Company; and

**WHEREAS**, further to the discussions between the Members per the Company's business plan, the Members wish to amend the Agreement in accordance with the terms hereinafter set forth.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and conditions contained herein, and other good and valuable consideration, and intending to be legally bound hereby, the Agreement is hereby amended as follows:

1. Amendment. The Agreement is hereby amended as follows:

Section 2.3 of the Agreement is hereby deleted in its entirety and replaced with the following:

"Except as otherwise expressly provided herein, the purpose of the Company shall be to conduct and engage in the following activities: (a) directly or indirectly (through one or more Subsidiaries or other Persons) acquire, purchase, own, hold, manage, develop, construct, operate, improve, renovate, rent, lease, fund, finance, encumber, as part of a long-term project to establish residential and commercial complexes in Florida, (b) to own, directly or indirectly, a limited liability company or other interest in, and act as a member of each Subsidiary, (c) to conduct such other lawful business activities related or incidental thereto or as the Members may otherwise determine in accordance with this Agreement and (d) to exercise all powers enumerated in the Act necessary to the conduct, promotion or attainment of the purposes set forth herein and for the protection and benefit of the Company. The Company is authorized and empowered to do any and

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

all acts and things necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of its purposes and for the protection and benefit of the Company, including all acts and things permitted under the Act and this Agreement."

2. Continuing Effect. Except as provided herein, this Amendment shall not constitute an amendment or waiver of any provision of the Agreement, which shall continue to remain in full force and effect in accordance with its terms.

3. Counterparts. This Amendment may be executed in one or more counterparts and each of such counterparts, for all purposes, shall be deemed to be an original but all of such counterparts together shall constitute but one and the same instrument, binding upon all parties hereto, notwithstanding that all of such parties may not have executed the same counterpart.

***[This Space Intentionally Left Blank]***

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement the day and year first above written.

**ELECTRA AMERICA SD MALL MANAGEMENT LLC**, a Delaware limited liability company

By: American Landmark LLC, a Florida limited liability company, its manager

By:____________________________
Name: Joseph G. Lubeck
Title: Manager

**BH-SD MALL LLC**, a Delaware limited liability company

By:____________________________
Name: Isaac Toledano
Title: Authorized Signatory

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement the day and year first above written.

**ELECTRA AMERICA SD MALL MANAGEMENT LLC**, a Delaware limited liability company

By: American Landmark LLC, a Florida limited liability company, its manager

By:____________________________
Name: Joseph G. Lubeck
Title: Manager

**BH-SD MALL LLC**, a Delaware limited liability company

By:____________________________
Name: Isaac Toledano
Title: Authorized Signatory

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE E - 2

## ELECTRA SOUTHPLACE JV OPERATING AGREEMENT (AND AMENDMENT)

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# LIMITED LIABILITY COMPANY AGREEMENT OF ELECTRA AMERICA SOUTHLAND 2 JV LLC

DATED AS OF September 8, 2022

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# TABLE OF CONTENTS

Page


**Article 1 Definitions** .......... 1

**Article 2 Formation** .......... 14
Section 2.1 Formation of Company. .......... 14
Section 2.2 Name and Principal Place of Business. .......... 14
Section 2.3 Purposes. .......... 14
Section 2.4 Term. .......... 15
Section 2.5 Title to the Property. .......... 15

**Article 3 Capital Contributions; Electra Member Loan; Capital Accounts; Additonal Capital Contributions** .......... 15
Section 3.1 Capital Contributions; Electra Member Loan. .......... 15
Section 3.2 Capital Accounts. .......... 16
Section 3.3 Interest and Right to Property. .......... 16
Section 3.4 Additional Capital Contributions. .......... 16
Section 3.5 Failure to Contribute Additional Capital Contributions. .......... 17

**Article 4 Management; Rights of Members; Fees and Expenses** .......... 18
Section 4.1 Management. .......... 18
Section 4.2 Fees. .......... 19
Section 4.3 Reimbursement for Expenses. .......... 19
Section 4.4 Co-Developer Joint Marketing. .......... 19
Section 4.5 Manager's Time. .......... 20
Section 4.6 Non-Exclusivity. .......... 20
Section 4.7 No Liability and Indemnity .......... 20
Section 4.8 Reliance by Third Parties. .......... 21
Section 4.9 Replacement of Manager. .......... 21
Section 4.10 Officers. .......... 22
Section 4.11 Subsidiaries. .......... 22
Section 4.12 Sale of Development Project. .......... 23

**Article 5 Rights of Members** .......... 23
Section 5.1 Right to Participate in Management. .......... 23
Section 5.2 Indemnification; Limited Liability. .......... 23
Section 5.3 Restrictions on Members. .......... 24
Section 5.4 Action by Members Without a Meeting. .......... 24
Section 5.5 Intentionally Omitted. .......... 24
Section 5.6 Financing Guaranties. .......... 24

**Article 6 Transfer of Member Interests** .......... 25
Section 6.1 Withdrawal and Transfers. .......... 25
Section 6.2 Additional Members. .......... 25
Section 6.3 Transfers by Members. .......... 25
Section 6.4 Buy-Sell. .......... 26
Section 6.5 Resignation, Bankruptcy or Dissolution of Manager. .......... 29

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 6.6 Bankruptcy or Dissolution of a Member. .....30
Section 6.7 Additional and Substituted Members.....30
Section 6.8 Non-Complying Assignments.....31
Section 6.9 Obligations of Successors. .....31
Section 6.10 Limitations on BH Member Permitted Transfers.....31

**Article 7 Distributions ..... 32**
Section 7.1 Distributions.....32
Section 7.2 Time for Distributions.....33

**Article 8 Allocation of Profits and Losses..... 33**
Section 8.1 Allocations. .....33
Section 8.2 Basis Adjustment. .....34
Section 8.3 Special Allocation Rules.....34
Section 8.4 Other Allocation Rules. .....35
Section 8.5 Tax Allocations.....36
Section 8.6 Curative Allocations. .....36
Section 8.7 Tax Matters. .....36

**Article 9 Records and Books of Account ..... 37**
Section 9.1 Records and Books of Account.....37
Section 9.2 Fiscal Year. .....37
Section 9.3 Banking. .....37
Section 9.4 Reports to Members.....37
Section 9.5 Approved Budgets. .....38

**Article 10 Dissolution, Liquidation and Termination ..... 39**
Section 10.1 Dissolution. .....39
Section 10.2 Liquidation. .....39
Section 10.3 No Obligation to Restore Capital Accounts.....39
Section 10.4 Termination. .....40

**Article 11 Status of the Company..... 40**

**Article 12 Miscellaneous..... 40**
Section 12.1 Indemnity. .....40
Section 12.2 Mediation; Litigation.....41
Section 12.3 Notices.....42
Section 12.4 Entire Agreement. .....42
Section 12.5 Waivers.....42
Section 12.6 Headings, Gender and Number. .....43
Section 12.7 Severability.....43
Section 12.8 Counterparts. .....43
Section 12.9 Benefit. .....43
Section 12.10 Further Actions.....43
Section 12.11 Interpretation. .....43
Section 12.12 No Third Party Beneficiaries.....44
Section 12.13 Intentionally Omitted. .....44
Section 12.14 Equitable Relief.....44

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**Article 13 Representations and Warranties** .......... 44
Section 13.1 Representations, Warranties and Covenants of Electra Member. .......... 44
Section 13.2 Representations, Warranties and Covenants of BH Member. .......... 45
Section 13.3 Indemnification. .......... 47

**Exhibits and Schedules**

Exhibit A Description of Property
Exhibit B Capital Contributions and Percentage Interests of the Members
Exhibit C Business Plan
Exhibit D Intentionally Omitted
Exhibit E Addresses for Notice
Exhibit F Electra Member Chart
Exhibit G BH Member Chart

Schedule 4.1(a) Manager's Duties
Schedule 4.9(b) Rights Retained by Electra Member Upon Removal as Manager

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# LIMITED LIABILITY COMPANY AGREEMENT
# OF
# ELECTRA AMERICA SOUTHLAND 2 JV LLC

This LIMITED LIABILITY COMPANY AGREEMENT of Electra America Southland 2 JV LLC (the "Company") is entered into on this 8th day of September with an effective date of the 19th day of July, 2022 by and between Electra America Southland 2 Management LLC, a Delaware limited liability ("Electra Member"), and BH Southplace Holdings LLC, a Delaware limited liability company having an office at c/o BH Group, 2999 NE 91Street, PH2, Aventura, FL 33180 ("BH Member").

## WITNESSETH:

WHEREAS, the Company was formed as a Delaware limited liability company pursuant to the filing of a Certificate of Formation in the office of the Secretary of State of the State of Delaware on July 19, 2022 (the "Certificate"); and

WHEREAS, the Company has been formed for the purpose of engaging in the Project, in each case through the Company and other legal entities in which the Company will invest, directly or indirectly, in connection with the Project (each, a "Project Entity") upon the closing on the transactions contemplated under the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and conditions herein contained, and other good and valuable consideration, the receipt and sufficiency of which hereby is acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

As used herein, the following terms shall have the following meanings.

"Act" shall mean the Delaware Limited Liability Company, Delaware Code, Title 6, Section 18-101, et seq., as amended, and shall include any corresponding provision or provisions of any succeeding law.

"Adjusted Capital Account Deficit" shall mean a deficit balance as of the end of the relevant Fiscal Year in a Member's Capital Account after giving effect to any amounts the Member is obligated to contribute or restore to the Company pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), and subsequently such Member's share of the items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The foregoing definition is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

"Additional Capital Contributions/Additional Capital Contribution" shall have the meaning ascribed to it in Section 3.4.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Affiliate" shall mean, when used with reference to a specified Person, (a) any Person that directly or indirectly through one or more intermediaries Controls or is Controlled by or is under common Control with the specified Person and (b) any Person who is an officer or director of a specified Person or Person who serves in a similar capacity with respect to a specified Person or is a spouse or relative of a specified Person. Neither the Company nor any Subsidiary shall be deemed to be an Affiliate of any Member or the Manager for purposes of this Agreement. Each of Lubeck, American Landmark, Electra, Electra Parent, Miller and ALM and each of their respective Affiliates are deemed to be Affiliates of Electra Member for all purposes hereunder.

"Affiliated Purchaser" shall have the meaning ascribed to it in Section 4.12.

"Agreement" shall mean this Limited Liability Company Agreement, as originally executed and as amended from time to time, as the context requires. Words such as "herein", "hereinafter", "hereof", "hereto", "hereby", "hereunder", when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

"ALM" means American Landmark Management LLC, a Delaware limited liability company that is an Affiliate of Electra Member.

"Alternate Key Person" means (x) James G. Miller, (y) Christine DeFilippis or (z) another replacement key person that has been proposed by Manager to replace the Key Person upon the death, permanent disability or incapacitation of all Key Persons, provided such replacement key person is at such time an executive vice president or other senior officer of American Landmark, or any of its Affiliates, that has not less than eight (8) years of commercial real estate experience in real estate asset ownership and operation.

"Approved Budget" shall have the meaning ascribed to it in Section 9.5.

"American Landmark" means American Landmark LLC, a Florida limited liability company and an Affiliate of Electra Member.

"Bankruptcy" or "Bankrupt" with respect to any Person shall mean:

(a) the institution by such Person of proceedings to be adjudged as bankrupt or insolvent, or for an order of relief or the consent by such Person to the institution of bankruptcy or insolvency proceedings against him or it, or the filing by such Person of a petition or answer or consent seeking reorganization or relief under the present or any future Federal bankruptcy statute or any other present or future applicable Federal, state, or foreign law regarding bankruptcy, insolvency or other relief for debtors, or the consent by such Person to the filing of any such petition or to the appointment of a receiver, liquidator, trustee (or other similar official) of such Person or of all or of a substantial part of the assets of such Person, or the making by such Person of any assignment for the benefit of creditors or the admission in writing by such Person of his or its inability to pay his or its debts generally as they come due or the commission by such Person of any act sufficient to sustain an order for relief under the present or any future Federal bankruptcy statute; or

(b) the entry by a court of competent jurisdiction of an order, judgment or decree judging such Person as bankrupt or insolvent or approving as properly filed a petition

NOT AN OFFICIAL COPY PUBLIC ACCESS - NOT AN OFFICIAL COPY PUBLIC ACCESS

seeking reorganization, arrangement, adjustment or composition of or in respect of such Person under the present or any future Federal bankruptcy statute or any other present or future applicable Federal, state or foreign law relating to bankruptcy, insolvency, or other relief of debtors, or appointing a receiver, liquidator, trustee (or other similar official) of such Person or of all or a substantial part of the assets of such Person, or ordering the winding up or liquidation of the affairs of such Person, which order, judgment or decree shall remain unstayed and in effect for an aggregate of sixty (60) days (whether or not consecutive).

"Bankruptcy Code" shall mean Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., as the same may be amended.

"BH Member" shall have the meaning ascribed to it in the caption to this Agreement.

"BH Member Default" shall mean (a) any material misrepresentation, omission or breach on the part of BH Member or any of its Affiliates with respect to any of the representations, warranties or covenants contained herein, or (b) any default under any guaranty or other credit enhancement provided by BH Member or any of its Affiliates in connection with the Loan Documents that has not been cured or waived within two (2) Business Days prior to the expiration of any applicable notice and cure period provided therein.

"BH Member Indemnitees" shall have the meaning ascribed to it in Section 13.3(a).

"BH Worldwide" shall mean BH Worldwide Real Estate Holdings LLC, a Delaware limited liability company and the owner of one hundred percent (100%) of BH Member.

"Business Day" shall mean any day other than Saturday, Sunday or any other days on which commercial banks in County of Miami-Dade, State of Florida or New York, New York are generally closed for commercial banking business.

"Business Plan" means the initial strategic plan attached hereto as Exhibit C covering the acquisition, Development, operation, improvement, marketing, financing, leasing, sale and/or other disposition of all or a portion of the Property, which plan includes, as a part thereof, the Operating Budget, the Development Budget and any other budgets prepared and implemented in accordance with such plan, and each future plan adopted by the Partnership from time to time in accordance with the terms of hereof.

"Calendar Quarter" shall mean any three (3) consecutive month period ending on March 31, June 30, September 30 and December 31 of any calendar year.

"Capital Account" shall have the meaning ascribed to it in Section 3.2.

"Capital Call Notice" shall have the meaning ascribed to it in Section 3.4.

"Capital Contribution" of a Member shall mean the amount of cash and the agreed upon fair market value (net of liabilities) of property contributed by such Member (or such Member's predecessor in interest) to the Company, including with respect to any Member, pursuant to Section 3.1 and Additional Capital Contributions contributed pursuant to Section 3.4.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Cash Flow" shall mean, for any fiscal period, (a) the cash receipts of the Company during such period derived from all sources (including any reduction in any Reserves but excluding Capital Contributions), including from any proceeds from any Sale or Refinancing, minus (b) the sum of (i) all cash expenditures and payments made by the Company during such period (excluding expenditures made from Capital Contributions and Reserves during such period), plus (ii) additions to Reserves during such period.

"Certificate" shall have the meaning ascribed to it in the Recitals.

"Code" shall mean the United States Internal Revenue Code of 1986, as the same may be amended, the regulations promulgated thereunder ("Treasury Regulations"), and any corresponding provisions of subsequent law.

"Company" shall have the meaning ascribed to it in the caption to this Agreement.

"Company Assets" shall mean all right, title and interest of the Company in and to all or any portion of the assets of the Company and any business property (real or personal) or estate acquired in exchange therefor or in connection therewith, including the Property and any membership or other interest in any Subsidiary, or all or any portion of the assets of any Subsidiary or any business property (real or personal) or estate acquired in exchange therefor or in connection therewith.

"Consent Notice" shall have the meaning ascribed to it in Section 4.1(b).

"Construction Management Agreement" shall mean the construction management agreement between the Property Owner and the Construction Manager.

"Construction Manager" shall initially mean ALM, or any Person or Persons who, at the time of reference thereto, has been appointed as a replacement construction manager for the Property, in each case in accordance with the terms and provisions of this Agreement.

"Control" (including its correlative meanings, "Controlled by," "Controlling" and "under common Control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether, in any case, through any of ownership of securities or partnership or other ownership interests, voting control, by contract or otherwise).

"Deadlock Event" shall mean a disagreement of the Members with respect to a Major Decision (subject to Section 4.1(b)), and the disagreement remains unresolved after the good faith negotiation of the Members (which shall be deemed to require the participation of Joseph G. Lubeck on behalf of Electra Member and Isaac Toledano on behalf of BH Member) for a period of thirty (30) days after delivery of written notice by a Member of the occurrence of a deadlock.

"Default Priority Loan" shall have the meaning ascribed to it in Section 3.5(a).

"Depreciation" shall mean, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period for federal income tax purposes; provided, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of any such year or

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

other period, Depreciation shall be an amount that bears the same relationship to the Gross Asset Value of such asset as the depreciation, amortization, or other cost recovery deduction computed for federal income tax purposes with respect to such asset for the applicable period bears to the adjusted tax basis of such asset at the beginning of such period, or if such asset has a zero adjusted tax basis, Depreciation shall be an amount determined under any reasonable method selected by Managing Member. Notwithstanding the foregoing, if the Company uses the "remedial allocation method" pursuant to Regulations Section 1.704-(3)(d), then Depreciation shall instead be determined pursuant to and consistent with Regulations Section 1.704-(3)(d)(2).

"Development" shall mean any development, construction, building, positioning, and branding of the Property in accordance with the Business Plan (including the budgets included as a part thereof).

"Development Budget" shall mean the initial development budget set forth as part the Business Plan attached hereto as Exhibit C, and each future development budget included as part of the Approved Budget approved by the Members in accordance with Section 9.5.

"Development Parcel FMV" shall have the meaning ascribed to it in Section 4.12.

"Development Project" shall have the meaning ascribed to it in Section 4.12.

"Distribution" shall mean any cash, securities, property or other assets distributed to a Member by the Company.

"Due Date" shall have the meaning ascribed to it in Section 3.4.

"Electra" shall mean Electra America Inc., a Delaware corporation and an Affiliate of Electra Member.

"Electra Bad Boy Event" means the occurrence of any of the following:

(a) The commission by Electra Member (whether in its capacity as "Manager" or "Member" hereunder) or any Key Person of fraud, theft or misappropriation relating to or affecting the Company, any Subsidiary, the Property or any other Company Assets;

(b) The commission by Electra Member (whether in its capacity as "Manager" or "Member" hereunder) or any Key Person of gross negligence or willful misconduct (i) in connection with the performance of duties hereunder or under any Electra Member Affiliate Agreement or (ii) relating to or affecting the Company, any Subsidiary, the Property or any other Company Assets;

(c) The conviction, guilty plea or plea bargain by Electra Member or any Key Person for any crime constituting a felony relating to or affecting the Company, any Subsidiary, the Property or any other Company Assets;

(d) If Electra Member, American Landmark, Electra Parent, or Lubeck is the subject of a Bankruptcy;

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(e) Any of Electra Member, American Landmark, Electra Parent, any Key Person, or any Person that directly or indirectly through one or more intermediaries Controls or is Controlled by or is under common Control with, Electra Member, American Landmark, Electra Parent, any Key Person, or any officer, director or Person who serves in a similar capacity with respect to any of the foregoing, becomes a Prohibited Person, subject in each case to the Non-Executive Cure Right;

(f) A Key Person is no longer involved in the day-to-day operation of Electra Member (whether in its capacity as "Manager" or "Member" hereunder) for any reason, or no longer has Control, exercisable without the consent or approval of any other Person, over the business and affairs of Electra Member, subject only to certain major decision veto rights of Electra and Miller;

(g) Any intentional misrepresentation, omission or breach on the part of Electra Member, Electra, American Landmark, Electra Parent, Lubeck, or any Affiliate of any of the foregoing with respect to any of the representations, warranties or covenants contained herein or in any Electra Member Affiliate Agreement that causes a material adverse economic consequence to the Company.

