Filing # 251856370 E-Filed 07/06/2026 06:24:23 PM
NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. ______________

BH APIRION LLC,

Plaintiff,

v.

ISAAC TOLEDANO,
BH SD-SOUTHPLACE MANAGER LLC,
BH-SD MALL LLC,
BH SOUTHPLACE HOLDINGS LLC, and
BH WORLDWIDE REAL ESTATE
HOLDINGS LLC,

Defendants.
_____________________________________/

## COMPLAINT

Plaintiff BH Apirion LLC ("Plaintiff" or "Apirion"), by its attorneys, brings this action seeking damages against defendants Isaac Toledano ("Toledano"), BH SD-Southplace Manager LLC ("BH Manager"), BH-SD Mall LLC ("BH Member"), BH Southplace Holdings LLC ("BH Member No. 2"), and BH Worldwide Real Estate Holdings LLC ("BH Worldwide" and, together with Toledano, BH Manager, BH Member, and BH Member No. 2, "Defendants"). Plaintiff alleges as follows:

## NATURE OF THE ACTION

1. This case seeks redress for Defendants' material breaches of their obligations under a Funding Agreement dated as of February 7, 2024 (the "Funding Agreement"), attached hereto as Exhibit "A." In the Funding Agreement, Apirion agreed to fund 90% of the money necessary for Toledano to satisfy his capital calls on two specific joint ventures to redevelop the Southland Mall

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

site in south Miami-Dade County. Toledano utilized the Funding Agreement and Apirion's money to hide from his joint venture partners that he was not in fact funding his entire share of the investment in the project, in violation of his agreements with his joint venture partners for the mall redevelopment project. This also stands in stark contrast to Toledano's public (but false) persona that he is a successful real estate developer who invests his own money into deals. The Funding Agreement provided that Apirion could convert its loan to BH Manager into equity, but Defendants have refused to effectuate that conversion. The reason why is now apparent; Toledano has stated that he was willing to approach his joint venture partners about Apirion converting to equity, but "I have to do it in such a way that I do not risk Electra taking me out of the deal for violation of the JV agreement I have with them." It is now clear that Toledano engaged in a consistent pattern of misrepresentations, concealment, and bad-faith conduct with regard to Apirion, as outlined in detail herein. The Southland Mall project is over budget and behind schedule, Apirion has invested over $13.5 million with nothing to show for it, Toledano refuses to provide full information about the project, has demanded (and continues to demand) money for other activities unrelated to the joint venture, and refuses to act in good faith to effectuate Apirion's conversion to equity. This Court must hold Defendants responsible for their conduct.

**PARTIES AND RELEVANT ENTITIES**

2. Plaintiff Apirion is a Delaware limited liability company. Apirion is a party to the Funding Agreement.

3. Defendant Toledano is a citizen of Florida and a resident of Miami-Dade County, Florida. Toledano personally guaranteed all obligations under the Funding Agreement.

4. Defendant BH Manager is a Delaware limited liability company 100% indirectly owned and controlled by Toledano. BH Manager is a party to the Funding Agreement.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

5. Defendant BH Member is a Delaware limited liability company 100% indirectly owned and controlled by Toledano. BH Member is a party to the Funding Agreement.

6. Defendant BH Member No. 2 is a Delaware limited liability company 100% indirectly owned and controlled by Toledano. BH Member No. 2 is a party to the Funding Agreement.

7. Defendant BH Worldwide is a Delaware limited liability company that is 100% owned and controlled by Toledano. BH Worldwide is a party to the Funding Agreement.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction over this action that seeks in excess of $50,000.

9. This Court has personal jurisdiction over all Defendants pursuant to Fla. Stat. § 48.193. As detailed herein, all Defendants operated, conducted, engaged in, or carried on a business or business venture in the State of Florida, caused injuries to Apirion within the State of Florida, and otherwise purposefully availed themselves of conducting activities in the State of Florida.

10. Venue is proper in this Court under Fla. Stat. § 47.011.

11. Venue also is proper in this Court pursuant to Section 14 of the Funding Agreement.

## FACTUAL ALLEGATIONS

**A. Toledano and BH Group.**

12. Toledano is a 51-year-old individual based in Aventura, Florida.

13. Toledano pitches himself as a "highly accomplished real estate developer and astute businessman."

14. Toledano operates through what he brands as "BH Group." According to its website, BH Group claims to have completed over 1,100 residential units with another 10,000+

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

"in-progress," 2 million square feet of commercial properties "owned and managed," and 30+ "properties in our portfolio."

