fiIN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:26-cv-25388-BB

BH APIRION LLC,

Plaintiff,

v.

ISAAC TOLEDANO,
BH SD-SOUTHPLACE MANAGER LLC,
BH-SD MALL LLC,
BH SOUTHPLACE HOLDINGS LLC, and
BH WORLDWIDE REAL ESTATE HOLDINGS LLC,

Defendants.

_______________________________________/

**MOTION TO DISMISS COMPLAINT WITH PREJUDICE AND INCORPORATED MEMORANDUM OF LAW**

Defendants ISAAC TOLEDANO ("**Toledano**"), BH SD-SOUTHPLACE MANAGER LLC ("**BH Manager**"), BH-SD MALL LLC ("**BH Member**"), BH SOUTHPLACE HOLDINGS LLC ("**BH Member No. 2**"), and BH WORLDWIDE REAL ESTATE HOLDINGS LLC ("**BH Worldwide**" and, together with Toledano, BH Manager, BH member, and BH Member No. 2, the "**Toledano Parties**"), through undersigned counsel, and pursuant to Fed. R. Civ. P. 12, hereby file this Motion to Dismiss Complaint with Prejudice.

## I. INTRODUCTION

The Complaint [D.E. 1] at pp. 10 - 229 (the "**Complaint**"), brought by Plaintiff BH APIRION LLC ("**Plaintiff**" or "**Apirion**") is baseless. The Complaint should be dismissed with prejudice because it fails to state cause of action in either of its two (2) counts and its claims are conclusively refuted by the exhibits attached to it. The Complaint is an attempt at revisionist history made years later about a transaction that Plaintiff now apparently regrets

making on the terms and conditions that it knowingly made, and with full knowledge of the transaction it now complains of. It is clear that the law provides Plaintiff no relief under these conditions. *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (Courts will "not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal.")[1]

The Complaint is nothing more than abject mudslinging designed to hide the inadequacies of the claims pled. Plaintiff takes twenty pages and 90 paragraphs of immaterial insults, half-truths, and innuendo to get to the simple (but baseless) heart of its claim: one sentence alleging three claimed breaches of the Funding Agreement. Complaint, ¶ 91, [D.E. 1] at p. 31.

The Complaint alleges claims for (i) breach of contract (Count I), and (ii) breach of the implied covenant of good faith and fair dealing (Count II). As set forth below, Count I should be dismissed because it fails to plead any breach of the Funding Agreement, which agreement is attached to the Complaint and thereby made part of the four-corners of the pleading. *Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 514 (11th Cir. 2019). Furthermore, Count II fails because Delaware does not recognize an action for breach of the implied covenant of good faith and fair dealing without the claimed breach of an express term of an agreement, which breach does not exist.

## II. FACTUAL BACKGROUND[2]

---

[1] The Funding Agreement is governed by Delaware law. Funding Agreement, Section 13, [D.E. 1] at p. 45.

[2] For purposes of this Motion to Dismiss only, the allegations of the Complaint are taken as true. *Stephens v. Dep't of Health & Human Servs.*, 901 F.2d 1571, 1573 (11th Cir. 1990) ("On a motion to dismiss, the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true.").

Defendants BH Member and BH Member No. 2 entered into two separate Joint Venture Agreements (the "**JV Agreements**") with non-party Electra America SD Mall JV LLC and Electra America Southland 2 JV LLC (altogether, "**Electra**"), resulting in joint ventures (the "**JVs**"). Complaint ¶¶ 22, 33 [D.E. 1] at pp. 14, 17. The JV Agreements are attached to the Funding Agreement and are found in the Complaint at [D.E. 1], pp. 72-156 and 157-229. Pursuant to the JV Agreements, Defendants are obligated to fund Capital Call Notices, as defined in the JV Agreements. *Id.* at pp. 92, 176. The scope of the JVs and the Capital Call Notices are defined by and not limited in the JV Agreements regarding the transactions alleged in the Complaint, and are certainly not limited as Plaintiff contends. The JV Agreements are very broad, and clearly state that "the purpose of the [JVs] shall be to…***acquire, purchase,*** own, hold, manage, develop, construct, operate, improve, renovate, rent, lease, fund, finance, encumber, as part of a long-term project to establish ***residential and commercial complexes in Florida***." *Id.* at pp. 152-153, 223-224 (emphasis added).