"Electra Member" shall have the meaning ascribed to it in the caption to this Agreement.

"Electra Member Affiliate Agreement" means any agreement between or among the Company (and/or any Subsidiary(ies)), on the one hand, and Electra Member, American Landmark, Electra, Electra Parent, Lubeck, Miller and/or any Affiliate(s) of any of the foregoing, on the other hand (including each of the property management agreement and the construction management agreement for the Property in effect as of the date hereof).

"Electra Member Loan" shall have the meaning ascribed to it in Section 3.1(c).

"Electra Member Indemnitees" shall have the meaning ascribed to it in Section 13.3(b).

"Electra Parent" means Electra Real Estate Ltd., an Israeli public company and an Affiliate of Electra Member.

"Emergency Expenses" shall mean the minimum amount necessary to perform any construction, repairs or rehabilitation to the Property which is immediately necessary to protect the life, health or safety of any person from imminent bodily harm or to prevent or mitigate imminent danger of material damage or harm to the Property or any material portion thereof.

"Existing Lender Approval(s)" shall have the meaning ascribed to it in Section 6.4(i).

"Fiscal Year" shall have the meaning ascribed to it in Section 9.2.

"Funding Member" shall have the meaning ascribed to it in Section 3.5(a).

"Good Faith Deposit" or "Good Faith Deposits" shall have the meaning ascribed to it in Section 6.4(c).

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Gross Asset Value" shall mean, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(a) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as reasonably agreed to by the contributing Member and the Manager;

(b) The Gross Asset Value of all Company Assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Manager and taking into account Code Section 7701(g), as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the Distribution by the Company to a Member of more than a de minimis amount of cash or Company Assets as consideration for an interest in the Company; (iii) the grant of more than a de minimis interest in the Company as consideration for the provisions of services to or for the benefit of the Company by an existing Member acting in such capacity, or by a new Member acting in such capacity or in anticipation of being a Member; and (iv) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i), (ii) and (iii) of this sentence shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(c) The Gross Asset Value of any Company asset Distributed to any Member shall be the gross fair market value of such asset on the date of Distribution, as reasonably determined by the Manager and taking into account Code Section 7701(g).

The Gross Asset Values of Company Assets shall be adjusted to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Paragraph (a) or Paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Interest" shall mean the interest of a Member in the Company, including the right of such Member in the capital, profits and losses of, and Distributions from, the Company, and the right of such Member to any and all benefits to which such Member may be entitled under this Agreement.

"Internal Rate of Return" shall mean the discount rate at which the net present value of the applicable Member's Capital Contributions to and Distributions from the Company equals zero, calculated for each such Capital Contribution from the actual date such Capital Contribution was made or the actual date such Distribution was received, as the case may be. The Member's Internal Rate of Return shall be calculated on the basis of the actual number of days elapsed over a 365 or 366-day year, as the case may be. Each Internal Rate of Return calculation shall be determined from and including the actual date upon which each such Capital Contribution was made by the Members (including if made prior to the date of this Agreement) to and including the actual date

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

of any Distribution is made on account thereof. Internal Rate of Return will be calculated using the Microsoft Excel function "XIRR". This function requires dates and amounts. All dates and amounts thereafter will be as they appear in the Company bank statements. All Distribution amounts shall be based on the amount of the Distribution prior to the application of any federal, state or local taxation to Members (including any withholding or deduction requirements).

"Key Person" means, initially, Lubeck. If and when an Alternate Key Person is appointed, if required in accordance herewith, such Alternate Key Person(s) shall be a Key Person for all purposes hereunder thereafter.

"Loan" shall mean each mortgage loan made to, or assumed by, the Property Owner and secured by a Property as of the Property Acquisition Date, as same may be amended, modified and/or restated from time to time, and any additional or supplemental loans obtained by the Property Owner and secured by the Property after the Property Acquisition Date, as same may be amended, modified and/or restated from time to time (but expressly excluding any Default Priority Loans described in Section 3.4).

"Loan Agreement" shall mean each loan agreement pursuant to which the Property Owner obtains a Loan, as the same may be amended, modified and/or restated from time to time.

"Loan Documents" shall mean, with respect to the Property, the related Loan Agreement, together with the other "Loan Documents" (as defined in such Loan Agreement), as the same may be amended, modified and/or restated from time to time.

"Lubeck" means Joseph G. Lubeck, an individual and an Affiliate of Electra Member.

"Major Decision" shall mean to make any decision:

(a) that constitutes a Sale;

(b) that results in the Company or any Subsidiary entering into a Loan or Refinancing;

(c) in respect to the Company or any Subsidiary entering into any transaction or related transactions to acquire any material assets outside of the ordinary course of the Company's business;

(d) to materially revise or amend the Approved Budget;

(e) in respect to (i) the filing of a voluntary petition or the initiation of proceedings to have the Company or any Subsidiary adjudicated bankrupt or insolvent, or the consent to the institution of bankruptcy or insolvency proceedings against the Company or any Subsidiary; (ii) a petition seeking or consenting to reorganization or relief of the Company or any Subsidiary as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Company or any Subsidiary; (iii) seeking or consenting to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Company or any Subsidiary of all or any substantial part of the properties and assets of the

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Company; or making any general assignment for the benefit of creditors of the Company or any Subsidiary; or (iv) admitting in writing the inability of the Company or any Subsidiary to pay its debts generally as they become due or declare or effect a moratorium on the Company debt or take any action in furtherance of any such action; or

(f) determining (a) any salary to be paid to any employee of the Company or any Subsidiary or (b) any fee to be paid to a Member or an Affiliate of a Member, in each case to the extent not specified in this Agreement.

"Manager" shall initially mean Electra Member, and thereafter any Person or Persons who, at the time of reference thereto, has been appointed as a replacement Manager, in each case in accordance with Sections 4.1(a) and/or 4.9(a). Managers shall refer to all Managers then acting as such at the time of reference thereto.

"Marketing Material" shall have the meaning ascribed to it in Section 4.4.

"Member" shall mean any Person who is a member (including additional Members and Substituted Members) of the Company at the time of reference thereto. Members shall refer to all Members at the time of reference thereto. The initial Members of the Company are Electra Member and BH Member.

"Member's Investment" shall have the meaning ascribed to it in Section 4.12.

"Miller" shall mean James G. Miller, a member of American Landmark and Affiliate of Electra Member.

"Necessary Expenses" shall mean (a) any expense expressly provided for in an Approved Budget, (b) the actual amount of any Uncontrollable Expenses, (c) the actual amount of any Emergency Expenses, (d) the minimum amount necessary in order for the Company or any Subsidiary to (i) perform its non-discretionary contractual obligations entered into in accordance with the terms hereof, and (ii) comply with any final court orders, judgments or other judicial or governmental proceedings (including all costs and expenses related thereto), and (e) any costs required by the Company or any Subsidiary in order to avoid or cure a default under any loan documents to which the Company or any Subsidiary is party (including the Loan Documents) or any lease under which the Company or any Subsidiary is lessor.

"Non-Funding Member" shall have the meaning ascribed to it in Section 3.5(a).

"Non-Executive Cure Right" means that an employee of Electra Member or any Affiliate thereof becoming a Prohibited Person shall not constitute an Electra Bad Boy Event pursuant to clause (f) of the definition thereof so long as each of the following conditions are satisfied:

(a) such employee was not a corporate officer or member of senior management of Electra Member or any Affiliate thereof;

(b) any action or omission resulting in such employee becoming a Prohibited Person was not committed at the direction of, or with the knowledge of, or as a result of the

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

negligent supervision of, any corporate officer or member of senior management of Electra Member or any Affiliate thereof;

(c) Electra Member or an applicable Affiliate causes the full restitution to the Company of any and all losses sustained by the Company as a result of such employee becoming a Prohibited Person within ten (10) Business Days after receipt of the demand for payment therefor;

(d) within ten (10) Business Day after the date that a corporate officer or member of senior management of Electra Member or any Affiliate thereof acquires knowledge of such employee becoming a Prohibited Person, and subject to compliance with all relevant local employment laws, Electra Member or an applicable Affiliate causes the removal (at its sole expense) of such employee from all involvement with the Company, all Subsidiaries and the Company Assets; and

(e) no more than two (2) employees of Electra Member or any Affiliate thereof have previously become Prohibited Persons.

"Notice" shall have the meaning ascribed to it in Section 12.3 hereof.

"Offeror" shall have the meaning ascribed to it in Section 6.4(a) hereof.

"Offeror Good Faith Deposit" shall have the meaning ascribed to it in Section 6.4(a).

"Operating Budget" means the initial operating budget set forth as part of the Business Plan attached hereto as Exhibit C and each annual operating budget included as part of the Approved Budget approved by the Members in accordance with Section 9.5.

"Other Members" shall have the meaning ascribed to it in Section 6.4(a).

"Other Members Good Faith Deposit" shall have the meaning ascribed to it in Section 6.4(c).

"Percentage Interest" means, initially, seventy five percent (75%) for the Electra Member and twenty five percent (25%) for the BH Member, and with respect to any Member at any time after the Effective Date, such Member's Interest expressed as a percentage, obtained by dividing the Capital Contributions made by such Member by the Capital Contributions made by all Members, as same may be adjusted from time to time pursuant to Section 3.5(c), and provided that, for purposes of this definition, a Default Priority Loan shall not be deemed a Capital Contribution.

"Permitted Transfer" shall mean any of the following, provided that such Transfer is permitted under the Loan Documents, and provided further that, notwithstanding anything to the contrary contained herein, the rights of the Members below are subject in all cases to the applicable provisions of this Agreement:

(a) If the Transferring Member is BH Member, any direct or indirect Transfer of BH Member's Interest (as opposed to a direct Transfer of BH Member's Interest in the

NOT AN OFFICIAL COPY-PUBLIC ACCESS-NOT AN OFFICIAL COPY-PUBLIC ACCESS

Company), (i) to any Person 100% of whose outstanding securities and other indicia of ownership and all economic, profits, voting and other equity interests are directly or indirectly owned, Controlled and held with power to vote by Toledano, and (ii) as a result of the death of a natural person, held by the decedent in question to the Person or Persons lawfully entitled thereto.

(b) If the Transferring Member is Electra Member, any direct or indirect Transfer of an interest in Electra Member (including any direct or indirect interest in Electra Member) in whole or in part, to any Person, in each case so long as following any such Transfer exclusive Control that is exercisable without the consent or approval of any other Person over the business and affairs of Electra Member (including Electra Member's Interest) remains vested in a Key Person (or a Key Person together with Electra Parent), subject only to certain major decision veto rights of a Key Person Affiliate.

"Person" shall mean any individual and any partnership, company, corporation, joint venture, trust, business trust, cooperative, association, limited liability company and other entity and the heirs, executors, administrators, successors and assigns thereof.

"Profits" or "Losses" shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(a) any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b) any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(c) in the event the Gross Asset Value of any Company asset is adjusted in accordance with Paragraph (b) or Paragraph (c) of the definition of "Gross Asset Value" above, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d) gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e) in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance Gross Asset Value of such property; and

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(f) notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 8.3 hereof shall not be taken into account in computing Profits or Losses.

"Prohibited Person" shall mean a Person with whom a U.S. Person is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC, including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. persons may not transact business or must limit their interactions to types approved by OFAC or otherwise.

"Project" shall mean engaging, directly and indirectly, in transactions involving acquisition, ownership, management, development, renovation, operation, funding, financing, selling, transferring, exchanging or otherwise disposing of one or more of the Properties by the Project Entities.

"Project Entities" shall have the meaning ascribed to it in the Recitals.

"Promote Clause" shall have the meaning ascribed to it in Section 3.4.

"Promote Share" means twenty-five percent (25%), as may be adjusted from time to time in accordance with Section 3.5(d).

"Proposal Notice" shall have the meaning ascribed to it in Section 6.4(a).

"Proposed Budget" shall have the meaning ascribed to it in Section 9.5.

"Property" shall mean that certain real property located in the City of Miami, County of Date and State of Florida, commonly known as "Seritage" and consisting of approximately __ acres of total land area as more particularly described on Exhibit A hereto.

"Property Acquisition Date" shall mean the date on which a Property Owner obtains fee simple title to a Property.

"Property Management Agreement" shall mean the property management agreement between the Property Owner and the Property Manager.

"Property Manager" shall initially mean an entity related to or controlled by American Landmark Management LLC or any Person or Persons who, at the time of reference thereto, has been appointed as a replacement property manager for the Property, in each case in accordance with the terms and provisions of this Agreement.

"Property Owner" shall mean BH Electra Southland Part 2 LLC, a Delaware limited liability company, and each other direct or indirect Subsidiary of the Company formed for the purpose of taking fee simple title to a Property.

"Purchase Agreements" shall mean that certain Real Estate Purchase Agreement dated June 20, 2022 by and between Seritage SRC Finance LLC, a Delaware limited liablity company

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

("Seller") and BH Electra Southland Part 2 LLC, a Delaware limited liability company, as same may be amended from time to time.

"Refinancing" shall mean the replacement, increase, consolidation, modification or extension of any mortgage (or mezzanine) loans on the Property or any portion thereof (including the Loan) or the placement of a mortgage (or mezzanine) loan on the Property or any portion thereof after the date hereof.

"Renovation Reserve(s)" shall mean a Company reserve account for funds held to pay for capital improvements as reflected in the Approved Budget. The Renovation Reserve referenced in the foregoing sentence shall be deemed a Reserve for all purposes hereunder.

"Required Approval" shall mean the approval of Members with a Percentage Interest equal to 50% or more, provided, however, that so long as (i) no BH Member Default has occurred and is continuing, and (ii) BH Member continues to own an Interest in the Company, the approval of BH Member shall be required for Required Approval.

"Reserves" means funds or other amounts set aside or otherwise allocated or designated for any valid purpose relating to the Property or the Company (including any amounts as to working capital), as may be required under any mortgage (or mezzanine) loans or other financing with respect to the Property or the Company or determined from time to time in accordance with, and subject to, the applicable provisions of this Agreement (including the Approved Budget and the Loan Documents).

"Residual Share" means, as of any date:

(a) With respect to BH Member, a percentage equal to (i) its Percentage Interest in the Company as of such date *plus* (ii) the Promote Share as of such date; and

(b) With respect to Electra Member, a percentage equal to its Percentage Interest in the Company as of such date *less* (ii) the Promote Share as of such date.

"Response Notice" shall have the meaning ascribed to it in Section 6.4(c).

"Response Period" shall have the meaning ascribed to it in Section 6.4(c).

"Sale" shall mean (whether in a single transaction or series of transactions): (i) a sale of the Property and any and all other Company Assets or any material portion thereof, (ii) a material condemnation, voluntary or involuntary conversion, insured material casualty or other disposition of the Property and any and all other Company Assets or any material portion thereof or (iii) a sale or other transfer of all of the membership interests in the Company (or, if applicable, in a Subsidiary).

"Subsidiary" means any entity directly or indirectly owned in whole or in part by the Company, including each Project Entity and Property Owner.

"Substituted Member" shall mean any Person who is an assignee of a transferred Interest and who is admitted to the Company as a Member pursuant to the provisions of Section 6.7.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"Target Amount" shall have the meaning ascribed to it in Section 8.1(a).

"Toledano" means Yizhak Toledano, and individual that is an Affiliate of BH Member. In the event of the death, disability or incapacity of Yizhak Toledano, his wife Liat Toledano shall be deemed to have replaced "Toledano" for all purposes hereunder.

"Transfer" shall have the meaning ascribed to it in Section 6.1.

"Transfer Notice" shall have the meaning ascribed to it in Section 6.10.

"Uncontrollable Expenses" shall mean the following expenditures: (x) real estate taxes, (y) utility charges, and (z) premiums for approved insurance.

"Valuation" shall have the meaning ascribed to it in Section 6.4(a).

## ARTICLE 2
## FORMATION

Section 2.1 Formation of Company.

The Company was formed as a Delaware limited liability company under and pursuant to the Act by the filing of the Certificate.

Section 2.2 Name and Principal Place of Business.

The Company shall conduct its business and promote its purposes under the firm name of Electra America Southland 2 JV LLC, or such other name or names as the Members may from time to time agree to. The Company's principal office for the transaction of business shall be at 1331 South Killian Drive, Suite A, Lake Park, Florida, 33403, or such other place or places as the Manager may select.

Section 2.3 Purposes.

Except as otherwise expressly provided herein, the purpose of the Company shall be to conduct and engage in the following activities: (a) directly or indirectly (through one or more Subsidiaries or other Persons) acquire, purchase, own, hold, manage, develop, operate, improve, renovate, rent, lease, fund, finance, encumber, sell, transfer, exchange, dispose of, invest in, or otherwise deal with, the Property and any other Company Assets, (b) to own, directly or indirectly, a limited liability company or other interest in, and act as a member of each Subsidiary, (c) to conduct such other lawful business activities related or incidental thereto or as the Members may otherwise determine in accordance with this Agreement and (d) to exercise all powers enumerated in the Act necessary to the conduct, promotion or attainment of the purposes set forth herein and for the protection and benefit of the Company. The Company is authorized and empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of its purposes and for the protection and benefit of the Company, including all acts and things permitted under the Act and this Agreement.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 2.4 Term.

The term of the Company began as of the date of the filing of the Certificate of Formation with the Secretary of State of the State of Delaware hereof and shall continue unless and until the Company shall be dissolved and terminated pursuant to the laws of the State of Delaware or Article 10 hereof.

Section 2.5 Title to the Property.

Each of the Members hereby acknowledges and agrees that title to the Property and all other Company Assets shall be held in the name of the Company (or, if applicable, a Subsidiary).

## ARTICLE 3

## CAPITAL CONTRIBUTIONS; ELECTRA MEMBER LOAN; CAPITAL ACCOUNTS; ADDITONAL CAPITAL CONTRIBUTIONS

Section 3.1 Capital Contributions; Electra Member Loan.

(a) On or before the Property Acquisition Date, Electra Member shall make a Capital Contribution to the Company in an amount which is equal to seventy five percent (75%) of the equity required by the Company and the Property Owner to close on its acquisition of the Property and to fund the Renovation Reserves and a working capital reserve to be established for the Company. Electra Member's Capital Account shall be credited with the aforesaid amount upon its funding of same.