15. In reality, Toledano plays a bit role in his development "projects" and typically latches himself on to other more successful real estate developers or investors such as Apirion in order to pretend to be more successful and richer than he actually is.

16. For example, when pressed for backup to support BH Group's representation that it had 10,000 residential units in development, Toledano only could scrape together evidence of only approximately 500 housing units.

17. Toledano also represented to Apirion that other projects he supposedly had completed generated internal rates of return (IRR) that were unusually high compared to comparable real estate projects. All of these representations were designed to paint an exaggerated picture of Toledano as a successful real estate investor.

18. The Southplace City Center is pitched as one of Toledano's "projects." This project is a redevelopment of the existing Southland Mall located in southern Miami-Dade County. According to the BH Group website, Southplace City Center is an "ambitious redevelopment [which] is a joint venture with Electra America, leveraging our expertise to transform this expansive property into a vibrant mixed-use community." This project is advertised on BH Group's website to include 5,000 residential units and 500,000 square feet of retail space. However, the first "phase" consists only of 350 apartments and 24,000 square feet of grocery space, to be completed in 2028.

19. In reality, the Southplace City Center project is not being developed by BH Group, but rather is a project developed by the U.S. arm of a successful Israeli real estate developer called Electra, in which Toledano plays a minor role.

**B. Joint Venture No. 1.**

20. Toledano and Electra entered into two separate joint venture agreements related to the Southplace project.

21. Toledano and Electra entered into the first joint venture as of February 23, 2022.

22. The first joint venture is memorialized through a limited liability company called Electra America SD Mall JV LLC ("Joint Venture No. 1"). Joint Venture No. 1 has two members. The Electra member is called Electra America SD Mall Management LLC, and owns 75% of the capital in Joint Venture No. 1. This Electra member also serves as the sole "Manager" under the LLC agreement. Toledano's member is BH-SD Mall LLC, referred to herein as Defendant BH Member, and owns 25% of the capital in Joint Venture No. 1.

23. Joint Venture No. 1 owns 100% of BH South Dixie SL Mall LLC, which is the fee simple title holder to the largest parcel comprising part of the current mall:




24. Joint Venture No. 1 also owns 100% of BH South Dixie Dev LLC, which is the fee simple title holder to another parcel comprising part of the current mall:



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS




25. And Joint Venture No. 1 also owns 100% of BH Retail South Dixie LLC, which is the fee simple title holder to another parcel comprising part of the current mall:




26. The following flow chart from the LLC agreement for Joint Venture No. 1 further describes the ownership structure of Joint Venture No. 1:




27. As noted in the Funding Agreement, Toledano subsequently transferred 100% of his interest in BH Worldwide Real Estate Holdings LLC (shown above on the ownership chart) to Defendant BH Manager.

28. Despite the fact that BH Member owns 25% of the capital in Joint Venture No. 1, BH Member only is required to put up 60% of the capital that otherwise would be required to fund that interest. Electra agreed to lend BH Member the remaining capital. This has the ultimate effect that BH Member is required to put up only 15% of the capital called from both members of Joint Venture No. 1.

29. The LLC Agreement for Joint Venture No. 1 contains an express representation and obligation to Electra by BH Member that all of BH Member's capital contributions will be satisfied with Toledano's "personal funds":



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

> (k) At all times during the existence of the Company, Toledano shall continuously (i) maintain exclusive Control, exercisable without the consent or approval of any other Person, over the business and affairs of BH Member, and (ii) cause all of BH Member's Capital Contributions required under this Agreement to be satisfied with Toledano's personal funds.
>
> 48

30. But Toledano violated that representation. As noted in the Funding Agreement, 90% of the money used to fund BH Member actually came from Plaintiff Apirion.

31. To summarize, Defendant BH Member owns 25% of the capital of Joint Venture No. 1 and is required to fund 15% of the capital called for the business, and BH Member is turn owned 100% by BH Manager, which is 100% owned by Toledano, but Toledano has falsely represented to Electra that Toledano is the sole source of funding for the business.