After the JV Agreements were signed, Plaintiff and Defendants entered into a Funding Agreement (the "**Funding Agreement**") by which Apirion would loan to BH Member and BH Member No. 2, 90% of Capital Call Notices that those entities would receive from the JVs. *Id.* at p. 51. Plaintiff claims that Defendants breached the Funding Agreement by (i) "causing Apirion to Fund matters unrelated to the Joint Ventures and the Funding Agreement," (ii) "misrepresenting to Apirion that the Funding Agreement would not cause of [*sic*] a breach of the Joint Venture agreements," and (iii) "failing to use good faith efforts to secure the contractual conversion of Apirion's loan to equity in BH Member and BH Member No. 2." Complaint ¶ 91, *Id.* at p. 31. However, the conduct alleged in each of these alleged breaches is contradicted and specifically permitted by the Funding Agreement, which itself attaches and incorporates the JV Agreements, all of which are attached to the Complaint, or are not otherwise independently actionable.

*First*, there can be no breach based on "causing Apirion to Fund matters unrelated to the Joint Ventures and the Funding Agreement" because, by the clear and unambiguous terms of those agreements, Capital Call Notices in the JV Agreements and funding calls in the Funding Agreement are not limited to property already owned by the JVs, and the Capital Calls otherwise fall within the express and permitted terms and scope of the agreements.

*Second*, Plaintiff fails to allege any provision of the Funding Agreement that is breached – because there is none – by an alleged pre-contractual "misrepresent[ation] to Apirion that the Funding Agreement would not cause of [*sic*] a breach of the Joint Venture agreements." Further, the JV Agreements are attached to the Funding Agreement, and Plaintiff is therefore charged with knowledge of their contents and terms, foreclosing Plaintiff's claim it was somehow misled about them. Last, any such claim is barred by the merger and integration clause in the Funding Agreement.

*Lastly*, there can be no breach based on "failing to use good faith efforts to secure the contractual conversion of Apirion's loan to equity in BH Member and BH Member No. 2" because (i) Defendants were ***not required*** to use good faith efforts to secure the contractual conversion alleged – because the Funding Agreement only requires such good faith efforts if Defendants expressly consent in writing to the contractual conversion, which never occurred, and in any event, (ii) the allegations of the Complaint clearly demonstrate that Defendants *did* nonetheless use good faith efforts to seek the conversion of Apirion's loan, and fully complied with what the Funding Agreement would ever require of them.

Accordingly, and as set forth below, Plaintiff's Complaint should be dismissed with prejudice.

## III. LEGAL STANDARD

To adequately plead a claim for relief, Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order

to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (abrogating *Conley v. Gibson,* 355 U.S. 41 (1957)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

"[M]ere conclusory statements[ ] do not suffice." *Iqbal*, 556 U.S. at 678. So when exhibits attached to a complaint "contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) (citing *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974) (conclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint. If the appended document ... reveals facts which foreclose recovery as a matter of law, dismissal is appropriate.")). "The classic example is when a plaintiff attaches a document to his complaint but his allegations about what the document is or says contradict the document itself." *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016).

## IV. ARGUMENT

### A. Count I Fails to State a Claim for Breach of Contract

"To establish a breach of contract claim, a party must prove: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages that the plaintiff suffered as a result of the breach." *S'holder Representative Services LLC v. Albertsons Companies, Inc.*, No. CV 2020-0710-JRS, 2021 WL 2311455, at *6 (Del. Ch. June 7, 2021).

Here, the allegations of the three claimed breaches of the Funding Agreement are identified in paragraph 91 of the Complaint, which states:

> 91. Defendants materially breached the Funding Agreement by, among other things, causing Apirion to Fund matters unrelated to the Joint Ventures and the Funding Agreement, misrepresenting to Apirion that the Funding Agreement would not cause of [*sic*] a breach of the Joint Venture agreements, and by failing to use good faith efforts to secure the contractual conversion of Apirion's loan to equity in BH Member and BH Member No. 2.

Complaint ¶ 91, [D.E. 1] at p. 31. However, each of these alleged breaches are directly contradicted by the plain and unambiguous terms of the Funding Agreement itself, which is attached to the Complaint.