(b) Subject to Section 3.1(c), on or before the Property Acquisition Date, BH Member shall make a Capital Contribution to the Company in an amount which is equal to twenty five percent (25%) of the equity required by the Company and the Property Owner to close on its acquisition of the Property and to fund the Renovation Reserves and a working capital reserve to be established for the Company. BH Member's Capital Account shall be credited with the aforesaid amount upon its funding of same.

(c) Electra Member agrees to contribute to the Company on behalf of BH Member sixty percent (60%) of the amount of BH Member's Capital Contributions (including any Additional Capital Contributions) as called for by this Agreement (i.e., 15% of the total initial required Capital Contributions by the Members). The amount so contributed under this Section 3.1(c) by Electra Member on behalf of BH Member towards it Capital Contributions shall be deemed (i) a loan from Electra Member to BH Member (an "***Electra Member Loan***"), which Electra Member Loan shall bear interest until repaid at a rate per annum equal to ten percent (10%) per annum, compounded annually, during the term of the Electra Member Loan; and (ii) a Capital Contribution from BH Member to the Company. Each Electra Member Loan shall be payable from any Distributions to be made by the Company to BH Member, and until such Electra Member Loan is paid in full the Company, and the Manager, on behalf of the Company, is irrevocably authorized and directed by the Members to pay to Electra Member from Distributions otherwise payable to BH Member by the Company the principal of, and accrued interest on, such Electra Member Loan. The Manager shall maintain records of the Electra Member Loans, including the calculation of the principal amount advanced and the accrued interest thereon, and provide the

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Members information on same upon request. All applicable amounts otherwise distributable to BH Member under this Agreement shall first be paid to Electra Member to be applied first to interest on such Electra Member Loan and then to the principal thereof. The Electra Member Loan is secured by a pledge by BH Member of its Interest in the Company to Electra Member.

(d) No Member shall be required to make any Capital Contributions in excess of the amount set forth in this Section 3.1 or loan any amount to the Company except as expressly provided in this Agreement.

Section 3.2 Capital Accounts.

A separate capital account (each a "Capital Account") shall be maintained for each Member, which shall consist of such Member's Capital Contribution, increased by such Member's share of Company profits pursuant to Article 8 hereof and by any Additional Capital Contributions, and decreased by Distributions to such Member by the Company pursuant to Sections 7.1 and 10.3 hereof, by such Member's share of Company losses pursuant to Article 8 hereof and by operation of Section 3.5(a). No Member shall be permitted to make any withdrawals from such Member's Capital Account, except as otherwise expressly provided herein. Capital Accounts shall be maintained in accordance with Code Section 704 and the regulations promulgated thereunder.

Section 3.3 Interest and Right to Property.

Except as expressly set forth herein, no interest or preferred return shall be paid on the Capital Contribution of any Member, nor shall any Member have the right to demand and receive property, other than cash, in return for such Member's Capital Contribution.

Section 3.4 Additional Capital Contributions.

If the Manager determines in its reasonable opinion that the Company does not have sufficient funds to pay all Necessary Expenses, then the Manager shall be entitled to send a written notice to all Members calling for such additional Capital Contributions ("Capital Call Notice") from the Members for the purpose of funding such shortfall. A Capital Call Notice shall state, among other things, the aggregate amount of additional capital that is required to be funded by the Members (subject to Section 3.1(c)) on a pro rata basis in accordance with their Percentage Interests, the purpose for which such additional capital is required and the date by which such additional Capital Contributions are required to be made (which shall be no sooner than thirty (30) days after the date all Members received such Capital Call Notice (other than with respect to Emergency Expenses which required funding date will be as reasonably set forth in the subject Capital Call Notice)("Due Date"). Such additional Capital Contributions actually received by the Company shall be referred to herein as the "Additional Capital Contributions" and individually, an "Additional Capital Contribution". Notwithstanding anything to the contrary in this Agreement, if any Additional Capital Contribution is to be made after any amount has been distributed under Section 7.1(a)(iii) (the "Promote Clause"), then such Additional Capital Contribution shall be made in accordance with the Members' respective proportionate shares of the distributions made under the Promote Clause unless (and until) on the date of such Additional Capital Contribution, (1) the aggregate amount of Capital Contributions then or theretofore made

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

in accordance with such proportionate shares equals (2) the aggregate amount of distributions then or theretofore made under such Promote Clause.

Section 3.5 Failure to Contribute Additional Capital Contributions.

(a) Any Member which fails to timely contribute all or any portion of any Additional Capital Contributions shall be considered a "Non-Funding Member". If a Member fails to make an Additional Capital Contribution, then the Company shall, upon notice to the Non-Funding Member, permit the other Member (the "Funding Member"), to advance all or any portion of the Additional Capital Contribution that the Non-Funding Member has failed to timely contribute and elect to either (i) treat such contribution, together with the Funding Member's contribution made in respect of the same Capital Call Notice, as a default loan to the Company and not as an Additional Capital Contribution (each, a "Default Priority Loan"), or (ii) treat such contribution as an Additional Capital Contribution. The Funding Member shall promptly provide the Non-Funding Member and the Company with written notice if it elects to exercise such right, including how it elects to treat such contribution.

(b) A Default Priority Loan shall bear interest at the fixed rate equal to twenty percent (20%) per annum, compounded quarterly, calculated on the basis of 365 or 366 days, as applicable for the number of days elapsed and shall be repaid from distributions in accordance with Section 7.1.

(c) If a Funding Member elects to treat its contribution on behalf of the Non-Funding Member as an Additional Capital Contribution, such Funding Member shall be deemed to have made an Additional Capital Contribution to the Company in an amount equal to the product of (A) two (2) and (B) the amount contributed by the Funding Member on account of the Non-Funding Member, and the Percentage Interests of the Members shall be adjusted accordingly.

(d) If BH Member is the Non-Funding Member, and Electra exercised its rights under clause (c) above, the Promote Share shall be reduced in proportion to the reduction in BH's Percentage Interest, and the amounts not distributed to BH as Promote Share from and after the date of such reduction shall instead be made to the Members, pro rata in accordance with their respective Percentage Interests. By way of example, if BH Member's Percentage Interest is (pursuant to clause (c) above), reduced from twenty five percent (25%) to twenty percent (20%)(i.e., a 20% reduction), then Distributions of the Promote Share to the BH Member shall be subject to a twenty percent (20%) reduction, from twenty five percent (25%) to twenty percent (20%), and Distributions made in respect of the forfeited five percent (5%) Promote Share from and after the date of such reduction shall be distributed to the Members, pro rata in accordance with their respective Percentage Interest as so adjusted (i.e., four percent (4%) to Electra Member and one percent (1%) to BH Member).

(e) Each Member acknowledges and agrees that the other Member would not be entering into this Agreement were it not for (i) the Members agreeing to make the Capital Contributions provided for in Section 3.01 and Section 3.4 of this Agreement and (ii) the remedy provisions above in this Section 3.5. Each Member acknowledges and agrees that if any Member fails to make its Capital Contributions pursuant to this Agreement, the other Member will suffer substantial damages and the remedy provisions set forth above are fair, just and equitable in all

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

respects and administratively superior to any other method for determining such damages. If a Member fails to timely contribute its full share of any Additional Capital Contribution called for pursuant to Section 3.4, the sole and exclusive remedy of the other Members and the Company on account of such failure shall be as set forth in Sections 3.5, 4.9 and 6.4 which shall be cumulative remedies (and no other recourse shall be available in connection therewith); provided, however, that notwithstanding the foregoing, each Member and any of its Affiliate shall be and remain liable for the payment of all amounts due from such Member or any of its Affiliate pursuant to any guaranties or indemnities given to the Company (or any other Person) by such Member or any Affiliate in connection with this Agreement and the Project.

## ARTICLE 4

## MANAGEMENT; RIGHTS OF MEMBERS; FEES AND EXPENSES

Section 4.1 Management.

(a) The business affairs of the Company shall be managed by a Manager, who may but need not be a Member. Except as otherwise provided herein, the Manager shall be designated by the Members only with Required Approval. The Members hereby appoint Electra Member as the initial Manager. The Manager shall be responsible to do all things and to prepare and make such filings and reports and otherwise to cause the Company, each Subsidiary and the Property to comply with the laws, rules, regulations and orders of applicable governmental authorities and to comply with (x) the provisions of the mortgages and financings of the Property, the Company and any Subsidiary (including the Loan and the Loan Documents), as well as (y) the then Approved Budget, among other things. The Manager shall perform all of its obligations under this Agreement with reasonable diligence and in a prompt and businesslike manner, exercising such care and skill as a prudent investor with sophistication and experience in acquiring, owning, operating and managing property like the Property would exercise in dealing with its own assets. As such, to the maximum extent permitted by applicable Law, neither the Manager nor any of its Affiliates shall owe any duties (including any fiduciary duties) to the Company, any Subsidiary or to any Member, assignee of any Member, or any other Person that is a party to or is otherwise bound by this Agreement, any and all such duties being hereby specifically disclaimed and eliminated in all respects; provided, that all such Persons shall be liable for any bad faith violation of the implied contractual covenant of good faith and fair dealing as and to the extent set forth in Section 18-1101(e) of the Act. Without limiting the generality of the foregoing, subject to Section 4.1(b), the Manager shall have the right and duty to do, accomplish and complete, for and on behalf of the Company, each Subsidiary and the Property all of the actions set forth on Schedule 4.1(a) hereto.

(b) Any Major Decision will require Required Approval. Either Member shall have the right to make a request for approval by Members to any Major Decision. All requests for approval to a Major Decision shall (a) be made in writing, sent pursuant to and in accordance with Section 12.3, (b) specify the date by which the Members must respond to such request, which date shall be not less than ten (10) Business Days after delivery of such request, and (c) be accompanied by (i) reasonable information regarding such proposed Major Decision and (ii) a description of the Major Decision proposed to be taken by the Company or applicable Subsidiary (any such request that satisfies the forgoing conditions, a "Consent Notice"). If a Member fails to deliver a written

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

response to a proposed Major Decision prior to the date specified in the Consent Notice pertaining thereto, then the Member requesting the Major Decision may (but shall have no obligation to) deliver a second (2[nd]) Consent Notice to the Manager and the applicable Member with bold font in all capital letters stating "THIS IS A SECOND NOTICE. YOU MUST RESPOND IN WRITING WITHIN FIVE (5) BUSINESS DAYS OR YOU WILL BE IRREVOCABLY DEEMED TO HAVE APPROVED THE MATTERS SET FORTH BELOW." Except as expressly provided in this Section 4.1(a), if a Member(s) fails to deliver a written response within five (5) Business Days after delivery of the second (2[nd]) Consent Notice, then the Manager and the Member(s) shall be deemed to have granted their consent to the Major Decision. If the applicable Member(s) timely deliver a written response to the Consent Notice, or if the applicable Member requesting the Major Decision does not deliver a second (2[nd]) Consent Notice, then the applicable Member(s) shall be deemed to have rejected the proposed Major Decision.

(c) Reserved.

(d) Reserved.

Section 4.2 Fees.

Except as expressly provided in this Agreement and subject to the then Approved Budget, Members and their Affiliates shall not be entitled to receive any fees or other compensation from the Company or any Subsidiary, including property management brokerage fees on the sale or lease of apartments at the Property or other fees or compensation in connection with the acquisition, construction, development, operation, management, financing or refinancing of the Property, the Company or any Subsidiary, and any such fees or other compensation received by any Member or its Affiliate shall be property of the Company and shall be held in trust for the benefit of, and promptly turned over, to the Company.

Section 4.3 Reimbursement for Expenses.

Each of the Members shall be responsible fall all out-of-pocket expenses incurred by it in connection with the Project, including, without limitation cost and fees incurred by each in connection with the preparation and negotiation of this Agreement. On the Property Acquisition Date, the approved pursuit costs and other expense items of each of the Members and their respective Affiliates incurred in connection with the Project and the acquisition by the Company of the Property (and the transactions contemplated hereby) shall be reimbursed by the Company to the Members in full. Following the Property Acquisition Date, each Member shall be entitled to reimbursement by the Company for all out-of-pocket expenses paid or incurred by it pursuant to the discharge of its obligations under this Agreement which are set forth in the then Approved Budget.

Section 4.4 Co-Developer Joint Marketing.

The content of all advertising, digital websites and online information, collateral marketing materials, press releases and all other media relating to any Project (collectively "Marketing Material") shall refer to both Electra Member and BH Member as "co-developers". All Marketing Material shall be delivered to Electra Member before being placed into circulation, and shall be subject to Electra Member's sole and absolute approval in all respects.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 4.5 Manager's Time.

The Manager shall devote such time to the Company and its business and affairs as shall be necessary to conduct the business and affairs of the Company and any Subsidiary in an efficient and businesslike manner and to carry out the Manager's responsibilities as set forth herein, and notwithstanding anything to the contrary to the foregoing, shall apply reasonable and diligent business practices in the performance of its responsibilities as Manager hereunder in a commercially reasonable manner.

Section 4.6 Non-Exclusivity.

Each Member and its Affiliates may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, brokerage and development of real property (competing or non-competing with the Property), and neither the Company nor any Member thereof shall have any right by virtue of this Agreement to participate in any way in any such independent ventures (whether presently existing or hereafter established or created) or to the income, profits or losses derived therefrom. No Member shall be obligated to present any particular investment opportunity to the Company even if such opportunity is of a character which, if presented to the Company, could be taken by the Company, and each Member shall have the right to take any such particular investment opportunity for its own account or to recommend same to others including such Member's Affiliates.

Section 4.7 No Liability and Indemnity.

Subject to the terms hereof (including Section 12.1 and Section 13.3), Manager shall not be liable, responsible or accountable to the Company or any Member for any act or omission performed or omitted pursuant to the authority granted to him or it hereunder or by law, or for a loss resulting from any mistake or error in judgment on its part, provided that such act, omission, mistake or error in judgment, as the case may be, did not result from the willful misconduct, gross negligence or fraud of such Manager, or the breach by the Manager of any provision of this Agreement in any material respect. A Manager may consult with legal counsel and any action taken or omitted in good faith in reliance upon and in accordance with the opinion or advice of such counsel shall be full protection and justification of a Manager with respect to the action so taken or omitted. Subject to Section 3.5, Section 12.1 and Section 13.3, the Company shall indemnify, defend and save harmless, solely from Company Assets, the Manager and its Affiliates, agents and/or representatives from any loss, damage, liability or expense incurred or sustained by it by reason of any act performed or omitted to be performed for or on behalf of the Company in accordance with this Agreement, but this indemnity shall not be applicable to any loss, damage, liability or expense resulting from the willful misconduct, gross negligence, or fraud of such Person or from any other events for which such Person or any of its Affiliates must indemnify the Company, any Member or any other Person pursuant to the terms hereof (or pursuant to any Electra Member Affiliate Agreement), nor shall it be applicable to the breach by such Person of any provision of this Agreement in any material respect, nor shall it be construed as a guaranty of payment as to any obligations of the Manager or its Affiliates hereunder. For the avoidance of doubt, none of Electra Member (whether in its capacity as "Manager" or "Member" hereunder),

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Electra Parent or any of their respective Affiliates shall be entitled to indemnification or reimbursement on account of any loss, damage, liability or expense incurred or sustained on account of, or in connection with, any Electra Bad Boy Event.

Section 4.8 Reliance by Third Parties.

Third parties dealing with the Company may rely conclusively upon the power and authority of Manager (or Lubeck (as applicable), acting in accordance with the applicable terms of this Agreement) to act as set forth herein and shall not be required to inquire into or ascertain the authority of Manager (or Lubeck, acting in accordance with the applicable terms of this Agreement) to so act; provided that the Manager shall not have any right or authority to assume or create any obligation or responsibility, express or implied, on behalf of or in the name of the Company, any Subsidiary or any of their respective Affiliates, or to bind the Company, any Subsidiary or any of their respective Affiliates in any manner, except as authorized by this Agreement, and the Manager shall not make any contrary representation to any third party.

Section 4.9 Replacement of Manager.

(a) Notwithstanding anything to the contrary set forth herein (but subject to Section 4.9(c)), BH Member shall unilaterally and in BH Member's sole discretion be entitled to remove Electra Member as Manager (and/or terminate any or all Electra Member Affiliate Agreements), and appoint BH Member (or any designee of BH Member) as the Manager of the Company at any time following the occurrence of any Electra Bad Boy Event; provided, however, that prior to BH Member exercising its right to remove Electra Member from its capacity as "Manager," BH Member shall be required to provide Electra Member with written notice of the specific event alleged to have fallen within the definition of an Electra Bad Boy Event and, solely to the extent such event is curable, BH Member shall grant Electra Member a period of twenty (20) Business Days after the receipt by Electra Member of such notice to cure such breach, and upon the failure by Electra Member to cure such breach within such cure period (as determined in BH Member's discretion), BH Member shall have the right to remove Electra Member from its capacity as "Manager".

(b) Notwithstanding anything to the contrary set forth in this Section 4.9: (i) BH Member shall not be entitled to remove the Manager if doing so would result in an "Event of Default" under the Loan; and (ii) BH Member shall not be entitled to remove the Manager if the Manager or any Affiliate thereof (including Lubeck) is a guarantor on a mortgage loan encumbering the Property, including without limitation, any non-recourse carve out guaranty, unless BH Member has, prior to, or concurrently with, such removal, either (x) arranged for such guarantor to be released from such guaranty for wrongful acts occurring after BH Member (or its designee) assumes the position of "Manager" hereunder, ***or*** (y) BH Member causes either BH Member, or another person or entity which is credit-worthy and reasonably acceptable to Electra Member, to provide indemnification to such guarantor with respect to any liability under such guaranty arising from the actions of BH Member or any replacement "Manager" designated by BH Member (including actions taken on behalf of or through the Company or any Subsidiary), after removal of Electra Member as "Manager" hereunder.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(c) Upon the removal of Electra Member as Manager pursuant to Section 4.9(a), (i) Electra Member shall use commercially reasonable efforts to describe to the Company all of the uncompleted business of the Manager and return all materials, records, documents and other items and information that belong to the Company or any Subsidiary or are used in connection with such former duties and responsibilities and reasonably cooperate with BH Member in transitioning and transferring any such duties and responsibilities of the Manager, including by executing any documents reasonably requested by BH Member in connection therewith, all at the reasonable expense of Electra Member, and (ii) none of Electra Member, Electra Parent or any of their respective Affiliates shall be entitled to any further fees from the Company or any Subsidiary (including those fees contemplated in Section 4.1(b)).

Section 4.10 <u>Officers.</u>

The Manager may, from time to time, appoint officers or other agents of the Company, who may but need not have titles, and shall exercise and perform such powers and duties as shall be assigned and delegated to them from time to time. Any officer or other agent may be removed at any time by the Manager, with or without cause. Each officer and other agent shall hold office until his or her successor is elected and qualified, unless earlier removed in accordance with this Section. Any number of offices may be held by the same individual. The officers and such other agents, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Manager not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business and the actions of the officers and such agents taken in accordance with such powers shall bind the Company.