**C. Joint Venture No. 2.**

32. Toledano and Electra entered into the second joint venture as of September 8, 2022.

33. The second joint venture is memorialized through a limited liability company called Electra America Southland 2 JV LLC ("Joint Venture No. 2"). Joint Venture No. 2 has two members. The Electra member is called Electra America Southland 2 Management LLC, and owns 75% of the capital interest in Joint Venture No. 2. This Electra member also serves as the sole "Manager" under the LLC agreement. Toledano's member is BH Southplace Holdings LLC, and owns 25% of the capital interest in Joint Venture No. 2.

34. Joint Venture No. 1 and Joint Venture No. 2 are referred to collectively herein as the "Joint Ventures."

35. Joint Venture No. 2 owns 100% of BH Electra Southland Part 2 LLC, which is the fee simple title holder to another parcel comprising part of the current mall:




36. This parcel is also sometimes referred to as the "Sears" property.

37. The following flow chart from the LLC agreement for Joint Venture No. 2 further describes the ownership structure of Joint Venture No. 2:




38. As noted above and in the Funding Agreement, Toledano subsequently transferred 100% of his interest in BH Worldwide Real Estate Holdings LLC (shown above on the ownership chart) to Defendant BH Manager.



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

39. Despite the fact that BH Member No. 2 owns 25% of the capital in Joint Venture No. 2, BH Member No. 2 only is required to put up 40% of the capital that otherwise would be required to fund that interest. Electra agreed to lend BH Member No. 2 the remaining capital. This has the ultimate effect that BH Member No. 2 is required to put up only 10% of the capital called from both members of Joint Venture No. 2.

40. The LLC Agreement for Joint Venture No. 2 also contains an express representation and obligation to Electra by BH Member No. 2 that all of BH Member No. 2's capital contributions will be satisfied with Toledano's "personal funds":

> (k) At all times during the existence of the Company, Toledano shall continuously (i) maintain exclusive Control, exercisable without the consent or approval of any other Person, over the business and affairs of BH Member, and (ii) cause all of BH Member's Capital Contributions required under this Agreement to be satisfied with Toledano's personal funds.

41. But Toledano also violated that representation. As noted in the Funding Agreement, 90% of the money used to fund BH Member No. 2 actually came from Plaintiff Apirion.

42. To summarize, Defendant BH Member No. 2 owns 25% of the capital of Joint Venture No. 2 and is required to fund 10% of the capital called for the business, and BH Member No. 2 is turn owned 100% by BH Manager, which is 100% owned by Toledano, but Toledano has falsely represented to Electra that Toledano is the sole source of funding for the business.

**D. The Funding Agreement.**

43. After Toledano entered into the joint ventures with Electra in 2022, he began to look for a source of funding to satisfy his capital calls, knowing that he lacked the resources, assets, and liquidity to be able to pay those monies himself – even with the reduced funding obligation Toledano had as a result of Electra already agreeing to lend him nearly half of the capital that he otherwise would need to put up.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

44. This led Toledano to approach Apirion to invest.

45. Apirion is owned by an Israeli citizen who owns and operates a large facilities management company in Israel. Apirion's principal came to know Toledano through Toledano's son-in-law, who also is the brother of Apirion's principal. Toledano represented himself as a mentor to the son-in-law and as a family member in seeking investments from Apirion on an informal basis. Toledano told the son-in-law things such as "I will make you very successful," "you will succeed with me," and "I will teach you real estate." Toledano told Apirion's principal that "we are family" and that Toledano was looking out for Apirion's interests. These were not arms' length discussions. Toledano's representations caused Apirion to invest with Toledano even in the absence of any formal agreement.

46. Prior to Apirion agreeing to invest in the Southplace City Center project, Toledano provided Apirion with a slide deck pitching a "premier investment opportunity: 50% stake in South Place City Center."

47. That slide deck represented that the project would have 5,000 residential units, a 150-key hotel, and 701,000 square feet of retail space "across 21 distinct blocks." The slide deck also represented that:

> Investors will receive an 8% preferred return annually from the GP position in the mall investment, along with first right of refusal on future land unit investments at cost price, without promotion. The development model is divided into 10 blocks, each with detailed financial projections, ensuring transparency and alignment between BH Group, Electra, and the investor.

48. Toledano's slide deck also made clear (contrary to Toledano's later position after he roped Apirion into making the investment) there would be "transparency and alignment between BH Group, Electra, and the investor."