**1. There is No Breach for "Causing Apirion to Fund Matters Unrelated to the Joint Ventures and the Funding Agreement."**

The first alleged breach – that Defendants allegedly "caus[ed] Apirion to Fund matters unrelated to the Joint Ventures and the Funding Agreement" – is facially contradicted by the Funding Agreement that establishes the alleged conduct is expressly permitted. To support this claim, Plaintiff alleges that "Toledano also called capital from Apirion for ***other development activities*** ***<u>at Southplace City Center</u>*** unrelated to Joint Venture No. 1 and Joint Venture No. 2." Complaint ¶ 72, [D.E. 1] at p. 27 (emphasis added). Plaintiff further alleges that the claimed "unrelated" matters were "for other 'blocks' that Electra was trying to purchase ***<u>at the project</u>***, which were not owned by Joint Venture No. 1 or Joint Venture No. 2." *Id.* ¶ 73 (emphasis added). But these allegations fail because the Defendants' alleged actions are permitted by the Funding Agreement.

The Funding Agreement certainly includes purchasing "blocks" "at the project," and nowhere in the Funding Agreement or the JV Agreements is there any prohibition from Defendants doing so. In fact, Defendants are expressly permitted to do so. The documents attached to the Complaint clearly demonstrate this beyond any doubt.

The scope of the Funding Agreement, and of the Funding Calls therein, is "to fulfill the obligations of the Company pursuant to the terms of the Joint Venture Agreement." Funding Agreement p. 2, [D.E. 1] at p. 38. In turn, the JV Agreements clearly state that "the purpose of the Company shall be to…***acquire, purchase,*** own, hold, manage, develop, construct, operate, improve, renovate, rent, lease, fund, finance, encumber, ***as part of a long-term project*** to establish ***residential and commercial complexes in Florida***." *Id.* at pp. 152-153, 223-224 (emphasis added). These clear contract terms facially contradict Plaintiff's allegations of breach for calling capital for "other development activities at Southplace City Center" or purchasing "other blocks…at the project." Complaint ¶¶ 72-73. To be sure, diving deeper into the specifics of the Funding Agreement and JV Agreements only bolsters this clear point.

**a. The Funding Agreement Requires Plaintiff to Fund the Capital Calls.**

The following table of relevant provisions quoted from the Funding Agreement clearly demonstrates that Plaintiff's obligations under the Funding Agreement were to fund any capital calls properly made by the JVs pursuant to the JV Agreements (which they were, as shown in the paragraph directly above and in the subsection immediately below), which include those improperly claimed in the Complaint to be a breach of the Funding Agreement (all emphasis added):

| **Relevant Quote from Funding Agreement** | **Page No.** |
|---|---|
| the nature and ***purposes of the business*** being conducted by the Company ***is to participate in the benefits received by investing in the Joint Ventures*** (defined below), ***which interests include***: (i) to own a twenty-five percent (25%) limited liability company membership interest in, and be entitled to its applicable share of Joint Venture Distributions, including without limitation fifty percent (50%) of the Joint Venture Distributions under Section 7. 1 (a)(ii i) of the Joint Venture Agreements *[see also footnote 2 below};* (ii) ***to contribute capital to the Joint Ventures in response to Capital Call Notices*** made pursuant to the Joint Venture Agreements (defined below); and (iii) to ***fulfill the obligations of the Company pursuant to the terms of the Joint Venture Agreement***. | Funding Agreement p. 2, [D.E. 1] at p. 38. |

| | |
|---|---|
| Apirion has been Funding, and shall continue to Fund, its Funding Percentage of the Funding Requirements. The Manager shall notify Apirion at least fourteen (14) days in advance of the amount that Apirion is required to Fund in response to any Funding Call (defined in Schedule A below). | Funding Agreement p. 4, Section 3(b), [D.E. 1] at p. 40. |
| "Funding" (and "to Fund", and "Funded") means, with respect to BH Member, to remit to the Company, in response to a Funding Call, its applicable Capital Contributions, and means, with respect to Apirion, to remit to the Company, in response to a Funding Call, amounts advanced under the Apirion Loan. | Funding Agreement p. A-3, [D.E. 1] at p. 51. |
| "Funding Call" means notice from the Manager to BH Member and Apirion respectively, of the Funding that each is to make to the Company so that the Company can meet its Funding Requirements as those requirements arise from time to time based on capital calls from the Electra SD Mall JV and/or from the Electra Southplace JV, as the case may be. | *Id.* |