Section 4.11 <u>Subsidiaries.</u>

All of the provisions of this Agreement regarding the management and governance of the Company shall apply to the management and governance of any and each Subsidiary, whether any such Subsidiary is managed or controlled directly or indirectly by the Company, as member, manager or otherwise. Any action to be taken by any Subsidiary shall for all purposes hereof be construed as an action taken by the Company and shall be subject to the same rights and limitations granted and imposed on the Members under this Agreement, subject to any additional rights and limitations granted or imposed in the governing documents of such Subsidiary. Any and all references herein to the Company or any Manager or Member causing or directing any action shall be deemed to refer to the Company causing (or such Manager or Member causing the Company to cause), in its capacity as member or manager of such Subsidiary, such action to be taken for and on behalf of such Subsidiary. In the event that the Company conducts its business through one or more Subsidiaries, the Manager shall perform, with no additional compensation, the same or substantially identical services for each such Subsidiary as the Manager performs for the Company, subject to the terms, conditions, limitations and restrictions set forth in this Agreement. The Manager agrees to perform such duties, and in such circumstances and with regard to such duties, the Manager shall be subject to the same standards of conduct and shall have the same duties and obligations in performing or such services on behalf of each such Subsidiary as are set forth in this Agreement. Without limiting the generality of the foregoing (and notwithstanding anything contained herein to the contrary), any action or decision to be taken or made by or on behalf of a Subsidiary that, if taken or made by or on behalf of the Company would otherwise require the direction or approval of one or more Members under this Agreement, will require the

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

direction or approval of the same. The Members agree that the Manager shall ensure (and the Manager hereby acknowledges and agrees) that the organizational documents of any Subsidiary will include any special purpose entity provisions required by any lender to any such Subsidiary.

Section 4.12 Sale of Development Project.

As part of its Business Plan, the Company contemplates selling land parcels with entitlements to develop apartment units (the "Development Project") at such parcel's then current fair market value (the "Development Parcel FMV") to either an unrelated third party, or to an Affiliate of either Member (as the case may be, each an "Affiliated Purchaser") for a purchase price no less than the Development Parcel FMV. In the event that the purchaser of the Development Project is an Affiliated Purchaser, then each Member (and or its Affiliates) may invest in Development Project, subject in each case to all of the following conditions: (i) the other investors of such Affiliated Purchaser permit such Member to co-invest in such Development Project, (ii) the dollar amount of such Member's co-investment shall be as agreed upon between such Member and the Affiliated Purchaser at the time of such co-investment (the "Member's Investment"), and (iii) such Member shall not be entitled to receive any promote or carried interest payments on such Member's Investment, nor shall such Member's Investment be subject to or bear any promote or carried interest payments to others.

## ARTICLE 5
## RIGHTS OF MEMBERS

Section 5.1 Right to Participate in Management.

Notwithstanding anything to the contrary contained herein, BH Member shall have those certain rights to participate in the management of the Company as expressly set forth in this Agreement. Except as expressly provided herein, Members (other than Manager) shall have no right to, nor shall they take any part in or interfere in any manner with the conduct, control or management of the Company's business and shall have no right or authority to act for or bind the Company, said powers being vested solely and exclusively in the Manager.

Section 5.2 Indemnification; Limited Liability.

(a) Subject to the terms hereof (including Section 3.5, Section 12.1 and Section 13.3), the Company shall indemnify, defend and hold harmless, solely from Company Assets, any Member (solely in its capacity as such, and for the avoidance of doubt, not in its capacity as a "Manager" or any other capacity hereunder), and its members, managers, directors, shareholders, limited partners, general partners, Affiliates, officers, employees, agents and/or other representatives from any loss, damage, liability or expense incurred or sustained by it by reason of any act performed, omitted to be performed for or on behalf of the Company (solely in its capacity as a "Member" hereunder and not, for the avoidance of doubt, it its capacity as a "Manager" or any other capacity hereunder) and in furtherance of its Interest, but this indemnity shall not be applicable to loss, damage, liability or expense to the extent resulting from the willful misconduct, gross negligence or fraud of such Person or from any other events for which such Person or any of its Affiliates must indemnify the Company, any Member or any other Person pursuant to the

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

terms hereof (or pursuant to any Electra Member Affiliate Agreement), nor shall it be construed as a guaranty of payment as to any obligations of a Member (or any Affiliate thereof) hereunder, including as to the obligations of Electra Member (whether in its capacity as "Manager" or "Member" hereunder) or any applicable Affiliate of any of the foregoing, as applicable, under (or as contemplated by) the terms hereof (including Section 5.6). For the avoidance of doubt, none of Electra Member (whether in its capacity as "Manager" or "Member" hereunder), Electra Parent or any of their respective Affiliates shall be entitled to indemnification or reimbursement on account of any loss, damage, liability or expense incurred or sustained on account of, or in connection with, any Electra Bad Boy Event.

(b) Except as expressly provided herein or in any guaranty or indemnity documents executed by a Member in connection with any financing with respect to the Property (or in any Electra Member Affiliate Agreement), no Member shall be liable for the debts, liabilities, losses, contracts or any other obligations of the Company, except to the extent any of the foregoing was caused by the willful misconduct, gross negligence or fraud of such Member. A Member shall be liable only to make its Capital Contribution and shall not be required to lend any funds to the Company or, other than its required share of any Additional Capital Contribution, to make any further Capital Contribution to the Company. No Member shall have any personal liability for the repayment of the Capital Contribution of any Member.

Section 5.3 Restrictions on Members.

No Member shall have the right or power to:

(a) Withdraw or reduce its Capital Contribution to the Company except provided by the Agreement or the Act;

(b) Bring an action for partition against the Company; or

(c) Cause the termination and dissolution of the Company by court decree or otherwise (except in compliance with this Agreement).

Section 5.4 Action by Members Without a Meeting.

Whenever the Members of the Company are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members who hold Percentage Interests having not less than the minimum percentage that would be necessary to authorize or take such action at a meeting at which all of the Members entitled to vote thereon were present and voted and shall be delivered to the office of the Company.

Section 5.5 Intentionally Omitted.

Section 5.6 Financing Guaranties.

Notwithstanding anything to the contrary set forth herein, no payment made by a Member or any Affiliate thereof pursuant to any guaranty, indemnity, credit enhancement or other agreement entered into pursuant to or in connection with the requirements of the Loan Documents

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(including any non-recourse carve out guaranty and hazardous materials indemnification agreement) shall be treated as a Necessary Expense, or as a Capital Contribution or Additional Capital Contribution by such Member, or increase such Member's Capital Account, and shall not entitle such Member or its Affiliates to reimbursement or indemnification by the Company, any Subsidiary or any other Member or its Affiliates in any manner or form. Without limiting the generality of the foregoing, Lubeck, Electra Member, Toledo, BH Member, and/or one or more of their respective Affiliates will be required to furnish in connection with the Loan, any and all usual and customary non-recourse carve out guaranties and hazardous materials indemnification agreements (or any other required guaranties/indemnities) on terms and conditions reasonably acceptably to such guarantors, and except as otherwise provided for herein, neither Member nor any of its Affiliates shall be required to indemnify or reimburse any such guarantors with respect to any such guaranty or agreement (nor shall any amount funded under any such guaranties or agreements constitute a Necessary Expense or Capital Contribution).

## ARTICLE 6

## TRANSFER OF MEMBER INTERESTS

Section 6.1 Withdrawal and Transfers.

Except as otherwise provided herein or with the consent of all the Members, no Member may (a) resign, withdraw or retire voluntarily from the Company, or (b) directly or indirectly, assign, sell, exchange, transfer, pledge, encumber, hypothecate or otherwise dispose of all or any part of its Interest, including any non-economic right provided to a Member, or any direct or indirect interest (whether legal or beneficial) in such Member (any direct or indirect assignment, sale, exchange, transfer, pledge, encumbrance, hypothecation or other disposition of an Interest being herein collectively called a "Transfer") to any Person. Notwithstanding the foregoing, no Member's consent shall be required with respect to (i) any Permitted Transfer, provided that in the case of any Transfer by the BH Member the provisions of Section 6.10 are satisfied, or (ii) Transfers made in accordance with the terms of Section 6.4.

Section 6.2 Additional Members. Additional Members may only be admitted to the Company in compliance with this Article 6.

Section 6.3 Transfers by Members.

(a) In the event that any Member at any time attempts to make a Transfer of its Interest in violation of the provisions of this Agreement, the other Members or any one of them, shall in addition to all other rights and remedies which they may have at law, in equity or under the provisions of this Agreement, be entitled to a decree or order restraining such attempted Transfer and the offending Member shall not plead in defense thereto that there would be an adequate remedy at law, it being recognized and agreed that the injury and damage resulting from such a breach would be impossible to measure monetarily.

(b) If any Interest of a Member is Transferred during any accounting period in compliance with the provisions of this Article 6, each item of income, gain, loss, expense, deduction and credit and all other items attributable to such Interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Interests during such period in accordance with Section 706(d) of the Code, using any conventions permitted by law. All Distributions on or before the date of such Transfer shall be made to the transferor, and all Distributions thereafter shall be made to the transferee.

(c) Anything in this Agreement to the contrary notwithstanding, no Member may Transfer any of its Interest to a Person that is a Prohibited Person, no Member may Transfer any of its Interest if such Transfer could cause the Company to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the regulations promulgated thereunder, could cause a termination of the Company within the meaning of the Code, or under applicable state or local tax laws and/or regulations, or could jeopardize the status of the Company as a partnership for federal income tax purposes and no Member may Transfer its Interest if such Transfer would require filing of a registration statement under the Securities Act of 1933, as amended, and the regulations promulgated thereunder, or cause the Company not to be entitled to an exemption from registration as an "investment company" pursuant to the Investment Company Act of 1940, as amended, or would otherwise violate or cause the Company to violate any applicable federal, state or foreign securities laws or regulations. Prior to the transfer of any Interest by a Member, the transferor shall be required to repay all Member Loans then outstanding and payable by such transferor, together with all interest accrued thereon.

(d) Except as otherwise provided herein, to the extent that any Transfer of a direct or indirect interest in any Member results in the Company or any Subsidiary being required to pay any review fee, legal fee or other cost or expense of the holder of any Loan and/or Refinancing, the Person(s) seeking to effect such Transfer (or the Member whose direct or indirect interest is so Transferred) shall pay to the holder of such Loan or Refinancing, or to the Company or applicable Subsidiary, all such fees, costs and expenses, and such payment(s) shall be made no later than the effective date of such Transfer.

Section 6.4 Buy-Sell.

(a) Following the first to occur of (i) the eighteen (18) month anniversary of Property Acquisition Date, in the event of a Deadlock Event, or (ii) the date on which Electra Member is actually removed as the Manager hereunder by virtue of a Electra Bad Boy Event, either Member (the "Offeror") shall (subject to the last sentence of this Section 6.4(a)) have the right (the "Buy-Sell Right") to give written notice (the "Proposal Notice") to the other Member (the "Other Member") stating that it is exercising its Buy-Sell Right under this Section 6.4, and provide in such Proposal Notice, a valuation stating the aggregate dollar amount (the "Valuation") that the Offeror would be willing to pay in immediately available funds if it were a third party for all of the Company Assets as of that date free and clear of all liabilities on such assets, and together with such Proposal Notice remit via wire transfer to First American Title Insurance Company, as escrow agent, funds in the amount of ten percent (10%) of the applicable purchase price that the Other Member would be entitled to receive if it elects to sell its Interests to the Offeror pursuant to this Section 6.4 (calculated in accordance with Section 6.4(b)) (the "Offeror Good Faith Deposit"). Notwithstanding the foregoing or anything to the contrary contained in this Agreement, (A) no Member shall have the right to exercise the Buy-Sell Right while (1) any Buy-Sell Right previously exercised is then pending and the procedures for the consummation of the transactions contemplated thereby have not yet been completed or terminated in accordance with the applicable

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

provisions of this Agreement, or (2) the Company or any Subsidiary has contracted to sell the Property to a third party pursuant to a legally binding agreement that has not been terminated.

(b) Upon receipt of the Proposal Notice, the Other Member shall have the obligation to choose one of the following options:

(i) to the extent applicable, provide written notice to Offeror that such Other Partner approve the Major Decision that the Offeror wanted approved as a Major Decision hereunder; or

(ii) to purchase the full Interest of the Offeror for a purchase price equal to the amount the Offeror would have been entitled to receive if the Company caused all the Company Assets to be sold for the Valuation and paid all the Company's outstanding indebtedness and other liabilities (including, if then outstanding, any mortgage or other financing) on the closing date of such buy-sell transaction and the Company Distributed the remaining net proceeds (after deducting the amount of any transfer taxes due and payable in connection with such sale), in accordance with this Agreement; or

(iii) to sell their full Interests to the Offeror, for a total purchase price equal to the amount the Other Members would have been entitled to receive if the Company caused all the Company Assets to be sold for the Valuation and paid all the Company's outstanding indebtedness and other liabilities (including, if then outstanding, any mortgage or other financing) on the closing date of such buy-sell transaction and the Company Distributed the remaining net proceeds (after deducting the amount of any transfer taxes due and payable in connection with such sale), in accordance with this Agreement.

Notwithstanding anything to the contrary herein, (i) no Member shall be permitted to sell less than all of its Interest in the Company pursuant to this Section 6.4, (ii) any assumption fees with respect to any Loan (or Refinancing) triggered by the transactions contemplated by this Section 6.4 shall be the sole responsibility of the purchasing Member, and (iii) any transfer taxes due and payable in connection with any such sale of Interest shall be paid by the Company.

(c) Such option shall be exercised upon the Other Member giving written notice thereof to the Offeror (the "Response Notice") within thirty (30) days after the receipt of the Proposal Notice (the "Response Period"). To the extent applicable, if the Other Member elects to approve the Major Decision which gave rise to the Deadlock Event, then such Major Action shall be deemed approved, the Offeror Good Faith Deposit shall be returned to Offeror, and Offeror shall have no further right to exercise the Buy-Sell Right regarding such Major Action which gave rise to the Deadlock Event. If the Other Member elects to purchase the Interest of the Offeror, simultaneously with the delivery of the Response Notice the Other Member shall remit via wire transfer to First American Title Insurance Company, as escrow agent, immediately available federal funds in the amount of ten percent (10%) of the applicable purchase price that the Offeror would be entitled to receive upon closing of such buy-sell transaction (calculated in accordance with Section 6.4(b)) (the "Other Member's Good Faith Deposit"; together with the Offeror Good Faith Deposit, the "Good Faith Deposits" and each individually, a "Good Faith Deposit"), whereupon the Offeror's Good Faith Deposit will be returned to Offeror (it being acknowledged that the Offeror Good Faith Deposit must be returned to the Offeror in full as a condition to any

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

such election by the Other Member). If the Offeror has not received such a Response Notice from the Other Member prior to the expiration of the Response Period, then and in such event the Other Member shall for all purposes be conclusively and irrevocably deemed to have delivered a Response Notice on the last day of the Response Period electing to sell its Interests to the Offeror, and the Offeror shall be required to purchase the Other Member's Interests for the same purchase price calculated pursuant to Section 6.4(b) above.

(d) The closing of the sale of the applicable Interest(s) pursuant to this Section 6.4 shall take place (at the location set forth in the Proposal Notice, which shall be within the New York metropolitan area or may be through the mail through escrow with First American Title Insurance Company) within sixty (60) days after receipt (or deemed receipt) by the Offeror of the Response Notice. At the closing, the purchaser shall pay the purchase price for the Interest(s) so purchased by wire transfer of immediately available federal funds. The seller shall execute, acknowledge and deliver to the purchaser such instruments of conveyance as shall be necessary or reasonably desirable to convey to the purchaser the Interest(s) of the seller free and clear of any liens, claims and encumbrances, and the seller shall be responsible for all gains taxes in connection therewith. The Good Faith Deposit made by the purchaser shall be credited toward the purchase price of the Interest(s) being sold at the closing and paid to the seller. In connection with the closing, the purchaser, at its or their sole cost, expense and liability, shall have the right to refinance any outstanding third party indebtedness of the Company (and the seller will reasonably cooperate with the purchaser(s) in connection therewith at no liability, cost or expense to the seller); provided, however, that the purchaser may not incur any liabilities, costs or expenses on behalf of the Company in connection with such refinancing (except for any liabilities, costs or expenses incurred upon or after the buy/sell closing which shall in no event be the responsibility of the seller), provided that the closing of such refinancing shall not be a condition to purchaser's obligation to close.

(e) Anything in this Agreement to the contrary notwithstanding, in the event of an offer by any Member pursuant to Section 6.4 hereof, the Manager agrees to conduct the usual affairs of the Company in the ordinary course until such time as the closing contemplated in paragraph (d) of this Section 6.4 shall have occurred; provided that no Distributions shall be made during such period, except that ordinary net operating income for solely the period between the Proposal Notice and closing shall instead accrue and a Distribution thereof shall be made concurrently with the closing in accordance with the terms hereof.

(f) If the seller breach its obligations under Section 6.4(d), then (i) the purchaser shall be entitled to all rights and remedies at law or in equity on account thereof (including specific performance but excluding the right to obtain consequential or punitive damages), and (ii) the seller shall thereafter have no further right to invoke the provisions of this Section 6.4. If the purchaser breach its obligations under Section 6.4(d), then (i) the seller shall be entitled to retain the Good Faith Deposit as liquidated damages (but not in reduction of their Capital Accounts), and (ii) the purchaser shall have no further right to invoke the provisions of this Section 6.4. The parties acknowledge that it would be impractical and extremely difficult to estimate the damages which the seller may suffer in connection with a default by the purchaser under Section 6.4(d). Therefore, the parties have agreed that a reasonable estimate of the total net detriment that the seller would suffer in such event is and, accordingly, such liquidated damages are not intended as a forfeiture or penalty within the meaning of applicable law.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(g) Each Member expressly agrees and acknowledges that TIME IS OF THE ESSENCE with respect to all time requirements, delivery and payment dates and other deadlines set forth in this Section 6.4. In that regard, all payments and other actions or documents required to be paid, delivered, received or taken on or prior to a specified date shall be so paid, delivered, received or taken on or prior to the specified or required date unless such date is extended in writing by the Member(s) entitled to such performance or payment and failure to make such payment or performance by such date shall be a default under this Agreement by such party.

(h) Notwithstanding anything to the contrary set forth in this Section 6.4, no Member shall be obligated or entitled to purchase the Interest of another Member hereunder if such other Member or its Affiliate (including Lubeck) is a guarantor on a mortgage loan encumbering the Property, including a non-recourse carve-out guaranty, unless the purchasing Member has, either prior to, or concurrently with, such purchase, either (x) arranged for such guarantor to be released from such guaranty for wrongful acts occurring after the purchasing Member closes on the acquisition of the Interest of the selling Member hereunder, or (y) the purchasing Member causes a credit-worthy person or entity reasonably acceptable to the selling Member to provide an indemnification to such guarantor pursuant to an agreement reasonably acceptable to both the selling and purchasing Members with respect to any liability under such guaranty arising from the actions of the purchasing Member or any replacement "Manager" designated by the purchasing Member (including actions taken on behalf of or through the Company or any Subsidiary), after closing of the acquisition of the selling Member's Interest.