49. On February 14, 2022, Toledano sent an email to Apirion soliciting an investment in the Southplace City Center project. Toledano imposed a tight 48-hour deadline for a response. In that email, Toledano offered closing within 45 days, an 8% preferred return, an additional 50%

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

of all profits earned by BH Manager from the Joint Ventures, and return of Apirion's invested capital within 12 to 24 months.

50. Apirion agreed to start funding Defendants' capital calls for Joint Venture No. 1 based on these representations and the promise of an 8% preferred return. Apirion started to do so in 2022, even in the absence of a written agreement, given the family relationship. Apirion understood that the total to be invested was approximately $7 million, to which Toledano responded in a text message in November 2022, "My word is my word, always remember."

51. However, the amount of capital calls demanded from Apirion later ballooned to over $13.5 million. This stands in contrast to Toledano's prior representations that the investment would be approximately $7 million. Toledano continued to demand more and more in capital calls, without Apirion ever having transparency into the project, a documented equity stake, or any collateral protections.

52. And Apirion has not been paid back one dime as return on the investment, over four years later. In fact, Toledano just continues to ask Apirion for more and more money. On information and belief, Toledano only has invested approximately $1 million of his own money as equity into the Joint Ventures, whereas Apirion has contributed over $13.5 million.

53. To make matters even worse, Toledano took a $489,250 "fee" from the closing of the first real estate purchase related to the Southplace City Center. Toledano did not share one penny of that payment with Apirion, despite the fact that Apirion is the true source of funding for BH Manager. Toledano also used Apirion's money to pay approximately $56,000 in expenses unrelated to the Joint Ventures, and to pay a $25,000 "bonus" to one of Toledano's employees.

54. Later in June 2022, Toledano approached Apirion regarding Joint Venture No. 2, and convinced Apirion to transfer $2 million as a further "loan" to finance Toledano's commitment

to the purchase price for the Sears parcel in Joint Venture No. 2. Toledano threatened Apirion that if it did not make this investment – described as the "cherry on the top" – Apirion would lose part of its investment in Joint Venture No. 1. Toledano also advised Apirion that the Sears acquisition was the "last missing piece of the puzzle!!!"

55. Toledano also misrepresented the terms of the Sears parcel investment to Apirion. Toledano calculated Apirion's investment as 90 percent of 15% of the joint venture equity investment, which was the case as to the original parcel. But BH's obligation as to the Sears parcel was only 10% of the joint venture equity investment. This misrepresentation resulted in Apirion funding approximately $140,000 more than contractually required. When Apirion pointed this out, Toledano berated Apirion's principal and only after being shown the relevant contractual language did Toledano reluctantly agree to refund the overpayment, and even then blamed it on Electra. On information and belief, Toledano knew what he was doing, and always hoped that he could get away with this mistake.

56. When Toledano later sought to memorialize Apirion's investments into a written document, he proposed the Funding Agreement, which was notably different from the terms agreed to previously and Toledano's (apparently worthless) "word." But by then it was too late because Apirion had invested well over $10 million into the project based on Toledano's prior representations about the business terms, and Toledano therefore had undue leverage as he insisted that Apirion agree to radically different terms in the Funding Agreement. Toledano attempted at every turn to take advantage of Apirion's limited English capabilities and unfamiliarity with U.S. real estate investment partnership documents. Toledano also took advantage of marital strife between his son-in-law and daughter in order to try to drive a wedge between Apirion's principal and the principal's brother.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

57. Instead, the Funding Agreement called Apirion's investment a "loan" to BH Manager, eliminated the 8% preferred return, replaced it with interest on the "loan" that would accrue (rather than be paid) – at the bare minimum permitted under IRS regulations – and provided that Toledano would be entitled to retain all (unspecified) "fees" paid by the Joint Ventures without using any of that money to repay Apirion for financing the vast majority of Toledano's financial contribution to the Joint Ventures.

58. The Funding Agreement was executed in February 2024, well after many of the investments in the Joint Ventures had already been funded by Apirion, as evidenced by Schedule C-1 to the Funding Agreement.

**E. Breaches of the Funding Agreement.**

59. Critically, the Funding Agreement provides a mechanism for Apirion to convert the "loan" into equity in BH Member and BH Member No. 2. This conversion is one of the most essential provisions of the agreement, and appears in Part 3 of the Funding Agreement, captioned "Purpose of Funding Agreement." Toledano understood the critical importance of this term, and represented that the Funding Agreement structure was temporary and tax-driven and that Apirion would be able to convert its investment into direct equity.