**b. The Capital Call Notices Were Proper Under the JV Agreements Because Capital Calls are Not Limited to Property Already Owned by the JVs, and are Instead, Significantly Broader.**

Because the Funding Agreement requires Plaintiff to fund any proper Capital Call Notice from the JVs, the next step in the analysis is to examine the breadth of Capital Call Notices in the JV Agreements. The JV Agreements clearly describe that "the purpose of the Company shall be to…***acquire, purchase,*** own, hold, manage, develop, construct, operate, improve, renovate, rent, lease, fund, finance, encumber, ***<u>as part of a long-term project</u> to establish residential and commercial complexes in Florida***." Complaint pp. 152-153, 223-224 (emphasis added). Accordingly, 'call[ing] 'capital' from A[pirion for other 'blocks' that Electra was trying to purchase ***at the project***, which were not owned by Joint Venture No. 1 or Joint Venture No. 2" was entirely ***permitted*** by the very agreement upon which Plaintiff's claim is based. *Cf.* Complaint ¶¶ 72-73 (emphasis added).

Other provisions of the JV Agreements also demonstrate this point. The JV Agreements define a "Capital Call Notice" in Section 3.4, which states that "[i]f the Manager determines in its reasonable opinion that the Company does not have sufficient funds to pay all **Necessary**

**Expenses**, then the Manager shall be entitled to send a written notice to all Members calling for such additional Capital Contributions." Complaint, [D.E. 1] at pp. 92, 176 (emphasis added). In turn, "Necessary Expenses" is defined to mean

> (a) any expense expressly provided for in an ***Approved Budget***, (b) the actual amount of any Uncontrollable Expenses, (c) the actual amount of any Emergency Expenses, (d) the minimum amount necessary in order for the Company or any Subsidiary to (i) perform its non-discretionary contractual obligations entered into in accordance with the terms hereof, and (ii) comply with any final court orders, judgments or other judicial or governmental proceedings (including all costs and expenses related thereto), and (e) any costs required by the Company or any Subsidiary in order to avoid or cure a default under any loan documents to which the Company or any Subsidiary is party (including the Loan Documents) or any lease under which the Company or any Subsidiary is lessor.

*Id.* at pp. 85 169 (emphasis added).

An "Approved Budget" is defined in Section 9.5 of the JV Agreements:

> Annually, the Manager shall prepare and submit to the Members a projected ***Operating Budget and Development Budget for the Company, all Subsidiaries and the Project*** for each Fiscal Year (each of the foregoing budgets shall be collectively referred to herein as the "Proposed Budget"). The Members shall consider such Proposed Budget and consult with the Manager to agree on an approved operating budget and an approved development budget for the Fiscal Year in question (***such budgets, when approved by all the Members, being collectively referred to herein as an "Approved Budget"***). The Members agree that the Business Plan for the initial Fiscal Year of the Company (or the remainder thereof) is as attached hereto as Exhibit C.

*Id.* at pp. 115, 198 (emphasis added).

Accordingly, the "Approved Budget," from which "Necessary Expenses" are derived, qualifies such expenses to be included in a "Capital Call Notice" which requires funding by Plaintiff pursuant to the Funding Agreement. The "Approved Budget" is based on the "Operating Budget and Development Budget for the ***Company***, all Subsidiaries ***and the Project***." *Id.* (emphasis added). As stated in the Amendments to the JV Agreements, "the purpose of the ***Company*** shall be to…***acquire, purchase***, own, hold, manage, develop, construct, operate, improve, renovate, rent, lease, fund, finance, encumber, ***as part of a long-term project to establish residential and commercial complexes in Florida***." *Id.* at pp. 152-

153, 223-224 (emphasis added). An expense qualifies to be part of an "Approved Budget" if it is part of the "Operating Budget and Development Budget for the Company," even if it is outside the scope of "the Project." *Id.* at pp. 115, 198. These provisions, clearly upon the face of the Complaint, are fatal to Plaintiff's claim of breach here.