(i) Notwithstanding the foregoing, or anything to the contrary set forth herein, in the event that the consummation of the buy-sell transaction described in this Section 6.4 would constitute a breach or default under any of the Loan Documents, or any documents or instruments evidencing and/or securing any Refinancing, the obligations of the purchasing Member(s) under this Section 6.4 shall be subject to and conditioned upon obtaining the approval of the holder(s) of the Loan and/or any Refinancing (in each case to the extent outstanding) to the extent the sale of the Interest(s) of the selling Member(s) as contemplated under this Section 6.4 would constitute or result in such a breach or default (the "Existing Lender Approval(s)"). The Members agree to use commercially reasonable efforts (without being required to incur costs in connection therewith, unless the Member(s) desiring to cause such consent agree to reimburse the other Member(s) for such costs), during the period beginning on the date that Offeror receives (or is deemed to have received) the Response Notice, and ending on the date which is sixty (60) days thereafter, to obtain the Existing Lender Approval(s) with respect to any transfer contemplated under this Section 6.4. In the event the Members fail to obtain the Existing Lender Approval(s) with respect to any such transfer within such sixty (60) day period, then (i) the applicable Buy-Sell Right shall be deemed to have been terminated, and (ii) First American Title Insurance Company will be required to return any applicable Good Faith Deposit to the Member(s) that deposited such funds.

Section 6.5 Resignation, Bankruptcy or Dissolution of Manager.

The resignation, Bankruptcy or dissolution of a Manager, or any other event that effectively precludes a Manager from fulfilling its responsibilities as Manager, shall not cause a dissolution of the Company unless within ninety (90) days thereafter, all of the remaining Members (other than any Affiliate of such Manager) agree in writing to dissolve the Company. Subject to Section 4.9, upon the resignation, Bankruptcy or dissolution of, or other such event with respect

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

to, a Manager, such Manager shall thereafter no longer be a Manager and the Members with Required Approval (other than such Manager or any Affiliate thereof, if applicable) shall appoint a replacement Manager. Except as expressly provided in this Agreement, the resignation, Bankruptcy or dissolution of, or other such event with respect to, a Manager, shall not affect any Interest it holds as a Member.

Section 6.6 Bankruptcy or Dissolution of a Member.

The Bankruptcy, dissolution or any other event that effectively terminates the continued membership of any Member, shall not cause a dissolution of the Company unless within ninety (90) days thereafter, all of the other Members (other than any Affiliate of such Member) agree in writing to dissolve the Company. Upon the Bankruptcy, dissolution or any other event that effectively terminates the continued membership of any Member, the representative or successor-in-interest thereof, as the case may be, shall be deemed to be an assignee of the economic interest of the Member in the Company and may apply for admission to the Company as a Substituted Member upon compliance with this Article 6 (including Section 6.7 hereof); provided, however, that in the event of the Bankruptcy of a Member, if such representative or successor in interest shall not comply with Section 6.7 hereof, then the interest of such Bankrupt Member shall be dealt with in accordance with applicable law at the earliest practicable time.

Section 6.7 Additional and Substituted Members.

(a) Anything herein contained to the contrary notwithstanding, no successor-in-interest of a Member and no assignee or transferee of all or any part of a Member's Interest, nor any Person to be admitted as an additional Member, shall be admitted to the Company as a Member except upon:

(i) submitting to the Manager (or to the Member(s) who are unaffiliated with the Manager if the transferor or transferee is the Manager or an Affiliate thereof) a duly executed and acknowledged counterpart of the instrument or instruments making such Transfer (except for an additional Member), together with such other instrument or instrument, including a counterpart of this Agreement as it then may have been amended, signifying such transferee's agreement to be bound by all of the provisions of the Company and this Agreement, including the restrictions upon Transfers of Interests (direct or indirect) therein and thereto, all of the foregoing in such form and substance as shall be reasonably satisfactory to the Manager (or to the Member(s) who are unaffiliated with the Manager if the transferor or transferee is the Manager or an Affiliate thereof); and

(ii) agreeing to bear all costs and expenses, including legal fees of the Company, incurred in affecting such substitution or admission.

Upon such Person's compliance with the foregoing provision, each of the Members shall take all actions reasonably required to effectuate the recognition of the effectiveness of such Transfer (if applicable) and the admission of such Person to the Company as an additional Member or a Substituted Member, as applicable, including transferring any such Interest in and to the Company, its capital, profits and losses upon the books thereof and executing, acknowledging and causing to be filed any necessary or appropriate amendment to this Agreement.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(b) The Manager (or the Members who are not affiliated with the Manager if the transferor or transferee is the Manager or an Affiliate thereof) shall not consent to the admission of any such assignee as a Substituted Member if, in its reasonable opinion, the applicable Transfer would violate any provision of this Article 6.

Section 6.8 Non-Complying Assignments.

Any assignment, sale, exchange or other Transfer in contravention of any of the provisions of this Article 6 shall be void and ineffectual, and shall not bind or be recognized by the Company.

Section 6.9 Obligations of Successors.

Any Person who acquires an Interest in the Company by assignment or is admitted to the Company as a Substituted Member shall be subject to and bound by all the provisions of this Agreement as if originally a party to this Agreement.

Section 6.10 Limitations on BH Member Permitted Transfers.

Any Transfer by BH Member described in subsection (a) of the definition of Permitted Transfer must satisfy all the conditions stated below unless otherwise waived in writing by Electra Member:

(a) after the Transfer, (x) Toledano shall continue to have (A) the sole and exclusive Control of the BH Member and sole and exclusive authority to approve or vote on all other matters affecting the Company on behalf of the BH Member, and (B) one hundred percent (100%) direct or indirect ownership, economic and beneficial interest in the BH Member; and (y) directly or through family trusts and/or family-controlled entities shall continue to own one hundred percent (100%) direct or indirect ownership, economic and beneficial interest in BH Worldwide;

(b) Electra Member has not notified BH Member in writing that it has reasonably determined that the transferee is a competitor of Electra Member or any Electra Member Affiliate in any significant market or activity;

(c) if an individual, the transferee is a U.S. citizen or resident, unless otherwise approved by Electra Member and to the extent such transferee is not a U.S. citizen or resident, such Transfer shall be subject to providing Electra Member with thirty (30) days prior notice and satisfactory completion by Electra Parent of its OFAC and "Know Your Customer" searches and review;

(d) if a legal entity of any type, the transferee is formed or organized under the laws of any state of the United States, unless otherwise approved by Electra Member and to the extent such transferee is not a U.S. citizen or resident, such Transfer shall be subject to providing Electra Member with thirty (30) days prior notice and satisfactory completion by Electra Parent of its OFAC and "Know Your Customer" searches and review;

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(e) Electra Member has not notified BH Member in writing that it has reasonably determined that one or more Transfers are part of a series of Transfers is not a Permitted Transfer;

(f) if a Transfer results in any Person who did not previously own ten percent (10%) or more of BH Member's Interest on the Effective Date or who was not otherwise known by the Electra Member as being an owner of ten percent (10%) or more of BH Member, then BH Member shall provide Electra Member with thirty (30) days prior notice and shall be subject to providing Electra Member with thirty (30) days prior notice and satisfactory completion by Electra Parent of its OFAC and "Know Your Customer" searches and review; and

(g) the Person is not a Prohibited Person.

Notwithstanding anything herein to the contrary, neither the BH Member nor any Affiliate shall proceed with a Permitted Transfer without first offering Electra Member and its Affiliates the right to acquire the BH Member Interest subject to such Transfer on substantially the same terms and conditions as being proposed to the transferee of such Interests. If BH Member desires to proceed with the Transfer, BH Member shall deliver notice thereof to Electra Member (an "***Transfer Notice***"), which Transfer Notice shall set forth the material business terms of such proposal including, without limitation, the financial terms of the Transfer. Electra Member or any Affiliate thereof shall have the option to acquire the subject Interests, which Electra Member or any Affiliate thereof shall exercise by delivering notice to the BH Member or its Affiliate, as applicable, within thirty (30) days of its receipt of the Transfer Notice. If Electra Partner declines or fails to exercise its right of first offer within such thirty (30) day period such failure shall be deemed a waiver of any such right only in respect to the subject Interest, and the forgoing provisions shall be applicable to any subsequent proposed Permitted Transfer by BH Member.

## ARTICLE 7

## DISTRIBUTIONS

Section 7.1 Distributions.

(a) The Manager shall cause all Distributions of Cash Flow to be applied and Distributed to the Members in the following amounts and order of priority:

(i) first, to the Members who have made Default Priority Loans, pro rata, in accordance with the amount of such Default Priority Loans held by such Members, to repay all accrued interest and principal on all Default Priority Loans, with amounts distributed under this clause (a) applied first to interest on such Default Priority Loans and then to principal of such Default Priority Loans;

(ii) second, pro rata to the Members in proportion to their respective Percentage Interests at the time of such Distribution until each of the Members has received, pursuant to this subsection (ii), aggregate Distributions equal to an Internal Rate of Return of eight percent (8%) as of the date of such Distribution;

NOT AN OFFICIAL COPY. PUBLIC ACCESS NOT AN OFFICIAL COPY. PUBLIC ACCESS

(iii) thereafter, to the Members in proportion to their respective Residual Share at the time of such Distribution.

Section 7.2 Time for Distributions.

Distributions of Cash Flow shall be made from time to time and at such time or times as the Manager may determine; provided, however, that Distributions of all then available Cash Flow shall be made at least monthly. Distributions of Cash Flow from a Refinancing or Sale shall be made concurrently with the closing of any such transaction. The Members acknowledge and agree that there is no express right to accelerate the payment of any Distribution as a result of the failure (or impending failure) of the Manager to satisfy the provisions of Section 4.9(a)(v).

## ARTICLE 8

## ALLOCATION OF PROFITS AND LOSSES

Section 8.1 Allocations.

(a) For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and Distributions during such Fiscal Year and all special allocations pursuant to Section 8.3 with respect to such Fiscal Year, all Profits and Losses (other than items of income, gain, loss and deduction specially allocated pursuant to Section 8.3) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (a) the amount which would be Distributed to such Member, determined as if the Company were to sell all of its assets for the Gross Asset Value thereof, pay all liabilities allocable to such assets according to their terms (limited, with respect to each nonrecourse liability, to the Gross Asset Value of the assets securing such liability) and Distribute the proceeds thereof pursuant to Section 10.2, hereof, minus (b) the sum of (i) such Member's share of Company Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(d) and (g)(3)) and Member Nonrecourse Debt Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(i)) and (ii) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Year (the "Target Amount"). Notwithstanding the foregoing, in the event that the amount of Profits or Losses for a Fiscal Year will not result in Capital Account balances for each Member being equal to each Member's Target Amount, items of income, gain, loss and deduction shall first be allocated to the Members so that the allocation of Profits or Losses for such Fiscal Year, (determined after taking into account the individual allocation of items of income, gain, loss and deduction) shall result in Capital Account balances for each Member being equal to each Member's Target Amount.

(b) Notwithstanding anything to the contrary in this Section 8.1, the amount of items of Company expense and loss allocated pursuant to this Section 8.1 to any Member shall not exceed the maximum amount of such items that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of any taxable year. All such items in excess of the limitation set forth in this Section 8.1 shall be allocated first to Members who would not have an Adjusted Capital Account Deficit, pro rata in proportion to their Capital Account balances as adjusted in accordance with the definition of Adjusted Capital Account Deficit.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 8.2 Basis Adjustment.

In the event of a transfer of an Interest in the Company, its capital, profits and losses, or the Distribution of any Company property to a Member, the Manager, upon the request of the transferee or distributee, as the case may be, may elect on behalf of the Company under the applicable provisions of the Code to cause the basis of the Company's property to be adjusted, for Federal income tax purposes, in the manner provided in the Code Sections 754, 734(b) and 743(b) and any corresponding provisions of state and local tax laws, to the extent applicable.

Section 8.3. Special Allocation Rules.

Before any allocations are made pursuant to Section 8.1 the following special allocations shall be made in the following order:

(a) If the Company incurs any "nonrecourse liability" or "partner nonrecourse debt" (as those terms are defined in Sections 1.704-2(b)(3) and 1.704-2(b)(4) of the Treasury Regulations, respectively), the Company shall make such allocations of items of income upon decreases in the "partnership minimum gain" or of "partner nonrecourse debt minimum gain" (determined in accordance with Sections 1.704-2(b)(2), 1.704-2(d) and 1.704-2(i)(3) of the Treasury Regulations), as the case may be, with respect thereto as are necessary to comply with the "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions of Sections 1.704-2(f), 1.704-2(i), 1.704-2(j) and 1.704-2(k) of the Treasury Regulations, taking into account all exceptions provided by such provisions to the applicability of this Section 8.3(a).

(b) All "nonrecourse deductions", computed and determined in accordance with Sections 1.704-2(b)(1), 1.704-2(c) and 1.704-2(j) of the Treasury Regulations, of the Company shall be allocated to the Members pro rata in accordance with their Percentage Interests.

(c) All "partner nonrecourse deductions" computed and determined in accordance with Sections 1.704-2(i)(1), 1.704-2(i)(2) and 1.704-2(j) of the Treasury Regulations, with respect to any "partner nonrecourse debt", as defined in Section 1.704-2(b)(4) of the Treasury Regulations, of the Company, including any liability of a subsidiary partnership that is treated as a "partner nonrecourse debt" pursuant to Section 1.704-2(k) of the Treasury Regulations, shall be allocated to the Members who bear the economic risk of loss for such debt in compliance with Sections 1.704-2(i) and 1.704-2(k) of the Treasury Regulations.

(d) If the Company incurs any "nonrecourse liability", as defined in Section 1.704-2(b)(3) of the Treasury Regulations, that is not secured by any specific property of the Company and that is recourse to the Company as an entity but expressly not recourse to any member or any partner of any partnership that is a Member, the Manager shall make allocations with respect to such "nonrecourse liability" in a manner which it reasonably determines to be in accordance the principles of Section 704(b) of the Code and the Treasury Regulations thereunder provided that if permitted by the Treasury Regulations, the Company will make such allocations to the Members pro rata in accordance with their Percentage Interests. .

(e) If any Member unexpectedly receives any adjustment, allocation or distribution described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

1(b)(2)(ii)(d)(6) of the Treasury Regulations which causes it to have a, or increases the amount of its, deficit Capital Account, items of Company income shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, such Member's deficit Capital Account as quickly as possible, provided that an allocation pursuant to this Section 8.3(e) shall be made to a Member only if and to the extent that such Member would have a deficit Capital Account after all other allocations provided for in this Article 8 have been tentatively made as if this Section 8.3(e) were not in this Agreement. This Section 8.3(e) is intended to constitute a "qualified income offset" as defined in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(f) If any Member has a deficit Capital Account balance as of the end of any Fiscal Year or other accounting period that is in excess of the amount such Member is obligated to restore to its Capital Account hereunder or is deemed to be obligated to restore to its Capital Account pursuant to the penultimate sentences of Section 1.704-2(g)(1) and 1.704-2(h)(5) of the Treasury Regulations, items of Company income and gain in the amount of such excess shall be specially allocated to such Member as quickly as possible, provided that an allocation pursuant to this Section 8.3(f) shall be made to a Member only if and to the extent that such Member would have a deficit Capital Account balance that is in excess of the amount such Member is obligated to restore to its Capital Account hereunder or is deemed to be obligated to restore to his or its Capital Account pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(h)(5) of the Treasury Regulations after all other allocations provided for in this Article 8 have been tentatively made as if this Section 8.3(f) were not in this Agreement.

Section 8.4 Other Allocation Rules.

(a) Allocations of income, gain, loss and deductions for any period during which the Members' relative interests in the Company have changed shall be made by the Manager using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b) Solely for purposes of determining the Members' shares of the Company's "excess nonrecourse liabilities" under Section 1.752-3(a)(3) of the Treasury Regulations, the Members' interests in Company profits shall be their Percentage Interests as then in effect.

(c) To the extent permitted by Sections 1.704-2(h) and 1.704-2(i)(6) of the Treasury Regulations, the Manager shall use its best efforts to treat a cash Distribution to any Member hereunder as having been made from the proceeds of a "nonrecourse liability" or "partner nonrecourse debt" (as those terms are defined in Sections 1.704-2(b)(3) and 1.704-2(b)(4) of the Treasury Regulations, respectively) of the Company, including any liability of a subsidiary partnership that is so treated pursuant to Section 1.704-2(k) of the Treasury Regulations, only to the extent that such Distribution would otherwise cause such Member to have a deficit Capital Account balance that is in excess of the amount such member is obligated to restore to its Capital Account, within the meaning of Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as of the end of the Fiscal Year during which the Distribution is made.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 8.5 Tax Allocations.

Federal tax allocations for each Fiscal Year or other accounting period of the Company shall be made consistent with the allocations of income, gain, loss and deduction specially allocated pursuant to this Article 8 for such year or period, except that, solely for tax purposes, (i) items of taxable income, gain, loss and deduction with respect to the Company Assets reflected hereunder in the Members' Capital Accounts and on the books of the Company at values that differ from the Company's adjusted tax basis in such assets shall be allocated among the Members so as to take account of those differences in accordance with the principles of Code Section 704(c) and with Sections 1.704-1(b)(2)(iv)(f), 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4)(i) of the Treasury Regulations, and (ii) adjustments made pursuant to Section 734(b) or Section 743(b) of the Code shall be taken into account. The Members are aware of the federal income tax consequences of the allocations made by this Article 8 and agree to report their shares of Company income, gain, loss, deduction and credit for income tax purposes in accordance with this Article 8.

Section 8.6 Curative Allocations.

If the Tax Matters Partner determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss, deduction or credit is not specified in this Article 8 (an "unallocated item"), or that the allocation of any item of Company income, gain, loss, deduction or credit hereunder is clearly inconsistent with the Member's economic interests in the Company (determined by reference to the general principles of Treasury Regulation Section 1.704-1(b) and the factors set forth in Treasury Regulation Section 1.704-1(b)(3)(ii)) (a "misallocated item"), then the Manager (with Spoke Consent) may allocate such unallocated items, or reallocate such misallocated items, to reflect such economic interests; provided, that no such allocation will be made without the prior consent of each Member that would be affected thereby (which consent shall not be unreasonably withhold) and provided, further, that no such allocation will have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

Section 8.7 Tax Matters.

Electra Member shall have the sole and exclusive right and the authority to (a) make any decision that pertains to taxes or tax matters with respect to the Company or any Subsidiary, including any decision regarding making or revoking any tax election, adopting or changing any tax accounting method by or on behalf of the Company or any Subsidiary, accepting, contesting or compromising any adjustment proposed by any tax authority or that the "partnership representative" is entitled to make under the amendments to Subchapter C of Chapter 63 of the Code made by the Bipartisan Budget Act of 2015; (b) change the taxable year for federal, state or foreign income tax purposes of the Company or any Subsidiary or (c) file any tax return or tax report on behalf of the company or cause any Subsidiary to file any tax return or tax report on behalf of such Subsidiary or take any tax position or make any tax election.