60. Section 3(d) of the Funding Agreement provides as follows:

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(d) Apirion shall have the right at any time, subject to BH Member's consent, and subject to Manager first obtaining the consent of the Electra Member (as that term is defined in the Joint Venture Agreements), and, if applicable of any other parties whose consent may be required such as any lender to the Joint Ventures, to cause the Apirion Loan to convert to capital contributions to the Company (more specifically, Apirion's Funding relative to SD Mall shall be capital contributions to SD Mall, and its Funding relative to Southland shall be capital contributions to Southland) on a retrospective basis and also on a going forward basis, in which event and at which time Apirion shall be a Member in the Company. To be clear, the Apirion Loan would convert to 90% of the overall capital contributions to the Company. More specifically, Apirion shall send to Manager and BH Member a request that BH Member consent to such conversion. BH Member shall provide its response within 10 days thereafter (If BH Member does not respond within such time period then Apirion shall send a second notice to Manager and BH Member, referring to the prior notice and stating that pursuant to this Section 3(d) a response from BH Member is due within 5 days of Manager receiving such second notice, and BH Member shall have 5 days following such reminder notice to respond). It is hereby agreed and clarified that in case the BH Member does not respond within such additional 5 days then it will be considered as if the BH Member has given its written consent to the said conversion. All notices to Manager and BH Member shall be sent simultaneously, by email and also by reputable overnight delivery service (or at least two business day delivery service given the distance involved) to BH Member's counsel, Eric Everett, Esq., DarrowEverett LLP, 50 Congress Street, Suite 1041, Boston, MA 02109, email: eeverett@darroweverett.com, and also with an email to CRENotices@darroweverett.com. If BH Member consents in writing then within 7 days thereafter the Manager will seek to obtain Electra Member's consent, and, if applicable, the other consents described above, and will present to Apirion references for said request(s) and for Electra Member's response, and, if applicable, for the response of the other applicable parties whose consent may be required.

Manager shall use good faith efforts to obtain the necessary consents (beginning with the consent of Electra Member) to such requested conversion to equity, but shall not be required to give economic or other concessions to Electra Member, or any other necessary consent parties, in order do so.

61. This provision applies duties on all Defendants. BH Manager is expressly obligated to work toward obtaining all consents. BH Member and BH Member No. 2 are required to consider their consent to conversion. Toledano personally guaranteed the performance of all obligations of the other Defendants under the Funding Agreement.

62. In 2023, before the Funding Agreement was executed, and when Apirion as funding 90% of Toledano's contributions based on Toledano's prior representations, Toledano claimed to make a half-hearted effort to try to obtain Electra's consent to bringing in Apirion as a full-fledged member. He sent his son-in-law a copy of a text message to Amir at Electra in Israel, which stated as follows (translated from Hebrew):

> Hi Amir, Following our telephone conversation, I hereby raise in writing the request according to which I wish to carry out a transfer of half of my rights in the

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCES

company BH-SD Mall LLC to a member of my family Mr. Netanel Morad (married to my daughter) who will be a partner in the project companies. Netanel works with me and the matter is done for reasons personal – family and also due to various taxation aspects. Besides that, no change will apply in the agreements, and all that is stated there will apply also to him accordingly. Likewise, no change will apply also in the conduct in relation to the project. It is clarified for the removal of any doubt, that no change will apply in the ownership of the company BH Worldwide Real Estate Holdings LLC which was and will remain under the control of the Toledano family. In light of the above, and with the aim to advance the matter, I would thank and greatly appreciate the receipt of your consent to the above.

63. No such transfer occurred then.

64. It also is noteworthy that Toledano did not disclose to Electra in that request that Apirion actually had been funding 90% of Toledano's required contributions to the Joint Ventures, in violation of the Joint Ventures' LLC agreements.

65. In reality, it appears that Toledano's offers to "help" his family member actually were Toledano trying to look out for his own financial interests in trying to cash out his personal stake in the Southland Mall project.

66. Also, before the Funding Agreement was executed, Toledano falsely represented to Apirion that he was permitted to sell 49% of his interest without Electra's approval. Toledano made this representation in order to induce Apirion to invest in the project even before the formal Funding Agreement was executed.