Moreover, the scope of "the Project" itself is broad enough to include all of the Capital Call Notices that Plaintiff was called upon to fund pursuant to the Funding Agreement. The "Project" is defined as "engaging, directly and indirectly, in transactions involving ***acquisition***, ownership, management, development, renovation, operation, funding, financing, selling, transferring exchanging or otherwise disposing of one or more of the ***Properties*** by the Project Entities." *Id.* at pp. 87-88, 172 (emphasis added). "Properties" is defined in a JV Agreement as "that certain mixed use real property located in Cutler Bay, Florida, commonly known as 'Southland Mall' and consisting of approximately 70 acres of total land area and approximately 808,776 leasable square feet, as more particularly described on Exhibit A hereto, including without limitation the Macy's Property and the Dixie Property." *Id.* at p. 88. "Property" is defined in the other JV Agreement as the "Seritage." *Id.* at p. 172.

In sum, each and all of these provisions make clear that the Funding Agreement and the JV Agreements are **not** limited to Capital Calls regarding property that was already owned by the JVs, but rather includes, among other things, the "acquisition" of property, the exact conduct that Plaintiff incorrectly purports to allege is a breach of the Funding Agreement. It is also clear that the JV Agreements, and thereby the Funding Agreement, relate to the entirety of the Southland Mall project, without limitation. If Plaintiff wanted a limitation as to the scope of the Funding Agreement that prohibited funding "for other 'blocks' that Electra was trying to purchase at the project, which were not owned by Joint Venture No. 1 or Joint Venture No. 2," they clearly failed to negotiate or include such in any agreement. Rather, the Funding Agreement and attached JV Agreements make clear that the scope is wide and certainly not

limited by the properties already owned by the JVs as Plaintiff incorrectly claims in its Complaint.

Indeed, these facts – which are part of the four corners of the Complaint – directly contradict the allegations from paragraphs 73-75 and 91 of the Complaint which intimate that any new acquisitions of property after 2022 were not part of the JV Agreements or the Funding Agreement. *See Griffin Indus., Inc.*, 496 F.3d at 1206 (when exhibits attached to a complaint "contradict the general and conclusory allegations of the pleading, the exhibits govern."). Accordingly, Count I of the Complaint fails to state a claim for breach of contract for "causing Apirion to fund matters unrelated to the Joint Ventures and the Funding Agreement." Indeed, based on the Funding Agreement and its exhibits, the complained of Capital Calls are expressly permitted, and any claim based on this alleged breach must be dismissed with prejudice.

### 2. There Can Be No Breach of Contract for "Misrepresenting to Apirion that the Funding Agreement Would Not Cause a Breach of the Joint Venture Agreements

The Complaint also fails to state a claim for breach of contract for allegedly "misrepresenting to Apirion that the Funding Agreement would not cause of a [*sic*] breach of the Joint Venture agreements," Complaint ¶ 91, because as a matter of law Plaintiff cannot claim to rely on the Defendants' alleged representation about what the Joint Venture agreements say. The JV Agreements are attached as exhibits to the Funding Agreement signed by Plaintiff, (Funding Agreement p. 3, [D.E. 1] at p. 39), and thus Plaintiff is charged with knowledge of the Funding Agreement and JV agreements and what they say. *See Pellaton v. Bank of New York*, 592 A.2d 473, 477 (Del. 1991) ("[a] party to a contract cannot silently accept its benefits, and then object to its perceived disadvantages, nor can a party's failure to read a contract justify its avoidance."); *see also, In re TSAWD Holdings, Inc.*, 595 B.R. 676, 684 (Bankr. D. Del. 2018) ("parties to a contract are conclusively presumed to know its contents and are bound by its terms"); *In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 396

(Bankr. D. Del. 2011) ("parties to a contract are charged with knowledge of its contents"). Plaintiff's claimed reliance on Defendants statements to them about the legal effect of the Funding Agreement on the JV Agreements is simply not actionable and this claim must be dismissed with prejudice for this reason.

Additionally, Section 11 of the Funding Agreement contains a merger and integration clause that also requires dismissal of Plaintiff's claim based on Defendants' alleged "misrepresenting to Apirion that the Funding Agreement would not cause of a [sic] breach of the Joint Venture agreements." Complaint, ¶ 91, [D.E. 1] at p. 31. Section 11 of the Funding Agreement states:

> **Section 11. <u>Entire Agreement</u>**. This Agreement and the exhibits and schedules hereto (including the Company Operating Agreement to the extent certain portions of it are expressly or impliedly incorporated herein) constitute the entire agreement of the Parties with response to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, among the parties with respect to the subject matter hereof and thereof.