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

## ARTICLE 9

## RECORDS AND BOOKS OF ACCOUNT

Section 9.1 Records and Books of Account.

Manager shall maintain or cause to be maintained, at the Company's principal office or at such other place or places as the Manager from time to time may determine, full and accurate records and books of account of the Company's business. Such records and books of account shall be maintained in accordance with generally accepted accounting principles. Each Member shall be afforded full and complete access to all such records and books of account during reasonable business hours and, at such hours, shall have the right of inspection and copying of such records and books of account, at his expense. The Manager shall hire such accountant or accounting firm as Manager shall determine (with the prior written approval of BH Member, not to be unreasonably withheld).

Section 9.2 Fiscal Year.

The fiscal year and taxable year of the Company (the "Fiscal Year") shall be a calendar year commencing on January 1 and ending on December 31.

Section 9.3 Banking.

An account or accounts in the name of the Company and/or any Subsidiary shall be maintained at such bank or banks as the Manager (subject to Section 4.4) may select, which bank or banks may or may not be affiliates of any Member. All uninvested funds of the Company or any Subsidiary shall be deposited in a bank account of the Company or such Subsidiary, as the case may be. All funds so credited to the Company or any Subsidiary in any such account shall be subject to withdrawal by checks made in the name of the Company or such Subsidiary and signed in such manner as determined by the Manager. Manager shall not be responsible for the failure of the institution in which the funds of the Company or any Subsidiary are held even if such institution is an Affiliate of any Member.

Section 9.4 Reports to Members.

(a) As soon as reasonably practical, but in no event later than ninety (90) days after the close of each Fiscal Year of the Company, Manager shall cause to be prepared and furnished to each Member:

(i) The information necessary for the preparation by each Member of his Federal, state and other income tax returns;

(ii) Updates as to any construction, renovation and/or leasing projects related to the Company or any Subsidiary, together with a reconciliation of the status thereof relative to the plans and specifications, scope of work, construction schedule and timeline therefor, and copies of all change orders approved in accordance with the terms hereof and draw requests submitted in accordance with the terms hereof during such month;

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

(iii) The amount in the Capital Account of such Member as of the last day of such Fiscal Year; and

(iv) An income statement and balance sheet of the Company as of the last day of such Fiscal Year.

(b) By the fifteenth (12th) day of each month, Manager shall cause to be prepared and furnished to each Member:

(i) A monthly report of Cash Flow of the Company and its Subsidiaries;

(ii) Copies of all reports, if any, given during such month to providers of financing to the Company and/or any of its Subsidiaries; and

(iii) Such other information as the Manager deems reasonably necessary for the Members to be advised of the current status of the Company and its business.

(c) Manager shall deliver to the Members certificates of insurance and, upon request by any Member, copies of the original policies evidencing such insurance coverage so as to evidence that such insurance coverage is at all times maintained in full force and effect without any lapse in coverage.

(d) Manager shall deliver to the Members promptly upon the receipt or sending thereof on behalf of the Company or any Subsidiary, copies of any material correspondence with any municipality as well as all material notices, material reports and material communications between the Company or any Subsidiary on the one hand, and any lender under any loan or any holder of any mortgage (or mezzanine loan) secured by all or any portion of the Property or any of the other Company Assets (including the Loan and any Refinancing).

Section 9.5 Approved Budgets.

Annually, the Manager shall prepare and submit to the Members a projected Operating Budget and Development Budget for the Company, all Subsidiaries and the Project for each Fiscal Year (each of the foregoing budgets shall be collectively referred to herein as the "Proposed Budget"). The Members shall consider such Proposed Budget and consult with the Manager to agree on an approved operating budget and an approved development budget for the Fiscal Year in question (such budgets, when approved by all the Members, being collectively referred to herein as an "Approved Budget"). The Members agree that the Business Plan for the initial Fiscal Year of the Company (or the remainder thereof) is as attached hereto as Exhibit C. Subsequent Proposed Budgets shall be prepared by the Manager and distributed to all Members no later than forty-five (45) days prior to the commencement of the Fiscal Year in question, and the Manager shall also furnish to the Members such reasonable financial information relating to the Company, all Subsidiaries and the Property as may be requested by any Member to the extent same is reasonably available to Manager. As to any portion of a Proposed Budget for a given Fiscal Year that has not been approved by the Members, the Manager shall cause the Company, all Subsidiaries and the Property to be operated in accordance with the applicable portion of the Approved Budget for the immediately preceding Fiscal Year.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## ARTICLE 10

## DISSOLUTION, LIQUIDATION AND TERMINATION

Section 10.1 Dissolution.

The Company shall be dissolved upon the first to occur of any of the following events;

(a) The consent of the Members pursuant to Section 6.5 or Section 6.6;

(b) The sale of all or substantially all of its assets, and the collection and Distribution of the proceeds thereof in accordance herewith; or

(c) Required Approval in writing for such dissolution has been obtained.

Section 10.2 Liquidation.

(a) Upon the dissolution of the Company, Manager shall take or cause to be taken a full accounting of the Company's assets and liabilities as of the date of such dissolution and shall proceed with reasonable promptness to liquidate the Company's assets and to terminate its business. The cash proceeds from the liquidation, as and when available therefor (after payment of expenses of liquidation and dissolution, discharge of liabilities to creditors (including Members who are creditors) or the making of reasonable provision therefore and the setting up of reasonable reserves as provided in the Act), shall be applied and Distributed in the order of priority set forth above in Section 7.1(a).

(b) The Manager shall administer the liquidation of the Company and the termination of its business. The Manager shall be allowed a reasonable time for the orderly liquidation of the Company's assets and the discharge of liabilities to creditors, so as to minimize losses resulting from the liquidation of the Company's assets.

(c) Anything herein contained to the contrary notwithstanding, a Manager shall not be personally liable for the return of any Member's Capital Contributions, or any part thereof upon such liquidation. Any such return shall be made solely from the Company's assets.

(d) Except as otherwise provided herein, no dissolution or termination of the Company shall relieve, release or discharge any Member, or any of his successors, assigns, heirs or legal representatives, from any previous breach or default of, or any obligation theretofore incurred or accrued under any provision of this Agreement, and any and all such liabilities, claims, demands or causes of action arising from any such breaches, defaults and obligations shall survive such dissolution and termination.

Section 10.3 No Obligation to Restore Capital Accounts.

Except as may otherwise be required by law, no Member whose Capital Account balance is a deficit amount (either during the existence of the Company or upon liquidation) shall have any obligation to return any amounts previously distributed to such Member or to contribute cash or other assets to the Company to restore or make up the deficit in such Member's Capital Account.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 10.4 Termination.

Upon compliance with the foregoing plan of liquidation and Distribution, the Manager shall file or cause to be filed the appropriate termination documents required to effectuate the dissolution and termination of the Company and the Company thereupon shall be terminated.

## ARTICLE 11

## STATUS OF THE COMPANY

The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member or officer shall be a partner or joint venturer of any other Member or officer, for any purposes other than federal and, if applicable, state income tax classification purposes, and this Agreement shall not be construed to the contrary. The Members and the Manager intend that the Company shall be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

## ARTICLE 12

## MISCELLANEOUS

Section 12.1 Indemnity.

(a) Electra Member shall indemnify, defend and hold the Company, each Subsidiary, BH Member and the other BH Member Indemnitees harmless from, against and in respect of any and all damages, liabilities, obligations, losses, costs, expenses, (including costs incurred in investigation and defense and reasonable attorney fees), penalties, fines and other judgments (at equity or at law) incurred by the Company, any Subsidiary, BH Member and/or any of the other BH Member Indemnitee in connection with or arising from any Electra Bad Boy Event. The provisions of this Section 12.1(a) shall survive any termination of this Agreement or the withdrawal, termination or de-affiliation of any Person(s) hereunder.

(b) BH Member shall indemnify, defend and hold the Company, each Subsidiary, Electra Member and the other Electra Member Indemnitees harmless from, against and in respect of any and all damages, liabilities, obligations, losses, costs, expenses, (including costs incurred in investigation and defense and reasonable attorney fees), penalties, fines and other judgments (at equity or at law) incurred by the Company, any Subsidiary, Electra Member and/or any of the other Electra Member Indemnitee in connection with or arising from any BH Member Default. All sums distributable or payable to BH Member or its Affiliate or designee hereunder shall be offset against any damages, liabilities, obligations, losses, costs, expenses, (including costs incurred in investigation and defense and reasonable attorney fees), penalties, fines, judgments (at equity or at law), or other amounts due to Electra Member, any Electra Indemnitee or the Company (or any Subsidiaries) from BH Member or any Affiliate of any of the foregoing pursuant to this Section 12.1(b), in such amounts as are determined pursuant to the terms of this Agreement, and shall be paid instead to Electra Member, the other Electra Indemnitees, the Company or the applicable Subsidiary, in such order as Electra Member shall determine (with the claims of Electra

NOT AN OFFICIAL COPY. PUBLIC ACCESS. NOT AN OFFICIAL COPY. PUBLIC ACCESS

Member and the other Electra Indemnitees to any such distributions, account or funds being prior to the claims of the Company and the Subsidiaries); the claims of BH Member and BH Member Indemnitees and any of their respective Affiliates to any such distributions, payments, accounts or funds shall be junior and subordinate to the claims of the indemnified parties under this Section 12.1(b). Each of Toledano, BH Worldwide, and BH Member represents and warrants to Electra Member and the Company that Electra Member's agreement to enter into this Agreement is of substantial and material benefit to each of the foregoing, and that this Agreement is the valid and binding obligation of each of the foregoing enforceable against such Persons in accordance with its terms. The provisions of this Section 12.1(b) shall survive any termination of this Agreement or the withdrawal, termination or de-affiliation of any Person(s) hereunder.

Section 12.2 Mediation; Litigation.

Subject to first satisfying the following mediation requirements set forth in this Section 12.2, and except to the extent that the disputants then agree in writing to any other method of resolution of a given dispute or except to the extent the resolution of any question is final, binding and conclusive upon the Members under the terms of this Agreement, any dispute arising among the Members, or any of them, or their successors-in-interest, or the estate of a deceased Member, or a Member and the Company, concerning the meaning or interpretation of this Agreement, or the rights, duties, or obligations of the Members, including the successors-in-interest and the estate of a deceased Member arising between the Members or between any Member and the Company shall be resolved by litigation in the state or federal courts lying in New Castle County, Delaware, with the laws of the State of Delaware to govern all matters relating to the interpretation and effect of this Agreement. Notwithstanding the foregoing, neither Member (nor any successor in interest or estate of a deceased Member) nor the Company shall initiate any such litigation unless an opportunity for non-binding mediation, as hereafter provided, is offered to the Person against whom a claim is to be filed (the "Respondent") and, if the Respondent so elects, the non-binding mediation is held and concluded. Prior to filing any claim against another Member or the Company, the Company and/or Member (or successor in interest or estate of a deceased Member) that desires to file the claim ("Petitioner") shall serve notice ("Claim Notice") on the Respondent(s) setting forth a description of the claims the Petitioner intends to make ("Claim") and offering the Respondent the opportunity to elect to submit such Claim to non-binding mediation. If, within ten (10) days of delivery of the Claim Notice, the Respondent has not delivered a notice ("Mediation Notice") to the Petitioner electing to have the Claim submitted to non-binding mediation, the Petitioner may thereafter pursue the claim through litigation in the courts as above provided. If the Respondent does timely serve a Mediation Notice, then the Petitioner shall not initiate litigation with respect to the Claim until such Claim has been submitted to non-binding mediation and such mediation proceeding has concluded. Any non-binding mediation shall be submitted to mediation under the auspices of the American Arbitration Association in New Castle County, Delaware, in accordance with its rules then in force and effect, and any resolution achieved in such mediation proceeding may be adopted and complied with by the parties to such proceeding and the Company but such resolution shall not be entitled to be made part of a judgment of a court of competent jurisdiction and shall not be entitled to any court ordered specific performance.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 12.3 Notices.

Unless otherwise provided herein, any offer, acceptance, election, approval, consent, certification, request, waiver, notice or other communication required or permitted to be given hereunder (hereinafter collectively referred to as a "Notice") shall be deemed given only if in writing and either (i) sent by certified or registered mail, postage prepaid and return receipt requested, or (ii) delivered by a reputable overnight carrier, delivery prepaid for delivery on the next Business Day, and in either case addressed to the Company at its then principal office and to the Member or Members to whom any such Notice is addressed at the addresses set forth on Exhibit E attached hereto. Notices sent by mail shall be effective three (3) Business Days following their deposit with the U.S. Post Office and notices sent by overnight courier shall be effective the next Business Day following their deposit with a reputable overnight carrier. Any Member may change its address set forth on Exhibit E attached hereto by written notice to the Company and each Member and shall be effective ten (10) days following the effective date of the Notice provided that a notice of change of address of any Member shall not be deemed to have been given until actual receipt by the Company. Notices on behalf of the Company or any Member may be given by their respective attorneys.

Section 12.4 Entire Agreement.

This Agreement contains the entire agreement of the parties hereto and supersedes all prior agreements and understandings, oral or otherwise, among the parties hereto with respect to the matters contained herein and (except as specifically noted herein) it cannot be modified or amended except by a writing signed by all Members; provided, however, that the Manager shall have the right to unilaterally amend this Agreement as contemplated by the definition of Permitted Transfer; provided, further, that if Electra Member is removed as Manager pursuant to Section 4.9(a), the replacement manager shall thereafter have the unilateral right to modify or amend this Agreement without the consent of Electra Member (or, if applicable, any other Member), subject in all cases to the rights afforded to Electra Member set forth in Schedule 4.9(b) attached hereto and provided further that any such modification or amendment does not constitute an event of default pursuant to the terms of any loan documents (including the Loan Documents) to which the Company (or a Subsidiary) is a party.

Section 12.5 Waivers.

Except as otherwise expressly provided herein, no purported waiver by any party of any breach by another party of any of its obligations, agreements or covenants hereunder, or any part thereof, shall be effective unless made in writing subscribed by the party or parties sought to be bound thereby, and no failure to pursue or elect any remedy with respect to any default under or breach of any provision of this Agreement, or any part thereof, shall be deemed to be a waiver of any other subsequent similar or different default or breach, or any election of remedies available in connection therewith, nor shall the acceptance or receipt by any party of any money or other consideration due it under this Agreement, with or without knowledge of any breach hereunder, constitute a waiver of any provision of this Agreement with respect to such or any other breach.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 12.6 Headings, Gender and Number.

The section headings herein contained have been inserted only as a matter of convenience of reference and in no way define, limit or describe the scope or intent of any provisions of this Agreement nor in any way affect any such provisions. Where appropriate as used herein, the masculine gender shall be deemed to include the feminine, the feminine gender shall be deemed to include the masculine, the singular number shall be deemed to include the plural and the plural number shall be deemed to include the singular. As used herein, the word "including" means "including, but not limited to".

Section 12.7 Severability.

Each provision of this Agreement shall be considered to be severable and if, for any reason, any such provision or provisions, or any part thereof, is determined to be invalid and contrary to any existing or future applicable law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, but this Agreement shall be construed and enforced in all respects as if such invalid or unenforceable provision or provisions had been omitted; provided, however, that the status of this Company, as a limited liability company taxed as a partnership, shall not be prejudiced.

Section 12.8 Counterparts.

This Agreement may be executed in one or more counterparts and each of such counterparts, for all purposes, shall be deemed to be an original but all of such counterparts together shall constitute but one and the same instrument, binding upon all parties hereto, notwithstanding that all of such parties may not have executed the same counterpart.

Section 12.9 Benefit.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective executors, administrators and successors, but shall not be deemed for the benefit of creditors of any other persons, nor shall it be deemed to permit any assignment by a Member of any of his rights or obligations hereunder except as expressly provided herein.

Section 12.10 Further Actions.

Each of the Members hereby agrees that he or it shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms thereof.

Section 12.11 Interpretation.

This Agreement and all matters pertaining thereto shall be governed by the laws of the State of Delaware. This Agreement shall not be construed against the party that caused the initial draft of this Agreement to be prepared as all parties hereto have had the opportunity to review and negotiate the form of this Agreement with counsel of their choosing.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Section 12.12 No Third Party Beneficiaries.

Other than as explicitly set forth herein, the provisions of this Agreement are not intended to be for the benefit of any creditor or other person (other than a Member in his capacity as a Member) to whom any debts, liabilities, or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members; and no such creditor or other person shall obtain any benefit from such provisions or shall, by reason of any such foregoing provision, make any claim in respect of any debt, liability, or obligation against the Company or any of the Members.

Section 12.13 Intentionally Omitted.

Section 12.14 Equitable Relief.

The Members hereby confirm that damages at law may be an inadequate remedy for a breach or threatened breach of this Agreement and agree that, except as provided in Section 3.5, in the event of a breach or threatened breach of any provision hereof, the respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but, nothing herein contained is intended to, nor shall it, limit or affect any right or rights at law or by statute or otherwise of a Member aggrieved as against the other for a breach or threatened breach of any provision hereof, it being the intention by this Section 12.14 to make clear the agreement of the Members that the respective rights and obligations of the Members hereunder shall be enforceable in equity as well as at law or otherwise and that the mention herein of any particular remedy shall not preclude a Member from any other remedy it or he might have, either in law or in equity.

## ARTICLE 13

## REPRESENTATIONS AND WARRANTIES

Section 13.1 Representations, Warranties and Covenants of Electra Member.

Electra Member hereby represents, warrants and covenants the following to BH Member:

(a) It is a limited liability company, duly formed and validly existing and in good standing under the laws of the state of its formation; it has all requisite power and authority to enter into this Agreement, to acquire and hold its Interest (as applicable) and to perform its obligations hereunder. The execution and delivery of this Agreement by it and the performance by it of the transactions contemplated hereby have been duly authorized by all requisite limited liability company actions or proceedings. This Agreement constitutes a legal, valid and binding obligation of Electra Member enforceable in accordance with its terms, subject to bankruptcy, general principles of equity and other laws effecting creditors' rights generally.

(b) The execution of this Agreement and the performance of the transactions contemplated hereby will not violate any provision of law, any order of any court binding on Electra Member, or any provision of any indenture, agreement, or other instrument to which Electra Member is a party, or be in conflict with, result in a breach of or constitute a default under

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

any such indenture, agreement or other instrument to which Electra Member is a party or is otherwise bound.

(c) No actions, suits, attachments, proceedings, assignments for the benefit of creditors, insolvency, event of Bankruptcy, reorganization or other proceedings are pending or, to its knowledge, threatened, against it.

(d) Electra Member has not engaged any broker or finder in connection with this Agreement or the transactions contemplated hereby. Electra Member shall indemnify BH Member and its Affiliates for all costs, damages and expenses (including reasonable attorneys' fees) which may arise out of a breach of the aforesaid representation and warranty. Electra Member agrees to pay any applicable fees and expenses due any broker or finder that Electra Member or any of its Affiliates has engaged, except as otherwise provided above.