67. In 2024, after the Funding Agreement had been executed, Apirion and Toledano discussed attempting to find a buyer for the Southplace City Center project, and Apirion worked on attempting to do so. This came about because Apirion complained about the delays in the timeline represented by Toledano regarding when Apirion would be repaid its investment. Toledano recognized that he had represented that Apirion already would be repaid at that point, and therefore suggested that the two parties attempt to sell 50% of the equity in the project as a result. Toledano participated in these efforts, and assisted with sale calculations and had potential

purchasers sign the BH non-disclosure agreement form. The sale effort was not done by Apirion acting "off the reservation."

68. However, consistent with his other misleading practices, Toledano repeatedly engaged in behavior to hide the existence of these discussions from Electra, his co-joint venturer. And Apirion began to discover that Toledano was not very familiar with the project, despite his representations that it was his project, and had mismanaged the project as a result. For example, Toledano arranged a meeting with Electra in order for Electra to provide detailed information to Apirion about the project. From Apirion's perspective, the purpose of this meeting was to obtain information in order to evaluate a potential sale, but Toledano misrepresented to Electra that the meeting was for his son-in-law to "start" working on the project. Toledano also asked Apirion to keep the sale efforts "quiet." Then, after Electra became aware of the process, Toledano shifted the blame away from himself and scolded Apirion for allegedly not keeping the efforts "quiet" enough.

69. Toledano claimed that Apirion could not meet freely with Electra because Toledano's son-in-law allegedly was too "young" and "inexperienced" in real estate investment. Yet when Apirion complains about Toledano misleading them, Toledano's tune suddenly changes and he describes Apirion as sophisticated and experienced investors.

70. The sale exploration efforts ultimately were unsuccessful.

71. In retrospect, all of this behavior is not surprising, because Toledano actually has nothing to do with the actual management of the real estate development project being done by Electra. These events also demonstrate a consistent pattern of Toledano attempting to "divide and conquer" by preventing Apirion from interacting directly with Electra. To Apirion, Toledano



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

represented that Apirion was a financial partner; to Electra, it appears that Toledano presented a much narrower and different story and failed to disclose Apirion's true role.

72. During this time period, Toledano also called capital from Apirion for other development activities at Southplace City Center unrelated to Joint Venture No. 1 and Joint Venture No. 2. Apirion had lost trust in Toledano and began to question all capital calls more extensively and demand updates on the development project which was overdue at that time. Even so, Toledano refused to provide all information about the transactions; for example, Toledano would not provide all wire confirmations to document that all Apirion payments were used for their intended purposes.

73. BH Manager called "capital" from Apirion for other "blocks" that Electra was trying to purchase at the project, which were not owned by Joint Venture No. 1 or Joint Venture No. 2. The total dollar amount of these "capital calls" for other matters was over $500,000. These capital calls also were inconsistent with Toledano's 2022 representation that the Sears purchase was the "last missing piece of the puzzle!!!," thereby confirming they are not part of the Funding Agreement for the Joint Ventures.

74. The parties' correspondence confirms that investments in other parcels was outside of Joint Venture No. 1.

75. When Apirion refused to fund other development efforts unrelated to Joint Venture No. 1 and Joint Venture No. 2 because these were not part of the deal agreed-to, Toledano's response was to threaten Apirion with default, and to take the ridiculous position that the "purpose" of the LLC is so broad that it could be used for real estate development and other business purposes anywhere in Florida.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

76. Toledano also repeatedly represented to Apirion that there were efforts to sell the Southplace City Center project and pay off Apirion. Of course, none of these ever came to fruition, and instead Toledano kept asking Apirion for more and more money.

77. Toledano also failed to provide Apirion with all information and updates on the project. Toledano steadfastly refused to ever allow Apirion to be listed as a direct recipient of material updates and other communications about the Joint Ventures. This behavior also is consistent with Toledano's "divide and conquer" approach described above.

78. After the failed sales effort and Toledano's other conduct, Apirion formally asked in 2024 to convert its "loan" to equity in BH Member and BH Member No. 2, pursuant to Section 3(d) of the Funding Agreement.