Complaint, [D.E. 1] at p. 45, Funding Agreement, Section 11 (all emphasis in original).

The merger and integration clause in Section 11 of the Funding Agreement makes all allegations of the Complaint regarding extrinsic agreements, representations, and promises ***unenforceable*** unless they are contained within the Funding Agreement itself, including the claim in Count I based on Defendant's allegedly "misrepresenting to Apirion that the Funding Agreement would not cause of a [sic] breach of the Joint Venture agreements." Complaint, ¶ 91, [D.E. 1] at p. 31; *see RTN Inv'rs, LLC v. RETN, LLC*, No. CIV.A.08C-04-007JRJ, 2011 WL 862268, at *13 (Del. Super. Ct. Feb. 10, 2011) ("Delaware courts consistently uphold integration or merger clauses within agreements" and "evidence of prior or contemporaneous agreements that contradict the terms of an integrated and complete writing is inadmissible."), *citing Tracinda Corp. v. DaimlerChrysler A G*, 364 F.Supp.2d 362, 401 (D.Del.2005) ("[T]he written documents governing this transaction contradict the oral representations allegedly made

... and contain integration clauses precluding the parties from incorporating any oral representations into the parties' agreements.").

Here, the merger and integration clause in Section 11 of the Funding Agreement precludes Plaintiff's claim in Count I based on its allegation of Defendants' "misrepresenting to Apirion that the Funding Agreement would not cause of a [sic] breach of the Joint Venture agreements." Complaint, ¶ 91, [D.E. 1] at p. 31. Accordingly, this claim must be dismissed with prejudice.

**3. There is no Breach for "Failing to Use Good Faith Efforts to Secure the Contractual Conversion of Apirion's Loan to Equity**

The Complaint also fails to state a claim in Count 1 for breach of the Funding Agreement based on Defendants' alleged "failing to use good faith efforts to secure the contractual conversion of Apirion's loan to equity in BH Member and BH Member No. 2." *See* Complaint ¶ 91, *Id.* at p. 31.

**(a) The Complaint Itself shows that Defendants used "Good Faith Efforts" to obtain Electra's Consent**

The Complaint itself shows that Defendants did use "good faith efforts" to secure Electra's consent, and Plaintiff's allegations to the contrary are lacking and fail to state a claim. *See. e.g.* Complaint ¶¶ 62, 68, 82-85, *Id.* at pp. 15-17, 20-21. Notably, the Funding Agreement provides no obligation on Defendants to consent in the first instance to the conversion of Apirion's loan to equity because Defendants are provided the right to consent ***or not to consent*** to such conversion. Funding Agreement Section 3(d), *Id.* at p. 32. If Defendants do consent to the conversion in writing, "then within 7 days thereafter [Defendants] will seek to obtain Electra Member's consent," and are required to use "good faith efforts" to do so. *Id.*

Plaintiff admits and acknowledges Defendants' efforts to obtain Electra's consent, Complaint ¶¶ 62, 68, 82-85, *Id.* at pp. 15-17, 20-21, but claims those efforts were not good enough. However, Plaintiff provides no basis for such a claim. Notably, the clause in question

only obligates Defendants to use "good faith efforts," which is "the lowest standard," beneath "best efforts," "reasonable best efforts," "reasonable efforts," or "commercially reasonable efforts." *Akorn, Inc. v. Fresenius Kabi AG*, No. CV 2018-0300-JTL, 2018 WL 4719347, at *87 (Del. Ch. Oct. 1, 2018), aff'd, 198 A.3d 724 (Del. 2018) (citing the ABA Committee on Mergers and Acquisitions). The standard for good faith efforts "requires honesty in fact and the observance of reasonable commercial standards of fair dealing. Good faith efforts are implied as a matter of law." *Id; see also Fox v. CDX Holdings, Inc.*, No. CV 8031-VCL, 2015 WL 4571398, at *25 (Del. Ch. July 28, 2015), aff'd, 141 A.3d 1037 (Del. 2016) ("When a contract governed by Delaware law calls upon a party to act or make a determination in good faith, without any qualifier, it means that the party must act in ***subjective good faith. Under a subjective good faith standard, 'the ultimate inquiry must focus on the subjective belief of the party accused of wrongful conduct.***'" (emphasis added)), citing *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 107 (Del. 2013) ("It is essential to ensure, however, that ***the subjective good faith standard remains distinct from an objective, 'reasonable person' standard***." (emphasis added)). Defendants' request to Electra to convert Apirion's loan to equity unquestionably met these standards.