(e) It is not a Prohibited Person.

(f) It is familiar with the definition of "accredited investor" in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended, and it represents that it is an "accredited investor" within the meaning of that Rule.

(g) It is not required to register as an "investment company" within the meaning ascribed to such term by the Investment Company Act of 1940, as amended, and covenants that it shall at no time while it is a Member of the Company conduct its business in a manner that requires it to register as an "investment company."

(h) It shall comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect and shall immediately notify the other Members in writing if it becomes aware that any of the foregoing representations, warranties or covenants are no longer true or have been breached or if Electra Member has a reasonable basis to believe that they may no longer be true or have been breached.

(i) The true and complete ownership and control structure of Electra Member and any of its Affiliates involved in the acquisition of the Property as of the date hereof is shown on Exhibit F and Electra Member shall promptly notify BH Member of any changes in the ownership structure or control from what is shown on such Exhibit.

(j) At all times during the existence of the Company, a Key Person shall continuously maintain exclusive Control, exercisable without the consent or approval of any other Person, over the business and affairs of Electra Member, subject only to certain major decision veto rights of Electra Parent, and/or Miller.

Section 13.2 Representations, Warranties and Covenants of BH Member.

BH Member hereby represents, warrants and covenants the following to Electra Member:

(a) It is a limited liability company, duly formed and validly existing and in good standing under the laws of the state of its formation; it has all requisite power and authority to enter into this Agreement, to acquire and hold its Interest and to perform its obligations

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

hereunder. The execution and delivery of this Agreement by BH Member and the performance by BH Member of the transactions contemplated hereby have been duly authorized by all requisite limited liability company actions or proceedings. This Agreement constitutes a legal, valid and binding obligation of BH Member enforceable in accordance with its terms, subject to bankruptcy, general principles of equity and other laws effecting creditors' rights generally.

(b) The execution of this Agreement and the performance of the transactions contemplated hereby will not violate any provision of law, any order of any court binding on BH Member, or any provision of any indenture, agreement, or other instrument to which BH Member is a party, or be in conflict with, result in a breach of or constitute a default under any such indenture, agreement or other instrument to which BH Member is a party or is otherwise bound.

(c) No actions, suits, attachments, execution proceedings, assignments for the benefit of creditors, insolvency, event of Bankruptcy, reorganization or other proceedings are pending or, to BH Member's knowledge, threatened, against BH Member.

(d) BH Member has not engaged any broker or finder in connection with this Agreement or the transactions contemplated hereby. BH Member shall indemnify Electra Member and its Affiliates for all costs, damages and expenses (including reasonable attorneys' fees) which may arise out of a breach of the aforesaid representation and warranty. BH Member agrees to pay any applicable fees and expenses due any broker or finder that BH Member or its Affiliates has engaged.

(e) BH Member is not a Prohibited Person.

(f) It is familiar with the definition of "accredited investor" in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended, and it represents that it is an "accredited investor" within the meaning of that Rule.

(g) It is not required to register as an "investment company" within the meaning ascribed to such term by the Investment Company Act of 1940, as amended, and covenants that it shall at no time while it is a Member of the Company conduct its business in a manner that requires it to register as an "investment company."

(h) It shall comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect and shall immediately notify the other Members in writing if it becomes aware that any of the foregoing representations, warranties or covenants are no longer true or have been breached or if the Member has a reasonable basis to believe that they may no longer be true or have been breached.

(i) BH Member has furnished to Electra Member a true, correct and complete copy of the Purchase Agreement and all amendments and modifications thereto, (ii) to the best of BH Member's knowledge, the Purchase Agreement is enforceable against all of the parties thereto in accordance with its terms, subject to bankruptcy, general principles of equity and other laws effecting creditors' rights generally, (iii) the Purchase Agreement has not been amended or modified (other than such amendments or modifications provided to Electra Member), (iv) to the best of BH Member's knowledge, no party to the Purchase Agreement is in default thereunder, (v) BH Member has provided Electra Member with all material due diligence documents in its

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

possession with respect to the Property, and (vi) to the best of BH Member's knowledge, BH Member has not misrepresented or omitted to disclose any material facts with respect to any of the Purchase Agreement or the Property.

(j) The true and complete ownership and control structure of BH Member and any of its Affiliates involved in the acquisition of the Property as of the date hereof is shown on Exhibit G and BH Member shall promptly notify Electra Member of any changes in the ownership structure or control from what is shown on such Exhibit.

(k) At all times during the existence of the Company, Toledano shall continuously (i) maintain exclusive Control, exercisable without the consent or approval of any other Person, over the business and affairs of BH Member, and (ii) cause all of BH Member's Capital Contributions required under this Agreement to be satisfied with Toledano's personal funds.

Section 13.3 Indemnification.

(a) Electra Member shall indemnify, defend and hold BH Member, its members, officers, Affiliates, employees, agents and/or other representatives ("BH Member Indemnitees") harmless from, against and in respect of any and all damages (but excluding lost profits, incidental, punitive, special or consequential damages), liabilities, obligations, losses, costs, expenses, (including costs incurred in investigation and defense and reasonable attorney fees), penalties, fines and other judgments (at equity or at law) incurred by any BH Member Indemnitee in connection with or arising from (i) the breach by Electra Member (whether in its capacity as "Manager" or "Member" hereunder) of Section 12.1(a) hereof, and/or (ii) the breach of any representation, warranty or covenant of Electra Member set forth in Section 13.1.

(b) BH Member shall indemnify, defend and hold Electra Member, its members, officers, Affiliates, employees, agents and/or other representatives ("Electra Member Indemnitees") harmless from, against and in respect of any and all damages (but excluding lost profits, incidental, punitive, special or consequential damages), liabilities, obligations, losses, costs, expenses, (including costs incurred in investigation and defense and reasonable attorney fees), penalties, fines and other judgments (at equity or at law) incurred by any Electra Member Indemnitee in connection with or arising from (i) the breach by BH Member of Section 12.1(b) hereof, an/or (ii) the breach of any representation, warranty or covenant of BH Member set forth in Section 13.2.

***[Signature Pages Follow]***

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**IN WITNESS WHEREOF**, the Members have hereunto executed this Agreement as of the day and year first above written.

**ELECTRA AMERICA SOUTHLAND 2 MANAGEMENT LLC,**
a Delaware limited liability company

By: American Landmark LLC, a Florida limited liability company, its Manager

By:________________________
Name: Joseph G. Lubeck
Title: Manager

**BH SOUTHPLACE HOLDINGS LLC,**
a Delaware limited liability company

By:________________________
Name:
Title:

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**IN WITNESS WHEREOF**, the Members have hereunto executed this Agreement as of the day and year first above written.

**ELECTRA AMERICA SOUTHLAND 2 MANAGEMENT LLC,**
a Delaware limited liability company

By: American Landmark LLC, a Florida limited liability company, its Manager

By:______________________________
Name: Joseph G. Lubeck
Title: Manager

**BH SOUTHPLACE HOLDINGS LLC,**
a Delaware limited liability company

By:______________________________
Name: ISAAC TOLEDANO
Title: AUTHORIZED SIGNATORY

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT A

Description of Property

[See Attached]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT B*

Capital Contributions and Percentage Interests

| Members | Capital Contributions | Percentage Interests |
|---|---|---|
| Electra America Southland 2 Management LLC | $[XX] | 75% |
| BH Southplace Holdings LLC | $[XX] | 25% |

To be updated once Assignment has been executed and at the time of the Property Acquisition Date.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT C

Business Plan

TO COME.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT D

[Intentionally Omitted]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT E

Addresses for Notice

Notices should be addressed as follows:

| | |
|---|---|
| if to Electra Member: | c/o American Landmark LLC<br>1331 South Killian Drive<br>Suite A<br>Lake Park, Florida, 33403<br>Attn: Joseph Lubeck |
| with a copy to: | Greenspoon Marder LLP<br>600 Brickell Avenue<br>36th Floor<br>Miami, FL 33131<br>Attn: John A. Gelety |
| if to BH Member: | BH-Southland 2 LLC<br>c/o BH Group<br>2999 NE 91Street, PH2<br>Aventura, FL 33180<br>Attn: Yizhak Toledano |
| with a copy to: | |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT F

Electra Member Chart

[See Attached]

Slide 1

# BH Electra Southland Part 2 LLC




**20701 SW 112th Avenue**
**Miami, Florida 33189**

* See Slide 2 for ownership detail
[There are no persons or entities that (i) own a 20% or greater direct or indirect interest in Borrower, or (ii) directly or indirectly control Borrower, that, in each case, are not reflected on this organizational chart].

51095221.3.pptx

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Slide 2

## American Landmark LLC




* Electra Real Estate Ltd. owns 100% of Electra America Inc. directly and indirectly thru its wholly-owned subsidiary Electech Real Estate BV, a Dutch private limited company.

[There are no persons or entities that (i) own a 20% or greater direct or indirect interest in Borrower, or (ii) directly or indirectly control Borrower, that, in each case, are not reflected on this organizational chart.]

51095221.3.pptx

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

EXHIBIT G

BH Member Chart

[See Attached]

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS



NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

SCHEDULE 4.1(a)

Manager's Duties

In addition to its specified duties and obligations in the body of the Agreement, the Manager shall have the following additional duties and responsibilities (subject in each instance to any requirement set forth in the Agreement for the Manager to obtain the consent of all or any portion of the Members (including as set forth in Sections 4.4 of the Agreement):

1. Administer the day-to-day operations of the Property pursuant to the Approved Budget.

2. Oversee and manage all professionals, consultants, advisors and other contractors retained by the Company or any Subsidiary (and at any time that the Property is subject to any construction, renovation or rehabilitation, verify that appropriate insurance and bonding (including any required by the terms of any other Loan Documents) is maintained by each contractor and subcontractor performing work on the Property).

3. Perform such advisory, consultation and asset management services as are customarily provided in asset management agreements for properties similar to the Property.

4. Upon learning thereof, promptly notify the Members of any material event, occurrence or condition that occurs or arises with respect to the Company Assets or any portion thereof, including the Property, and provide the Members with such information as any Member may reasonably request from time to time with respect thereto.

5. Cause the Company and the Subsidiaries to take such actions as may be necessary to cause the Company and the Subsidiaries to comply, in all material respects (and in any event to prevent the incurrence of any criminal penalties or sanctions or any material civil fines or penalties), with all laws, rules, and regulations and any and all orders or requirements of any governmental authority having jurisdiction over the Company, any Subsidiary or the Property, as well as all restrictive covenants and easement agreements affecting the Property.

6. Cause the Company and the Subsidiaries to comply with the terms and provisions of all Loan Documents.

7. Implement fully each decision approved in accordance with any other relevant provisions of the Agreement until such action is fully implemented.

8. Cause the Company and each Subsidiary to comply with the provisions of all leases, property management, construction management and service agreements covering the Property, and other agreements and contracts binding on the Company, any Subsidiary and/or the Property.

9. Cause the Company and the Subsidiaries to maintain at all times (to the extent of funds available to such party), those policies of liability and property (including business income coverage) insurance and other policies of insurance as shall be required under the Approved Budget, or otherwise required by hereunder. Manager shall promptly notify the Members

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

regarding any occurrence, claim or potential claim that may be covered by insurance. Manager shall deliver to the Members certificates of insurance and, upon request by any Member, copies of the original policies evidencing such insurance coverage so as to evidence that such insurance coverage is at all times maintained in full force and effect as required by the Agreement without any lapse in coverage, and Manager shall verify compliance with all insurance and/or bonding required by the Agreement or required to be maintained by the Company or any Subsidiary. Manager shall also obtain insurance certificates evidencing any other insurance coverage required under any property management agreement or construction management agreement.

10. Coordinate the defense of any claims, demands, suits or legal proceedings made or instituted against the Company or any Subsidiary through legal counsel for the Company or applicable Subsidiary and otherwise engaged in accordance with the terms of the Agreement.

11. Cause the Company and each Subsidiary: (i) to open, maintain and close bank accounts on behalf of such party at such banks or other financial institutions as are approved by Electra Member, (ii) to promptly deposit any and all revenues, receipts and all other payments, cash and/or income of any kind, type or nature, received by the Company or any Subsidiary into such bank accounts for the benefit of such party.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

SCHEDULE 4.9(b)

Rights Retained by Electra Member Upon Removal as Manager

1. Except as otherwise provided in the Agreement, admit new members to the Company in a manner that dilutes Electra Member's Interest by a higher percentage than the percentage by which BH Member's Interest is diluted in connection with such admission.

2. Amend the Agreement in a manner that (i) diminishes the economic rights or economic entitlements of any Member not executing such amendment (as compared to the Members executing such amendment), (ii) increases the economic obligations of any Member not executing such amendment (as compared to the Members executing such amendment) or (iii) increases the liabilities under the Agreement of any Member not executing such amendment (as compared to the Members executing such amendment).

3. Cause the Company or a Subsidiary to undertake a Bankruptcy.

4. Cause the Company or a Subsidiary to merge or consolidate with another Person.

5. Cause the Company or a Subsidiary to enter into (or modify) any agreement between or among the Company (and/or any Subsidiary(ies)), on the one hand, and BH Member and/or any of its Affiliate(s), on the other hand, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# AMENDMENT TO LIMITED LIABILITY COMPANY AGREEMENT OF ELECTRA AMERICA SOUTHLAND 2 JV LLC

This Amendment (this "***Amendment***") to the Limited Liability Company Agreement of Electra America Southland 2 JV LLC, a Delaware limited liability company (the "***Company***") is made as of October 27, 2022 and effective as of July 19, 2022 (the "***Effective Date***"), among Electra America Southland 2 Management LLC, a Delaware limited liability company ("***Electra Member***") and BH Southplace Holdings LLC, a Delaware limited liability company ("***BH Member***"). Any defined (capitalized) terms used, but not defined, in this Amendment shall have the same meaning as ascribed to such term in the Agreement (as hereafter defined).

## RECITALS

**WHEREAS**, the Company was organized by filing a Certificate of Formation with the Secretary of the State of Delaware on July 19, 2022 and, the Members entered into that certain Limited Liability Company Agreement of the Company on September 8, 2022 (the "***Agreement***") to govern their respective rights and obligations as Members of the Company; and

**WHEREAS**, further to the discussions between the Members per the Company's business plan, the Members wish to amend the Agreement in accordance with the terms hereinafter set forth.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and conditions contained herein, and other good and valuable consideration, and intending to be legally bound hereby, the Agreement is hereby amended as follows:

1. Amendment. The Agreement is hereby amended as follows:

Section 2.3 of the Agreement is hereby deleted in its entirety and replaced with the following:

> "Except as otherwise expressly provided herein, the purpose of the Company shall be to conduct and engage in the following activities: (a) directly or indirectly (through one or more Subsidiaries or other Persons) acquire, purchase, own, hold, manage, develop, construct, operate, improve, renovate, rent, lease, fund, finance, encumber, all as part of a long-term project to establish residential and commercial complexes in Florida, (b) to own, directly or indirectly, a limited liability company or other interest in, and act as a member of each Subsidiary, (c) to conduct such other lawful business activities related or incidental thereto or as the Members may otherwise determine in accordance with this Agreement and (d) to exercise all powers enumerated in the Act necessary to the conduct, promotion or attainment of the purposes set forth herein and for the protection and benefit of the Company. The Company is authorized and empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to, or convenient for the furtherance and accomplishment of its purposes and for the protection and benefit

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

of the Company, including all acts and things permitted under the Act and this Agreement."

2. Continuing Effect. Except as provided herein, this Amendment shall not constitute an amendment or waiver of any provision of the Agreement, which shall continue to remain in full force and effect in accordance with its terms.

3. Counterparts. This Amendment may be executed in one or more counterparts and each of such counterparts, for all purposes, shall be deemed to be an original but all of such counterparts together shall constitute but one and the same instrument, binding upon all parties hereto, notwithstanding that all of such parties may not have executed the same counterpart.

*[This Space Intentionally Left Blank]*

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement the day and year first above written.

**ELECTRA AMERICA SOUTHLAND 2 MANAGEMENT LLC**, a Delaware limited liability company

By: American Landmark LLC, a Florida limited liability company, its manager

By:____________________________
Name: Joseph G. Lubeck
Title: Manager

**BH SOUTHPLACE HOLDINGS LLC**, a Delaware limited liability company

By:____________________________
Name: Isaac Toledano
Title: Authorized Signatory

*[Amendment to LLC Agreement of Electra America Southland 2 JV LLC]*

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement the day and year first above written.

**ELECTRA AMERICA SOUTHLAND 2 MANAGEMENT LLC**, a Delaware limited liability company

By: American Landmark LLC, a Florida limited liability company, its manager

By:____________________________
Name: Joseph G. Lubeck
Title: Manager

**BH SOUTHPLACE HOLDINGS LLC**, a Delaware limited liability company

By:____________________________
Name: Isaac Toledano
Title: Authorized Signatory

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE F-1

## TRUST DOCUMENT

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE F-2

### INSTRUCTIONS TO THE TRUSTEE

Reference is made to the final grammatical paragraph of Section 4 of this Funding Agreement, which states:

> As collateral for fulfilling the obligations of the BH Member, BH Worldwide, the Manager, SD Mall and Southplace under this agreement, the BH Worldwide and the BH Member will deliver to G.L.E Trust Services LTD, the trust company of Apirion's lawyers, Goldfarb, Gross, Seligman (Tel Aviv office) (contact attorneys: Israel Aziel, and Yael Mirone Mezamer) in trust (hereinafter: the "Trustee") on the Effective Date certificates of all of BH Worldwide membership interests in the BH Member and all of BH Member's membership interests in the Company (i.e. in SD Mall and Southplace), deeds of transfer of membership interests in the BH Member from BH Worldwide to Apirion and of membership interests in the Companies from BH Member to Apirion, all duly signed by the BH Worldwide and BH Member (respectively), and any other required documents (hereinafter: the "Trust Document"). The Parties irrevocably instruct the Trustee to hand over the Trust Documents to Apirion at the end of 43 days from the date that Apirion delivered a written notice to the BH Member regarding the violation of the obligations of the BH Member and/or BH Worldwide and/or the Manager and/or SD Mall and/or Southplace under this agreement (hereinafter: the "Default Notice"), with a copy to the Trustee, and provided that the Trustee has not received a written notice from both the BH Member and Apirion confirming that the default has been cured within 30 day period from the delivery of the Default Notice. Notwithstanding the above, in case Apirion has not given its confirmation that the default has been cured within said 30 days, then the BH Member will send Apirion a written reminder and if Apirion has not given its confirmation that the default has been cured within 3 more days (i.e. 33 days from the delivery of the Default Notice) then the Parties irrevocably instruct the Trustee to hand over the Trust Document to Apirion at the end of 10 more days (i.e. 43 days from the delivery of the Default Notice) unless one of the following has occurred:
> (i) the Trustee has received a written notice from both the BH Member and Apirion confirming that the default has been cured within said 10 days.
> (ii) The Trustee received an order from a competent court which prevents the transfer of the documents to Apirion.
> It is agreed for this matter only, that the competent court to discuss the question of whether the conditions for the release of the Trust Document have been met and to issue an order as stated, will be the District Court in Tel Aviv, Israel, and the law that will apply will be the Israeli law, and this despite everything stated in sections 13-15 below.
> The Trust Document is attached herewith as Schedule F-1 and the instructions to the Trustee are attached herewith as Schedule F-2. A copy of such Default Notice

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

shall be sent simultaneously, by email and also by reputable overnight delivery service (or at least two business day delivery service given the distance involved) to BH Member's counsel, Eric Everett, Esq., DarrowEverett LLP, 50 Congress Street, Suite 1041, Boston, MA 02109, email: eeverett@darroweverett.com, and also with an email to CRENotices@darroweverett.com.