79. Toledano reluctantly agreed to approach Electra pursuant to the Funding Agreement, but consistently stonewalled, tried to talk Apirion out of it, lacked candor with Electra, and thereby breached BH Manager's obligations under the Funding Agreement to "use good faith efforts to obtain the necessary consents (beginning with the consent of Electra Member) to such requested conversion to equity."

80. For example, in December 2024, Toledano wrote to Apirion and stated that he was willing to approach Electra about Apirion converting to equity, but "I have to do it in such a way that I do not risk Electra taking me out of the deal for violation of the JV agreement I have with them."

81. This admission of wrongdoing by Toledano was telling and contradicts Defendants' express representations in the Funding Agreement that "the Company [BH Member and BH Member No. 2] is permitted to obtain financing to fund its portion of the Capital Contributions to the Joint Venture."

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

82. Finally, in August 2025, after Apirion was forced to engage counsel to protect its interests. Toledano finally made a half-hearted effort to obtain Electra's consent. Apirion has no knowledge what telephone conversations took place, but on information and belief Toledano spoke with Amir Yaniv from Electra and failed to disclose all of the details of Apirion's role during such conversations.

83. Toledano did send an email from his phone on August 7, 2025 to Electra to follow up on his telephone conversations regarding Apirion's conversion to equity:

**From:** Isaac Toledano <Isaac@bhinvestments.us>
**Sent:** Thursday, August 7, 2025 4:58 PM
**To:** Amir Yaniv <amiry@ere.co.il>
**Subject:** Southland mall project

Amir,
per our discussion the other day, my son in law Netanel morad and his brother Yaakov has a loan/funding arrangement with me. It is only a loan/funding arrangement, NOT an equity interest. just fyi Yaakov Morad is experience in sophisticated US commercial real estate investing. The name of the Delaware entity is BH Apirion LLC ("Apirion").

The purpose of this email is to ask if Electra would consent to Aprion having an *equity* interest in each of the two BH joint venture member entities (namely, BH-SD Mall, LLC as to the Mall joint venture, and BH Southplace Holdings, LLC as to the Southplace joint venture). Under the existing operating agreements for those BH entities I am the Manager, and I would remain the Manager.

My request is that Electra waive the Transfer requirements to allow this particular (indirect) Transfer. Once Electra approve this request I will also ask the lender TYKO for there approval.

If this concept as I have outlined it meets with Electra's preliminary approval, then I can send KYC information, etc.

Please let me know.

Isaac Toledano

Please excuse the short replies and typos as this email was sent from my iPhone.

84. Toledano's email to Electra did not explain the true role that Apirion has played, the fact that Apirion is the party that actually had funded the vast majority of Toledano's equity

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

contributions to the Joint Ventures, Toledano's prior promises to Apirion that they would be converted to equity, or the terms of the Funding Agreement.

85. Electra responded a short time later the same day, purporting to reject the request:

**From:** Amir Yaniv <amiry@ere.co.il>
**Date:** August 7, 2025 at 12:53:30 EDT
**To:** Isaac Toledano <Isaac@bhinvestments.us>
**Subject: RE: Southland mall project**

Dear Isaac,

While we greatly appreciate you as a partner and a friend, unfortunately, Electra Real Estate won't be able to accept your request below.
We made the Southland deal with you. We are not in a position to accept additional partners into our JV.
We hope you understand.

86. By definition, because Toledano approached Electra to obtain its consent, the conditions precedent in Section 3(d) to obtain the consent of both BH Member and BH Member No. 2 were satisfied.

87. Toledano took no further steps to obtain Electra's consent, despite Apirion's repeated pre-suit efforts during 2025 and 2026 – as well as Apirion's numerous proposed other solutions – to get Toledano to live up to the agreement or restructure the parties' relationship. Thus necessitating this lawsuit.

**COUNT I – BREACH OF CONTRACT**

88. Plaintiff repeats and realleges the allegations contained in paragraphs 1 – 87 above as if set forth fully herein.

89. The Funding Agreement is a valid and enforceable contract between Apirion and Defendants.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

90. Toledano personally guaranteed all obligations of BH Manager, BH Member, and BH Member No. 2 under the Funding Agreement, as a guaranty of payment and performance, which is an enforceable obligation under the Funding Agreement, and thereby is individually liable under the Funding Agreement to the same extent as the other Defendants.