Pursuant to the subjective good faith standard, Plaintiff comes *nowhere near* alleging a failure of Plaintiff to use "good faith efforts." Plaintiff does not allege any refusal by Defendants to obtain consent; to the contrary, Plaintiff's allegations describe the efforts that Defendants actually made, which on their face and in fact were perfectly reasonable and good faith efforts to obtain Electra's consent. *See* Complaint ¶ 83, [D.E.] at p. 29.[3]

---

[3] The written request sent by Defendants to Electra is quoted in full in ¶ 83 of the Complaint, as follows:

Amir,
Per our discussion the other day, my son in law Netanel morad and his brother Yaakov has a loan/funding arrangement with me. It is only a loan/funding arrangement, NOT an equity

As described in the Complaint, Defendants reached out to Electra in writing to obtain their consent, but Electra refused to provide it. *Id.* ¶¶ 83, 85. Plaintiff does not allege any refusal by Defendants to request Electra's consent - in fact the Complaint admits the opposite - and Plaintiff does not allege that Defendants made any statements or performed any other actions that caused Electra not to consent. Rather, Plaintiff merely points to alleged omissions in Defendants' requests for Electra's consent that are not required anywhere in the Funding Agreement to be included.[4] *Id.* ¶¶ 82, 84. These allegations are insufficient to allege a failure to use good faith efforts. *Fox*, No. CV 8031-VCL, 2015 WL 4571398, at *25 ("Under a subjective good faith standard, 'the ultimate inquiry must focus on the subjective belief of the party accused of wrongful conduct.'").

---

interest. just fyi Yaakov Morad is experience in sophisticated US commercial real estate investing. The name of the Delaware entity is BH Apirion LLC ("Apirion").

***The purpose of this email is to ask if Electra would consent to Apirion having an equity interest in each of the two BH joint venture member entities*** (namely, BH-SD Mall, LLC as to the Mall joint venture, and BH Southplace Holdings, LLC as to the Southplace joint venture). Under the existing operating agreements for those BH entities I am the Manager, and I would remain the Manager.

***My request is that Electra waive the Transfer requirements to allow this particular (indirect) Transfer. Once Electra approve this request I will also ask the lender TYKO for there approval.***

If this concept as I have outlined it meets with Electra's preliminary approval, then I can send KYC information, etc.

Please let me know.

Isaac Toledano

Please excuse the short replies and typos as this email was sent from my iPhone. (emphasis added)

[4] Although admittedly not pertinent on a Motion to Dismiss and thus should not be considered on this Motion, the undersigned provides notice to the Court and to Plaintiff's counsel that, if this case moves forward and is heard on the merits, the evidence will show that Plaintiff's own attorney substantially ghost-wrote the email sent by Defendants to Electra, making Plaintiff's claim about it all the more frivolous.

**(b) The Condition Precedent of Defendants' own Written Consent to Conversion Never Occurred.**

Moreover, Defendants' obligation to use good faith efforts never even arose, given that Defendants never gave their own written consent to Plaintiff's conversion to equity – a technical knockout to Plaintiff's claim.

The Funding Agreement provides that any conversion by Plaintiff to equity is "subject to BH Member's consent," meaning that this provision does not even get off the ground unless BH Member – two of the Defendants here – consents to it. *See* Funding Agreement Section 3(d), [D.E. 1] at p. 41 ("Apirion shall have the right at any time, ***subject to BH Member's consent***, and subject to Manager first obtaining the consent of the Electra Member . . . to cause the Apirion Loan to convert to capital contributions of the Company . . . ." and "***If BH Member consents <u>in writing</u>*** then within 7 days thereafter the Manager will seek to obtain Electra Member's consent" (emphasis added)). No such consent was ever given, and no such consent is alleged. On the contrary, Plaintiff alleges that "because Toledano approached Electra to obtain its consent, the conditions precedent in Section 3(d) to obtain the consent of both BH Member and BH Member No. 2 were satisfied." Complaint ¶ 86. It appears Plaintiff is alleging that Defendants *waived* the technical requirements of consent under the Funding Agreement. However, under Delaware law, "[w]aiver is the voluntary and intentional relinquishment of a known right" that "implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights." *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005). "The facts relied upon to prove waiver must be unequivocal." *Id.*