The Parties will have no claims against the Trustee regarding the trust and his actions as said trustee. The BH Member, BH Worldwide, the Manager, SD Mall and Southplace declares that they know that the Trustee is the trust company of Apirion's lawyers - Goldfarb, Gross, Seligman (Tel Aviv office), which represents Apirion and Yaakov Morad, and they do not and will not have any claim regarding this representation, and furthermore they confirm that Apirion's lawyers can continue to represent Apirion and Yaakov Morad, including against the BH Member, BH Worldwide, the Manager, SD Mall and Southplace and regarding this agreement. The trust will end in one of the following two cases: (1) with the delivery of the Trust Document to Apirion in accordance with the above; or (2) upon receipt by the Trustee of a written notice signed by both the BH Member and Apirion according to which the BH Member, BH Worldwide, the Manager, SD Mall and Southplace have fully fulfilled their obligations according to this agreement and their joint order to return the Trust Document to the BH Member and BH Worldwide (respectively).Trustee hereby agrees to hold the Trust Document in escrow, and in trust, pursuant to the foregoing provision and release the Trust Document only under the conditions as set forth above.

**G.L.E Trust Services LTD**
By:____________________
Name: __________________
Title:____________________

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | CIVIL ACTION SUMMONS (b) | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHERS | **Form for Personal Services on a Natural Person** | 2026-013631-CA-01 |
| **PLAINTIFF(S)**<br>BH APIRION LLC | **VS DEFENDANT(S)**<br>ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, and BH WORLDWIDE REAL ESTATE HOLDINGS LLC | **CLOCK IN** |

**THE STATE OF FLORIDA:** TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this lawsuit on defendant:

| To Defendant(s): | Address: |
|---|---|
| ISAAC TOLEDANO | 16901 Collins Ave., Suite PH5503, Sunny Isles Beach, FL 33160 |

**IMPORTANT**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience:

**"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at www.dadecountyprobono.org."**

**MIAMI-DADE COUNTY COURT LOCATIONS**

☒ **ONS Justice Center Central Court** (05)
Room 6.240
20 NW 1st Ave
Miami, FL 33128

☐ **Joseph Caleb Center Court** (20)
Suite 103
5400 N.W. 22nd Avenue
Miami, FL 33142

☐ **Hialeah District Court** (21)
Room 100
11 East 6th Street
Hialeah, FL 33010

☐ **North Dade Justice Center** (23)
Room 100
15555 Biscayne Blvd.
North Miami Beach, FL 33160

☐ **Coral Gables District Court** (25)
Room 100
3100 Ponce De Leon Blvd.
Coral Gables, Miami, FL 33134

☐ **South Dade Justice Center** (26)
Room 1200
10710 SW 211 Street
Miami, FL 33189

**SERVICE**

| Plaintiff/Plaintiff Attorney | Address: |
|---|---|
| Brian P. Miller, Esq.<br>Florida Bar No. 0980633 | King & Spalding LLP<br>Southeast Financial Center<br>200 South Biscayne Blvd., Suite 4700<br>Miami, FL 33131 |

| | | DATE ON: |
|---|---|---|
| **JUAN FERNANDEZ-BARQUIN**<br>**CLERK OF THE COURT AND COMPTROLLER**<br>**MIAMI-DADE COUNTY**<br>**CIRCUIT AND COUNTY COURTS** | Melanie CLERK | 7/14/2026 |

# AMERICANS WITH DISABILITIES ACT OF 1990
# ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 252154494 E-Filed 07/09/2026 06:18:52 PM
NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2026-013631-CA-01 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| BH APIRION LLC | ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, and BH WORLDWIDE REAL ESTATE HOLDINGS LLC | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): BH SD-SOUTHPLACE MANAGER LLC

c/o Registered Agent Corporation Service Company

251 Little Falls Drive

Wilmington, DE 19808

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: Brian P. Miller, Esq.

whose address is: King & Spalding LLP

Southeast Financial Center, 200 South Biscayne Blvd., Suite 4700

Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | |
|---|---|---|
| **JUAN FERNANDEZ-BARQUIN**<br>**CLERK OF THE COURT AND COMPTROLLER**<br>**MIAMI-DADE COUNTY**<br>**CIRCUIT AND COUNTY COURTS** | BY:________________<br>DEPUTY CLERK | DATE |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2026-013631-CA-01 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| BH APIRION LLC | ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, and BH WORLDWIDE REAL ESTATE HOLDINGS LLC | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): BH-SD MALL LLC
c/o Registered Agent Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: Brian P. Miller, Esq.

whose address is: King & Spalding LLP
Southeast Financial Center, 200 South Biscayne Blvd., Suite 4700
Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | |
|---|---|---|
| **JUAN FERNANDEZ-BARQUIN**<br>**CLERK OF THE COURT AND COMPTROLLER**<br>**MIAMI-DADE COUNTY**<br>**CIRCUIT AND COUNTY COURTS** | BY:________________<br>DEPUTY CLERK | DATE |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 252154494 E-Filed 07/09/2026 06:18:52 PM
NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2026-013631-CA-01 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| BH APIRION LLC | ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, and BH WORLDWIDE REAL ESTATE HOLDINGS LLC | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): BH SOUTHPLACE HOLDINGS LLC
c/o Registered Agent Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: Brian P. Miller, Esq.

whose address is: King & Spalding LLP
Southeast Financial Center, 200 South Biscayne Blvd., Suite 4700
Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | |
|---|---|---|
| **JUAN FERNANDEZ-BARQUIN**<br>**CLERK OF THE COURT AND COMPTROLLER**<br>**MIAMI-DADE COUNTY**<br>**CIRCUIT AND COUNTY COURTS** | BY:________________<br>DEPUTY CLERK | DATE |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 252154494 E-Filed 07/09/2026 06:18:52 PM

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2026-013631-CA-01 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| BH APIRION LLC | ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, and BH WORLDWIDE REAL ESTATE HOLDINGS LLC | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): BH WORLDWIDE REAL ESTATE HOLDINGS LLC
c/o Registered Agent Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: Brian P. Miller, Esq.

whose address is: King & Spalding LLP
Southeast Financial Center, 200 South Biscayne Blvd., Suite 4700
Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | |
|---|---|---|
| **JUAN FERNANDEZ-BARQUIN**<br>**CLERK OF THE COURT AND COMPTROLLER**<br>**MIAMI-DADE COUNTY**<br>**CIRCUIT AND COUNTY COURTS** | BY:____________________<br>DEPUTY CLERK | DATE |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | CIVIL ACTION SUMMONS (b) | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHERS | **CIVIL ACTION SUMMONS (b)**<br>**Form for Personal Services on a Natural Person** | 2026-013631-CA-01 |
| **PLAINTIFF(S)**<br>BH APIRION LLC | **VS DEFENDANT(S)**<br>ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, and BH WORLDWIDE REAL ESTATE HOLDINGS LLC | **CLOCK IN** |

**THE STATE OF FLORIDA:** TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this lawsuit on defendant:

| To Defendant(s): | Address: |
|---|---|
| ISAAC TOLEDANO | 16901 Collins Ave., Suite PH5503, Sunny Isles Beach, FL 33160 |

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience:

**"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at www.dadecountyprobono.org."**

**MIAMI-DADE COUNTY COURT LOCATIONS**

☒ **ONS Justice Center Central Court** (05)
Room 6.240
20 NW 1st Ave
Miami, FL 33128

☐ **Joseph Caleb Center Court** (20)
Suite 103
5400 N.W. 22nd Avenue
Miami, FL 33142

☐ **Hialeah District Court** (21)
Room 100
11 East 6th Street
Hialeah, FL 33010

☐ **North Dade Justice Center** (23)
Room 100
15555 Biscayne Blvd.
North Miami Beach, FL 33160

☐ **Coral Gables District Court** (25)
Room 100
3100 Ponce De Leon Blvd.
Coral Gables, Miami, FL 33134

☐ **South Dade Justice Center** (26)
Room 1200
10710 SW 211 Street
Miami, FL 33189

**SERVICE**

| Plaintiff/Plaintiff Attorney | Address: |
|---|---|
| Brian P. Miller, Esq.<br>Florida Bar No. 0980633 | King & Spalding LLP<br>Southeast Financial Center<br>200 South Biscayne Blvd., Suite 4700<br>Miami, FL 33131 |

| | | |
|---|---|---|
| **JUAN FERNANDEZ-BARQUIN**<br>**CLERK OF THE COURT AND COMPTROLLER**<br>**MIAMI-DADE COUNTY**<br>**CIRCUIT AND COUNTY COURTS** | Melanie CLERK | **DATE ON:**<br>7/14/2026 |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2026-013631-CA-01 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| BH APIRION LLC | ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, and BH WORLDWIDE REAL ESTATE HOLDINGS LLC | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): BH SD-SOUTHPLACE MANAGER LLC

c/o Registered Agent Corporation Service Company

251 Little Falls Drive

Wilmington, DE 19808

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: Brian P. Miller, Esq.

whose address is: King & Spalding LLP

Southeast Financial Center, 200 South Biscayne Blvd., Suite 4700

Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | DATE |
|---|---|---|
| **JUAN FERNANDEZ-BARQUIN**<br>**CLERK OF THE COURT AND COMPTROLLER**<br>**MIAMI-DADE COUNTY**<br>**CIRCUIT AND COUNTY COURTS** | BY: [signature] 38084<br>DEPUTY CLERK | 7/14/2026 |

JUAN FERNANDEZ-BARQUIN

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2026-013631-CA-01 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| BH APIRION LLC | ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, and BH WORLDWIDE REAL ESTATE HOLDINGS LLC | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): BH-SD MALL LLC

c/o Registered Agent Corporation Service Company

251 Little Falls Drive

Wilmington, DE 19808

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: Brian P. Miller, Esq.

whose address is: King & Spalding LLP

Southeast Financial Center, 200 South Biscayne Blvd., Suite 4700

Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | DATE |
|---|---|---|
| **JUAN FERNANDEZ-BARQUIN**<br>**CLERK OF THE COURT AND COMPTROLLER**<br>**MIAMI-DADE COUNTY**<br>**CIRCUIT AND COUNTY COURTS** | BY: Mclarke<br>DEPUTY CLERK | 7/14/2026 |

# AMERICANS WITH DISABILITIES ACT OF 1990
# ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | 2026-013631-CA-01 |
| **PLAINTIFF(S)**<br>BH APIRION LLC | **VS. DEFENDANT(S)**<br>ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, and BH WORLDWIDE REAL ESTATE HOLDINGS LLC | **SERVICE** |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): BH SOUTHPLACE HOLDINGS LLC
c/o Registered Agent Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: Brian P. Miller, Esq.

whose address is: King & Spalding LLP
Southeast Financial Center, 200 South Biscayne Blvd., Suite 4700
Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | |
|---|---|---|
| **JUAN FERNANDEZ-BARQUIN**<br>**CLERK OF THE COURT AND COMPTROLLER**<br>**MIAMI-DADE COUNTY**<br>**CIRCUIT AND COUNTY COURTS** | 9876<br>BY: ____<br>DEPUTY CLERK | DATE<br>7/14/2026 |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS** | 2026-013631-CA-01 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | SERVICE |
|---|---|---|
| BH APIRION LLC | ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, and BH WORLDWIDE REAL ESTATE HOLDINGS LLC | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): BH WORLDWIDE REAL ESTATE HOLDINGS LLC

c/o Registered Agent Corporation Service Company

251 Little Falls Drive

Wilmington, DE 19808

CLOCK IN

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: Brian P. Miller, Esq.

whose address is: King & Spalding LLP

Southeast Financial Center, 200 South Biscayne Blvd., Suite 4700

Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | |
|---|---|---|
| **JUAN FERNANDEZ-BARQUIN<br>CLERK OF THE COURT AND COMPTROLLER<br>MIAMI-DADE COUNTY<br>CIRCUIT AND COUNTY COURTS** | BY: [signature] 9876<br>DEPUTY CLERK | DATE<br>7/14/2026 |

JUAN FERNANDEZ-BARQUIN ... IN GOD WE TRUST

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:26-cv-25010

(REMOVED STATE COURT CASE NO. 2026-012788-CA-01)

ISAAC TOLEDANO a/k/a YIZHAK TOLEDANO, an individual, BH-SD MALL LLC, a Delaware limited liability company BH SOUTHPLACE HOLDINGS, LLC, a Delaware limited liability company, BH SD-SOUTHPLACE MANAGER LLC a Delaware limited liability company, BH WORLDWIDE REAL ESTATE HOLDINGS, LLC, a Delaware limited liability company,

Plaintiffs,

v.

YAAKOV MORAD, an individual, APIRION REAL ESTATE, LLC, a Delaware limited liability company, BH APIRION LLC, a Delaware limited liability company.

Defendants.
_______________________________________/

**NOTICE OF REMOVAL**

Defendant BH Apirion LLC ("Defendant" or "BH Apirion LLC") hereby removes the civil action captioned *Toledano, et al. v. Morad, et al.*, Case No. 2026-012788-CA-01, filed June 24, 2026 in the Eleventh Judicial Circuit Court, in and for Miami-Dade County, Florida (the "State Court Action"). BH Apirion LLC removes the State Court Action to this Court pursuant to 28 U.S.C. § 1441. Copies of the process and pleadings served on BH Apirion LLC in the State Court

Action and all other filings with the State Court, including a copy of the complaint (the "Complaint"), are included in Exhibit A and Exhibit B hereto.[1]

1. On June 24, 2026, Plaintiffs commenced the State Court Action against Defendants, including BH Apirion LLC.

2. On June 26, 2026, Plaintiffs served Defendant BH Apirion LLC.

3. The claims set forth in the Complaint arise out of an alleged need for declaratory relief and an alleged breach of contract in connection with two real estate transactions.

4. BH Apirion LLC timely files its notice of removal, in accordance with 28 U.S.C. § 1441(b), as it is filed within 30 days of when Plaintiffs served BH Apirion LLC a copy of "the initial pleading setting forth the claim for relief upon which such action or proceeding is based." 28 U.S.C. § 1446(b).

5. BH Apirion LLC has not yet responded to the allegations in Plaintiffs' Complaint due to a pending motion for extension in the State Court Action. *See* Docket Entries, included in Exhibit A. BH Apirion LLC reserves all rights to assert any and all defenses and/or counterclaims.

6. Removal is proper because there is complete diversity between the parties. 28 U.S.C. § 1332(a); 28 U.S.C. § 1441(b).

7. According to Plaintiffs' Complaint, Plaintiff Isaac Toledano, a/k/a Yizhak Toledano, is an individual citizen and resident of the United States.

8. Specifically, upon information and belief, Plaintiff Toledano is a citizen of the State of Florida.

---

[1] Defendant BH Apirion LLC expressly preserves and does not waive its right to seek disqualification of counsel for Plaintiffs

9. According to Plaintiffs' Complaint, Plaintiff, BH-SD Mall LLC, is a Delaware limited liability company, registered to do business in Florida.

10. Upon information and belief, based on the citizenship of all of its ultimate member(s), BH-SD Mall LLC is a citizen of Florida.

11. According to Plaintiffs' Complaint, Plaintiff BH Southplace Holdings, LLC, is a Delaware limited liability company.

12. Upon information and belief, based on the citizenship of all of its ultimate member(s), BH Southplace Holdings, LLC is a citizen of Florida.

13. According to Plaintiffs' Complaint, Plaintiff, BH SD-Southplace Manager LLC is a Delaware limited liability company.

14. Upon information and belief, based on the citizenship of all of its ultimate member(s), BH SD-Southplace Manager LLC is a citizen of Florida.

15. According to Plaintiffs' Complaint, Plaintiff, BH Worldwide Real Estate Holdings, LLC, is a Delaware limited liability company.

16. Upon information and belief, based on the citizenship of all of its ultimate member(s), BH Worldwide Real Estate Holdings is a citizen of Florida.

17. Removing Defendant BH Apirion LLC is a Delaware limited liability company. Based on the citizenship of its sole member, BH Apirion LLC is a citizen of Israel.

18. Defendant Yaakov Morad is the sole member of BH Apirion LLC.

19. Defendant Yaakov Morad is an individual citizen of Israel.

20. Defendant Apirion Real Estate, LLC is a Florida limited liability company. Based on the citizenship of its sole member, Apirion Real Estate, LLC also is a citizen of Israel.

21. Defendant Yaakov Morad also is the sole member of Apirion Real Estate LLC.

22. No Defendant is a citizen of the State of Florida.

23. Based on the damages alleged in Plaintiffs' Complaint—a $1,289,496.62 funding shortfall under a Funding Agreement—it is facially apparent that the amount in controversy exceeds $75,000. Plaintiffs also seek declaratory relief.

24. Copies of all pleadings, process, orders, and other filings in the State Court Action are attached to this notice as required by 28 U.S.C. § 1446(a).

25. Removing Defendant BH Apirion LLC will promptly file a copy of this notice of removal with the clerk of the Circuit Court, Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, where the suit has been pending. *See* 28 U.S.C. §§ 1446(a), (d).

26. Based on all the foregoing, BH Apirion LLC hereby respectfully removes the State Court Action to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1332 and 1441.

Dated: July 24, 2026

Respectfully submitted,

**KING & SPALDING LLP**
200 S. Biscayne Blvd., Ste. 4700
Miami, FL 33131
Telephone: (305) 462-6000
Facsimile: (305) 462-6100

By: */s/ Brian P. Miller*
Brian P. Miller
Florida Bar No.: 0980633
Ross E. Linzer
Florida Bar No.: 0073094
bmiller@kslaw.com
rlinzer@kslaw.com

*Attorneys for Defendant BH Apirion LLC*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 24, 2026, a true and correct copy of the foregoing was served by electronic mail and U.S. Mail postage prepaid upon the following:

***Counsel for Plaintiffs:***

Alan J. Kluger, Esq.
Steve I. Silverman, Esq.
Jonathan Korin, Esq.
**KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.**
201 South Biscayne Boulevard
Twenty Seventh Floor
Miami, Florida 33131
akluger@KlugerKaplan.com
miglesias@klugerkaplan.com
ssilverman@KlugerKaplan.com
clong@klugerkaplan.com
jkorin@KlugerKaplan.com
mfernandez@klugerkaplan.com

*/s/ Brian P. Miller*
Brian P. Miller