91. Defendants materially breached the Funding Agreement by, among other things, causing Apirion to Fund matters unrelated to the Joint Ventures and the Funding Agreement, misrepresenting to Apirion that the Funding Agreement would not cause of a breach of the Joint Venture agreements, and by failing to use good faith efforts to secure the contractual conversion of Apirion's loan to equity in BH Member and BH Member No. 2.

92. As a direct and proximate result of Defendants' breaches of the Funding Agreement, Apirion has suffered substantial damages, including paying capital calls that were not required under the Funding Agreement, diminution in the value of its investment due to Defendants' mismanagement of the Joint Ventures, loss of use of capital, lost opportunity costs, expenses incurred due to Defendants' breaches, and losses from inability to convert its loan into equity pursuant to the terms of the Funding Agreement and thereby participate in the upside from the Joint Ventures.

93. Defendants' breaches of the Funding Agreement excuse Apirion's obligations to fund additional amounts under the Funding Agreement and excuse any defaults that Defendants contend Apirion has incurred under the Funding Agreement.

94. Apirion's investments in the Joint Ventures were part of a series of a complex transaction. Despite being requested repeatedly, Defendants have refused to provide adequate details regarding the uses of the money that Apirion has provided, which are facts known only to Defendants. Defendants also obfuscated the use of Apirion's investments and the flow of funds

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

in the Joint Ventures. Therefore, Apirion also is entitled to an equitable accounting of the investments, capital calls, management and other fees paid to Toledano and his affiliates, related-party transactions by Toledano and his affiliates, and the use of proceeds from Apirion's investments into the Joint Ventures or otherwise to the extent that Apirion's remedy at law is inadequate.

95. All conditions precedent to Apirion's recovery have been satisfied.

**COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

96. Plaintiff repeats and realleges the allegations contained in paragraphs 1 – 87 above as if fully set forth herein.

97. The Funding Agreement, like all contracts, includes an implied covenant of good faith and fair dealing, which required Defendants to act in good faith and to refrain from engaging in unreasonable, grossly negligent, or bad faith conduct that would prevent Apirion from receiving the benefits of its bargain.

98. The Funding Agreement also implies the obligation that Defendants act in good faith to secure the conversion of Apirion's loan to equity, which is an essential purpose of the contract.

99. Through their conduct, as described herein, Defendants breached the implied covenant of good faith and fair dealing.

100. As a direct and proximate result of these breaches of the implied covenant, Apirion has suffered substantial damages, including paying capital calls that were not required under the Funding Agreement, diminution in the value of its investment due to Defendants' mismanagement of the Joint Ventures, loss of use of capital, lost opportunity costs, expenses incurred due to

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Defendants' breaches, and losses from inability to convert its loan into equity pursuant to the terms of the Funding Agreement and thereby participate in the upside from the Joint Ventures.

101. Apirion's investments in the Joint Ventures were part of a series of a complex transaction. Despite being requested repeatedly, Defendants have refused to provide adequate details regarding the uses of the money that Apirion has provided, which are facts known only to Defendants. Defendants also obfuscated the use of Apirion's investments and the flow of funds in the Joint Ventures. Therefore, Apirion also is entitled to an equitable accounting of the investments, capital calls, management and other fees paid to Toledano and his affiliates, related-party transactions by Toledano and his affiliates, and the use of proceeds from Apirion's investments into the Joint Ventures or otherwise to the extent that Apirion's remedy at law is inadequate

102. All conditions precedent to Apirion's recovery have been satisfied.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants:

(a) Finding that each Defendant in each Count is jointly and severally liable on each Count set forth above;

(b) Awarding monetary damages in an amount to be proven at trial;

(c) Awarding pre-judgment and post-judgment interest;

(d) Awarding injunctive relief;

(e) Awarding an accounting; and

(f) Awarding such other and further relief as the Court may deem just and proper.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Dated: July 6, 2026

Respectfully submitted,

*/s/ Brian P. Miller*

**KING AND SPALDING LLP**
Brian P. Miller
Florida Bar No. 0980633
Ross E. Linzer
Florida Bar No. 0073094
Southeast Financial Center
200 S. Biscayne Boulevard, Suite 4700
Miami, FL 33131
Telephone: (305) 462-6000
Facsimile: (305) 462-6100
bmiller@kslaw.com
rlinzer@kslaw.com
miamilit@kslaw.com

*Attorneys for Plaintiff*