Here, Plaintiff fails to allege sufficient facts to show Defendants' waiver of their contractual right to withhold consent, and therefore Plaintiff's claim of breach does not even begin. *See id.* Notably, Defendants' efforts to obtain Electra's consent for Plaintiff's conversion to equity *do not* constitute Defendants' own written consent for same. Moreover, given the

subjective standard for "good faith efforts," it is irreconcilable for Plaintiff to claim in one breath that (i) Defendants' efforts to obtain Electra's consent constituted a ***knowing and intentional*** relinquishment of Defendants' own right to withhold consent, but yet that (ii) Defendants did not have ***subjective intent*** to procure Electra's consent, all that is required under the law.

Accordingly, Plaintiff fails to state a claim for breach of the Funding Agreement for "failing to use good faith efforts to secure the contractual conversion of Apirion's loan to equity in BH Member and BH Member No. 2" and this claim in Count I must also be dismissed with prejudice.

**B. Count II Fails to State a Cause of Action**

Count II of the Complaint is a stand-alone count for breach of the implied covenant of good faith and fair dealing. This Count alleges that "[t]he Funding Agreement . . . includes an implied covenant of good faith and fair dealing" to "act in good faith to secure the conversion of Apirion's loan to equity," and that Defendants breached this obligation. Complaint ¶ 98, [D.E. 1] at p. 32. Like the allegations in Count I regarding the conversion of Plaintiff's loan to equity, this claim also fails.

Delaware law provides that the implied duty of good faith and fair dealing is "best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005). "***Existing contract terms control, however***, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty...unattached to the underlying legal document.'" *Id.* (emphasis added) "Thus, one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement." *Id.; Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del.

2010) (courts will "not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal.").

Here, there is no "gap in the contract's provisions," and "implied good faith cannot be used to circumvent the parties' bargain. *See Dunlap*, 878 A.2d at 441. Plaintiff's claim in paragraph 98 of Count II (that Defendants did not "act in good faith to secure the conversion of Apirion's loan to equity") is merely a repetition and regurgitation of the same claim alleged in paragraph 91 of Count I (that Defendants "fail[ed] to us good faith efforts to secure the contractual conversion of Apirion's loan to equity in MH Member and BH Member No. 2"). As shown above, this fails to state a claim for Defendants' breach of the Funding Agreement regarding the conversion of Apirion's loan to equity, thus warranting the dismissal of Count I. Accordingly, for the same reasons, and based on *Dunlap*, Count II should also be dismissed with prejudice. *Id.*

**III. CONCLUSION**

For all the reasons stated above, Plaintiff Apirion's Complaint should be dismissed with prejudice.

WHEREFORE, Defendants ISAAC TOLEDANO, BH SD-SOUTHPLACE MANAGER LLC, BH-SD MALL LLC, BH SOUTHPLACE HOLDINGS LLC, and BH WORLDWIDE REAL ESTATE HOLDINGS LLC respectfully request that this Court enter an order dismissing with prejudice Plaintiff BH APIRION LLC's Complaint, awarding Defendants' reasonable attorneys' fees and costs if and as permitted, and granting any other relief in favor of Defendants as the Court deems just and warranted.

Respectfully submitted,

**KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.**
*Counsel for Defendants*
201 South Biscayne Boulevard
Suite 1800
Miami, Florida 33131

Telephone: (305) 379-9000
Facsimile: (305) 379-3428

By: s/ *Steve I. Silverman*
**Alan J. Kluger**
Fla. Bar No. 200379
akluger@KlugerKaplan.com
**Steve I. Silverman**
Fla. Bar No. 516831
ssilverman@KlugerKaplan.com
**Jonathan Korin**
Fla. Bar. No. 93914
jkorin@KlugerKaplan.com

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished to all counsel of record via the CM/ECF on this August 20, 2026.

By: */s/ Steve I. Silverman*
Steve I. Silverman, Esq.